1  finance paperwork before sending it to OCC. Specifically, Cresh representatives, acting on behalf
2  of the Defendants' Enterprise, evidently "whited-out" certain terms from the paperwork—without
3  the knowledge or approval of Media Lead—referring to a "rebate" to be paid by Cresh to Media
4  Lead. During the January 2009 conference call referenced above, Cresh's representatives
5  admitted to OCC executive Ronald Strong that they had used white-out on Media Lead's finance
6  paperwork in the manner that Media Lead had suggested. However, Cresh already had been paid
7  its claimed Partner "margin" of $81,421.20 by the time Media Lead contacted Oracle directly in
8  October 2008.

### Defendants' Fraudulent Purchase Transactions

43. <u>The Alethea Transaction.</u> In or about August 2008, defendant Rudin, on behalf of Cresh and the Defendants' Enterprise, submitted a proposal to OCC regarding a potential transaction involving an end-user known as Aegis Group, which is an entity evidently headed by defendant Tiernan. When OCC personnel posed questions to Mr. Rudin regarding certain perceived irregularities in the proposal, he asked that they "delete" the application because the deal had become more "complex" and now involved "a solution for Aegis/Boeing/City of Tacoma joint venture."

44. Then, in September 2008, defendant Rudin resurfaced with an end-user organization known as "LESA." On information and belief, LESA is a legitimate public sector entity located in Seattle, Washington, comprised of fourteen different law enforcement agencies. Mr. Rudin represented at the time that LESA desired to finance its acquisition of Oracle software licenses and technical support services. In September 2008, defendant Tiernan completed and executed a form on LESA's behalf, purporting to act as its President, in connection with OCC's evaluation of its credit.

45. In or about September 2008, in reliance on the representations of defendants Rudin and Tiernan, OCC composed and sent to LESA certain financing documentation for LESA to execute as Oracle's obligor. But, LESA never returned the paperwork. When OCC inquired as to the reasons why, a LESA representative, Thomas Orr, informed OCC that the documentation did not reflect the transaction that Cresh had described to LESA. Evidently, certain of the Defendants

- 10 -

COMPLAINT

had informed LESA that Cresh or its affiliated entities would sign the paperwork instead, and function as the obligor to Oracle; Cresh would then supposedly "outsource" the Oracle products and services to LESA.

46. Furthermore, Mr. Orr confirmed telephonically that LESA never had any intention of entering into the transaction which Cresh had presented to Oracle. When OCC asked why LESA already had submitted a document executed by its president, Mark Tiernan, Mr. Orr responded that Mr. Tiernan was not LESA's President, and that he was not on the list of people involved with LESA. Subsequently, through further investigation, OCC learned that Mr. Tiernan was a principal of Aegis, as well as of defendant Alethea.

47. Undeterred, Cresh subsequently re-engaged Oracle in an attempt to restructure the transaction with Alethea as the end-user customer. In furtherance of that effort, on or about December 16, 2008, Cresh provided a purchase order to Oracle committing to purchase the software licenses and technical support services described therein and reflecting that Alethea had authorized the acquisition. That purchase order stated that it had been placed by "Certus Solutions, Inc. c/o CGC," and other documents also list "CGC" or "Certus Group of Companies LLC" as the "bill to" or "ship to" address. Oracle then issued invoices to Cresh for the amount of the license fees and technical support services reflected in the purchase order, for a total of $163,363.00. True and correct copies of the purchase order provided by Cresh/Certus, and the subsequent invoices issued by Oracle are attached collectively as Exhibit D and incorporated herein as though set forth at length.

48. Defendants simultaneously attempted to obtain financing for the Alethea transaction. Cresh represented to Oracle at the time that Alethea's investors included not only LESA—which already had stated its refusal to enter into the transaction presented by Cresh—but also other high profile entities such as one named Premio, Inc. OCC, however, refused to finance the transaction based on the documentation that Alethea had provided. Alethea then offered to provide a guaranty from Premio. Specifically, in December 2008, Cresh delivered to OCC a corporate guaranty purporting to be from Premio, signed by defendant Rutherford as its Chief Financial Officer. OCC questioned the guaranty and conducted further due diligence. OCC

- 11 -

COMPLAINT

BAKER MARQUART CRONE & HAWXHURST LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

1  personnel immediately discovered that Premio's Internet website did not mention Mr. Rutherford,
2  and the receptionist who answered at Premio's main telephone number had not heard of
3  Mr. Rutherford. Then, in December 2008, an Executive Vice President of Premio contacted OCC
4  and stated that he was the only officer of the company authorized to execute a guaranty and that
5  the guaranty delivered to OCC had never been authorized. OCC subsequently wrote to Alethea
6  stating that it required additional proof of authorization for the corporate guaranty, but no one
7  from Alethea ever responded, including Mr. Rutherford.

8  49. During the January 13, 2009 telephone call referenced above, OCC's Ronald Strong asked Cresh personnel (defendants Rudin, Cuevas and Van Ginkel) about the purported Premio guaranty. They responded that there had been a "misunderstanding." OCC ultimately decided not to finance the Alethea transaction. To date, no defendant has paid Oracle the $163,363.00 owed in connection with this transaction.

50. <u>The PBGC Transaction.</u> On or about August 28, 2009, an agency of the United States government, the Pension Benefit Guaranty Corporation ("PBGC"), accepted a bid submitted by Certus to purchase Oracle software licenses and support services through Certus as an Oracle Partner. According to defendant Rudin, Certus had agreed to be acquired by defendant Dearborne, another member of Defendants' Enterprise which held itself out as a certified Service Disabled Veteran-Owned Small Business in order to "offer Federal customers Oracle tech/apps solutions," even though, as best Oracle can presently determine, Dearborne never executed an Oracle Partner Network agreement and was not a legitimate Oracle Partner. An "Ordering Document" delivered by Certus to Oracle listed as Certus' customer contact "Certus Solutions, Inc. c/o Michael Mai, Dearborne Circle LLC," and listed defendant Kramer at Dearborne as the "Contract Administrator." True and correct copies of the Ordering Document executed by both Mr. Rudin and Mr. Mai on behalf of Certus and Dearborne are attached collectively as Exhibit E and incorporated herein as though set forth at length.

51. In connection with this transaction, on or about August 31, 2009, Certus/Dearborne issued a purchase order to Oracle in the amount of $874,996.20. Then, in October 2009, Oracle issued invoices to Certus/Dearborne reflecting what was owed for the software license fees and

first quarterly payment for the first year of technical support services. True and correct copies of the purchase order and invoices are attached collectively as Exhibit F and incorporated herein as though set forth at length. On information and belief, on or about October 8, 2009, the PBGC provided Dearborne with $908,504.00 in payment of its software licenses and first quarterly software support services installment.

52. By November 2009, Oracle's invoices for the license fees and first quarter of technical support services became past due. When personnel in Oracle's collections department called defendant Mai to secure payment, he claimed that Dearborne had allegedly released the requisite funds to Certus. After contacting Mr. Rudin on the subject, he claimed that the funds from Dearborne had never been received. Despite admissions by Mr. Rudin that the monies were owed, and repeated promises from Mr. Rudin that Oracle would be paid—including his oral agreement to a payment plan that Certus failed to honor—neither Certus nor Dearborne has ever remitted to Oracle any portion of the $908,504.00 received from the PBGC in consideration for Oracle's products and technical support services, nor have they paid any portion of the amount otherwise owed to Oracle in connection with this transaction, totaling at least $874,996.20.

### FIRST CAUSE OF ACTION

(Violations of 18 U.S.C. § 1962(c) By All Plaintiffs Against All Defendants)

53. Oracle hereby re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 52, above.

54. Defendants have, directly or indirectly, conducted and participated in the conduct of the affairs of an Enterprise through a pattern of racketeering activity, in violation of Section 1962(c) of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO"). The purpose of this RICO Enterprise was to commit repeated fraud against Oracle, as alleged specifically above. Oracle has a private right of action for violations of 18 U.S.C. § 1962(a)-(d) pursuant to 18 U.S.C. § 1964(c).

55. Specifically, the Defendants herein formed an association-in-fact RICO Enterprise within the meaning of 18 U.S.C. § 1961(4), which was engaged in and whose activities affected interstate commerce during all relevant times. The RICO Enterprise has been in existence and

used by Defendants for their commercial and unlawful purposes since at least July 2008. On information and belief, the RICO Enterprise continues to exist and perpetrate the fraudulent scheme alleged herein against Oracle and others. The RICO Enterprise has a cognizable organization and decision-making structure, with each of the individual defendants having distinct roles, and is separate and distinct from the pattern of racketeering activity committed by Defendants.

56. Defendants engaged in a pattern of racketeering activity in that they committed and caused to be committed the various acts in furtherance of the RICO Enterprise and conspiracy. At least defendants Rudin, Cuevas, Van Ginkel and Mai directed the affairs of the Enterprise, with the support and consultation of the remaining Defendants.

57. Defendants conducted and participated in the conduct of the RICO Enterprise through a pattern of racketeering activity, in that they committed and caused to be committed the following acts indictable under the laws of the United States, in the following particulars set out below. Each of the predicate acts was part of a larger scheme to financially benefit by fraud and, through false documents, transactions and affiliations, to put such distance and barriers between the victims and the proceeds as to make recovery enormously difficult, if not impossible.

<u>Wire Fraud</u>

58. On or about the dates indicated and as set out more fully below, and at other times, Defendants, having devised and intending to devise a scheme and artifice to defraud Oracle and others, and to obtain financial benefits and property by false or fraudulent pretenses, representations and promises, did transmit and cause to be transmitted by means of wire and radio communications in interstate and foreign commerce, various writings for the purpose of executing said scheme and artifice, in violation of 18 U.S.C. § 1343, which, pursuant to 18 U.S.C. § 1961, is a predicate offense for violations of 18 U.S.C. §§ 1962, *et seq*. The following predicate acts of wire fraud, among others, were in furtherance of this fraudulent scheme:

    (a) A June 24, 2008 email from defendant Van Ginkel to Oracle employee Kimberly Noeth in which Mr. Van Ginkel attaches a pricing sheet for Media Lead and requests that Oracle "not contact the CEO of Media Lead directly."

- 14 -

On information and belief, Mr. Van Ginkel made the request in order to conceal Defendants' fraud.

(b) An August 1, 2008 letter from Mr. Van Ginkel to OCC requesting that OCC transfer funds by wire to a Union Bank of California account in the name of "Cresh c/o CGC."

(c) Acceptance on September 15, 2008 of a wire transfer by "Cresh c/o CGC" in the amount of $81,421.20, as payment of Cresh's alleged Partner margin for the Media Lead transaction. On information and belief, Cresh accepted this wire transfer knowing that it was fraudulently induced by Defendants' RICO Enterprise, and having no intent to fulfill the obligations for which the amount was being paid as consideration.

(d) Acceptance on September 15, 2008 of a wire transfer by "Cresh c/o CGC" in the amount of $35,070.00, as payment of Cresh's alleged Partner margin for the K2 transaction. On information and belief, Cresh accepted this wire transfer knowing that it resulted from the fraudulent conduct of Defendants' RICO Enterprise, and that even had the K2 transaction been legitimate, the amount actually "owed" to Cresh would have been much less.

(e) A September 18, 2008 email from defendant Rutherford to defendants Rudin, Van Ginkel and Tiernan, which was later forwarded by Mr. Van Ginkel to Oracle employee Carlos Barrantes, in which Mr. Rutherford purports to attach financial statements of Aegis along with a "CPA letter" in his capacity as a member of a company called "CPA Partner." On information and belief, Mr. Rutherford was not the objective third-party auditor he represented himself to be, but was instead acting on behalf of the RICO Enterprise, and he knew the financial statements he attached to be inaccurate.

(f) A November 17, 2008 telephone conversation between Oracle executive Ronald Strong and defendant Rudin, in which Mr. Rudin, among other things:

i. Falsely claimed that K2, CGCRP and Media Lead were three of twelve subsidiaries of GGC Group, and that Mr. Rudin was the "tech decision maker" for the three subsidiaries. In fact, on information and belief, Media Lead was not a subsidiary of CGC Group, but instead was a separate entity, and CGC Group was nothing more than a shell corporation comprised of other shell corporations fabricated for the purpose of participating in the RICO Enterprise's efforts to defraud Oracle.

ii. Falsely claimed with regard to the K2, CGCRP and Media Lead transactions that Oracle had "booked" the transactions and pushed through "incomplete" contracts without having received the authorization of end-users. In fact, Oracle did no such thing, and Mr. Strong informed Mr. Rudin that Oracle possessed the proper completed documentation reflecting end-user authorization for each of the deals. Indeed, the completed Payment Plan Agreements and Payment Schedules executed by K2, CGCRP and Media Lead are attached as Exhibits A, B and C, respectively.

iii. Falsely stated that Mr. Rudin and Cresh did not possess complete contracts for the K2, CGCRP and Media Lead transactions, but if Oracle could provide the contracts, "CGC Group Financing" would take responsibility for repaying all three loans even if it had to incur losses as a result. In fact, Defendants had received executed contracts for each of the transactions, and, on information and belief, had no intention of repaying the loans.

iv. Falsely represented that Oracle provided the "wrong software" for the K2, CGCRP and Media Lead transactions, which supposedly explained the delays in payment. In fact, Oracle provided access to the exact products ordered.

- 16 -

COMPLAINT

     v. Falsely claimed that Mr. Rudin was "going back and forth with Oracle licensing" in an effort to obtain the correct software. In fact, it appears that Mr. Rudin was doing no such thing, and, on information and belief, this was yet another subterfuge via the RICO Enterprise to mislead Oracle.

     vi. Falsely claimed that Oracle completed the K2, CGCRP and Media Lead transactions utilizing the wrong documents. Of course, Oracle is the sole determiner of which documents are "correct" in connection with its own transactions, and in each case it used the appropriate documentation.

(g) The January 13, 2009 telephone conversation between OCC executive Ronald Strong and defendants Rudin, Cuevas and Van Ginkel described above.

(h) A January 22, 2009 email from defendant Rudin to Oracle employee Brent Johns falsely claiming that, among other things: (1) OCC had approved financing for the transaction involving end-user Alethea but later retracted that approval (when, in fact, OCC withdrew from the transaction because it discovered that the corporate guaranty Defendants provided in order to secure the financing had never been authorized); (2) Alethea thereafter "told [Certus] that it would not purchase the Oracle software and complained about behavior of [OCC]"; and (3) Alethea is "owned by LESA (City of Tacoma) and works closely with the Department of Justice, Boeing IDS and Department of Homeland Security." On information and belief, all of defendant Rudin's claims were inaccurate, and were made on behalf of the RICO Enterprise for the sole purpose of deceiving Oracle.

(i) A February 12, 2009 email from defendant Cuevas to Oracle employee Malini Aloysius, copying defendants Van Ginkel and Rudin, stating that all Alethea invoices are "in dispute," and claiming to have sent "several messages to [Oracle employee] Brent Johns" with no response. Mr. Cuevas' statements

- 17 -

constituted further subterfuge aimed at concealing the fraud in which Defendants were engaged via the RICO Enterprise.

(j) A November 16, 2009 telephone conversation in which defendant Mai falsely promised Oracle employee Vanitha Velu that payment for the outstanding amount owed to Oracle in relation to the transaction involving end-user PBGC would be processed that day. In fact, on information and belief, neither Mr. Mai nor any other participant in Defendants' fraudulent RICO Enterprise ever had any intention of paying anything to Oracle.

(k) A December 9, 2009 telephone conversation in which defendant Mai falsely represented to Oracle employee Vanitha Velu that Dearborne had "released the payment" for the outstanding balance due Oracle in relation to the transaction involving end-user PBGC. No such payment was ever received by Oracle and, on information and belief, Dearborne never "released" it or otherwise made any effort to pay it.

(l) A telephone conversation on or about December 23, 2009 between defendant Rudin and Oracle employee Vanitha Velu in which Mr. Rudin falsely professed to be locating the payment supposedly sent to Certus by defendants Mai and Dearborne, which payment reflected the amount due to Oracle in connection with the transaction involving end-user PBGC.

(m) A December 28, 2009 email from defendant Rudin to Oracle employee Vanitha Velu in which, on information and belief, Mr. Rudin falsely claimed to have forwarded the unpaid invoices deriving from the transaction involving end-user PBGC to Certus' "finance team to handle."

(n) A January 8, 2010 email from defendant Kramer to Oracle employee Vanitha Velu falsely stating that Mr. Kramer would "process payment asap" in connection with the transaction involving end-user PBGC.

(o) A February 5, 2010 email from defendant Rudin to Oracle employee Anne Achey representing that the delay in responding and processing payment with

regard to the transaction involving end-user PBGC was due to Mr. Rudin "currently traveling back from Iraq & Afghanistan ...." On information and belief, Mr. Rudin's statement was false and constituted another excuse on behalf of the RICO Enterprise aimed at delaying Oracle's discovery of the extent of Defendants' fraud perpetrated via the RICO Enterprise.

(p) A February 9, 2010 telephone conversation between defendant Rudin and Ms. Achey in which Mr. Rudin professed to be communicating with defendants Mai and Kramer in order to obtain payment for Oracle with regard to the transaction involving end-user PBGC.

(q) A March 15, 2010 telephone conversation during which defendant Rudin informed Oracle employee Pratik Bhumralkar that the reason for the delay in paying the amount owed to Oracle in connection with the transaction involving end-user PBGC was due to his company "going through a financial crisis," and during which Mr. Rudin promised to (a) send an email regarding the situation within twenty-four hours, and (b) send Oracle payment by the end of March 2010. These statements or promises were also false, and, on information and belief, were known to be false when made.

(r) A March 22, 2010 telephone conversation between defendant Rudin and Oracle employee Pratik Bhumralkar in which Mr. Rudin claimed that Defendants were going to pay the amount due Oracle in connection with the transaction involving end-user PBGC, but that his "legal team" was negotiating the precise amount with Oracle. In fact, Mr. Rudin plainly knew that no payment was forthcoming and that he had no "legal team" working on the issue, nor did any such "legal team" ever contact Oracle. Significantly, Mr. Rudin repeatedly admitted that the amount Oracle claimed to be owed in connection with the PBGC transaction was correct, and his misrepresentations were further fraud perpetrated on behalf of the RICO Enterprise.

(s) A March 30, 2010 email from defendant Rudin to Oracle employee Deborah Dillidine and others at Oracle in which Mr. Rudin claimed to be "working with [Oracle employee] Pratik [Bhumralkar] on a payment plan," and claimed to have "started process to divest Certus Solutions Inc. from Dearborne under a buy-back agreement..." in order to make the required payment. On information and belief, Mr. Rudin and the remainder of the RICO Enterprise never intended to abide by any payment plan, or otherwise make payments to Oracle, and this was yet another ploy via the RICO Enterprise to delay Oracle from taking action against Defendants.

(t) A May 12, 2010 email from defendant Rudin to Oracle employees Lesta Brady and Deborah Dillidine in which Mr. Rudin falsely stated, among other things, that he would "make it a priority" to "establish a payment plan" with Oracle for payment of the monies owed Oracle from the transaction involving end-user PBGC.

(u) A May 12, 2010 email from defendant Mai to PBGC officer Edwin Little in which Mr. Mai misrepresented that Dearborne has "paid all vendors" including Certus in connection with the PBGC transaction. On information and belief, Mr. Mai knew his representations to be false, and made them in his role as a participant in the RICO Enterprise.

(v) A May 13, 2010 telephone conversation between Oracle in-house counsel Robert McKague and defendant Rudin in which Mr. Rudin falsely indicated Certus' willingness to participate in a payment plan in order to provide Oracle with payment of the monies owed from the transaction involving end-user PBGC.

(w) A May 17, 2010 email from defendant Rudin to Mr. McKague and others at Oracle stating that the Certus team would "review and execute" the payment plan agreed to between Certus and Oracle regarding the unpaid monies owed Oracle from the transaction involving end-user PBGC. On information and

- 20 -

COMPLAINT

belief, neither Certus nor any other member of the RICO Enterprise intended to do anything of the sort.

(x) A May 28, 2010 telephone conversation between defendant Rudin and Oracle employee Deborah Dillidine in which Mr. Rudin stated that he was working on getting the above-mentioned payment plan signed in order to provide payment to Oracle on behalf of Certus. On information and belief, and as alleged above, at all times, Mr. Rudin knew that Defendants had no intention of ever paying Oracle.

59. The Defendants' repeated solicitation of funding via wire transfer, through fraudulent requests, also constitutes wire fraud in violation of 18 U.S.C. § 1343. In carrying out their fraud, Defendants defrauded not only Oracle but also an agency of the U.S. government.

## Mail Fraud

60. On or about the dates indicated and as set out more fully below, and at other times, the Defendants, having devised and intending to devise a scheme and artifice to defraud Oracle and others, and to obtain money and property by false or fraudulent pretenses, representations and promises, for the purpose of executing such scheme and attempting to do so, placed and caused to be placed in a post office or authorized depository for mail, various matters and things to be delivered by private and commercial interstate carriers; and also knowingly caused others to place in a post office, authorized depository for mail matter, or with a private commercial or interstate carrier, various matters and things to be delivered by mail or such carrier, in violation of 18 U.S.C. § 1341, which, pursuant to 18 U.S.C. § 1961 is a predicate offense for violations of 18 U.S.C. §§ 1962, *et seq*. The following predicate acts of mail fraud were in furtherance of Defendants' fraudulent scheme:

(a) On or about August 27, 2008, at the direction of the RICO Enterprise, defendant Rudin claims to have sent via commercial interstate carrier Federal Express ("FedEx") to defendant Van Ginkel "contracts" executed by defendant Tiernan, which contracts were executed in furtherance of their fraudulent conspiracy.

(b) On information and belief, at the direction of the RICO Enterprise, defendant Van Ginkel caused a November 20, 2008 letter to be placed in the mails to a third-party, which letter falsely stated that the "Oracle Financing that was offered to CGC operating companies, partners and customers were [sic] flawed with incorrect booking of Oracle software and delays in processing."

(c) On information and belief, at the direction of the RICO Enterprise, defendant Rudin caused, on March 9, 2009, a letter to be sent via FedEx containing material falsehoods regarding, among other things: (1) allegedly false information provided to Certus by Oracle; and (2) alleged omissions by Oracle with regard to Certus. On information and belief, this letter was aimed at further concealing Defendants' fraud and delaying or preventing legal action by Oracle.

61. On information and belief, each defendant agreed to the commission of and participated in multiple predicate acts.

62. Knowledge and information necessary to provide additional instances of other predicate acts in violation of the criminal statutes set forth above is within the knowledge and possession of the Defendants. Oracle will require discovery in order to provide such additional specific instances.

63. The above predicate acts constituted a pattern of racketeering activity. They were related and continuing. The predicate acts were interrelated by their similar participants, similar victims, their similar purpose to enrich Defendants at Oracle's expense, among others, and the similar method by which the great majority of the crimes were perpetrated. Each of the predicate acts was material to the scheme to obtain Oracle products and funds by fraud and, through false documents, transactions and affiliations, to put such distance and barriers between the victims and the proceeds as to make recovery enormously difficult, if not impossible.

64. The predicate acts were related as well by their purpose to conceal the continuing fraud from Oracle. Although OCC personnel previously began to suspect that the Defendants were engaging in misconduct, Oracle (including its sales organization) did not begin to suspect

and start to uncover the full extent of Defendants' scheme until after Defendants successfully completed the PBGC transaction described above.

65. In addition, the pattern of racketeering is continuing. On information and belief, Defendants continue to move assets and to juggle corporate entities, the principal purpose of which is to prevent the payment of obligations to Oracle. Moreover, Defendants continue to pursue attempts to hinder Oracle's recovery and to conceal their own misconduct. And, they have attempted to engage Oracle in other fraudulent transactions. For example, in late 2008, defendant Rudin presented to Oracle a supposed transaction involving the U.S. Army "Los Alamitos location." Accordingly, the nature of the predicate acts presents both the threat and the fact of continued criminal activity.

66. The pattern of fraud achieved through telephone, facsimile and electronic communications, as well as by wire transfers, that the RICO Enterprise employed constitutes a violation of 18 U.S.C. § 1962(a)-(c). Specifically, the Defendants received income from racketeering by inducing the wire transfers alleged above. Defendants then, on information and belief, used a portion of this income to further the conspiracy and thereby continue to directly and proximately injure Oracle. This constitutes a violation of 18 U.S.C. § 1962(a). Similarly, in violation of 18 U.S.C. § 1962(b), Defendants acquired and maintained an interest in the RICO Enterprise, as alleged herein. Defendants also, directly or indirectly, conducted or participated in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity, as alleged above, in violation of 18 U.S.C. § 1962(c).

67. Because the pattern of racketeering activity alleged was done pursuant to a conspiracy among the Defendants, they also have violated 18 U.S.C. § 1962(d), which outlaws conspiracies to violate 18 U.S.C. § 1962(a)-(c).

68. As a result of Defendants' prolonged and continuing pattern of fraud, Oracle has suffered significant damages, including the value of the profit "margin" on various transactions extorted from Oracle, the value of software provided or made available to third-parties without payment of consideration to Oracle, the value of the loans which Oracle provided at Defendants' request, the erosion of Oracle's reputation and goodwill as a result of Defendants' actions and

statements to Oracle's business associates and customers, and damage to Oracle's business relationships and opportunities. Oracle has been damaged by the wrongful conduct of Defendants in an amount to be determined at trial, plus interest and treble damages in accordance with 18 U.S.C. § 1964(c), and each of the Defendants is jointly and severally liable to Oracle for its damages. Oracle is also entitled to an award of its attorneys' fees and costs.

## SECOND CAUSE OF ACTION

(Fraud By All Plaintiffs Against All Defendants)

69. Oracle hereby re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 68, above.

70. Defendants, individually and through agents, affirmatively presented Oracle with what it claimed were bona fide transactions with end-user customers. Defendants, individually and through agents, also affirmatively represented to Oracle on numerous occasions that Defendants and/or end-user customers would pay the amounts set forth in various transactional documents executed by the Defendants in connection with the sale of software licenses and technical support services. At the time that Defendants made these false and fraudulent representations and promises to Oracle, Defendants had no intention of performing in accordance with their promises, and knew that their representations were false. Defendants intended to obtain not only payments from Oracle in the form of undue Partner "margin," but even attempted to induce Oracle to pay them the entirety of financings in cash—something Oracle refused to do. Defendants also intended to obtain payments from end-user customers such as the PBGC, without ever paying Oracle for the software and services that such end-user customers had ordered. Likewise, Defendants made numerous intentional misrepresentations of fact to Oracle, as alleged at length above.

71. At the time these false representations and promises were made by Defendants, Oracle was ignorant of Defendants' secret intent not to perform under the contracts alleged herein. Moreover, Oracle could not, in the exercise of reasonable diligence, have discovered the falsity of the misrepresentations or of Defendants' secret intention not to perform in accordance with Defendants' promises.

72. In reliance on Defendants' representations and promises, which was reasonable under the circumstances, Oracle was induced to enter into the contracts alleged herein and thereafter devoted significant effort and expense performing its own contractual obligations.

73. If Oracle had known that Defendants' representations were false, or of Defendants' actual intention not to perform their promises, Oracle would not have entered into the agreements alleged herein, nor performed the obligations recited in the contracts referenced above.

74. As a direct result of Defendants' fraudulent conduct alleged herein, Oracle has been damaged in an amount to be proved at trial. On information and belief, Defendants engaged in the conduct described above with fraudulent intent and with a conscious or reckless disregard for Oracle's rights and welfare. Defendants acted toward Oracle with malice, oppression and fraud. Accordingly, Oracle is entitled to an award of punitive and exemplary damages against Defendants in an amount sufficient to punish and make an example of Defendants and to deter them and others similarly situated from engaging in similar wrongful conduct in the future. Oracle is also entitled to an award of its attorneys' fees and costs.

### THIRD CAUSE OF ACTION

(Breach of Written Contract By OCC Against All Defendants)

75. Oracle hereby re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 74, above.

76. OCC fully performed any conditions which it was obligated to satisfy under the written Payment Plan Agreement and Payment Schedule entered into with CGCRP, except those which have been excused by CGCRP's prior material breach.

77. CGCRP breached the contract by failing to abide by its payment obligations as alleged herein.

78. As a result of the foregoing breaches of contract, OCC has been damaged in the amount of $96,588.00, plus prejudgment interest. OCC is also entitled to an award of its attorneys' fees and costs, as provided for in the parties' written agreements.

## FOURTH CAUSE OF ACTION

(Breach of Written Contract By OCC Against All Defendants)

79. Oracle hereby re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 78, above.

80. OCC fully performed any conditions which it was obligated to satisfy under the written Payment Plan Agreement and Payment Schedule entered into with K2, except those which have been excused by K2's prior material breach.

81. K2 breached the contract by failing to abide by its payment obligations as alleged herein.

82. As a result of the foregoing breaches of contract, OCC has been damaged in the amount of $45,908.00, plus prejudgment interest. OCC is also entitled to an award of its attorneys' fees and costs, as provided for in the parties' written agreements.

## FIFTH CAUSE OF ACTION

(Breach of Written Contract By Oracle America, Inc. Against All Defendants)

83. Oracle hereby re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 82, above.

84. Oracle America, Inc. has fully performed any conditions which it was obligated to satisfy under the written agreements entered into with Cresh/Certus with respect to the transaction for Alethea's benefit, alleged above, except those which have been excused by Cresh's/Certus' and Alethea's prior material breach.

85. Cresh/Certus and Alethea breached the contract by failing to abide by their payment obligations as alleged herein.

86. As a result of the foregoing breaches of contract, Oracle America, Inc. has been damaged in the amount of $163,363.00, plus prejudgment interest. Oracle America, Inc. is also entitled to an award of its attorneys' fees and costs, as provided for in the parties' written agreements.

COMPLAINT

## SIXTH CAUSE OF ACTION

(Breach of Written Contract By Oracle America, Inc. Against All Defendants)

87. Oracle hereby re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 86, above.

88. Oracle America, Inc. has fully performed any conditions which it was obligated to satisfy under the written agreements entered into with Certus and Dearborne with respect to the transaction for the benefit of the PBGC, alleged above, except those which have been excused by Certus' and Dearborne's prior material breach.

89. Certus and Dearborne breached the contract by failing to abide by their payment obligations as alleged herein.

90. As a result of the foregoing breaches of contract, Oracle America, Inc. has been damaged in the amount of $874,996.20, plus prejudgment interest. Oracle America, Inc. is also entitled to an award of its attorneys' fees and costs, as provided for in the parties' written agreements.

## SEVENTH CAUSE OF ACTION

(Unjust Enrichment By All Plaintiffs Against All Defendants)

91. Oracle hereby re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 90, above.

92. Defendants have obtained directly and indirectly from Oracle various sums in connection with the transactions alleged above, as well as sums from third-parties, such as the PBGC, that are due and owing to Oracle.

93. As a direct and proximate result of Defendants' unlawful and improper conduct, as set forth above, Defendants have been unjustly enriched and Oracle has suffered, and will continue to suffer damage. The amount of damages suffered by Oracle, and unjust enrichment enjoyed by Defendants, shall be proved at trial. Oracle is also entitled to an award of its attorneys' fees and costs, as well as imposition of a constructive trust over Defendants' ill-gotten gains (such as the $908,504.85 received from the PBGC).

COMPLAINT