SACV 10-1853 DOC - 7/19/2013 - Day 1

1

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    HONORABLE DAVID O. CARTER, JUDGE PRESIDING

4    - - - - - - -

5    ORACLE AMERICA, INC., et al.,        )
                                          )
6            Plaintiffs,                  )
                                          )
7        vs.                              ) No. SACV 10-1853 DOC
                                          )     Day 1
8    MICHAEL Q. MAI,                      )
                                          )
9            Defendant.                   )
     _____)

10

11

12

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                    Jury Trial

15               Santa Ana, California

16              Friday, July 19, 2013

17

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141

24

25   10cv1853 Oracle 2013-07-19 D1

1    **APPEARANCES OF COUNSEL:**

2

     FOR PLAINTIFFS ORACLE AMERICA, INC., et al.:

3

4            Andrew C. Temkin
             ORACLE CORPORATION
5            500 Oracle Parkway MS 5op7
             Redwood City, CA 94065
6            650-506-5200

7            Daryl M. Crone
             CRONE HAWXHURST LLP
8            10880 Wilshire Boulevard
             Suite 1150
9            Los Angeles, California 90024
             310-893-5150

10

             Joshua Paul Gelbart
11           CRONE HAWXHURST LLP
             10880 Wilshire Boulevard
12           Suite 1150
             Los Angeles, California 90024
13           310-893-5150

14

15   FOR DEFENDANT MICHAEL Q. MAI:

16           John J. Ramp
             RAMP & ASSOCIATES
17           7755 Center Avenue
             Suite 1100
18           Huntington Beach, California 92647
             714-372-2292

19

20           Stephen Edward Olear
             LAW OFFICES OF STEPHEN E. OLEAR
21           500 N. State College Boulevard
             Suite 540
22           Orange, California 92868

23

24

25

**I N D E X**

| | |
|---|---|
| **PROCEEDINGS** | **PAGE** |
| Plaintiff Opening Statement | 4 |
| Defense Opening Statement | 18 |

**TESTIMONY**

| **PLAINTIFF WITNESSES** | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** |
|---|---|---|---|---|
| ACHEY, Anne | | | | |
| By Mr. Crone | 31 | | | |
| By Mr. Ramp | | 104 | | |

**EXHIBITS**

| **EXHIBIT NO./DESCRIPTION** | **IDENTIFICATION** | **IN EVIDENCE** |
|---|---|---|
| 17  08/28/09 E-mail from A. Achey to Q. Rudin | | 73 |
| 18  Purchase Order from Dearborne to Oracle | | 82 |
| 20  Invoice from Oracle to Dearborne | | 90 |
| 21  Four invoices form Oracle | | 93 |
| 119  08/29/09 E-mail from Q. Rudin to A. Achey; copied to D. Dilldine, M. Mai, and C. Kramer | | 56 |

SACV 10-1853 DOC  7/19/2013 - Day 1

4

**EXHIBITS (Continued)**

| EXHIBIT NO./DESCRIPTION | IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 123  06/10/10 E-mail from E. Little to M.Mai, Q. Rudin; copied to A. Achey, J. Acosta, and L. Campbell | | 100 |
| 125  08/31 E-mail from M. Mai | | 78 |
| 126  09/29/09 E-mail from M. Mai to A. Achey; copied to C. Kramer, Q. Rudin, and ps-orders_us@oracle.com | | 86 |

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
|        | 1  | **SANTA ANA, CALIFORNIA, FRIDAY, JULY 19, 2013**             |
|        | 2  | **Day 1**                                                    |
|        | 3  | (12:07 p.m.)                                                 |
| 12:07  | 4  | THE COURT:  Counsel on behalf of Oracle, your               |
|        | 5  | opening statement.                                           |
| 12:07  | 6  | MR. CRONE:  Thank you, Your Honor.                           |
| 12:07  | 7  | Does Your Honor want to finally resolve the                 |
|        | 8  | motions *in limine* this morning?                            |
| 12:07  | 9  | THE COURT:  Those are final decisions, Counsel.             |
|        | 10 | Thank you.  You can submit it to the Court, and those are   |
|        | 11 | final.                                                       |
| 12:06  | 12 | **PLAINTIFF'S OPENING STATEMENT**                            |
| 12:07  | 13 | MR. CRONE:  Good morning, again, ladies and                 |
|        | 14 | gentlemen.  My name is Daryl Crone.  And I, along with      |
|        | 15 | Joshua Gelbart, Andrew Temkin represent Oracle in this case,|
|        | 16 | and thank you again for your time and your service in this  |
|        | 17 | case.                                                        |
| 12:07  | 18 | Oracle, for those of you who don't know, is a               |
|        | 19 | company located and headquartered here in California --     |
|        | 20 | actually, with locations elsewhere, but it's headquartered  |
|        | 21 | in Northern California.  And among other things, Oracle     |
|        | 22 | primarily sells database software.  What you'll hear in this|
|        | 23 | case is that database software is software that helps store,|
|        | 24 | manage, and distribute large amounts of electronic data.    |
| 12:08  | 25 | Also with me today is Ann Achey.                            |

| | | |
|---|---|---|
| 12:08 | 1 | Ms. Achey, if you could please stand up. |
| 12:08 | 2 | *(Ms. Achey stands up.)* |
| 12:08 | 3 | MR. CRONE:  Ms. Achey is here from Virginia, and |
| | 4 | Ms. Achey works in a unit of Oracle in Virginia.  She's |
| | 5 | going to be our first witness, who, as Your Honor stated to |
| | 6 | you, you will get to hear from, I believe, this afternoon. |
| 12:08 | 7 | Thank you, Ms. Achey. |
| 12:08 | 8 | Also with us is John Owens, who will be assisting |
| | 9 | us with some of the technical issues that we'll have during |
| | 10 | this trial. |
| 12:08 | 11 | *(Mr. Owens stands up.)* |
| 12:08 | 12 | MR. CRONE:  Let me turn to the evidence that |
| | 13 | you'll hear in this case, ladies and gentlemen.  This case, |
| | 14 | although as His Honor said, is not a criminal case; it's a |
| | 15 | civil case.  This case is about theft.  It's about theft by |
| | 16 | the defendant, Michael Mai, of nearly $900,000 that he |
| | 17 | received from the United States Government, which he should |
| | 18 | have paid to Oracle in connection with the sale of software |
| | 19 | in 2009. |
| 12:09 | 20 | You're also going to hear evidence about an |
| | 21 | ongoing scheme that took place over the course of several |
| | 22 | years perpetrated by Mr. Mai and a variety of |
| | 23 | co-conspirators, including other individuals and other |
| | 24 | corporations that they controlled. |
| 12:09 | 25 | The evidence will show that the defendant received |

1  large sums of money through these numerous

2  misrepresentations to the United States Government, to

3  Oracle, and to third parties.

12:09  4       For example, you'll hear about how the defendant,

5  Mr. Mai, had a company that's called Dearborne Circle, LLC.

6  It received more than $900,000 paid by the United States

7  Government.

12:09  8       And he was paid that money after he got Oracle to

9  deliver software to an agency of the government that you'll

10  hear often in this case.  It's called a "Pension Benefit

11  Guaranty Corporation."  You may hear us refer to that as the

12  PBGC throughout this case.

12:10  13       And Mr. Mai did not pay a dollar of that $900,000

14  that he received from the United States Treasury to Oracle,

15  even though it is undisputed that Oracle is owed roughly

16  $876,000 of it.

12:10  17       You'll also hear a lot about one of Mr. Mai's

18  co-conspirators in this case, a man by the name of Quin

19  Rudin, who Mr. Mai has known for more than 15 years.  You'll

20  hear about various statements that both Rudin and the

21  defendant, Mr. Mai, made to Oracle to get it to deliver

22  software to the United States Government, this agency of

23  government that I mentioned before, Pension Benefit Guaranty

24  Corporation.  And you'll hear how Mr. Mai associated himself

25  with Mr. Rudin and the entities that he had created.

12:11   1          You'll hear how this transaction with Oracle never

2    would have happened without Mr. Mai claiming to Oracle that

3    he had actually acquired Mr. Rudin's business called "Certus

4    Solutions, Inc."

12:11   5          You'll also hear about how Mr. Mai claimed that

6    his business, which I mentioned before is called "Dearborne

7    Circle," was supposedly a properly certified

8    Service-Disabled Veteran-Owned Small Business.  Now, that's

9    a special designation that the United States Government

10   gives out to people who principally own a small business and

11   that were injured during their service to our country.

12:11   12         And what Mr. Mai was claiming that he, the owner

13   of this business, Dearborne Circle, supposedly had been

14   disabled through military service to our country.

12:11   15         And you'll hear how -- why it is that he sought

16   that false certification, ladies and gentlemen, because the

17   government and businesses like Oracle like to honor our

18   military veterans, especially those who have been disabled

19   through combat, by providing them access to certain

20   government contracts.

12:12   21         Well, as it turns out, Mr. Mai has never even

22   served in the military.  In fact, he will have to admit to

23   you that the government eventually caught up with him and

24   took away his improper disabled veterans certification for

25   his Dearborne Circle business, which the evidence will show

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | he never should have received to begin with.                         |
| 12:12 | 2  | You'll also get to see Dearborne's own bank                          |
|       | 3  | records in this case.  Those records are going to show               |
|       | 4  | Mr. Mai's receipt of a check from the United States Treasury         |
|       | 5  | and that Mr. Mai didn't pay Oracle what it was owed of the           |
|       | 6  | more than $900,000 that Dearborne had received.  Instead,            |
|       | 7  | Mr. Mai immediately obtained a cashier's check in the amount         |
|       | 8  | of over $285,000 -- of $285,000, sent wire transfers in the          |
|       | 9  | 10s of hundreds of thousands of dollars to various other             |
|       | 10 | persons and entities.  Not Oracle.                                   |
| 12:13 | 11 | And as I mentioned, to this day, Oracle hasn't                      |
|       | 12 | been paid a dollar for the software that it delivered to the         |
|       | 13 | government nearly four years ago and at Mr. Mai's request.           |
| 12:13 | 14 | Let me turn to a timeline that we have put                          |
|       | 15 | together for you, ladies and gentlemen, and walk you through         |
|       | 16 | some of the events that you will hear in this case.                  |
| 12:13 | 17 | As I said, if you look at the screen, you'll see                    |
|       | 18 | that -- you'll hear quite a bit about Quin Rudin, as I               |
|       | 19 | mentioned a minute ago.  And, as I said, Mr. Mai and                 |
|       | 20 | Mr. Rudin have known each other for at least 15 years.               |
| 12:13 | 21 | Well, in 2008, Mr. Rudin claimed Mr. Rudin told                     |
|       | 22 | Mr. Mai about his own company, the Certus Solutions, Inc.            |
|       | 23 | that I mentioned before.  And Mr. Rudin told Mr. Mai that            |
|       | 24 | Certus Solutions sold software developed by companies like          |
|       | 25 | Oracle.  And you'll hear about how Quin Rudin registered             |

1    with Oracle to become a certified reseller of Oracle

2    software.  I won't get into the details of the transaction

3    exactly how that worked.  Ms. Achey will explain that I hope

4    later today, and she'll explain the role of a retailer in

5    this type of transaction.

12:14  6          But in short, ladies and gentlemen, it's a common

7    business practice for technology companies such as Oracle to

8    use third-party resellers, especially with government

9    contracts like the one that's at issue in this case.

12:14  10         Now, you'll also hear that Mr. Rudin -- this

11   case -- well, let me step back.

12:15  12         This case is about intentional misrepresentation

13   or fraud, as I'll get into in a moment.  It's undisputed

14   that Mr. Rudin defrauded a division of Oracle in late 2008

15   that finances the purchases of software, something that's

16   called "Oracle Credit."

12:15  17         Well, in late 2008 or early 2009 --

12:15  18         MR. RAMP:  Your Honor, I'm going to raise an

19   objection.  He says "undisputed."  We dispute that.  He says

20   "undisputed."

12:15  21         THE COURT:  This is opening statement, and that's

22   not a stipulation between the parties.  This is just

23   counsel's view of what the evidence will show.

12:15  24         MR. CRONE:  I believe it's in the pretrial order.

12:15  25         THE COURT:  Thank you, Counsel.

| 12:15 | 1 | MR. CRONE:  Okay.  Okay. |
| 12:15 | 2 | In late 2008, early 2009, Mr. Quin Rudin |
| | 3 | introduced Mr. Mai to an individual named Mark Tiernan, who |
| | 4 | I believe you'll also get the opportunity to meet in this |
| | 5 | case.  Mr. Tiernan is a distinguished military veteran, who |
| | 6 | runs an engineering firm located in the Seattle, Washington |
| | 7 | area called Aegis Technologies.  Mr. Tiernan's Aegis |
| | 8 | Technologies is a legitimate Service-Disabled Veteran-Owned |
| | 9 | Small Business.  Part of Aegis' business is bidding on and |
| | 10 | fulfilling government contracts. |
| 12:16 | 11 | At the time, in 2009, Mr. Tiernan had formed a |
| | 12 | company called "Alethea."  And what Alethea was attempting |
| | 13 | to do was adapt a surveillance system that used cameras in |
| | 14 | the military for use by local police departments.  And |
| | 15 | you'll get to hear a little bit about Alethea and Mr. Mai's |
| | 16 | involvement with it during this case and about how that |
| | 17 | opportunity was harmed and destroyed because of Mr. Mai's |
| | 18 | conduct. |
| 12:16 | 19 | Well, in August 2009 -- well, in August 2009, |
| | 20 | Mr. Mai decided that he was gonna start bidding on |
| | 21 | government contracts, too, just like Mr. Tiernan's company. |
| | 22 | And he signed up for regular notices from something called |
| | 23 | fedbid.com.  It's an Internet website, a bulletin board-type |
| | 24 | service where you can see all the government contracts that |
| | 25 | are out for bid.  And you can find out about contracts, such |

1    as the government wishing to purchase software like Oracle

2    software.

12:17    3         And one thing you'll hear about in this case is

4    that the government has to obtain multiple bids from

5    different vendors before it can purchase a product like

6    computer software.  And so Mr. Mai was scouring the

7    fedbid.com website for opportunities, and he outbid other

8    established software resellers to provide nearly $900,000 of

9    Oracle software to an agency of the federal government,

10    which I mentioned before, the Pension Benefit Guaranty

11    Corporation.  And the evidence will show that Mr. Mai's

12    Dearborne Circle had never before sold software to anyone.

12:18    13         Mr. Mai then contacted Oracle with Mr. Rudin in an

14    effort to get Oracle to actually deliver its software to the

15    Pension Benefit Guaranty Corporation.  To be clear, the

16    evidence will show that Mr. Rudin isn't solely to blame for

17    what happened here, as the defense would have you believe.

18    The evidence is going to show that Mr. Mai himself made

19    multiple false representations to the government and to

20    Oracle to get this deal done.

12:18    21         Among other things, you will hear from Ms. Achey,

22    who works at Oracle.  Let me tell you a little bit about

23    her, and as I said, you'll hear from her this afternoon.

24    She helps process the sales of software to various branches

25    of the United States Government.  That was her role in the

1    fall of 2009.  And she will tell you about how Mr. Mai

2    extensively participated in misrepresentations designed to

3    get her to finalize and process this contract for delivery

4    of software to the PBGC.

12:19    5            In particular, you're going to see a series of

6    e-mails and contracts from Mr. Mai and Mr. Rudin in the late

7    August and early September 2009 time frame.  For starters,

8    as I mentioned earlier, Mr. Mai and Mr. Rudin both

9    represented to the government and to Oracle that Dearborne

10   was a legitimate Service-Disabled Veteran-Owned Small

11   Business.  And the evidence will show that that was false.

12:19    12           They also told Oracle that Mr. Mai's Dearborne

13   Circle had purchased 100 percent ownership of Mr. Rudin's

14   Certus Solutions, Inc.  And the evidence will show that

15   Mr. Mai made that representation himself, not just Quin

16   Rudin.

12:20    17           Mr. Mai will admit to you that that representation

18   was false because there simply never was an acquisition of

19   Mr. Rudin's Certus Solutions.  And, again, the reason for

20   that statement was to try to finalize a transaction

21   involving Oracle.

12:20    22           Mr. Mai also signed Oracle's paperwork and sent

23   other documents to Oracle, which you'll see in this case,

24   representing that his company would pay for the products

25   that he was ordering.  And that turned out to be false, as

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | well.                                                        |
| 12:20 | 2  | In short, all of these misrepresentations were             |
|       | 3  | made to Oracle in an attempt to allow this transaction to   |
|       | 4  | proceed, which is what you'll see from the evidence in this |
|       | 5  | case.                                                       |
| 12:20 | 6  | And you'll also see Oracle's invoices sent to              |
|       | 7  | Mr. Mai's Dearborne Circle at his home address, which he and |
|       | 8  | Dearborne simply never paid.                                |
| 12:21 | 9  | Well, in October 2009, you'll hear that Mr. Mai            |
|       | 10 | was able to get the Pension Benefit Guaranty Corporation to |
|       | 11 | expedite payment to him, and he received payment from the   |
|       | 12 | United States Treasury for $908,504.85.  I'd like to show   |
|       | 13 | you that check.  You'll see this later during our           |
|       | 14 | evidentiary presentation.  It's from Exhibit 23.            |
| 12:21 | 15 | Mr. Mai immediately deposited this check into his          |
|       | 16 | Dearborne Circle bank account.  And immediately after       |
|       | 17 | depositing this check from the Treasury, Mr. Mai began      |
|       | 18 | transferring large sums of money to third parties, rather   |
|       | 19 | than to Oracle.  Among other things, Mr. Mai withdrew       |
|       | 20 | $285,000 in a cashier's check from the bank.  He wrote      |
|       | 21 | checks for 10s -- or more than a hundred thousand dollars,  |
|       | 22 | and he transferred money out by wire transfer.  And none of |
|       | 23 | this went to Oracle.                                        |
| 12:22 | 24 | Mr. Mai will tell you that he paid all of that             |
|       | 25 | money to Quin Rudin, and that he expected Mr. Rudin to pay  |

|       |    |                                                                       |
|-------|----|-----------------------------------------------------------------------|
|       | 1  | Oracle.  But the evidence will show that that is false, too.           |
| 12:22 | 2  | Among other things, the evidence will show that                       |
|       | 3  | Oracle expected to be paid in a single lump sum, just like             |
|       | 4  | the thousands of other transactions that Oracle engages in            |
|       | 5  | every year.                                                            |
| 12:22 | 6  | And the evidence will show that if Mr. Mai had                        |
|       | 7  | been participating in a legitimate transaction, he would              |
|       | 8  | have paid Oracle directly or paid Mr. Rudin in a single lump           |
|       | 9  | sum; and he didn't do either.                                          |
| 12:22 | 10 | You'll also hear Mr. Mai talk about two e-mail                         |
|       | 11 | messages that he's come forward with in this case that                 |
|       | 12 | supposedly show Mr. Rudin telling him how to pay for the               |
|       | 13 | software, because Mr. Mai claims those e-mail messages                 |
|       | 14 | supposedly show that Mr. Rudin was intending to pay Oracle             |
|       | 15 | himself.                                                               |
| 12:23 | 16 | But the evidence is going to show that Mr. Mai                        |
|       | 17 | deliberately destroyed the native file versions of those              |
|       | 18 | e-mail messages during the course of this case.                       |
| 12:23 | 19 | And Mr. Mai, who knows a great deal -- bit about a                    |
|       | 20 | software -- about software, given his lengthy history in               |
|       | 21 | this industry, will admit to you that only the native file             |
|       | 22 | versions of those e-mail messages, which he destroyed, would           |
|       | 23 | have shown when those e-mails were actually authored or                |
|       | 24 | whether they were ever modified.                                       |
| 12:23 | 25 | But let me step back for a moment because this is                     |

1    an important aspect of the case.

12:23    2          The evidence is going to show, ladies and

3    gentlemen, you will be able to conclude, at the conclusion

4    of the evidence, that the key documents that Mr. Mai has

5    come forward, and is coming forward with in an attempt to

6    help prove his defense in the case, were invented during the

7    course of the case.

12:24    8          The evidence is also going to show that Mr. Mai

9    knew as early as February 2010 that Oracle had never been

10    paid for the software licenses that he had ordered.  In

11    addition, you'll hear that the Pension Benefit Guaranty

12    Corporation itself told Mr. Mai to pay what Oracle was owed,

13    and that Oracle repeatedly requested that both Mr. Mai and

14    Mr. Rudin pay for the software that they had ordered,

15    especially after the government had already paid them more

16    than $900,000 for it.

12:24    17          Oracle's attorneys, one of Mr. Temkin's

18    colleagues, also tried to get Mr. Mai to pay what was owed

19    to avoid this very lawsuit, and the evidence will show that

20    Mr. Mai didn't even respond to Oracle's letter sent in an

21    attempt to avoid this case.

12:25    22          Well, I'd ask you, ladies and gentlemen, to pay

23    some special attention at this point to the timeline and

24    during our presentation of the evidence in this case.

25    Mr. Mai will also try to explain to you that somehow he

1    didn't know what Quin Rudin was doing, but nearly a year

2    after he took more than $900,000 from the government and

3    didn't pay Oracle what it was owed, the evidence is going to

4    show they were still working together and associating with

5    one another to complete more transactions that harmed third

6    parties, too.  That is what the evidence is going to show in

7    this case.  And this was long after Mr. Mai had been

8    repeatedly told by Oracle that it had never been paid a

9    dollar of what it was owed.

12:25    10    I mentioned Mark Tiernan before and his promising

11    startup business called "Alethea" in the Seattle area of

12    Washington State.  The evidence will show that Mr. Mai tried

13    to use Mark Tiernan's name to get more than $500,000 from

14    the software company Microsoft and a bank called "PNC."

12:26    15    Among other things, you'll hear testimony about

16    how Mr. Mai invented fake e-mail addresses, a fake telephone

17    number, a fake voice mail, and a fake mailing address for

18    Mr. Tiernan's business, and then he told Microsoft about

19    them.  You'll also hear how Mr. Mai personally sent fake

20    financial records to Microsoft to try to further the scheme.

12:26    21    As I said earlier, you'll hear from Mr. Tiernan

22    himself, hopefully during this trial, and he will tell you

23    in person how he, too, was lured in by Mr. Mai.

12:26    24    Well, Oracle investigated all of this at great

25    time and expense, and what it found was that Mr. Rudin and

                1    Mr. Mai and others, and various other entities that they

                2    controlled or invented, had an intensive conspiracy.  You'll

                3    hear about a law, which His Honor mentioned before.  It's

                4    called the Racketeer Influenced and Corrupt Organizations

                5    Act, or RICO for short.  One of Oracle's claims in this case

                6    is that Mr. Mai violated that law.

12:27           7         You'll also hear about how Oracle claims Mr. Mai

                8    has committed intentional misrepresentation, which is also

                9    referred to sometimes as fraud.

12:27          10         At the conclusion of the evidence in this case,

               11    I'll have the opportunity to speak with you again.  And at

               12    that time, I'll ask you to hold Mr. Mai responsible for the

               13    damages that he caused Oracle.

12:27          14         But let me say just a few final words before you

               15    hear from Mr. Mai's counsel, John Ramp.

12:27          16         You'll notice that during this case, that there

               17    will be no witness who will be appearing on Michael Mai's

               18    behalf.  There won't be one person who will support his

               19    story that this was Mr. Rudin's fault.

12:27          20         I know I've thrown a lot of information at you

               21    during this opening statement and I apologize for that, but

               22    at the end of the day, ladies and gentlemen, this case is

               23    actually fairly simple and straightforward.

12:28          24         The bottom line is that Oracle delivered products

               25    at the defendant's request and it never got paid for them,

1    not one dollar.

12:28    2    And Mr. Mai, along with his co-conspirator, Quin

3    Rudin, were the reason Oracle never got paid.

12:28    4    When you listen to the evidence in this case, you

5    might ask yourself two questions.  First, what would a

6    legitimate business person have done in this situation?

7    That's the question you might ask yourselves as you hear

8    what these witnesses have to say.

12:28    9    And, second, where is the money, and where should

10    it be?  You might consider that question when looking at the

11    checks that were paid to Michael Mai and his company,

12    Dearborne Circle, and the cashier's check and wires that

13    were transferred to third parties and not to Oracle.  One

14    piece of evidence you will not see in this case is a single

15    check that was ever paid to Oracle.

12:29    16    We look forward to presenting this evidence to

17    you, ladies and gentlemen, in this case, and we thank you

18    again for your time and service.

12:29    19    THE COURT:  Counsel, your opening statement on

20    behalf of Mr. Mai.

12:29    21    MR. RAMP:  Thank you, Your Honor.

12:29    22    **DEFENSE OPENING STATEMENT**

12:29    23    MR. RAMP:  Good morning -- good afternoon, ladies

24    and gentlemen.  I want to thank you for being selected a

25    jury.  It looks like you're a jury -- I've been watching

|       |    |                                                                     |
|-------|----|---------------------------------------------------------------------|
|       | 1  | you.  It looks like you've been paying close attention to           |
|       | 2  | what Mr. Crone said.  I hope you will give us the same               |
|       | 3  | attention.                                                           |
| 12:30 | 4  | This case, as Mr. Crone explained to you, is                        |
|       | 5  | brought by Oracle.  They have raised serious allegations             |
|       | 6  | against Mr. Mai.  We will show that they do not have the             |
|       | 7  | evidence to support their allegations.                               |
| 12:30 | 8  | As His Honor explained, they have the burden of                     |
|       | 9  | proof.  They must prove beyond a reasonable doubt every              |
|       | 10 | allegation -- sorry -- must prove beyond a preponderance of          |
|       | 11 | the evidence every allegation.  I got -- I was thinking              |
|       | 12 | about criminal case law there.  They must prove beyond --            |
|       | 13 | must prove beyond a preponderance of the evidence all their          |
|       | 14 | allegations.                                                         |
| 12:30 | 15 | We would show that Mr. Mai was an honest                            |
|       | 16 | businessman.  He went into this transaction with PBGC in an          |
|       | 17 | attempt to make a commission.                                        |
| 12:31 | 18 | We will show there was no conspiracy between                        |
|       | 19 | Mr. Mai and Mr. Rudin; in fact, it was Mr. Mai who was               |
|       | 20 | victimized by Mr. Rudin.                                             |
| 12:31 | 21 | We will show that Oracle was aware of the                           |
|       | 22 | activities of Mr. Rudin and their fraudulent activities              |
|       | 23 | against their company, but they went and did business with          |
|       | 24 | him over and over again.                                             |
| 12:31 | 25 | Also, we believe that the witnesses will not show                   |

DEBBIE GALE, U.S. COURT REPORTER

12:31

12:32

12:32

12:32

12:33

1    what they want to show.  Their witness is Ms. Achey, who is

2    an Oracle employee.  We will show that she's got a reason to

3    support Oracle.  She's employed by them.  She's getting paid

4    by them.  So we will show doubt into her credibility.

5        There are other witnesses.  A person by the name

6    of Mark Tiernan.  Mark Tiernan was sued by Oracle for the

7    same allegations they've sued Mr. Mai.  They accused

8    Mr. Tiernan of RICO violations.  They accused Mr. Tiernan of

9    fraud.  They accused his companies of RICO violations.

10   They -- and fraud.

11       But the evidence will show they worked out a deal

12   with Mr. Tiernan.  He would get out of this lawsuit and

13   become their witness and talk favorably about them and make

14   false accusations against Mr. Mai.  They would let him out

15   of this lawsuit.

16       Sort of like a criminal defendant, when one person

17   testifies against the other defendant, the State's gonna

18   give them a good deal; no jail time.  We will show what

19   Tiernan gained was he didn't have to deal with this lawsuit.

20   He didn't have to spend thousands and thousands of dollars

21   protecting himself from these false allegations.

22       We have our own timeline up here on the board.

23   And this shows what truly happened; the true facts that will

24   come out in this case.

25       PBGC agency issued solicitation software bid for

DEBBIE GALE, U.S. COURT REPORTER

12:33

1   any vendors to participate.  They wanted software, and they

2   were looking for vendors who could acquire software for

3   them.  That solicitation was published on fedbid.com.

4           And it also should be noted that this -- this bid

5   had no requirement that the company was a disabled vet

6   company or had to be an Oracle reseller.  We will show that

7   these red herrings that Oracle's throwing at you regarding

8   the disabled vet company, because that was not a requirement

9   for him to make the bid and win the bid.

12:33

10          Mr. Mai learned of the bid through fedbid.com.

11  His goal, his only goal was to make a commission for his

12  services and for his work.

12:34

13          Mai obtained an Oracle software price quote from a

14  company called DL Software (sic), Inc.  He gets a quote from

15  them asking them how much is it gonna cost for Oracle -- for

16  this Oracle product and what would be my commission.  And

17  they were something called a "reseller."  A reseller is an

18  authorized entity or person who can resell Oracle software.

12:34

19          Quin Rudin was an authorized reseller.  Mr. Mai

20  was not.  So Mr. Mai obtains a bid from DLT software.  He

21  gets that price quote -- or, sorry, he got a price quote.

22  And he got another price quote from a company called

23  "GSA.gov."  And then he gets another price quote from --

24  software price quote from Certus/Rudin.  The evidence will

25  show that Rudin owns the company called "Certus."

DEBBIE GALE, U.S. COURT REPORTER



12:35   1          These facts will show there was no conspiracy

2       between Mr. Mai and Mr. Rudin or his company, because he was

3       going to other companies to submit a bid.  We will show if

4       there was a conspiracy, he wouldn't have wasted his time

5       going to these other companies because this so-called

6       conspiracy was already hatched.  They will show -- we will

7       show there was no plan that they can show to -- or prove

8       when this plan was hatched, who agreed to it, Mr. Mai agreed

9       to it.  They will have no evidence of that.

12:35   10         So Mr. Mai does win the fedbid.com auction with

11      the Certus price quote.  Certus/Rudin gave him a better

12      margin in selling the software.  That's why he went to

13      Mr. Rudin and finished the bid with him.

12:36   14         Mai informs Certus/Rudin about the winning bid and

15      asked Certus to deliver the software license within 30 days.

16      PBGC FedBid gave Mai 30 days to deliver the software or he

17      would lose the bid.

12:36   18         Since Mr. Mai was not an Oracle reseller, he had

19      to go through Mr. Rudin's company to purchase the software

20      for the software to be delivered to the government agency

21      called PBGC.

12:36   22         The evidence will show there was never a contract

23      between Mr. Mai or his company, Dearborne, with Oracle.  The

24      contract was with Oracle and Mr. Rudin and his company

25      called "Certus."



12:36  1         Mr. Mai denies the allegations that he ever

2    purchased Dearborne.  He denies the allegations that he told

3    people at Oracle that he purchased the company called

4    "Certus."

12:37  5         So Oracle delivers the software license to

6    Certus/Rudin.  Oracle's goal in this case was to make money

7    also.  They wanted its software sold to this government

8    agency.  Also, evidence will show Oracle makes further money

9    on a yearly basis through its licensing program.

12:37  10        Oracle delivers the software to Certus/Rudin, then

11   Rudin and his company, Certus, delivers the software to Mai

12   as per the contract with PBGC.  And Mai gets the software

13   and he delivers it to PBGC, because it was Mr. Mai who had

14   the contract with PBGC.

12:37  15        PBGC sends the check to Mr. Mai to pay for the

16   software.  The check was shown by Mr. Crone.  Check was paid

17   to Dearborne Circle, LLC, not to Mr. Mai.

12:38  18        Mr. Mai pays the fedbid.com for the auction fees.

19   He also pays Certus and Rudin for the software minus the

20   commission.  He did so in a way that was instructed to him

21   by Mr. Rudin.

12:38  22        And Mr. Mai will give testimony to the fact that

23   the e-mails were not altered.  The e-mails from Mr. Rudin

24   were not altered.

12:38  25        So Mr. Mai pays Certus and Rudin the money he

1    received from PBGC minus his commission.

12:38   2         Oracle goes to Mr. Rudin and asks, "Since the

3    deal's completed, when will you pay us?"  They even instruct

4    (verbatim) an installment payment plan with Mr. Rudin so

5    Mr. Rudin can pay the money that he and his company owed

6    Oracle.

12:39   7         Rudin never does pay Oracle.  It was Rudin's

8    obligation to pay Oracle because Mr. Mai had already paid

9    Mr. Rudin.  Then -- Oracle, then, wrongfully sues Mr. Mai.

10   Not just Mr. Mai.  Oracle sues multiple individuals,

11   multiple companies with made-up allegations.

12:39   12         And many people, all except Mr. Mai, has been

13   dismissed out of this lawsuit.  They did get a judgment

14   against Mr. Rudin.  He did not answer the lawsuit.  So they

15   got what's called a default judgment.  So they've got a

16   judgment against Mr. Rudin for Mr. Rudin's wrongdoings.

12:39   17         I'd like to show you another timeline that we

18   have.

12:39   19         This timeline refers to the activities of Mr. Quin

20   Rudin from 1996 to 2010.  The evidence will show that he

21   used to work for a company called PeopleSoft in 1996.

22   Oracle acquired PeopleSoft in 2005.  Mr. Rudin gets laid off

23   from Oracle in 2006.  Then -- and then Mr. Rudin, through a

24   company called "K2 Transaction (sic)," does a transaction

25   with Oracle.  In that transaction, Mr. Rudin engaged in

1    wrongful activities.  The evidence will show that Mr. Mai

2    had nothing to do with the K2 transaction.

12:40   3            There was also another transaction that Mr. Rudin

4    was involved in -- that was the second one -- CGCRP.  Oracle

5    has stated in court papers that Mr. Rudin committed wrongful

6    acts in that transaction.  Once again, evidence will show

7    that Mr. Mai had nothing to do with that transaction.  He

8    had no relationship with Mr. Rudin regarding that

9    transaction.

12:41   10           We will show evidence that it was Mr. Tiernan who

11   was involved in that transaction.  The same transaction they

12   said Mr. Rudin committed fraudulent activities, Mr. Tiernan

13   was involved in that with Mr. Rudin.

12:41   14           Another transaction Mr. Rudin was involved in was

15   the Media Lead transaction.  Once again, Oracle states that

16   Mr. Rudin committed fraudulent activity in that transaction.

17   The evidence will show Mr. Mai had nothing to do with

18   Mr. Rudin in that transaction.  He didn't even know about

19   it.

12:41   20           And then the final one here is Alethea transaction

21   with Oracle.  Alethea is a company owned by Mr. Tiernan.

22   Mr. Tiernan was accused of doing fraudulent activities in

23   that transaction with Oracle.  But in order to get out of

24   this lawsuit, he works out a deal with Oracle to talk to

25   them and say false things about Mr. Mai.  We will show that

1    he lied about Mr. Lie -- Mr. Mai.  We will show it was, in

2    fact, him who engaged in wrongful activities with other

3    companies.

12:42  4          Next, in 2009, Quin Rudin commits identity theft

5    on Mr. Mai.  Quin Rudin changes domain names.  Quin Rudin

6    changes e-mails.  He wants Oracle and he wants Anne Achey

7    and other people at Oracle to believe it was Mr. Mai who was

8    saying these things.  In fact, it was Quin Rudin without the

9    knowledge of Mr. Mai.

12:42  10         And then the PBGC transaction with Oracle takes

11   place.  That's what we're here about.  That's what this case

12   is about is the PBGC transaction.

12:43  13         Before Oracle files a lawsuit against Mr. Mai,

14   Mr. Mai filed a police report against Mr. Rudin for

15   committing identity theft on Dearborne Circle.  Mr. Mai will

16   testify as to about a hundred thousand dollars, I believe,

17   that Mr. Rudin stole from him.  Now, if this was a

18   conspiracy, as the plaintiff alleges, why would Mr. Mai file

19   a criminal complaint, criminal charges against Mr. Rudin?

12:43  20             MR. CRONE:  Objection.  Improper argument.

12:43  21             THE COURT:  Sustained.  Sustained.

12:43  22             MR. RAMP:  Then Oracle files a lawsuit, this

23   lawsuit that we're here today, and named Mr. Mai as a

24   defendant, Quin Rudin as a defendant, his company, Certus,

25   as a defendant, Mark Tiernan as a defendant, and his -- Mark

| | | |
|---|---|---|
| | 1 | Tiernan's company, Alethea, as a defendant. |
| 12:44 | 2 | After he filed the answer to the lawsuit, |
| | 3 | Mr. Michael Mai filed a cross-complaint against Rudin.  That |
| | 4 | further shows there's no conspiracy between them; there's no |
| | 5 | partnership between them, because Mr. Mai is filing a |
| | 6 | cross-complaint against his so-called partner. |
| 12:44 | 7 | MR. CRONE:  Objection.  Improper argument. |
| 12:44 | 8 | THE COURT:  Well, Counsel, you might state "the |
| | 9 | evidence will show."  You're saying it as a fact.  Just "the |
| | 10 | evidence will show." |
| 12:44 | 11 | MR. RAMP:  Yes, Your Honor. |
| 12:44 | 12 | This will go to show Mr. Mai's situation in this |
| | 13 | lawsuit where he was victimized by Quin Rudin and then he |
| | 14 | gets victimized by this lawsuit brought by Oracle. |
| 12:45 | 15 | I think the evidence will show that Mr. Mai did |
| | 16 | everything that was legal.  Evidence will show he's never |
| | 17 | been arrested, never been accused of anything.  Evidence |
| | 18 | will also show that he's never been investigated by the |
| | 19 | federal government for this so-called wrongful doings. |
| 12:45 | 20 | And I'd like to remind the jury this is a civil |
| | 21 | case and not a criminal case.  No criminal charge has been |
| | 22 | brought against Mr. Mai for any of these alleged activities. |
| 12:45 | 23 | And, in closing, I believe Oracle cannot prove |
| | 24 | their case with the burden that they have. |
| 12:45 | 25 | I want to thank you for listening to me and, um, I |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | will talk to you again at the end of trial.                  |
| 12:45 | 2  |         Thank you.                                           |
| 12:45 | 3  |         THE COURT:  All right.  Ladies and gentlemen, why    |
|       | 4  | don't you go take a lunch right now, and hopefully, those    |
|       | 5  | lines will be down.  There's a cafeteria downstairs.         |
|       | 6  | There's some places in the area.  I'm wondering if we can    |
|       | 7  | get right back to work in about 45 minutes, if that would be |
|       | 8  | acceptable, and make good use of your time.  I'm going to    |
|       | 9  | ask you to reconvene at 1:30 this afternoon.                 |
| 12:46 | 10 |         You're admonished not to discuss this matter         |
|       | 11 | amongst yourselves, nor form or express any opinion          |
|       | 12 | concerning the case.                                         |
| 12:46 | 13 |         The only disruption that could occur is if the       |
|       | 14 | other jury deliberating on a totally unrelated case, which   |
|       | 15 | we finished, which is a trademark case that has nothing to   |
|       | 16 | do with this case with completely different parties, has a   |
|       | 17 | question.  So far, they had one question this morning, which |
|       | 18 | is why you got delayed down in the jury room for a few       |
|       | 19 | moments.  If so, I might ask you to wait, but I'll tell you   |
|       | 20 | what I'm doing, so you're not inconvenienced.  Otherwise,    |
|       | 21 | it's get right back to work.  Okay?                          |
| 12:46 | 22 |         Just leave the notepad that you took notes on, if    |
|       | 23 | you did, right on the seat you occupy.  Please don't discuss |
|       | 24 | this matter with anyone or form or express an opinion.       |
| 12:46 | 25 |         Counsel, at 1:30, then.                              |

| 12:46 | 1 | *(Jury recesses for lunch at 12:46 p.m.)* |

12:46    1        *(Jury recesses for lunch at 12:46 p.m.)*

12:47    2        *(Out of the presence of the jury.)*

12:47    3        THE COURT: We're back on the record.

12:47    4        MR. CRONE: Your Honor, if we could address one

5   thing. It has to do with the efficiency of trial. I wanted

6   to ask this question now.

12:47    7        THE COURT: Sure.

12:47    8        MR. CRONE: As Your Honor may know, there are only

9   going to be three witnesses in this case.

12:47    10       THE COURT: I didn't know that. I know what the

11   limitations are on the defense.

12:47    12       MR. CRONE: Okay.

12:47    13       THE COURT: I wasn't sure what was occurring with

14   the plaintiff.

12:47    15       MR. CRONE: Okay.

12:47    16       THE COURT: I'm thinking about bringing them back

17   Tuesday now, instead of Monday, because that one juror is

18   punished without being paid. So when she's here, she should

19   be in session.

12:47    20       MR. CRONE: Um, and the reason I'm bringing this

21   up is, after I call Ms. Achey, I will be calling Mr. Mai

22   adversely. And my question was there's been some indication

23   from his counsel that he would like to call Mr. Mai a second

24   time after my case --

12:48    25       THE COURT: He can.

| 12:48 | 1 | MR. CRONE:  -- I think it would be far more |
| | 2 | efficient -- |
| 12:48 | 3 | THE COURT:  You can each shape your own case.  He |
| | 4 | can testify during your case; but then, Counsel, at the |
| | 5 | presentation of your case, if you want to recall him, you |
| | 6 | may. |
| 12:48 | 7 | MR. CRONE:  All right.  Thank you, Your Honor. |
| 12:48 | 8 | MR. RAMP:  Thank you, Your Honor. |
| 12:48 | 9 | THE COURT:  All right. |
| 12:48 | 10 | *(Lunch recess held at 12:48 p.m.)* |
| 01:32 | 11 | *(Proceedings resumed at 1:32 p.m.)* |
| 01:33 | 12 | *(In the presence of the jury.)* |
| 01:33 | 13 | THE COURT:  All right.  The jury's present.  If |
| | 14 | you'd like to be seated, ladies and gentlemen.  The parties |
| | 15 | are present. |
| 01:33 | 16 | Counsel on behalf of Oracle, your first witness, |
| | 17 | please. |
| 01:33 | 18 | MR. CRONE:  Thank you. |
| 01:33 | 19 | Oracle calls Anne Achey to the stand. |
| 01:33 | 20 | THE COURT:  Thank you.  If you'd step forward, |
| | 21 | please, between the double doors and raise your right hand. |
| 01:33 | 22 | **ANNE ACHEY, PLAINTIFF'S WITNESS, SWORN** |
| 01:33 | 23 | THE WITNESS:  I do. |
| 01:33 | 24 | THE COURT:  Thank you.  If you would be seated. |
| 01:34 | 25 | THE WITNESS:  Okay. |

| 01:34 | 1 | THE COURT:  And would you state to the jury your |
| | 2 | full name. |
| 01:34 | 3 | THE WITNESS:  Anne Wetherill Achey. |
| 01:34 | 4 | THE COURT:  And would you spell your last name, |
| | 5 | please. |
| 01:34 | 6 | THE WITNESS:  A-C-H-E-Y.  Wetherill, |
| | 7 | W-E-T-H-E-R-I-L-L. |
| 01:34 | 8 | THE COURT:  And this is direct examination by |
| | 9 | Oracle. |
| 01:34 | 10 | Counsel. |
| 01:34 | 11 | MR. CRONE:  Thank you, Your Honor.  May I proceed? |
| 01:34 | 12 | THE COURT:  You may proceed. |
| 01:34 | 13 | MR. CRONE:  Thank you. |
| 01:34 | 14 | **DIRECT EXAMINATION** |
| 01:34 | 15 | BY MR. CRONE: |
| 01:34 | 16 | Q.   Good afternoon, Ms. Achey. |
| 01:34 | 17 | Where do you work? |
| 01:34 | 18 | A.   I work for Oracle.  I'm physically located in Reston, |
| | 19 | Virginia, which is a suburb of Washington, D.C. |
| 01:34 | 20 | Q.   All right.  And did you work in the Reston, Virginia, |
| | 21 | office in the fall of 2009? |
| 01:34 | 22 | A.   Yes, I did. |
| 01:34 | 23 | Q.   All right.  Can you tell us, just at a high level, |
| | 24 | generally, what business Oracle is in? |
| 01:35 | 25 | A.   Oracle develops and sells database software, primarily |

01:35   1   database, but we do sell applications, some application

       2   packages.

01:35   3   Q.   All right.  And just generally, what is database

       4   software?

01:35   5   A.   The database software allows companies, individuals to

       6   manage large volumes of data.  They can manage it, publish

       7   it, et cetera.

01:35   8   Q.   Is the United States Government a regular customer of

       9   Oracle's database software?

01:35   10   A.   Yes, they are.

01:35   11   Q.   Okay.  Could you give the jury some examples of the

     12   kinds of uses to which the federal government puts Oracle

     13   database software?

01:35   14   A.   Okay.  I'll give you two examples.  One is U.S. Navy.

     15   We've sold a lot of software to the U.S. Navy.  They use it

     16   to track the troop deployments, to track their equipment,

     17   where the ships are located, nuclear information for what's

     18   on the nuclear ships.  They do that.

01:35   19       Another large customer of ours in the civilian space is

     20   Department of Homeland Security.  Every time you go through

     21   a customs or immigration, all that data from your passport

     22   is entered into an Oracle database.

01:36   23   Q.   All right.  Thank you, Ms. Achey.

01:36   24       When did you first start working for Oracle?

01:36   25   A.   September of 1999.  It's been almost 14 years.

| 01:36 | 1 | Q.   All right.  And where did you work before Oracle? |
| 01:36 | 2 | A.   I worked for a small systems integrator.  We were doing |
| | 3 | software development for the Department of Defense. |
| 01:36 | 4 | Q.   And did you attend college? |
| 01:36 | 5 | A.   I did. |
| 01:36 | 6 | Q.   And where was that? |
| 01:36 | 7 | A.   Attended University of Georgia.  I have a bachelor's in |
| | 8 | math from the University of Georgia.  I have a master's in |
| | 9 | statistics, and then I have a master's in business |
| | 10 | administration from Marymont University. |
| 01:36 | 11 | Q.   All right.  Did you have a job title in August 2009 at |
| | 12 | Oracle? |
| 01:37 | 13 | A.   Job title then would have been channels manager. |
| 01:37 | 14 | Q.   Okay.  And what was your job responsibilities as a |
| | 15 | channel manager? |
| 01:37 | 16 | A.   I was primarily interfacing between the sales team and |
| | 17 | what we have is Oracle resellers, who augment the sales |
| | 18 | team.  So I was an interface with them.  I help the |
| | 19 | resellers develop their pipeline.  I help them, you know, |
| | 20 | process Oracle software deals. |
| 01:37 | 21 | Q.   All right.  And you said -- you said quite a few things |
| | 22 | there, Ms. Achey. |
| 01:37 | 23 | First of all, did you have any participation in the |
| | 24 | actual sale of the software to customers? |
| 01:37 | 25 | A.   No. |

01:37    1    Q.   Okay.  And you've used the plural, even though we're

         2    talking about the federal government.  Why is that, in terms

         3    of customers?

01:37    4    A.   Customers, because the federal government, we service

         5    both the civilian agencies like the Department of Justice,

         6    Department of Homeland Security, and Department of Defense,

         7    Army, Air Force, Navy.

01:38    8    Q.   All right.  And you said a moment ago that you were

         9    helping develop pipeline?

01:38   10    A.   Right.

01:38   11    Q.   What do you mean -- what is pipeline?

01:38   12    A.   Pipeline is all of the resellers work to develop a list

        13    of deals, potential deals that they can bring into the

        14    company.  And as you can imagine, not all deals come in; but

        15    it's -- develop the pipeline.  You have to have a

        16    significant amount of deals, potential deals, to develop the

        17    actual what comes in.

01:38   18    Q.   All right.  And, generally -- we'll get into this a

        19    little bit more detail in a few minutes, but generally, when

        20    you said you process paperwork with respect to particular

        21    sales, what did you mean by that?

01:38   22    A.   When a reseller has a transaction for Oracle software,

        23    they need to have their purchase order to Oracle.  They need

        24    to have a partner ordering document that outlines the

        25    pricing, terms, et cetera.  And we also need to see

1    additional pieces of information, such as the government

2    purchase order to the resealer.

01:39   3    Q.   All right.  And in the fall 2009, what customers in

4    particular were you interacting with?  Was it just the

5    federal government?

01:39   6    A.   Just the federal government.

01:39   7    Q.   Did you have responsibility for all sales of Oracle

8    software to the federal government during this time frame,

9    or was there a portion of it that you were responsible for?

01:39  10    A.   I had responsibility for all.  I was channel manager

11   for all technical, which is the database, and middleware,

12   all technical software.  And then I was also involved in the

13   approval process for everything else.

01:39  14    Q.   All right.  And does Oracle sell software directly to

15   the federal government?

01:39  16    A.   Very limited direct sales.  Most of it goes through our

17   resellers.

01:39  18    Q.   All right.  And are you familiar with something that's

19   called the "Oracle Partner Network"?

01:40  20    A.   Yes, I am.

01:40  21    Q.   All right.  Can you just tell us what the Oracle

22   Partner Network is?

01:40  23    A.   Oracle Partner Network, or OPN, is the system that

24   allows companies to come in and submit applications, fill

25   out the paperwork, pay for the rights to resell Oracle

01:40    1    software.

01:40    2    Q.   And how difficult is it to join the Oracle Partner

         3    Network?

01:40    4    A.   They need to go into an Internet site on Oracle.com;

         5    they need to agree to terms and conditions of how they're

         6    going to manage the sales; and they need to have a credit

         7    card to put the fees against.

01:40    8    Q.   All right.  And when Oracle refers to a reseller as a

         9    partner, what does that mean?

01:40   10    A.   Primarily, they are resellers.  They act in a

        11    fulfillment mode.  They're not partners such that they're,

        12    you know, real tight with Oracle, but they are resellers.

        13    It's an arm's length relationship.

01:41   14    Q.   All right.  And can you explain for us the function of

        15    a software reseller?  What do they do?

01:41   16    A.   The software reseller is to extend the Oracle sales

        17    force -- our sales force is very limited, as you can

        18    imagine -- and it's to extend it to reach more customers to

        19    have more interface with the customers.

01:41   20    Q.   All right.  And in 2009, can you give us an estimate of

        21    how many such retailers there were?

01:41   22    A.   Oracle-wide there would have been thousands.

01:41   23    Q.   Now, why -- why -- can just anyone claim to have the

        24    ability to sell Oracle software to the federal government?

01:41   25    A.   They -- anyone can sell it, but the bottom line is when

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
|        | 1  | they come to Oracle, they need to come through someone in    |
|        | 2  | OPN, a reseller.  So if they're not a reseller themselves,   |
|        | 3  | we need to establish the path of how they get to us.         |
| 01:42  | 4  | Q.   All right.  So let me turn to the contract process that |
|        | 5  | you --                                                        |
| 01:42  | 6  | A.   Okay.                                                    |
| 01:42  | 7  | Q.   -- that you mentioned a moment ago, Ms. Achey.          |
| 01:42  | 8  |      Through your work at Oracle, have you become familiar   |
|        | 9  | with how resellers actually bid on a government contract for |
|        | 10 | software?                                                     |
| 01:42  | 11 | A.   Yes.                                                     |
| 01:42  | 12 | Q.   Okay.  And how can someone learn about the federal      |
|        | 13 | government's interest in purchasing software?               |
| 01:42  | 14 | A.   Okay.  There are several websites, FedBid ops is one of |
|        | 15 | 'em.  It's like a bulletin board.  You can register for that |
|        | 16 | site, and they can send you out announcements of specific    |
|        | 17 | opportunities.  I've got an ID for it, and I got two of 'em  |
|        | 18 | this morning.                                                 |
| 01:42  | 19 |      Or they also -- it looks like a bulletin board, so you  |
|        | 20 | can go out, review everything that's posted.  So you can say |
|        | 21 | I want -- I'm interested in this particular type of          |
|        | 22 | opportunity, send me announcements on that, or you control   |
|        | 23 | the bulletin board.                                          |
| 01:43  | 24 | Q.   All right.  And you -- you mentioned, I believe, fedbis |
|        | 25 | ops?                                                          |

| 01:43 | 1 | A.   Right.  FedBid ops. |
| 01:43 | 2 | Q.   Have you heard of something called fedbid.com? |
| 01:43 | 3 | A.   That's their website.  Dot com is the website. |
| 01:43 | 4 | Q.   I see.  Have you ever personally used the fedbid.com |
|       | 5 | website? |
| 01:43 | 6 | A.   I do have a user ID for it, and I have used it. |
| 01:43 | 7 | Q.   Are you familiar with the procedures used by fedbid.com |
|       | 8 | in connection with this process you're describing? |
| 01:43 | 9 | A.   Generally. |
| 01:43 | 10 | Q.   In your experience, how does someone bid on a federal |
|       | 11 | contract to purchase software using the fedbid.com system? |
| 01:43 | 12 | A.   Well, it can be done in several ways.  Usually, the |
|       | 13 | more common way is they can ask for specific proposals |
|       | 14 | backed -- software quotes, where you might, you know, submit |
|       | 15 | an MS Excel spreadsheet with pricing and the products on it; |
|       | 16 | or they can do reverse auctions, where you submit a price |
|       | 17 | and you can go in and submit a lower price as time goes on. |
| 01:44 | 18 | Q.   Typically, does more than one bidder compete for a |
|       | 19 | given federal contract that's posted on this fedbid.com |
|       | 20 | website? |
| 01:44 | 21 | A.   Typically, more than one.  And one of the reasons the |
|       | 22 | government uses these sites is because they need to have |
|       | 23 | minimum of three bids. |
| 01:44 | 24 | Q.   Okay.  How does a reseller determine the price that |
|       | 25 | it's going to have to pay Oracle for the software that's |

DEBBIE GALE, U.S. COURT REPORTER

01:44     1    ultimately going to be delivered to the -- well, let me step

          2    back.

01:44     3        How does the reseller determine the price that it's

          4    going to bid on the fedbid.com website?

01:44     5    A.   They would base the price they're going to bid on what

          6    they have to pay Oracle.

01:44     7    Q.   Okay.

01:44     8    A.   You would determine your price to Oracle and then

          9    figure up what your margin is for your price to the

         10    customer.

01:45    11    Q.   All right.  And how does a reseller go about

         12    determining the price that they would have to pay Oracle

         13    ultimately for software that's gonna be delivered to the

         14    federal government?

01:45    15    A.   When you join OPN, Oracle Partner Network, there are

         16    standard discounts that are given at that point.  And you

         17    take the standard discount off the published commercial

         18    price list, which is on Oracle.com.  So that's a standard

         19    way of doing it.

01:45    20        If, for your opportunity, you realize you need a lower

         21    price than that will get you, you can come to Oracle

         22    corporate and request increased discount so that you can

         23    offer a lower price.

01:45    24    Q.   Okay.  And is that process for attaining in advance a

         25    better discount for the Oracle software -- is there a



| | 1 | special technical term at all that's used internally at |
| | 2 | Oracle? |
| 01:45 | 3 | A.   It's "nonstandard request." |
| 01:45 | 4 | Q.   Are there also any prenegotiated prices that are given |
| | 5 | to the federal government? |
| 01:46 | 6 | A.   We -- most General Services Administration, GSA, |
| | 7 | manages catalogs for thousands of different vendors.  They |
| | 8 | can be anything from pencils to software to hardware.  And |
| | 9 | we have our GSA-scheduled resellers who have increased |
| | 10 | discounts for the federal government via their GSA schedule. |
| | 11 | But it's all tied to their GSA schedule, which is published. |
| 01:46 | 12 | Q.   How does a reseller learn that it's won the bidding |
| | 13 | process through this fedbid.com website? |
| 01:46 | 14 | A.   They get an e-mail from FedBid, and it's also posted so |
| | 15 | that the people that did not win know who won. |
| 01:46 | 16 | Q.   Okay.  Have you ever heard of the term "contract |
| | 17 | award"? |
| 01:46 | 18 | A.   That's essentially -- the contract award is "We picked |
| | 19 | you for our winner and here's your contract." |
| 01:47 | 20 | Q.   Now, in the ordinary course of your work, including in |
| | 21 | fall 2009, did you learn who won particular auctions with |
| | 22 | the federal government to supply Oracle software? |
| 01:47 | 23 | A.   The process was the winning reseller would contact us |
| | 24 | and say, "We won; now we need to prepare the paperwork, and |
| | 25 | we need to get our order in to Oracle so we can deliver to |

1    the end customer."

01:47    2    Q.   Now, why is it in particular that you would have

3    received that type of information in 2009?

01:47    4    A.   Because at that point in time, in my role as channel

5    manager, one of the things I did was I'm the first person

6    that saw the paperwork when it came in.  One of my functions

7    was to validate that everything was complete.  If it wasn't

8    complete, work with the reseller to get the complete

9    paperwork and then process it on.

01:47    10    Q.   Okay.  And to be clear, when a reseller is involved in

11    this type of transaction, who does the government pay for

12    the software that's being delivered?

01:48    13    A.   The government pays the reseller.

01:48    14    Q.   All right.  And how does Oracle get paid for the

15    software that it's delivering to the government?

01:48    16    A.   The reseller pays Oracle.

01:48    17    Q.   All right.  Now, given that Oracle in this type of

18    transaction is going to be paid by the reseller rather than

19    the government, does the reseller have to attain any type of

20    credit authorization in advance from Oracle before moving

21    forward with such a transaction?

01:48    22    A.   If the transaction is over $200,000, we have to go to

23    Oracle Credit to get credit approval prior to processing the

24    order.  That's one of the things I, as channel manager,

25    would have to do.  If the order was over 200,000, submit the

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | deal specifics to Oracle Credit to get the credit approval.  |
| 01:48 | 2  | Q.    Okay.  Now, you mentioned Oracle Credit?               |
| 01:48 | 3  | A.    Right.                                                 |
| 01:48 | 4  | Q.    Is that a different unit of Oracle?                    |
| 01:49 | 5  | A.    Yes.                                                   |
| 01:49 | 6  | Q.    Is that also sometimes referred to as Oracle Finance   |
|       | 7  | Division, or is that a different unit?                       |
| 01:49 | 8  | A.    That's a different unit still.                         |
| 01:49 | 9  | Q.    Okay.  And in connection with this type of transaction,|
|       | 10 | generally what types of materials are provided to Oracle     |
|       | 11 | Credit for its analysis as to obtaining a credit check?      |
| 01:49 | 12 | A.    Generally, they would have at least one year of        |
|       | 13 | financials from the reseller on file, and they would use     |
|       | 14 | that.                                                        |
| 01:49 | 15 | Sometimes if it's a new entity, they might ask for           |
|       | 16 | several years of financials.  But it's up to them, you know, |
|       | 17 | to determine what information they need.                     |
| 01:49 | 18 | Q.  All right.  Ms. Achey, have you helped prepare a slide   |
|       | 19 | to illustrate how a typical transaction might work?          |
| 01:49 | 20 | A.    Yes.                                                   |
| 01:49 | 21 | Q.  And would that help aid your testimony to the jury here  |
|       | 22 | today?                                                       |
| 01:49 | 23 | A.  I think so, so that they can follow.                     |
| 01:49 | 24 | Q.  All right.                                               |
| 01:49 | 25 | MR. CRONE:  Your Honor, permission to show our               |

1    Slide D3, which has been previously shown to counsel.

01:50  2           THE COURT:  You may.

01:50  3           I need to take a recess at some point, and I want

4    to pick a logical breaking point for both of you.  I

5    probably need about half an hour to 45 minutes with the

6    other jury.

01:50  7           MR. CRONE:  All right.

01:50  8           THE COURT:  So why don't you reach a logical point

9    in your presentation, then I'll take that recess.

01:50  10          MR. CRONE:  Okay.  Thank you, Your Honor.

01:50  11          THE COURT:  Then I'll bring you back, ladies and

12   gentlemen; we're going to continue this afternoon.

01:50  13          Okay.

01:50  14          MR. CRONE:  That's fine.  Let's have D3.

01:50  15      (Slide displayed.)

01:50  16   BY MR. CRONE:

01:50  17   Q.   All right.  Ms. Achey, if you could explain for the

18   jury -- walk us through a typical transaction with the

19   federal government and a reseller.

01:50  20   A.   Okay.  So as you look at this, there are three entities

21   involved.  On the far right, you have the U.S. Government;

22   then, in the middle, you have the reseller; and on the far

23   left, is Oracle.  Three separate entities involved.  The

24   federal government will post their solicitation, their

25   request for quote, proposal, and the reseller will put in

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | their proposal, their quote, or bid.                         |
| 01:50 | 2  | So that's Step No. 1.                                         |
| 01:50 | 3  | Okay.  Step No. 2, the government takes all of the           |
|       | 4  | proposals, quotes they receive.  They evaluate 'em; they     |
|       | 5  | pick out the best value; and they make a contract award to a |
|       | 6  | selected reseller.                                           |
| 01:51 | 7  | Step No. 3 is then the reseller works with Oracle to         |
|       | 8  | give a complete order package to Oracle for the purchase so  |
|       | 9  | that the reseller can meet their obligations to the          |
|       | 10 | government.                                                   |
| 01:51 | 11 | Step No. 4, once we receive the P.O., Oracle books the       |
|       | 12 | purchase order for the software.  Then we give the           |
|       | 13 | information to the customer so that he can download the      |
|       | 14 | software, and we have met the delivery of the products.      |
| 01:51 | 15 | Step No. 5, Oracle will invoice the reseller for the         |
|       | 16 | product.                                                     |
| 01:51 | 17 | And then, Step No. 6 is the reseller invoices the U.S.       |
|       | 18 | Government, you know, for their fees.  And then the          |
|       | 19 | government pays the reseller.                                 |
| 01:52 | 20 | And then, Step No. 8, the reseller pays Oracle.              |
| 01:52 | 21 | Q.  All right.  Thank you, Ms. Achey.                        |
| 01:52 | 22 | And sometimes, are Steps No. 5 and 6 switched?               |
| 01:52 | 23 | A.  Sometimes.  I mean, quite frequently we have resellers   |
|       | 24 | that are billing the government prior to getting the invoice |
|       | 25 | from Oracle because they want to get their money from the    |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | government as soon as possible --                            |
| 01:52 | 2  | Q.   All right.                                              |
| 01:52 | 3  | A.   -- so that's quite frequently and -- yes, that's the   |
|       | 4  | only one that would really be mixed.                        |
| 01:52 | 5  | Q.   All right.  Now, just because a reseller has won the   |
|       | 6  | bidding process through the fedbid.com website, for example,|
|       | 7  | does Oracle necessarily have to sell the reseller the       |
|       | 8  | software for delivery to the federal government?            |
| 01:52 | 9  | A.   No.                                                    |
| 01:52 | 10 | Q.   Okay.  Can you give us an example of why that might be?|
| 01:53 | 11 | A.   If the reseller was not an Oracle reseller.  If the    |
|       | 12 | reseller was -- had bid something that was not according to |
|       | 13 | Oracle terms.  If they -- you know, if they tried for a     |
|       | 14 | price that was different than the standard discount or      |
|       | 15 | anything they'd received previously approved.               |
| 01:53 | 16 | Q.   All right.  And focusing on Step No. 4 on this slide,  |
|       | 17 | typically how does Oracle deliver software to the customers?|
| 01:53 | 18 | A.   We do electronic download.  We give the customer a     |
|       | 19 | customer support identifier, CSI, which is a number, which  |
|       | 20 | once they have that, they can go into Oracle.com and        |
|       | 21 | download the software from there.                           |
| 01:53 | 22 | Q.   And I gather from this slide that Oracle often delivers|
|       | 23 | product to the customer before receiving any payment from   |
|       | 24 | the reseller; is that accurate?                             |
| 01:54 | 25 | A.   I would be willing to bet we have never received       |

| | | |
|---|---|---|
| | 1 | payment before delivering. |
| 01:54 | 2 | Q.    Why does Oracle do that? |
| 01:54 | 3 | A.    Because we make the software available.  As soon as we |
| | 4 | book the order so that the customer can have it and move |
| | 5 | forward with their business. |
| 01:54 | 6 | Q.   All right. |
| 01:54 | 7 | MR. CRONE:  Thank you, Ms. Achey. |
| 01:54 | 8 | This would be a good stopping point, Your Honor. |
| 01:54 | 9 | THE COURT:  Ladies and gentlemen, I'm going to ask |
| | 10 | you to take a recess, and I apologize to you, but I want to |
| | 11 | attend to another matter. |
| 01:54 | 12 | *(To Counsel)*  I believe I have all the parties |
| | 13 | here; is that correct, Counsel?  Both parties. |
| 01:54 | 14 | All right. |
| 01:54 | 15 | *(To the Jury)*  Probably about half an hour to 45 |
| | 16 | minutes.  So I'm not going to expect you back until 2:30, |
| | 17 | but I would like to get started at that time.  If you're |
| | 18 | back in the jury room at that time, I might need a few more |
| | 19 | minutes.  But maybe you could just recess until 2:30.  Could |
| | 20 | you do that for me?  Okay.  All right. |
| 01:54 | 21 | You're admonished not to discuss this matter |
| | 22 | amongst yourselves, nor form or express any opinion |
| | 23 | concerning the case. |
| 01:54 | 24 | We'll be right back with up, I hope at 2:30. |
| 01:55 | 25 | *(Recess held at 1:55 p.m.)* |

| | | |
|---|---|---|
| 02:48 | 1 | *(Proceedings resumed at 2:48 p.m.)* |
| 02:49 | 2 | *(In the presence of the jury.)* |
| 02:49 | 3 | THE COURT:  All right.  The jury's once again |
| | 4 | present. |
| 02:49 | 5 | Counsel, if you would be seated, parties, please, |
| | 6 | and the witness. |
| 02:49 | 7 | Ladies and gentlemen, thank you for your patience. |
| | 8 | We've concluded the matter with the other jury.  There won't |
| | 9 | be any further interruption. |
| 02:49 | 10 | Counsel, if you would like to resume your direct |
| | 11 | examination, and you can go back and reask some questions |
| | 12 | just to bring the jury back into focus, if you'd like to. |
| 02:49 | 13 | MR. CRONE:  I appreciate that.  Thank you, |
| | 14 | Your Honor. |
| 02:49 | 15 | DIRECT EXAMINATION (*Resumed*) |
| 02:49 | 16 | BY MR. CRONE: |
| 02:49 | 17 | Q.  Ms. Achey, I think at the -- |
| 02:49 | 18 | MR. CRONE:  Why don't we put the -- actually, D3 |
| | 19 | back up, if we could, Mr. Owens. |
| 02:49 | 20 | *(Slide displayed.)* |
| 02:50 | 21 | BY MR. CRONE: |
| 02:50 | 22 | Q.  Ms. Achey, before the break, we were going through this |
| | 23 | slide and you were going through the process for a |
| | 24 | government purchase agreement.  And, again, this -- to make |
| | 25 | sure that I understood what you were saying, you were |

        1    saying -- I asked you just because a reseller wins a bidding

        2    process that is reflected by Item No. 1 on this slide, does

        3    Oracle have to actually sell the reseller the software?

02:50   4    A.    No, they don't.

02:50   5    Q.    And can you again sort of refresh our recollection as

        6    to why that is?  Can you give us an example why that is?

02:50   7    A.    Suppose they sold the software to the government for a

        8    price significantly less than what they could have purchased

        9    it from Oracle; the pricing would be off.

02:50   10   Q.    Okay.  And let me -- and then how about if Oracle

        11   Credit came back with a negative conclusion as to its

        12   analysis of the creditworthiness of a reseller, would that

        13   be another reason why Oracle might not complete the

        14   transaction?

02:51   15   A.    Absolutely.

02:51   16   Q.    All right.  So, Ms. Achey, at this point I'd like to

        17   turn to the Pension Benefit Guaranty Corporation transaction

        18   that's in issue in this case.

02:51   19   A.    Okay.

02:51   20   Q.    Do you recall working on a transaction involving

        21   Mr. Mai in August and September of 2009?

02:51   22   A.    Yes, I do.

02:51   23   Q.    Did that involve the federal government?

02:51   24   A.    Yes, it was for PBGC.

02:51   25   Q.    All right.  And can you tell us briefly what the

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
|        | 1  | Federal Benefit Guaranty Corporation is?                     |
| 02:51  | 2  | A.   PBGC is a federal organization that guarantees pension  |
|        | 3  | funds.  Say you work for a corporation such as Honeywell,     |
|        | 4  | Luxottica, who has a defined pension plan, PBGC is the one    |
|        | 5  | that guarantees the money will be there when you get to      |
|        | 6  | retirement.                                                  |
| 02:52  | 7  | Q.   Okay.  And the name of the unit is Pension Benefit      |
|        | 8  | Guaranty Corporation?                                        |
| 02:52  | 9  | A.   Right.                                                  |
| 02:52  | 10 | Q.   In your understanding, is that an agency of the federal |
|        | 11 | government?                                                  |
| 02:52  | 12 | A.   It is an agency of the federal government.              |
| 02:52  | 13 | Q.   All right.  And when did you first become aware that    |
|        | 14 | the Pension Benefit Guaranty Corporation was looking to buy  |
|        | 15 | the Oracle software that Mr. Mai ultimately became involved  |
|        | 16 | in?                                                          |
| 02:52  | 17 | A.   Would have been the first week of August 2009.         |
| 02:52  | 18 | Q.   How did you become aware of that?                       |
| 02:52  | 19 | A.   We had one of our other resellers, TUSC, T-U-S-C,       |
|        | 20 | submit a nonstandard request for additional discount for the |
|        | 21 | purchase.                                                    |
| 02:52  | 22 | Q.   All right.  And that request for nonstandard discount,  |
|        | 23 | is that something that typically, during this time period,   |
|        | 24 | came through you?                                            |
| 02:52  | 25 | A.   Yes.  It came through me, because I would have seen it  |

DEBBIE GALE, U.S. COURT REPORTER



1   for two different reasons.  I was a channel manager for that

2   type of software that they were selling, and also, I was the

3   first level of approver.

02:53   4   Q.   All right.

02:53   5   A.   So I would have seen it two different times.

02:53   6   Q.   And when you say you were a "first-level approver,"

7   what do you mean by that?

02:53   8   A.   When you submit a nonstandard request for either

9   discount or terms, it has to go up through multiple Oracle

10   management levels for approval.  It depends on exactly how

11   far it has to go.  If it's something like this, it only went

12   through three approval levels; sometimes it has to go

13   through as many as five.

02:53   14   Q.   When you say "approval levels," you mean superiors of

15   yours?

02:53   16   A.   Absolutely.  I mean, the top level is Larry Ellison, HQ

17   app.

02:53   18   Q.   Okay.  I believe you said TUSC was one of the other

19   bidders?

02:53   20   A.   Yes.  They're the one that submitted the first week in

21   August.

02:53   22   Q.   All right.  And were they the only other bidder that

23   you had heard of in connection with this particular

24   transaction before you had any contact with Mr. Mai?

02:53   25   A.   Um, August 12th, the day before the proposals were due

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| | 1 | into the government, DLT, another one of our resellers, |
| | 2 | submitted a request for additional discount. |
| 02:54 | 3 | Q.   All right.  And were you familiar with DLT before this |
| | 4 | transaction? |
| 02:54 | 5 | A.   Yes. |
| 02:54 | 6 | Q.   And are you also familiar with TUSC? |
| 02:54 | 7 | A.   Yes. |
| 02:54 | 8 | Q.   Were DLT and TUSC members of this Oracle Partner |
| | 9 | Network you testified about earlier today? |
| 02:54 | 10 | A.   Yes, they both were. |
| 02:54 | 11 | Q.   Had you done business with, for example, DLT before? |
| 02:54 | 12 | A.   I've done a significant amount of business with DLT |
| | 13 | since 2000. |
| 02:54 | 14 | Q.   All right.  And is -- to you knowledge, is and was DLT |
| | 15 | a significant reseller, as you said, for Oracle products? |
| 02:54 | 16 | A.   Yes. |
| 02:54 | 17 | Q.   And do you have -- do you know how much business Oracle |
| | 18 | has done with DLT over the years? |
| 02:54 | 19 | A.   It's been in the billions.  Last August, I asked 'em |
| | 20 | for a five-year run of what they had done, and it was |
| | 21 | 1.3 billion at that point in time.  So you can figure five |
| | 22 | years, 1.3; 2000, this is 13 years at least. |
| 02:55 | 23 | Q.   All right.  Did you, at some point in time, come to |
| | 24 | learn which one of these -- well, strike that.  Let me start |
| | 25 | that over again. |

02:55     1          At some point in time, did you learn which reseller had

          2     won the bidding process for the PBGC transaction that you're

          3     referencing?

02:55     4     A.    I learned on August 28th.

02:55     5     Q.    All right.  And that's 2009?

02:55     6     A.    2009.  I'm sorry.

02:55     7     Q.    No problem.

02:55     8          How did you learn that?

02:55     9     A.    I learned from the sales rep.  Debbie Dilldine

          10    contacted me and advised me that it had been awarded to

          11    Dearborne.

02:55     12    Q.    And by "Dearborne," do you mean Dearborne Circle?

02:55     13    A.    Dearborne Circle, yes.

02:55     14    Q.    And Ms. Dilldine, where geographically does she work?

02:55     15    A.    She is the account manager for PBGC, and she also works

          16    in the Reston, Virginia, office.

02:56     17    Q.    All right.  And as an account manager at Oracle, what

          18    were her responsibilities in August of 2009?

02:56     19    A.    She worked directly with the customer identifying their

          20    software requirements.  You know, what their business needs

          21    were and then what software would satisfy the business

          22    needs.

02:56     23    Q.    All right.  And with respect to the transaction,

          24    actually papering the transaction, that process that you

          25    described for the jury before the break, did Ms. Dilldine

1    have any participation in that as part of her job

2    responsibilities?

02:56    3    A.    No, that's not part of her job.

02:56    4    Q.    Okay.  When Ms. Dilldine informed you that Dearborne

5    Circle had been the winning bidder on this transaction, what

6    did you do?

02:56    7    A.    Dearborne Circle was not a known entity to me.  So the

8    first thing I did was go to the OPN site to see if they were

9    an Oracle reseller.  I wanted to get some background on 'em

10    as quickly as possible.

02:57    11    Q.    All right.  And when -- did you reach a conclusion

12    after looking at the Oracle Partner Network website?

02:57    13    A.    They -- they were not an Oracle partner.

02:57    14    Q.    And what did you do next after -- after learning that?

02:57    15    A.    I advised Debbie that, yes, I'd searched and they were

16    not part of the network and we needed to do some additional

17    homework.

02:57    18    Q.    Okay.  At some point in time, did you come to learn

19    about a company called "Certus Solutions, Inc."?

02:57    20    A.    As part of her process, Debbie was in contact with

21    Dearborne, and she was told at that point in time that

22    Dearborne had bought Certus.

02:57    23    MR. RAMP:  Objection, Your Honor.  This is

24    hearsay.

02:57    25    THE COURT:  Counsel.

02:57    1          MR. CRONE:  It's being offered to show what she

         2    did in conformity after being told this.

02:57    3          THE COURT:  All right.

02:57    4          (To the Jury:)  You're not to take that statement

         5    about what she, Debbie, said for the truth of the matter

         6    asserted.

02:58    7          She's not here, so she can't be cross-examined.

         8    And our system guarantees that you have the opportunity to

         9    cross-examine and have the person present.  But I'll allow

        10    it to show what she did in relation to this conversation.

02:58   11          Now, that's complicated.  It means you can't take

        12    what Debbie said is the truth.  It's just being offered to

        13    receive it, only to show the next action Ms. Achey took.

02:58   14          Counsel.

02:58   15          MR. CRONE:  Thank you, Your Honor.

02:58   16    BY MR. CRONE:

02:58   17    Q.   Ms. Achey, you were saying what Ms. Dilldine had

        18    informed you about this conversation with Mr. Mai?

02:58   19    A.   Right.  Let me go back again.

02:58   20          Okay.  She'd informed me that Mr. Mai had told her that

        21    they had acquired Certus, who was a member of OPN, and that

        22    Quin Rudin was then a Dearborne employee and he would be

        23    working with us to satisfy the needs.

02:58   24    Q.   All right.  Did you then determine whether or not

        25    Certus Solutions, Inc. was a member of the Oracle Partner

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | Network?                                                      |
| 02:59 | 2  | A.   Yes, I did.  I checked OPN website, and they were       |
|       | 3  | there.                                                        |
| 02:59 | 4  | Q.   And then what did you do after reaching that            |
|       | 5  | conclusion?                                                   |
| 02:59 | 6  | A.   After that conclusion, I had an e-mail that Mr. Mai had  |
|       | 7  | sent to Debbie, that she forwarded to me, with Mr. Rudin's   |
|       | 8  | e-mail address; and I sent him an e-mail and said, "Please   |
|       | 9  | contact me.  I'm your Oracle point of contact."              |
| 02:59 | 10 | Q.   All right.  And did you have any contact with Mr. Rudin |
|       | 11 | after that point?                                            |
| 02:59 | 12 | A.   Later in the day, I received, um -- e-mail from him     |
|       | 13 | with a Partner Ordering Document and a copy of the          |
|       | 14 | government purchase order to Dearborne.                     |
| 02:59 | 15 | Q.   All right.  Ms. Achey, I believe you have some exhibit  |
|       | 16 | binders there with you.                                     |
| 02:59 | 17 | A.   I do.                                                   |
| 02:59 | 18 | Q.   If you could turn to Exhibit 119 in your binder.       |
| 03:00 | 19 | A.   Okay.                                                   |
| 03:00 | 20 | Q.   Ms. Achey, have you seen Exhibit 119 before?          |
| 03:00 | 21 | A.   Yes, I have.  This is the e-mail I received.          |
| 03:00 | 22 | Q.   All right.  Is this an e-mail that you received in the  |
|       | 23 | ordinary course of your work at Oracle?                     |
| 03:00 | 24 | A.   Yes.                                                    |
| 03:00 | 25 | Q.   Is this an e-mail that you, with the attachments, have  |

DEBBIE GALE, U.S. COURT REPORTER

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | kept in the ordinary course of your work for Oracle?         |
| 03:00 | 2  | A.   Yes, it is.                                             |
| 03:00 | 3  | MR. CRONE:  Your Honor, I would move Exhibit 119             |
|       | 4  | in evidence.                                                 |
| 03:00 | 5  | THE COURT:  And who's that e-mail from again?                |
| 03:00 | 6  | THE WITNESS:  It's from Quin Rudin to myself,                |
|       | 7  | copying Debbie Dilldine, Michael Mai, and Claude Kramer.     |
| 03:00 | 8  | THE COURT:  Michael Meyer?                                   |
| 03:00 | 9  | THE WITNESS:  Michael Mai.                                   |
| 03:00 | 10 | THE COURT:  Mai.                                             |
| 03:00 | 11 | THE WITNESS:  I'm sorry.                                     |
| 03:00 | 12 | THE COURT:  Received.                                        |
| 03:00 | 13 | *(Exhibit No. 119 received in evidence.)*                    |
| 03:00 | 14 | THE COURT:  Thank you.                                       |
| 03:00 | 15 | MR. CRONE:  May I publish, Your Honor?                       |
| 03:00 | 16 | THE COURT:  You may.                                         |
| 03:00 | 17 | *(Exhibit displayed.)*                                       |
| 03:01 | 18 | BY MR. CRONE:                                                |
| 03:01 | 19 | Q.   And just to be clear, Ms. Achey, if you look at the    |
|       | 20 | header information for this e-mail that's on page 1 of       |
|       | 21 | Exhibit 119, you see, first, it's from Quin Rudin,          |
|       | 22 | Quin@dearbornellc.com.                                       |
| 03:01 | 23 | Did I read that correctly?                                   |
| 03:01 | 24 | A.   Yes.                                                    |
| 03:01 | 25 | Q.   Was that an e-mail address that you communicated with  |

DEBBIE GALE, U.S. COURT REPORTER

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
|       | 1  | Mr. Quin Rudin on, in connection with this transaction?          |
| 03:01 | 2  | A.   Yes.                                                         |
| 03:01 | 3  | Q.   And then it says "to Anne.Achey@Oracle.com."  That was       |
|       | 4  | your e-mail address?                                              |
| 03:01 | 5  |       THE COURT:  That wasn't understandable, Counsel.            |
| 03:01 | 6  |       MR. CRONE:  I'll say that again.                            |
| 03:01 | 7  | BY MR. CRONE:                                                     |
| 03:01 | 8  | Q.   The e-mail address, Anne.Achey@Oracle.com, was that          |
|       | 9  | your e-mail address at the time?                                  |
| 03:01 | 10 | A.   Yes, it was.                                                 |
| 03:01 | 11 | Q.   And then it's -- one of the person's who was copied was      |
|       | 12 | Michael -- where it says Michael Mai and then                    |
|       | 13 | MMai@dearbornellc.com?                                            |
| 03:02 | 14 | A.   That's right.                                               |
| 03:02 | 15 | Q.   Was that an e-mail address that you used in connection       |
|       | 16 | with communicating with Mr. Mai on this transaction?             |
| 03:02 | 17 | A.   Yes.                                                         |
| 03:02 | 18 | Q.   Did you ever use a different e-mail address with             |
|       | 19 | Mr. Mai at any point in time?                                     |
| 03:02 | 20 | A.   No, I didn't.                                               |
| 03:02 | 21 | Q.   And then there's another individual here who was             |
|       | 22 | copied:  Claude Kramer III?                                       |
| 03:02 | 23 | A.   Right.                                                       |
| 03:02 | 24 | Q.   With another dearbornellc.com e-mail address?                |
| 03:02 | 25 | A.   True.                                                        |

03:02  1   Q.   Do you ever communicate with any other individual --
       2   sorry -- did you ever communicate with Mr. Kramer at any
       3   point in time with any other e-mail address other than this
       4   one?
03:02  5   A.   No.  This is the only one.
03:02  6   Q.   All right.  Had you ever heard of Quin Rudin before
       7   this transaction, Ms. Achey?
03:02  8   A.   No.
03:02  9   Q.    If Mr. Rudin or his Certus Solutions had been involved
      10   in previous transactions that weren't involving the U.S.
      11   Government or might have involved Oracle Credit or Oracle
      12   Finance that you talked about earlier, would you have been
      13   told about that?
03:03 14   A.   No.  If it wasn't for the federal government, I would
      15   have no visibility.
03:03 16   Q.   Okay.  And can you tell us who Claude Kramer III is or
      17   was, to your understanding?
03:03 18   A.   The contracts manager for Dearborne Circle.
03:03 19   Q.   And what is a contracts manager?
03:03 20   A.   Normally, most companies, resellers, that is a person
      21   who processes all agreements, who processes purchase orders,
      22   signs purchase orders, et cetera.
03:03 23   Q.   All right.  Let me now focus your attention on this
      24   e-mail from Mr. Rudin.  You see here the -- specifically,
      25   the first sentence.  It says "Hi, Anne, here is the POD and

|  | 1 | contract award from PBGC" -- |
| 03:03 | 2 | A.    Yes. |
| 03:03 | 3 | Q.    -- you see where I'm reading? |
| 03:03 | 4 |       What is a POD? |
| 03:03 | 5 | A.    POD is an acronym for Partner Ordering Document.  This |
|  | 6 | is the document between Oracle and the reseller that lays |
|  | 7 | out the products, the quantities, price, and any specific |
|  | 8 | terms. |
| 03:04 | 9 | Q.    And what does "contract award from PBGC" refer to? |
| 03:04 | 10 | A.    That would be the P.O. from the government to |
|  | 11 | Dearborne. |
| 03:04 | 12 | Q.    If I can now draw your attention to the second sentence |
|  | 13 | in this e-mail, where it says, "For your reference, you can |
|  | 14 | work with Michael Mai directly as the account manages |
|  | 15 | (verbatim) our federal customers, and Claude Kramer is our |
|  | 16 | contracts manager." |
| 03:04 | 17 |       Did I read that correctly? |
| 03:04 | 18 | A.    Yes. |
| 03:04 | 19 | Q.    Did Mr. Mai ever inform you at any point in time that |
|  | 20 | he was not the account manager for federal customers? |
| 03:04 | 21 | A.    No. |
| 03:04 | 22 | Q.    Did Mr. Mai or anyone else inform you that Claude |
|  | 23 | Kramer III was not a contracts manager for Dearborne? |
| 03:05 | 24 | A.    No. |
| 03:05 | 25 | Q.    Now, let me draw your attention to the third sentence |

|       |    |                                                                              |
|-------|----|------------------------------------------------------------------------------|
|       | 1  | in this e-mail, which starts, "FYI Dearborne Circle, LLC is                   |
|       | 2  | a certified SDVOSB."  And I'll stop there.                                    |
| 03:05 | 3  |      Ms. Achey, what is a certified SDVOSB?                                   |
| 03:05 | 4  | A.   Certified disabled veterans-owned small business.                       |
|       | 5  | That's a certification from the Department of Veterans                        |
|       | 6  | Affairs.                                                                      |
| 03:05 | 7  | Q.   You mean the U.S. Department of Veterans Affairs?                        |
| 03:05 | 8  | A.   U.S.                                                                     |
| 03:05 | 9  | Q.   I'm sorry, was that yes?                                                 |
| 03:05 | 10 | A.   Yes.                                                                     |
| 03:05 | 11 | Q.   And then you'll see right below the signature block for                  |
|       | 12 | Mr. Rudin below, an e-mail address -- again, it's                             |
|       | 13 | Quin@dearbornellc.com -- you'll see in italics a "certified                   |
|       | 14 | Service-Disabled Veteran-Owned business"?                                     |
| 03:05 | 15 | A.   Yes.                                                                     |
| 03:05 | 16 | Q.   And that's the same thing that you were testifying to                    |
|       | 17 | before that that acronym means?                                              |
| 03:06 | 18 | A.   Yes.                                                                     |
| 03:06 | 19 | Q.   Ms. Achey, do you know what a set aside is?                              |
| 03:06 | 20 | A.   Yes, I do.                                                               |
| 03:06 | 21 | Q.   What is a set aside?                                                     |
| 03:06 | 22 | A.   Sometimes the government wants to specify what type of                   |
|       | 23 | business is going to win the business.  It could be for a                     |
|       | 24 | small business.  It could be for woman-owned business, or it                  |
|       | 25 | could be for certified Service-Disabled veteran business.                    |

03:06   1   Q.   Was this particular transaction that we're looking at

        2   here a set aside?

03:06   3   A.   No, it wasn't.

03:06   4   Q.   Okay.  But in your experience, does the federal

        5   government have any preference to do business with certified

        6   Service-Disabled Veteran-Owned Small Businesses?

03:06   7   A.   Yes, they do.  And, in fact, they have an annual score

        8   card process, where they go through and they have to

        9   indicate what types of businesses they do business with.

       10   The government does not want all of the business going to

       11   large businesses.  They want to help these small businesses,

       12   women-owned businesses grow and be viable.

03:07  13   Q.   Now, this score card procedure that you just testified

       14   about, is that also applicable where transactions aren't a

       15   set aside?

03:07  16   A.   Yes.

03:07  17   Q.   Did Oracle and does Oracle have a corporate policy that

       18   preferred doing business with certified Service-Disabled

       19   Veteran-Owned Small Businesses?

03:07  20   A.   Just like the federal government, we'll go out of our

       21   way to try to help them succeed and make their business

       22   grow.

03:07  23   Q.   Did Mr. Mai ever inform you at any time in writing or

       24   over the telephone that Dearborne Circle wasn't principally

       25   owned or controlled by a Service-Disabled veteran?

| | | |
|---|---|---|
| 03:07 | 1 | A.   No, he didn't. |
| 03:07 | 2 | Q.   Did he ever tell you in any conversation that he hadn't |
| | 3 | ever been in the military? |
| 03:07 | 4 | A.   No. |
| 03:08 | 5 | Q.   Let me focus on the second half of the third sentence |
| | 6 | in this e-mail, Ms. Achey.  It goes on to say -- well, I'll |
| | 7 | start from the beginning.  "FYI Dearborne Circle, LLC is a |
| | 8 | certified SDVOSB and acquired Certus Solutions, Inc. to |
| | 9 | offer federal customers Oracle tech/apps solutions." |
| 03:08 | 10 | Did I read that correctly, Ms. Achey? |
| 03:08 | 11 | A.   Yes, you did. |
| 03:08 | 12 | Q.   What did you understand the second half of that |
| | 13 | sentence to mean? |
| 03:08 | 14 | A.   That Dearborne had purchased/acquired Certus Solutions, |
| | 15 | and at that point in time, after the acquisition, they were |
| | 16 | one and the same.  Dearborne, Certus were the same. |
| 03:08 | 17 | Q.   All right.  Let me draw your attention back to the |
| | 18 | signature block on Mr. Rudin's e-mail.  You see there -- |
| 03:08 | 19 | MR. CRONE:  If we could have the signature block, |
| | 20 | Mr. Owens. |
| 03:08 | 21 | (Exhibit displayed.) |
| 03:08 | 22 | BY MR. CRONE: |
| 03:08 | 23 | Q.   You see there that it says "Quin Rudin" and then |
| | 24 | "managing partner, Dearborne Circle, LLC"? |
| 03:09 | 25 | A.   Yes. |

DEBBIE GALE, U.S. COURT REPORTER

03:09    1    Q.   Did Mr. Mai ever tell you that at any point in time,

2    either over the telephone or in writing, that Mr. Rudin

3    wasn't the managing partner of Dearborne Circle?

03:09    4    A.   No, he didn't.

03:09    5    Q.   By the way, did you have an understanding of where

6    Mr. Rudin and Mr. Mai, in your various e-mails or

7    conversations -- where they were calling or e-mailing you

8    from?

03:09    9    A.   California.

03:09   10    Q.   And what's that's based on?

03:09   11    A.   Based upon the address on the purchase order, based

12    upon the address on the Partner Ordering Document, and area

13    codes of the phone numbers.

03:09   14    Q.   All right.  Now let me draw your attention to -- there

15    is -- further down in the e-mail chain, you'll see there's

16    an e-mail that begins at the bottom of page 1 and then

17    continues on to the second half of page 2 --

03:10   18    A.   Right.

03:10   19    Q.   -- do you see where I'm reading, Ms. Achey?

03:10   20    A.   I do.

03:10   21    Q.   Was this e-mail that we're looking at here -- well,

22    first of all, it reflects -- if you look at the bottom of

23    page 1, does it -- does it reflect who it -- this e-mail was

24    from?

03:10   25    A.   The e-mail was from Michael Mai to Debbie Dilldine and

DEBBIE GALE, U.S. COURT REPORTER

           1    Quin Rudin.
03:10      2    Q.   All right.  And for the -- in terms of who he had sent
           3    it to, you're looking at the top of page 2?
03:10      4    A.   That's right.
03:10      5    Q.   All right.  And was this e-mail from Mr. Mai included
           6    in the e-mail chain that you received from Mr. Rudin at -- a
           7    little bit after 1:00 o'clock on August 28th of 2009?
03:10      8    A.   Yes, it was attached.
03:11      9    Q.   And if I can draw your attention now to the e-mail from
          10    Mr. Mai on the top half of this page.  Specifically, you'll
          11    see there is a sentence just above "regards" from Mr. Mai?
03:11     12    A.   Right.  I see it.  Would you like me to read it?
03:11     13    Q.   No.  I'll -- please, if you would.
03:11     14    A.   *(Reading:)* "Like I have indicated to you on the phone,
          15    Dearborne Circle, LLC has 100 percent ownership of Certus
          16    Solutions, Inc.  Regards, Michael Mai."
03:11     17    Q.   All right.  Now, first of all, was that consistent with
          18    the conversation that you earlier testified you had had with
          19    Ms. Dilldine?
03:11     20    A.   Yes, it is.
03:11     21    Q.   And we saw that statement regarding the acquisition of
          22    Certus Solutions, Inc. and Mr. Rudin's e-mail, as well.  Was
          23    that important to you at the time?
03:12     24    A.   It was, because it showed to me that Certus and
          25    Dearborne were one in the same.

| 03:12 | 1 | Q.   At any point in time, did you consider Dearborne and |
| | 2 | Certus to be different companies? |
| 03:12 | 3 | A.   No, always the same. |
| 03:12 | 4 | Q.   Below the signature block on Mr. Mai's e-mail -- |
| 03:12 | 5 | MR. CRONE:  If we could pull that up and magnify |
| | 6 | that, the signature block. |
| 03:12 | 7 | *(Exhibit displayed.)* |
| 03:12 | 8 | BY MR. CRONE: |
| 03:12 | 9 | Q.   -- you'll see below Mr. Mai's e-mail address, phone, |
| | 10 | and fax number there, it says, again, in italics "certified |
| | 11 | Service-Disabled Veteran-Owned business" and then in |
| | 12 | parenthesis "SDVOSB." |
| 03:12 | 13 | Do you see where I'm reading? |
| 03:12 | 14 | A.   Yes, I do. |
| 03:12 | 15 | Q.   Did Mr. Mai ever correct that statement from his own |
| | 16 | e-mail messages to you? |
| 03:12 | 17 | A.   No, he didn't. |
| 03:12 | 18 | Q.   Did Mr. Mai ever actually send you a copy of his -- any |
| | 19 | certification he had received from the Department of |
| | 20 | Veterans Affairs on the subject? |
| 03:13 | 21 | A.   He forwarded to me a message that he had previously |
| | 22 | sent to PBGC that had the certification from Department of |
| | 23 | Veterans Affairs attached. |
| 03:13 | 24 | Q.   Okay.  And, I'm sorry, you're saying that he had |
| | 25 | previously sent it to the PBGC before you? |

| | | |
|---|---|---|
| 03:13 | 1 | A.   Right. |
| 03:13 | 2 | Q.   Let me have you turn, Ms. Achey, to page 3 of this |
| | 3 | document. |
| 03:13 | 4 | A.   Okay. |
| 03:13 | 5 | Q.   And you'll see this is the -- am I right, the pages 3 |
| | 6 | through 7, is that a single document? |
| 03:13 | 7 | A.   Yes, it is. |
| 03:13 | 8 | Q.   All right.  And what is -- I'm sorry.  Was this |
| | 9 | document attached to the e-mail that you received on |
| | 10 | August 28th, 2009? |
| 03:13 | 11 | A.   Yes, this is a Partner Ordering Document that was |
| | 12 | attached. |
| 03:13 | 13 | Q.   All right.  And if I can draw your attention to the |
| | 14 | upper left-hand corner of this document where it says |
| | 15 | "partner name." |
| 03:14 | 16 | What -- do you see where I'm reading, Mr. Achey? |
| 03:14 | 17 | A.   Yes, I do. |
| 03:14 | 18 | Q.   What information typically is supposed to be put there |
| | 19 | where it says "partner name"? |
| 03:14 | 20 | A.   I mean, it's a partner name as it is in OPN. |
| 03:14 | 21 | Q.   All right.  And you see where it says, "Certus |
| | 22 | Solutions, Inc. care of Dearborne Circle, LLC"? |
| 03:14 | 23 | A.   Yes. |
| 03:14 | 24 | Q.   Did you ever instruct Mr. Mai to put "care of |
| | 25 | Dearborne" on this document? |

03:14  1  A.   No.  The document came in before we had any

2  conversations of substance.

03:14  3  Q.   If you had known at -- and if you had known at the time

4  that Dearborne had never acquired Certus Solutions, Inc.,

5  would you have actually even still used this public sector

6  Partner Ordering Document that we're looking at on page 3?

03:14  7  A.   We would have -- if Certus was not part of Dearborne,

8  we would have used a different Partner Ordering Document

9  that represented two separate companies.

03:15  10  Q.   Below that, you'll see that there -- below the partner

11  name on this document, you'll see there's a "ship to" name?

03:15  12  A.   Yes.

03:15  13  Q.   If we go lower on the document, you'll see --

03:15  14       MR. CRONE:  Thank you, Mr. Owen.

03:15  15  BY MR. CRONE:

03:15  16  Q.   You'll see a "ship to" name; then it says, "Pension

17  Benefit Guaranty Corp. receiving room," and then it has an

18  address in Washington, correct?

03:15  19  A.   That's true.

03:15  20  Q.   Now, does that reflect that Oracle was actually going

21  to physically deliver the software to the PBGC?

03:15  22  A.   No.

03:15  23  Q.   And in this particular transaction at a high level, how

24  was the software going to be delivered?

03:15  25  A.   Software was delivered by electronic download.  What we

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | do is we provide the customer service identifier to the      |
|       | 2  | customer, and then they can go into the website Oracle.com   |
|       | 3  | and download the software.                                   |
| 03:16 | 4  | Q.   All right.  Now, if you look at the bottom part of this  |
|       | 5  | page 3, where it has a listing -- do you see where I'm        |
|       | 6  | reading --                                                   |
| 03:16 | 7  | A.   Right.                                                   |
| 03:16 | 8  | Q.   -- on the bottom third there?                           |
| 03:16 | 9  |      What is that reflecting?                                |
| 03:16 | 10 | A.   Those are all the different products and the quantities |
|       | 11 | and the pricing to go with the products in the order.        |
| 03:16 | 12 | Q.   All right.  Let me have you turn to page 7 of this       |
|       | 13 | exhibit, the final page of this Partner Ordering Document.   |
| 03:16 | 14 | A.   Okay.                                                    |
| 03:16 | 15 | Q.   Let me know when you're there.                          |
| 03:16 | 16 | A.   I'm there.                                               |
| 03:16 | 17 | Q.   If you look at the signature block there, and it says    |
|       | 18 | "partner," and then it has a signature, then a typed-out     |
|       | 19 | "Michael Mai, managing partner," and then the date of        |
|       | 20 | August 28th, 2009.  Is that accurate?                        |
| 03:16 | 21 | A.   That's true.                                            |
| 03:16 | 22 | Q.   Did Mr. Mai ever tell you, after you got this e-mail in  |
|       | 23 | which he was copied, that this was not his signature?        |
| 03:16 | 24 | A.   No, he didn't.                                           |
| 03:17 | 25 | Q.   Let me have you turn to page 8, Ms. Achey, of            |

DEBBIE GALE, U.S. COURT REPORTER

|  |  |  |
|---|---|---|
|  | 1 | Exhibit 119 -- |
| 03:17 | 2 | A.   Okay. |
| 03:17 | 3 | Q.   And then you'll see this exhibit goes on for a couple |
|  | 4 | more pages.  It ends at page 10. |
| 03:17 | 5 | A.   Okay. |
| 03:17 | 6 | Q.   Are pages 8, 9, and 10 a single document? |
| 03:17 | 7 | A.   They are.  They're the first three pages of the |
|  | 8 | purchase order to Dearborne from PBGC. |
| 03:17 | 9 | Q.   All right.  And is that also the contract award that |
|  | 10 | you were referring to earlier? |
| 03:17 | 11 | A.   Yes, it is. |
| 03:17 | 12 | Q.   All right.  And was -- were these pages, 8 through 10, |
|  | 13 | also attached to the e-mail that you received on August 28th |
|  | 14 | of 2009? |
| 03:17 | 15 | A.   Yes, they were. |
| 03:17 | 16 | Q.   And can you tell us just generally, at a high level, |
|  | 17 | what types of products the Pension Benefit Guaranty |
|  | 18 | Corporation ordered?  Were they -- was it database software? |
| 03:17 | 19 | A.   It was database software, database and options. |
| 03:17 | 20 | Q.   Okay.  And would their order have included any type of |
|  | 21 | service or support from Oracle? |
| 03:18 | 22 | A.   They ordered one year of maintenance support on the |
|  | 23 | software. |
| 03:18 | 24 | Q.   And when you say "maintenance support," what does that |
|  | 25 | entitle a customer to receive? |

DEBBIE GALE, U.S. COURT REPORTER

03:18   1   A.   That entitles 'em to receive any software patch

    2   corrections.  If there are problems, you get patches.

03:18   3       That entitles 'em to receive any software update.

    4   Quite frequently, we update the software, move to different

    5   version levels.

03:18   6       And it also entitles 'em to receive support via phone.

03:18   7   Q.   Now, based on the documentation that you received and

    8   this e-mail that's marked as Exhibit 119, who did you

    9   understand to be the reseller ordering the software in this

   10   transaction?

03:18  11   A.   Dearborne Circle, LLC.

03:18  12   Q.   When -- Ms. Achey, when you received the details of the

   13   pricing for this transaction, did you have a reaction to it?

03:19  14   A.   Uh, yes.  The pricing was a bit creative.

03:19  15   Q.   What do you mean by that?

03:19  16   A.   Normally, when we have a document like this, we show

   17   the unit pricing per Oracle's published price list and the

   18   discounts off of the published price list.

03:19  19       The list prices were not anywhere close to what the

   20   Oracle published pricing was.  The discount was per their

   21   agreement, but the list prices were significantly lower.

03:19  22   Q.   Does -- well, does Oracle normally, typically,

   23   authorize prices such as those that were included in the

   24   Partner Ordering Document that was delivered to you?

03:19  25   A.   The prices were much lower than what we would normally

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | have approved.                                               |
| 03:20 | 2  | Q.   Okay.  And did you ultimately discuss with Mr. Mai or   |
|       | 3  | Mr. Rudin how they had arrived at the prices that they put   |
|       | 4  | on their bid to the PBGC and then ultimately were -- that    |
|       | 5  | they used to make their bid to the PBGC and ultimately were  |
|       | 6  | included in this Partner Ordering Document?                  |
| 03:20 | 7  | A.   What I was told was the pricing that they used for the  |
|       | 8  | unit, quote/unquote, list pricing was the pricing that DLT   |
|       | 9  | had published on their GSA schedule.  So this was already    |
|       | 10 | discounted pricing that came from GSA website, GSA           |
|       | 11 | advantage.                                                   |
| 03:20 | 12 | Q.   Okay.  You said quite a bit there, Ms. Achey.          |
| 03:20 | 13 | A.   I know.                                                 |
| 03:20 | 14 | Q.   So let me step back.  First of all, who is it that told |
|       | 15 | you about this pricing issue?                                |
| 03:20 | 16 | A.   Mr. Mai.                                                |
| 03:20 | 17 | Q.   Mr. Mai?                                                |
| 03:20 | 18 | A.   Yes.                                                    |
| 03:20 | 19 | Q.   And was it a -- you mentioned that they had gotten      |
|       | 20 | pricing from DLT?                                            |
| 03:21 | 21 | A.   They had pulled the pricing, DLT's GSA pricing, from    |
|       | 22 | the GSA website.                                             |
| 03:21 | 23 | Q.   Okay.  And the GSA, that's the General Services         |
|       | 24 | Administration?                                              |
| 03:21 | 25 | A.   Yes.                                                    |

03:21 1    Q.    Okay.  And -- and the GSA pricing, was that -- that was

2    an already discounted price; is that accurate?

03:21 3    A.    The GSA pricing is discounted approximately 55 percent.

03:21 4    Q.    Were you able to process this transaction as Mr. Mai

5    and Mr. Rudin contemplated it?

03:21 6    A.    No.

03:21 7    Q.    And why is that?

03:21 8    A.    Because the pricing -- Oracle would not accept the

9    pricing as presented.

03:21 10   Q.    Did you, um, ultimately find out -- well, did you know

11   how much the Pension Benefit Guaranty Corporation was going

12   to pay Dearborne Circle for the delivery of this software

13   pursuant to the bid that was accepted in this auction?

03:22 14   A.    908,000.

03:22 15   Q.    All right.  And at a standard discount for the

16   software, using standard price list discount --

03:22 17   A.    Right.

03:22 18   Q.    -- Ms. Achey, would the price that they ultimately

19   would have had to pay Oracle been more or less than the

20   908,000 that the government was ultimately going to have to

21   pay them?

03:22 22   A.    Significantly more.

03:22 23   Q.    When you say "significantly," can you give us an

24   estimate of how much more?

03:22 25   A.    Instead of 908, I think it was about 1.3 million, and

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | that's round figures.                                        |
| 03:22 | 2  | Q.   And when you say "1.3 million," that would have been    |
|       | 3  | their cost to order it from Oracle?                          |
| 03:22 | 4  | A.   Right.  So that would have been a $400,000 loss.        |
| 03:22 | 5  | Q.   What did you do to address that issue?                  |
| 03:22 | 6  | A.   I worked with, primarily, Quin Rudin on it to back into |
|       | 7  | a price that would have been less than the 908 so they could |
|       | 8  | still have margin, but closer to an acceptable price to      |
|       | 9  | Oracle.  So I was trying to meet 'em halfway in the middle.  |
| 03:23 | 10 | Q.   If you could turn to Exhibit 17 in the binders in front |
|       | 11 | of you, Ms. Achey.                                           |
| 03:23 | 12 | A.   Okay.                                                   |
| 03:23 | 13 | Q.   Have you seen Exhibit 17 before?                        |
| 03:23 | 14 | A.   Yes.  It's an e-mail that I drafted and sent.           |
| 03:23 | 15 | Q.   Okay.  And when you say you sent it, is it accurate to  |
|       | 16 | say you sent it on August 28th of 2009, after Exhibit 119?   |
| 03:23 | 17 | A.   Yes.                                                    |
| 03:23 | 18 | Q.   And who did you send it to?                             |
| 03:23 | 19 | A.   I sent it to Quin Rudin, copied Michael Mai and Claude  |
|       | 20 | Kramer.                                                      |
| 03:23 | 21 |        MR. CRONE:  Your Honor, we'd move Exhibit 17 into     |
|       | 22 | evidence.                                                    |
| 03:23 | 23 |        THE COURT:  Received.                                 |
| 03:23 | 24 |    (Exhibit No. 17 received in evidence.)                    |
| 03:23 | 25 |        MR. CRONE:  Thank you, Your Honor.  May we            |

|       |    |                                                           |
|-------|----|-----------------------------------------------------------|
|       | 1  | publish?                                                   |
| 03:23 | 2  |           THE COURT:  You may.                             |
| 03:23 | 3  |      *(Exhibit displayed.)*                                |
| 03:23 | 4  |           MR. CRONE:  Thank you.                           |
| 03:23 | 5  | BY MR. CRONE:                                              |
| 03:23 | 6  | Q.   And again, Ms. Achey, what was the purpose of you    |
|       | 7  | sending this particular e-mail to Mr. Rudin, Mr. Mai,     |
|       | 8  | Mr. Kramer?                                                |
| 03:24 | 9  | A.   In order for us to move forward with processing an   |
|       | 10 | order for the software for PBGC, we had to seek corporate |
|       | 11 | approval for some nonstandard discounts.                  |
| 03:24 | 12 |      So what I had done was I backed into, calculated the |
|       | 13 | discount of 61 percent.  And I was letting 'em know that's |
|       | 14 | what it was, and based upon our conversations, what I --  |
|       | 15 | accept -- what I thought an acceptable justification would |
|       | 16 | have been.                                                 |
| 03:24 | 17 | Q.   All right.  In the middle of this e-mail, you have a |
|       | 18 | reference to partner name --                               |
| 03:24 | 19 |           MR. CRONE:  If we could have that --            |
| 03:24 | 20 |      *(Exhibit displayed.)*                                |
| 03:24 | 21 |           THE WITNESS:  Right.                            |
| 03:24 | 22 | BY MR. CRONE:                                              |
| 03:24 | 23 | Q.   -- and it says, "Partner Name:  Certus Solutions Inc., |
|       | 24 | Care Of Dearborne Circle, LLC."                           |
| 03:24 | 25 | A.   Right.                                                |

| | | |
|---|---|---|
| 03:24 | 1 | Q.   Is that something that you typed in this e-mail? |
| 03:24 | 2 | A.   I typed it in this e-mail, yes. |
| 03:24 | 3 | Q.   And why -- why did you do that? |
| 03:24 | 4 | A.   Well, that was the name that was on the Partner |
| | 5 | Ordering Document.  That was the name we will process it |
| | 6 | forward.  And Certus Solutions was the name in OPN; |
| | 7 | Dearborne was the name on the government P.O., but because |
| | 8 | of the acquisition, they were one in the same.  So we're |
| | 9 | bringing everything together. |
| 03:25 | 10 | Q.   Right below that you see there's a paragraph with a |
| | 11 | "bolded" title just above it. |
| 03:25 | 12 | MR. CRONE:  If we could pull that up. |
| 03:25 | 13 | (Exhibit displayed.) |
| 03:25 | 14 | BY MR. CRONE: |
| 03:25 | 15 | Q.   You'll see it starts with requesting a nonstandard -- a |
| | 16 | 61 percent discount on licenses and support? |
| 03:25 | 17 | A.   Yes. |
| 03:25 | 18 | Q.   And that refers to the nonstandard request you were |
| | 19 | testifying about? |
| 03:25 | 20 | A.   Right.  Their standard discount was 30 percent, and we |
| | 21 | were going forward with the request for 61. |
| 03:25 | 22 | Q.   And when you say a "request," did that require several |
| | 23 | tiers of authority above your own at the time? |
| 03:25 | 24 | A.   It required two above myself. |
| 03:25 | 25 | Q.   You'll see there, below this bolded title, there's a |

```
      1   paragraph that's been typed in.  Did you type that yourself?
03:26 2   A.   Yes.
03:26 3   Q.   All right.  And what was the purpose of you typing this
      4   paragraph?
03:26 5   A.   Because we would have to give corporate a justification
      6   for why they received a nonstandard discount, and based upon
      7   my conversations Quin and Michael, I zeroed in on what I
      8   believed were the salient points from their discussion.
03:26 9   Q.   All right.  And let me have you focus on the third
     10   sentence in this paragraph that says, "Certus Solutions, a
     11   Service-Disabled veteran company bid."
03:26 12       Do you see where I'm reading?
03:26 13  A.   I do.
03:26 14  Q.   Why did you include that this transaction involved a
     15   Service-Disabled veteran company?
03:26 16  A.   Because that was very important to the company coming
     17   in.  It was important enough that they had forwarded me a
     18   copy of their certification from VA.  And it was important
     19   enough for them to emphasize it in our discussions that
     20   they -- they believed that was one of the reasons they won
     21   the bid.
03:27 22  Q.   Now, you -- I notice you put Certus Solutions bid --
03:27 23  A.   Right.
03:27 24  Q.   -- as opposed to Dearborne.  Do you recall why you did
     25   that?
```

03:27   1   A.   I don't recall specifically.  Like I said, they were

        2   one in the same throughout the process.

03:27   3   Q.   And then, if you go on to the next sentence where it

        4   says, "The customer awarded the business to Certus" --

03:27   5   A.   Right.

03:27   6   Q.   Right.

03:27   7        -- is it for the same reason that you put Certus

        8   rather than Dearborne?

03:27   9   A.   Yes.

03:27  10   Q.   Incidentally, at any point in time, did you have

       11   telephone conversations with Mr. Mai regarding whether or

       12   not Dearborne Circle had acquired Certus Solutions, Inc.?

03:28  13   A.   I don't know whether we discussed it on the phone.  We

       14   had it in the e-mail.  That was sufficient.

03:28  15   Q.   If I can have you turn to Exhibit 125, Ms. Achey.

03:28  16   A.   Okay.  I'm there.

03:28  17   Q.   All right.  And you see this is -- is this an e-mail

       18   that you've seen before, Ms. Achey?

03:28  19   A.   Yes, it is.

03:28  20   Q.   Is this also an e-mail that you've had access to in

       21   connection with your Oracle employment?

03:28  22   A.   Yes.

03:28  23   Q.   And are such e-mails kept in the ordinary course of

       24   Oracle's business?

03:28  25   A.   Yes, they are.

03:28  1  Q.   And is this an e-mail from Mr. Mai to several other

2  individuals at Oracle?

03:28  3  A.   Yes, it is.

03:28  4  Q.   And do you know what unit of Oracle those individuals

5  worked in -- well, let me step back.

03:28  6       Would you agree this is an e-mail dated August 31,

7  2009?

03:28  8  A.   Yes.

03:28  9  Q.   And was -- do you recall what, uh, unit these

10  individuals worked in?

03:29  11  A.   These individuals worked for the Oracle Credit.

03:29  12  Q.   Do you have personal knowledge as to why Mr. Mai was

13  contacting these individuals at Oracle Credit?

03:29  14  A.   I had sent in a credit approval for the transaction,

15  and I had been told that they did not have financial records

16  on file, so I got the points of contact and asked Quin Rudin

17  and Mr. Mai to get Dearborne financials in to them.

03:29  18       MR. CRONE:  Your Honor, I would move Exhibit 125

19  into evidence.

03:29  20       THE COURT:  Received.

03:29  21  *(Exhibit No. 125 received in evidence.)*

03:29  22       MR. CRONE:  Thank you, Your Honor.  May we

23  publish?

03:29  24       THE COURT:  You may.

03:29  25       MR. CRONE:  Thank you.

03:29   1        (Exhibit displayed.)

03:29   2   BY MR. CRONE:

03:29   3   Q.   Ms. Achey, let me draw your attention to the first

        4   sentence in this e-mail from Mr. Mai.  You see where it

        5   says, "Ann Achey referred you to us as we need to issue a

        6   purchase order to Oracle to book an order which will require

        7   credit approval"?

03:30   8   A.   Yes.

03:30   9   Q.   Is that consistent with the conversation that you just

       10   testified about that you had with Mr. Mai or Mr. Rudin?

03:30  11   A.   Yes, it is.

03:30  12   Q.   And when it says, "we need -- we need to issue a

       13   purchase order to Oracle," what is that referring to?

03:30  14   A.   A purchase order for the software required for the PBGC

       15   transaction.

03:30  16   Q.   And is that typically a document that's sent by a

       17   reseller to Oracle in connection with these type of

       18   transactions?

03:30  19   A.   Yes.

03:30  20   Q.   And at the end of that sentence where it says that, um,

       21   "will require credit approval," is credit approval typical

       22   for this size of transaction?

03:31  23   A.   Credit approval is required for everything over 200K,

       24   and this was 800-and-some K.

03:31  25        (Cell phone interruption.)

DEBBIE GALE, U.S. COURT REPORTER

| 03:31 | 1 | A JUROR:  Sorry. |
| 03:31 | 2 | BY MR. CRONE: |
| 03:31 | 3 | Q.   Ms. Achey, at the second sentence here -- oh, just |
|  | 4 | going back to credit approval.  I believe you said credit |
|  | 5 | approval was required for this -- for a transaction that was |
|  | 6 | gonna be more than $800,000? |
| 03:31 | 7 | A.   More than 200,000, and this deal was 800,000. |
| 03:32 | 8 | Q.   And why is it that Oracle wanted to have credit |
|  | 9 | approval for transactions that exceeded $200,000 in value? |
| 03:32 | 10 | A.   Oracle wants to review the company's financials to |
|  | 11 | ensure that Oracle will be paid for the software and |
|  | 12 | services. |
| 03:32 | 13 | Q.   Let me now draw your attention to the second sentence |
|  | 14 | in Mr. Mai's e-mail.  It says, "Attached is our consolidated |
|  | 15 | financial statements." |
| 03:32 | 16 | Well, let me have it pulled up first. |
| 03:32 | 17 | (Exhibit displayed.) |
| 03:32 | 18 | BY MR. CRONE: |
| 03:32 | 19 | Q.   "Attached is our consolidated financial statements for |
|  | 20 | Dearborne Circle, LLC, which acquired Certus Solutions, Inc. |
|  | 21 | at end of 2008." |
| 03:32 | 22 | Did I read that correctly? |
| 03:32 | 23 | A.   You did. |
| 03:32 | 24 | Q.   Just stepping back for a moment.  Whose financials |
|  | 25 | would Oracle Credit review in a transaction like this one? |

03:33    1    A.   They will review the parent company.  Dearborne was the

2    parent.  If you look at it as a parent-child relationship:

3    Dearborne was the parent; Certus was the child, so they

4    would review Dearborne.

03:33    5    Q.   All right.  And did -- if you had been told at the time

6    that Certus Solutions was the contracting reseller and there

7    never had been an acquisition of Dearborne Circle, whose

8    financials would Oracle Credit have looked at at the time?

03:33    9    A.   Certus Solutions.

03:33    10    Q.   And did Mr. Mai ever tell you in any subsequent

11    conversation after this e-mail on August 31, 2009, that

12    Dearborne had not been acquired -- that Dearborne had not

13    acquired Certus Solutions, Inc. at the end of 2008?

03:33    14    A.   No, he didn't.

03:34    15    Q.   Ms. Achey, could you please turn to Exhibit No. 18 in

16    your books.

03:34    17    A.   Okay.

03:34    18    Q.   Is it in front of you, Ms. Achey?

03:34    19    A.   I am.

03:34    20    Q.   Have you seen this before?

03:34    21    A.   Yes.

03:34    22    Q.   Can you tell us what this is?

03:34    23    A.   This is a purchase order from Dearborne to Oracle for

24    the software for PBGC.

03:34    25    Q.   And does Oracle keep purchase orders like this in the

| | | |
|---|---|---|
| | 1 | ordinary course of its business? |
| 03:34 | 2 | A.   Yes, they do. |
| 03:34 | 3 | MR. CRONE:  And, Your Honor, we'll move Exhibit 18 |
| | 4 | in evidence. |
| 03:34 | 5 | THE COURT:  Received. |
| 03:34 | 6 | *(Exhibit No. 18 received in evidence.)* |
| 03:34 | 7 | MR. CRONE:  May we publish? |
| 03:34 | 8 | THE COURT:  You may. |
| 03:34 | 9 | MR. CRONE:  Thank you. |
| 03:34 | 10 | *(Exhibit displayed.)* |
| 03:34 | 11 | BY MR. CRONE: |
| 03:34 | 12 | Q.   Ms. Achey, can you tell us the date of this purchase |
| | 13 | order? |
| 03:34 | 14 | A.   Purchase order is August 31, 2009. |
| 03:34 | 15 | Q.   All right.  And then if you look at the upper left-hand |
| | 16 | corner of this document, you'll see there is a listing and |
| | 17 | it says, again, "Certus Solutions, Inc., care of Dearborne |
| | 18 | Circle, LLC." |
| 03:35 | 19 | You see where I'm reading? |
| 03:35 | 20 | A.   Yes, I do. |
| 03:35 | 21 | Q.   Did you ever instruct Mr. Mai to put Dearborne's name |
| | 22 | on this purchase order? |
| 03:35 | 23 | A.   No. |
| 03:35 | 24 | Q.   Did you ever tell him that that was an Oracle |
| | 25 | requirement of any kind? |

03:35    1    A.    No.

03:35    2    Q.    Now, according to this purchase order, when was

         3    Dearborne requesting delivery of the product?

03:35    4    A.    September 4th, 2009.

03:35    5    Q.    And then there's a reference that you're looking at

         6    the -- the row of information there above the numbers on the

         7    right-hand side, the delivery date; is that correct?

03:35    8    A.    That's right.

03:35    9              MR. CRONE:  If we could bring that back up.

03:35   10         (Exhibit displayed.)

03:35   11    BY MR. CRONE:

03:35   12    Q.    You'll then see in the middle column there's a

        13    reference to "net 30" there --

03:35   14    A.    Right.

03:35   15    Q.    -- on the screen.

03:35   16              What does that refer to?

03:35   17    A.    Well, it says "shipping terms," but really it's payment

        18    terms.  Payment terms would be net 30.

03:35   19    Q.    And what does "net 30" mean?

03:36   20    A.    30 days after receipt of the invoice.

03:36   21    Q.    Now, does that mean they were proposing to pay Oracle

        22    before or after the delivery of the licenses to the federal

        23    government?

03:36   24    A.    After delivery of the licenses.

03:36   25    Q.    Does Oracle require its end-user customers, such as the

1   Pension Benefit Guaranty Corporation, to enter into a

2   license agreement for the software that they purchase?

03:36   3   A.   Yes.

03:36   4   Q.   And who typically obtains the customer's signature on a

5   license agreement like that?

03:36   6   A.   Normally, that's the responsibility of the reseller.

03:36   7   Q.   Did that happen here?

03:36   8   A.   No, it didn't.

03:36   9   Q.   Did you take any steps to try to resolve that issue?

03:36   10   A.   Once we determined that the customer had issues with

11   some of the terms in the license agreement, I worked with

12   the customer legal department and Oracle legal department to

13   get to an agreement that everybody could sign.

03:36   14   Q.   Okay.   In particular, why were you getting involved in

15   that?

03:37   16   A.   'Cause I was the channel manager.

03:37   17   Q.   What was the result of those negotiations?

03:37   18   A.   It took about three weeks to get to, but we had to go

19   through several layers of approvals up to HQ app.   And we

20   did come up with a license agreement that Oracle would

21   accept, that the customer would sign.

03:37   22   Q.   All right.   And those license changes, did that affect

23   any of the products that the PBGC was going to ultimately

24   end up with?

03:37   25   A.   During the conversations that we had with the customer,

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
|       | 1  | we determined that the customer had ordered WebLogic, when       |
|       | 2  | they should have ordered Internet Application Server.  So        |
|       | 3  | they had ordered the wrong product, so we had to do a            |
|       | 4  | product switch.                                                  |
| 03:37 | 5  | Q.   Did that product switch that you -- you mentioned, did      |
|       | 6  | that affect the price at all that would have to be paid to       |
|       | 7  | Oracle for the software it was going to deliver to the           |
|       | 8  | government on Dearborne's behalf?                                |
| 03:38 | 9  | A.   It did not affect the price because we increased the        |
|       | 10 | discount one more time so that we could maintain the same        |
|       | 11 | price.                                                           |
| 03:38 | 12 | Q.   When you say increase the discount, do you mean you         |
|       | 13 | went through another --                                          |
| 03:38 | 14 | A.   Another approval.                                           |
| 03:38 | 15 | Q.   -- another approval of discounting?                         |
| 03:38 | 16 | A.   Yes.                                                        |
| 03:38 | 17 | Q.   Was that something that had to go through someone           |
|       | 18 | higher than yourself, again?                                     |
| 03:38 | 19 | A.   Yes.  Yes, it was.                                          |
| 03:38 | 20 | Q.   Ms. Achey, can you please turn to Exhibit 126 in your       |
|       | 21 | binders?                                                         |
| 03:38 | 22 | A.   Okay.  I'm there.                                           |
| 03:38 | 23 | Q.   Have you seen this document before?                         |
| 03:38 | 24 | A.   Yes, I have.                                                |
| 03:38 | 25 | Q.   And is this an e-mail that you received on                  |

|       |    |                                                                |
|-------|----|----------------------------------------------------------------|
|       | 1  | September 29th, 2008?                                           |
| 03:38 | 2  | A.    It is.                                                    |
| 03:38 | 3  | Q.    And who sent it to you?                                   |
| 03:38 | 4  | A.    Michael Mai sent it to me, copying Claude Kramer and      |
|       | 5  | Quin Rudin.                                                     |
| 03:39 | 6  |          MR. CRONE:  Your Honor, we would move Exhibit 126      |
|       | 7  | into evidence.                                                 |
| 03:39 | 8  |          THE COURT:  Received.                                  |
| 03:39 | 9  |      *(Exhibit No. 126 received in evidence.)*                  |
| 03:39 | 10 |          MR. CRONE:  May we publish, Your Honor?               |
| 03:39 | 11 |          THE COURT:  You may.                                   |
| 03:39 | 12 |       *(Exhibit displayed.)*                                    |
| 03:39 | 13 | BY MR. CRONE:                                                  |
| 03:39 | 14 | Q.    Now, Ms. Achey, there's also an attachment to this       |
|       | 15 | e-mail.  Do you see it -- it starts at page, um -- well,        |
|       | 16 | there's several attachments, right?  There's an                |
|       | 17 | Attachment 4 -- sorry.  There's an attachment that begins at    |
|       | 18 | page 4, and then there's another one at page 5 --              |
| 03:39 | 19 | A.    Right.                                                    |
| 03:39 | 20 | Q.    -- or is that one attachment?                            |
| 03:39 | 21 | A.    Yes.  It's one attachment.  I believe it came in as one   |
|       | 22 | PDF file.                                                       |
| 03:39 | 23 | Q.    I see.                                                    |
| 03:39 | 24 |          And starting at page 5, can you tell us what this is? |
| 03:39 | 25 | A.    This was the revised Partner Ordering Document to         |

|        |    |                                                          |
|--------|----|----------------------------------------------------------|
|        | 1  | reflect the correct products and discounts.              |
| 03:39  | 2  | Q.   All right.  And if you look on the -- if we can     |
|        | 3  | focus -- do you know why this was being sent to you, this|
|        | 4  | revised Partner Ordering Document?                       |
| 03:40  | 5  | A.   We had finally worked through all the issues with the|
|        | 6  | customer and with the reseller, and we now had a package |
|        | 7  | that we could book; in other words, we could put in the  |
|        | 8  | system and process.                                      |
| 03:40  | 9  | Q.   All right.  And I hate to jump around on you, but if we|
|        | 10 | could turn back to page 1 for a moment.                  |
| 03:40  | 11 | A.   Okay.                                               |
| 03:40  | 12 |         MR. CRONE:  If we could bring up the first       |
|        | 13 | sentence in the first e-mail here from Mr. Mai.          |
| 03:40  | 14 |     (Exhibit displayed.)                                 |
| 03:40  | 15 | BY MR. CRONE:                                            |
| 03:40  | 16 | Q.   It says, "Anne, revised all the documents to reflect|
|        | 17 | the correct price."                                      |
| 03:40  | 18 |     Is that accurate?                                    |
| 03:40  | 19 | A.   Yes.                                                |
| 03:40  | 20 | Q.   Is that consistent with what you just earlier testified|
|        | 21 | about modifying the price for the software?              |
| 03:40  | 22 | A.   Right.                                              |
| 03:40  | 23 | Q.   All right.  So going back to page 5, the Partner    |
|        | 24 | Ordering Document, if we could --                        |
| 03:40  | 25 | A.   Okay.                                               |

| 03:40 | 1 | Q.   -- and focus on the upper right-hand corner of this |
| | 2 | document -- |
| 03:40 | 3 | A.   Right. |
| 03:40 | 4 | Q.   -- you'll see here there's a partner "bill to" contact? |
| 03:41 | 5 | A.   Yes. |
| 03:41 | 6 | Q.   And what information is typically put there? |
| 03:41 | 7 | A.   That's who is going to receive the invoices from Oracle |
| | 8 | and, consequently, process a check to Oracle for the product |
| | 9 | and services. |
| 03:41 | 10 | Q.   Okay.  And is it Mr. Mai's name and e-mail address as |
| | 11 | used during this time period? |
| 03:41 | 12 | A.   Yes. |
| 03:41 | 13 | Q.   And was that his phone number that you used during this |
| | 14 | time period? |
| 03:41 | 15 | A.   I would assume so.  Well, it's missing a digit. |
| 03:41 | 16 | Q.   It's cut off here. |
| 03:41 | 17 | A.   Yeah.  It's missing a digit. |
| 03:41 | 18 | Q.   If you could turn back to Exhibit 119 momentarily. |
| 03:41 | 19 | And this is in evidence. |
| 03:41 | 20 | If we could turn to page 3. |
| 03:41 | 21 | A.   It's missing the same digit. |
| 03:41 | 22 | Q.   All right.  But it still has him as the partner "bill |
| | 23 | to" contact.  Is that accurate? |
| 03:42 | 24 | A.   Yes. |
| 03:42 | 25 | Q.   And then back on Exhibit 126, if you'd turn to the |

| | | |
|---|---|---|
| | 1 | final page of this Partner Ordering Document, which is at |
| | 2 | page 9 -- |
| 03:42 | 3 | A.   Page 9. |
| 03:42 | 4 | Q.   -- of Exhibit 126. |
| 03:42 | 5 | If we look at the signature block, it says "partner" |
| | 6 | and then there's a signature and then has typed in the name |
| | 7 | of Quin Rudin and managing partner.  Is that accurate? |
| 03:42 | 8 | A.   Yes, that's true. |
| 03:42 | 9 | Q.   Did Mr. Mai ever contact you at any time to inform you |
| | 10 | that Quin Rudin was not the managing partner of Dearborne |
| | 11 | after receiving this e-mail? |
| 03:42 | 12 | A.   No, he didn't. |
| 03:42 | 13 | Q.   Ms. Achey, if you could turn to Exhibit 20.  Let me |
| | 14 | know when you're there.  Are you there? |
| 03:43 | 15 | A.   I'm there. |
| 03:43 | 16 | Q.   Can you tell us what Exhibit 20 is? |
| 03:43 | 17 | A.   Exhibit 20, the first two -- yeah, it's only two pages. |
| | 18 | It's an invoice from Oracle to Dearborne for the product -- |
| | 19 | for the licensed product for PBGC. |
| 03:43 | 20 | Q.   All right.  And are these invoices made at or near the |
| | 21 | time that a transaction is processed by you? |
| 03:43 | 22 | A.   Yes, they're made shortly after the deal is booked. |
| 03:43 | 23 | Q.   And are these made and stored by Oracle in the regular |
| | 24 | course of its business? |
| 03:43 | 25 | A.   Yes, they are. |

| | | |
|---|---|---|
| 03:43 | 1 | MR. CRONE:  Move to admit Exhibit 20, Your Honor. |
| 03:43 | 2 | THE COURT:  Received. |
| 03:43 | 3 | *(Exhibit No. 20 received in evidence.)* |
| 03:43 | 4 | MR. CRONE:  May we publish? |
| 03:43 | 5 | THE COURT:  You may. |
| 03:43 | 6 | *(Exhibit displayed.)* |
| 03:43 | 7 | BY MR. CRONE: |
| 03:43 | 8 | Q.   And I believe, Ms. Achey, you just testified that this |
| | 9 | invoice reflected the software licenses; is that correct? |
| 03:43 | 10 | A.   Yes. |
| 03:43 | 11 | Q.   And is -- are these invoices typically mailed out to |
| | 12 | resellers in the ordinary course of Oracle's business? |
| 03:43 | 13 | A.   Yes, they are. |
| 03:43 | 14 | Q.   And you see there's a "bill to" on the right-hand side |
| | 15 | of the first page? |
| 03:44 | 16 | A.   Right.  That is correct. |
| 03:44 | 17 | Q.   All right.  And so to be clear, this would have been |
| | 18 | mailed out to an address in Huntington Beach, California, at |
| | 19 | 19621 Dearborne Circle? |
| 03:44 | 20 | A.   Yes. |
| 03:44 | 21 | Q.   Let me have -- draw your attention to the bottom part |
| | 22 | of the first page of Exhibit 20. |
| 03:44 | 23 | A.   Okay. |
| 03:44 | 24 | Q.   Specifically, the actual box on the very bottom part of |
| | 25 | the page here. |

03:44   1   A.   That one.   *(Indicates.)*

03:44   2         MR. CRONE:   Thank you, Mr. Owens.

03:44   3         *(Exhibit displayed.)*

03:44   4   BY MR. CRONE:

03:44   5   Q.   Ms. Achey, can you tell us what the grand total of this

        6   invoice was?

03:44   7   A.   The grand total of the invoice is 760,242.65.

03:45   8   Q.   Okay.  Now, you'll see here there's a -- I understand

        9   it's a little bit hard to read, but if you see the columns,

        10  the second column on the top, it says "tax."

03:45   11        You see where I'm reading?

03:45   12  A.   Yes.

03:45   13  Q.   Do transactions of -- for the sale of software to the

        14  federal government typically involve the imposition of sales

        15  tax?

03:45   16  A.   No, they do not.

03:45   17  Q.   Can you explain for us why it is that this invoice

        18  included an amount for taxes?

03:45   19  A.   Okay.  Federal government is exempt from sales tax, but

        20  for the reseller to take advantage of that, they need to

        21  have a tax exempt certificate on file for the specific state

        22  that the customer's located in.

03:45   23  Q.   All right.  And so in this particular transaction, if

        24  you could -- if you could tell us what the total of the

        25  invoice would have been without sales tax?

| | | |
|---|---|---|
| 03:45 | 1 | A.    717,210. |
| 03:46 | 2 | Q.    All right.  Now, did Mr. Mai or Mr. Rudin ever provide |
| | 3 | proper tax paperwork to have the amount of the sales taxes |
| | 4 | on this or any other Oracle invoice removed from the |
| | 5 | invoices? |
| 03:46 | 6 | A.    No.  The tax certificate that they provided was for the |
| | 7 | State of California.  And for it to be applicable for this |
| | 8 | deal, it needed to be for the District of Columbia. |
| 03:46 | 9 | Q.    All right.  And is that -- why did they need one for |
| | 10 | the District of Colombia? |
| 03:46 | 11 | A.    Because that's where the software was being delivered. |
| 03:46 | 12 | Q.    All right.  Approximately how long does it take to fill |
| | 13 | out the paperwork that you're referring to? |
| 03:46 | 14 | A.    Just like everything else in today's world, it's |
| | 15 | online.  You go to an online site owned by the District of |
| | 16 | Columbia and fill out the paperwork and put in the relevant |
| | 17 | company information. |
| 03:46 | 18 | Q.    Okay.  And approximately how many minutes would it take |
| | 19 | you to fill out such paperwork? |
| 03:46 | 20 | A.    Um, I've been told it's 5 to 10 minutes.  I checked |
| | 21 | with one of our other resellers. |
| 03:47 | 22 | Q.    Now, just to be clear, was the -- all right.  This -- |
| | 23 | the sum that is reflected on the bottom of page 1 of |
| | 24 | Exhibit 20, was Oracle expecting to be paid for the software |
| | 25 | licenses that are billed in this invoice in a single lump |

|       |    |                                                                |
|-------|----|----------------------------------------------------------------|
|       | 1  | sum?                                                           |
| 03:47 | 2  | A.   Yes.  Software needs to be paid net 30 in one sum.        |
| 03:47 | 3  | Q.   If I could have you turn to Exhibit 21, please.           |
| 03:47 | 4  | A.   Okay.                                                     |
| 03:47 | 5  | Q.   And can you tell us what Exhibit 21 is?                   |
| 03:47 | 6  | A.   Okay.  Exhibit 21 consists of four separate invoices     |
|       | 7  | for the support services for the licenses.  And it is four    |
|       | 8  | separate invoices because, with the federal government, we    |
|       | 9  | bill quarterly in arrears.                                     |
| 03:48 | 10 | Q.   And were these invoices also generated at or near the    |
|       | 11 | time of the billing cycle that you're referring to?           |
| 03:48 | 12 | A.   Yes.                                                      |
| 03:48 | 13 | Q.   And are these also maintained and stored by Oracle in    |
|       | 14 | the ordinary course of its business?                          |
| 03:48 | 15 | A.   Yes.                                                      |
| 03:48 | 16 |       MR. CRONE:  Your Honor, I move Exhibit 21 in            |
|       | 17 | evidence.                                                      |
| 03:48 | 18 |       THE COURT:  Received.                                   |
| 03:48 | 19 |    (Exhibit No. 21 received in evidence.)                     |
| 03:48 | 20 |       MR. CRONE:  May we publish?                             |
| 03:48 | 21 |       THE COURT:  You may.                                    |
| 03:48 | 22 |    (Exhibit displayed.)                                       |
| 03:48 | 23 |       MR. CRONE:  Mr. Owens, if you could bring up the       |
|       | 24 | bottom part of this.  Actually, before we do that, let's      |
|       | 25 | take a look at the left-hand -- upper left-hand corner.       |

| | | |
|---|---|---|
| 03:48 | 1 | *(Exhibit displayed.)* |
| 03:48 | 2 | BY MR. CRONE: |
| 03:48 | 3 | Q.   Ms. Achey, so these were -- also would have been mailed |
| | 4 | out to the reseller in the ordinary course of business? |
| 03:48 | 5 | A.   Yes. |
| 03:48 | 6 | Q.   -- is that correct? |
| 03:48 | 7 | And we're just looking at the first of the four -- |
| 03:48 | 8 | A.   Right. |
| 03:48 | 9 | Q.   -- of the quarterly invoices that are reflected in |
| | 10 | Exhibit 21, but they all have the same "bill to" address; is |
| | 11 | that correct? |
| 03:48 | 12 | A.   That's true. |
| 03:48 | 13 | Q.   And these are also the same -- |
| 03:49 | 14 | MR. CRONE:  If we could have that back up, |
| | 15 | Mr. Owens. |
| 03:49 | 16 | *(Exhibit displayed.)* |
| 03:49 | 17 | BY MR. CRONE: |
| 03:49 | 18 | Q.   That's also, again, the same Huntington Beach address |
| | 19 | we looked at before? |
| 03:49 | 20 | A.   Yes, it is. |
| 03:49 | 21 | Q.   All right.  Now, if we could look at the bottom part of |
| | 22 | the screen again. |
| 03:49 | 23 | A.   Okay. |
| 03:49 | 24 | MR. CRONE:  Thank you, Mr. Owens. |
| | 25 | |

| | | |
|---|---|---|
| 03:49 | 1 | BY MR. CRONE: |
| 03:49 | 2 | Q.   If you could tell us the grand total of each one of |
| | 3 | these four quarterly invoices? |
| 03:49 | 4 | A.   The grand total would be $41,813.35.  And that does |
| | 5 | include tax. |
| 03:49 | 6 | Q.   Okay.  Now, if you exclude the amount of the taxes, |
| | 7 | what would the total of each one of these invoices have |
| | 8 | been? |
| 03:49 | 9 | A.   39,446.55. |
| 03:49 | 10 | Q.   Have you helped prepare a slide to help illustrate the |
| | 11 | balance of these invoices, Ms. Achey? |
| 03:49 | 12 | A.   Yes. |
| 03:49 | 13 | Q.   And would that aid your testimony to the jury here |
| | 14 | today? |
| 03:49 | 15 | A.   Yeah, I think it would help. |
| 03:49 | 16 |        MR. CRONE:  Your Honor, permission to show |
| | 17 | demonstrative D6. |
| 03:49 | 18 |        THE COURT:  D6.  You may show D6. |
| 03:50 | 19 |        MR. CRONE:  Thank you, Your Honor. |
| 03:50 | 20 |    (Demonstrative slide displayed.) |
| 03:50 | 21 | BY MR. CRONE: |
| 03:50 | 22 | Q.   Ms. Achey, if you could explain to the jury what this |
| | 23 | slide reflects? |
| 03:50 | 24 | A.   Okay.  This slide reflects two different things.  The |
| | 25 | "excluding tax" is the amounts that Oracle expected when we |

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | booked the deal to get in.  It shows the product, the first        |
|       | 2  | line, for 717,210.  And then it shows four quarterly               |
|       | 3  | invoices that add up to 157,786.20, for a grand total of           |
|       | 4  | 874,996.20.  And that's the same number that's on the              |
|       | 5  | Partner Ordering Document that we reviewed earlier.                |
| 03:50 | 6  | The above portion shows what the amounts were with tax.            |
| 03:50 | 7  | Instead of 717,210 for the product, it increased to               |
|       | 8  | 760,242.65.  And instead of 157,786.20, it increased to           |
|       | 9  | 167,253.4.                                                         |
| 03:51 | 10 | So the total price, once you added in tax, increased              |
|       | 11 | from 874,996.20 to 927,496.05.                                    |
| 03:51 | 12 | Q.   All right.  But, Ms. Achey, the amounts of money that        |
|       | 13 | is owed to Oracle, is it accurate to say that when you            |
|       | 14 | combined the invoices that were reflected on Exhibit 20 as        |
|       | 15 | well as 21, that the total without tax, without sales tax,        |
|       | 16 | is $874,996.20?  Is that right?                                   |
| 03:51 | 17 | A.   That's true.  That's what was on the Partner Ordering        |
|       | 18 | Document and what we expected to receive.                         |
| 03:51 | 19 | Q.   Has Oracle been paid anything on any of these invoices?      |
| 03:51 | 20 | A.   No.                                                           |
| 03:51 | 21 | Q.   Do you know whether Oracle actually delivered the           |
|       | 22 | product that's referenced in these invoices to the Pension       |
|       | 23 | Benefit Guaranty Corporation?                                     |
| 03:51 | 24 | A.   Yes, we did deliver the product.                             |
| 03:52 | 25 | Q.   Let me have you turn to Exhibit 127, and let me know        |

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | when you're there.                                         |
| 03:52 | 2  | A.    Okay.  I am there.                                    |
| 03:52 | 3  | Q.    Can you tell us what Exhibit 127 reflects, what it is? |
| 03:52 | 4  | A.    This is a page out of the collections analysts' notes, |

03:52   3   Q.   Can you tell us what Exhibit 127 reflects, what it is?

03:52   4   A.   This is a page out of the collections analysts' notes,

5   where they keep notes on the online system when they make

6   calls to customers about outstanding invoices.

03:52   7   Q.   Is this also a document that Oracle generates and

8   stores in the ordinary course of its business?

03:52   9   A.   Yes, it is.

03:52   10   Q.   Have you had access to these notes in the course of

11   your work for Oracle?

03:52   12   A.   Yes.

03:52   13   Q.   And are such notes made at or near the time of the

14   communications that are made by Oracle's collections

15   department?

03:52   16   A.   They are made -- they're typing in the note as they're

17   talking to the customers.

03:52   18        MR. RAMP:  Objection.  Based on hearsay.

03:52   19        THE COURT:  Who's notes are these?

03:52   20        MR. CRONE:  By someone in collections department,

21   Your Honor.

03:52   22        THE WITNESS:  Right.

03:52   23        THE COURT:  I'll sustain it at this time.  I'm

24   going to want additional time to speak to counsel about

25   this.

03:53   1              MR. CRONE:  Okay.

03:53   2              THE COURT:  I need a better foundation.  Who took

        3    them, when, not just generally.

03:53   4              So sustained.

03:53   5              MR. CRONE:  Shall I proceed after this exhibit, or

        6    would you like me to lay a foundation now, Your Honor?

03:53   7    BY MR. CRONE:

03:53   8    Q.   Specifically, Ms. Achey, can you tell us who prepared

        9    these notes, to your understanding?

03:53   10   A.   Ms. Velu, V-E-L-U.

03:53   11   Q.   And at the time, did you actually have -- when I say

        12   "at the time," in 2009, did you have communications with

        13   Ms. Velu regarding this transaction?

03:53   14   A.   Yes.  I had e-mails and phone calls, both.

03:53   15   Q.   Okay.  And so did you know at the time that Ms. Velu

        16   worked in a -- worked with Oracle in a particular division

        17   of Oracle?

03:53   18   A.   Yes, she was in the collections department.

03:53   19   Q.   Okay.  And were these particular notes sent to you at

        20   any time?

03:53   21   A.   Yes.

03:54   22   Q.   Was -- what was the purpose for why they were sent to

        23   you?

03:54   24   A.   Um, she was becoming very frustrated because we were

        25   not being paid.  Her management was watching, the unpaid

|  |  |  |
|---|---|---|
|  | 1 | balances continued, and she was hoping that she could get |
|  | 2 | some assistance in getting the invoices paid. |
| 03:54 | 3 | Q.   And -- and at that time, did you review these -- did |
|  | 4 | you review the notes contemporaneously when they were sent |
|  | 5 | to you? |
| 03:54 | 6 | A.   Yes. |
| 03:54 | 7 | Q.   Did you have any subsequent conversation with Ms. Velu, |
|  | 8 | or e-mails, after you received what's reflected by |
|  | 9 | Exhibit 127? |
| 03:54 | 10 | A.   Right. |
| 03:54 | 11 | MR. RAMP:  Hearsay objection again, Your Honor. |
| 03:54 | 12 | THE COURT:  Sustained, Counsel.  We'll take this |
|  | 13 | out of the presence of the jury. |
| 03:54 | 14 | MR. CRONE:  I'll move on, Your Honor. |
| 03:54 | 15 | BY MR. CRONE: |
| 03:54 | 16 | Q.   Ms. Achey, if I could have you turn to Exhibit 123. |
| 03:55 | 17 | A.   Okay.  I am there. |
| 03:55 | 18 | Q.   Can you tell us what Exhibit 123 is? |
| 03:55 | 19 | A.   It's an e-mail from Edwin Little, who is the |
|  | 20 | contracting officer at PBGC, to Quin Rudin and Michael Mai. |
| 03:55 | 21 | Q.   Okay.  Were you copied on this e-mail? |
| 03:55 | 22 | A.   Yes, I was. |
| 03:55 | 23 | Q.   And can you -- and this was dated June 10th of 2010? |
| 03:55 | 24 | A.   That's correct. |
| 03:55 | 25 | Q.   Okay. |

| | | |
|---|---|---|
| 03:55 | 1 | MR. CRONE: Your Honor, I would move Exhibit 123 |
| | 2 | in evidence. |
| 03:55 | 3 | THE COURT: Received. |
| 03:55 | 4 | *(Exhibit No. 123 received in evidence.)* |
| 03:55 | 5 | MR. CRONE: May I publish? |
| 03:55 | 6 | THE COURT: You may. |
| 03:55 | 7 | *(Exhibit displayed.)* |
| 03:55 | 8 | BY MR. CRONE: |
| 03:55 | 9 | Q. I think you said that -- you mentioned Edwin Little was |
| | 10 | the contracting officer? |
| 03:55 | 11 | A. Yes. |
| 03:55 | 12 | Q. What do you mean by that? |
| 03:55 | 13 | A. He is the person authorized by the government to |
| | 14 | obligate the government to issue purchase orders, sign |
| | 15 | contracts, et cetera. |
| 03:55 | 16 | Q. All right. And you see the -- in this e-mail that's at |
| | 17 | the top half of this page -- |
| 03:55 | 18 | MR. CRONE: If we could have that expanded. |
| 03:56 | 19 | *(Exhibit displayed.)* |
| 03:56 | 20 | BY MR. CRONE: |
| 03:56 | 21 | Q. Ms. Achey, can you read this e-mail for us? |
| 03:56 | 22 | A. "Michael, Oracle has not received their money for the |
| | 23 | licenses under the subject contract. Please call Ms. Anne |
| | 24 | Achey at (703)364-3110 to resolve the problem. It is |
| | 25 | troubling that while your company has received full payment |

Case 8:10-cv-01853-DOC-RNB  Document 193  Filed 09/19/13  Page 102 of 138  Page ID #:2150
SACV 10-1853 DOC  7/19/2013 - Day 1

102

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | for the licenses, Oracle has not been paid, and we are not   |
|       | 2  | receiving official Oracle support.  Please provide an        |
|       | 3  | explanation for this situation and when Ms. Achey at Oracle  |
|       | 4  | will receive payment.  Sincerely, Edwin Little."             |
| 03:56 | 5  | Q.   Ms. Achey, just to be clear, what does "official        |
|       | 6  | support" refer to?                                           |
| 03:56 | 7  | A.   They were not able to access the Oracle support site,   |
|       | 8  | My Oracle Support.                                           |
| 03:56 | 9  | Q.   All right.                                              |
| 03:56 | 10 |       MR. CRONE:  And by the way, just let's -- if we        |
|       | 11 | could see the date and header on this, Mr. Owens, again, the |
|       | 12 | header of this e-mail.                                       |
| 03:57 | 13 |    *(Exhibit displayed.)*                                     |
| 03:57 | 14 | BY MR. CRONE:                                                |
| 03:57 | 15 | Q.   Again, this reflects that you -- did you receive this   |
|       | 16 | on June 10th of 2010 --                                      |
| 03:57 | 17 | A.   Yes.                                                    |
| 03:57 | 18 | Q.   -- at about 11:24 a.m.?                                 |
| 03:57 | 19 | A.   Yes, I did.                                             |
| 03:57 | 20 | Q.   Did Oracle ultimately provide official Oracle support   |
|       | 21 | to the Pension Benefit Guaranty Corporation?                 |
| 03:57 | 22 | A.   Ultimately, we did.                                     |
| 03:57 | 23 | Q.   And why did Oracle do that?                             |
| 03:57 | 24 | A.   Once I had several conversations with Edwin Little and  |
|       | 25 | then I worked with Oracle's legal department, and we         |

DEBBIE GALE, U.S. COURT REPORTER

|       |    |                                                                     |
|-------|----|---------------------------------------------------------------------|
|       | 1  | determined that the customer PBGC had paid the reseller, and        |
|       | 2  | it was not their fault that Oracle had not been paid, and we        |
|       | 3  | wanted to get them back online.                                     |
| 03:57 | 4  | Q.   Did Oracle ever receive payment on any of its invoices         |
|       | 5  | concerning this transaction even after this e-mail?                 |
| 03:58 | 6  | A.   No, they didn't.                                                |
| 03:58 | 7  | Q.   And did -- did you ever receive any call from Mr. Mai          |
|       | 8  | after June 10th of 2010?                                             |
| 03:58 | 9  | A.   Not that I recall.                                              |
| 03:58 | 10 | Q.   Just so we're clear, Ms. Achey, I'd like to just follow        |
|       | 11 | up on -- show this slide we were looking at, at the                 |
|       | 12 | beginning of your testimony.                                        |
| 03:58 | 13 |          MR. CRONE:  Your Honor, may I put D3 back up?              |
| 03:58 | 14 |          THE COURT:  Certainly.                                     |
| 03:58 | 15 |      (Demonstrative slide displayed.)                               |
| 03:58 | 16 | BY MR. CRONE:                                                        |
| 03:58 | 17 | Q.   All right.  Ms. Achey, this -- again, this was the             |
|       | 18 | slide where you were discussing the -- where you were               |
|       | 19 | discussing the -- how government purchase agreements work,          |
|       | 20 | essentially; is that right?                                         |
| 03:58 | 21 | A.   Right.                                                          |
| 03:58 | 22 | Q.   And where -- if you can just explain for us where in          |
|       | 23 | this transact -- where in the process, using this slide, did        |
|       | 24 | this particular transaction break down?                             |
| 03:59 | 25 | A.   Everything occurred except No. 8.                              |

Case 8:10-cv-01853-DOC-RNB  Document 193  Filed 09/19/13  Page 104 of 138  Page ID #:2152
SACV 10-1853 DOC  7/19/2013 - Day 1

104

| | | |
|---|---|---|
| 03:59 | 1 | Q.   And that's -- |
| 03:59 | 2 | A.   The product was delivered to the customer; invoices |
| | 3 | were sent; the customer paid the reseller; Oracle was never |
| | 4 | paid. |
| 03:59 | 5 | Q.   Now, you had mentioned earlier at the beginning of your |
| | 6 | testimony that there were several other bidders that were |
| | 7 | bidding for the same transaction that Dearborne ultimately |
| | 8 | won? |
| 03:59 | 9 | A.   Yes, at least two that I know of. |
| 03:59 | 10 | Q.   Now, if you had known back in August of 2009 that |
| | 11 | Oracle would never be paid for the software that it had |
| | 12 | bought -- that it had delivered to the Pension Benefit |
| | 13 | Guaranty Corporation, could Oracle have completed this |
| | 14 | transaction using one of those other resellers? |
| 03:59 | 15 | A.   Absolutely. |
| 03:59 | 16 | Q.   How can you be so sure? |
| 03:59 | 17 | A.   Well, I know they had approvals for nonstandard |
| | 18 | requests to give them discounts that would have put their |
| | 19 | pricing in the price range of what the government ultimately |
| | 20 | awarded for. |
| 04:00 | 21 | We've done enough business with them.  I know we would |
| | 22 | have been paid. |
| 04:00 | 23 | So it would have taken maybe three or four weeks to |
| | 24 | work the transition of getting it re-awarded, but it could |
| | 25 | have been done. |

Case 8:10-cv-01853-DOC-RNB  Document 193  Filed 09/19/13  Page 105 of 138  Page ID #:2153
SACV 10-1853 DOC 7/19/2013 - Day 1

105

| 04:00 | 1 | Q.    Would you have any concern about Oracle being paid on |
| | 2 | this transaction if you had proceeded with one of those |
| | 3 | other resellers? |
| 04:00 | 4 | A.    No concerns at all. |
| 04:00 | 5 | Q.    Okay.  And why again is that? |
| 04:00 | 6 | A.    Because of the amount of business we've done with them. |
| 04:00 | 7 | Q.    Can you give us just an estimate of how many |
| | 8 | transactions you processed over the course of your career at |
| | 9 | Oracle? |
| 04:00 | 10 | A.    In the hundreds. |
| 04:00 | 11 | Q.    And have you ever had this happen before, or since, |
| | 12 | where a reseller failed to pay for product that Oracle had |
| | 13 | delivered to the federal government at a reseller's request? |
| 04:00 | 14 | A.    No.  This is a one-time occurrence. |
| 04:01 | 15 | MR. CRONE:  Thank you, Your Honor.  I pass the |
| | 16 | witness. |
| 04:01 | 17 | THE COURT:  Cross-examination. |
| 04:01 | 18 | **CROSS-EXAMINATION** |
| 04:01 | 19 | BY MR. RAMP: |
| 04:01 | 20 | Q.    Good afternoon, Ms. Achey -- Achey? |
| 04:01 | 21 | A.    Achey. |
| 04:01 | 22 | Q.    Thank you. |
| 04:01 | 23 | How long have you been employed with Oracle? |
| 04:01 | 24 | A.    Fourteen years in September. |
| 04:01 | 25 | Q.    And you described your position as a channel manager. |

Case 8:10-cv-01853-DOC-RNB   Document 193   Filed 09/19/13   Page 106 of 138   Page ID #:2154
SACV 10-1853 DOC   7/19/2013 - Day 1

106

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | Can you describe that?                                                  |
| 04:01 | 2  | A.   At the time of the transaction, I was a channel                    |
|       | 3  | manager.  I worked in the channel's organization.  I worked            |
|       | 4  | with our resellers, helping them to manage their pipeline,             |
|       | 5  | helping them to develop business for Oracle, helping them to           |
|       | 6  | get any approvals they might need for specific transactions.           |
| 04:02 | 7  | Q.   Does anyone work under you?                                        |
| 04:02 | 8  | A.   No.                                                                |
| 04:02 | 9  | Q.   And is it your position that you approve or "disprove"             |
|       | 10 | transactions?                                                          |
| 04:02 | 11 | A.   At that point in time, I was the first-level approver             |
|       | 12 | for federal business.                                                  |
| 04:02 | 13 | Q.   And who was the second level?                                      |
| 04:02 | 14 | A.   That would have been T1, Keith Block, license approver.            |
| 04:02 | 15 | Q.   And then one person above him?                                     |
| 04:02 | 16 | A.   Judson Altoff.                                                     |
| 04:03 | 17 | Q.   In this transaction we're discussing, the PBGC                     |
|       | 18 | transaction --                                                         |
| 04:03 | 19 | A.   Right.                                                            |
| 04:03 | 20 | Q.   -- who made the final approval that Oracle would go               |
|       | 21 | ahead with this transaction?                                          |
| 04:03 | 22 | A.   The final business approval came from Judson Altoff's             |
|       | 23 | office.                                                                |
| 04:03 | 24 | Q.   And that would be one step above you or two steps?                 |
| 04:03 | 25 | A.   Two steps.                                                        |

| | | |
|---|---|---|
| 04:03 | 1 | Q.    When did he make that decision? |
| 04:03 | 2 | A.    The weekend -- well, the first approval request would |
| | 3 | have been between the 28th and the 31st of August.  The last |
| | 4 | approval request for the license agreement would have been |
| | 5 | towards the end of September. |
| 04:03 | 6 | Q.    And that was the final approval that was needed? |
| 04:04 | 7 | A.    Yes -- |
| 04:04 | 8 | Q.    So -- |
| 04:04 | 9 | A.    -- and that was for terms also because of the terms |
| | 10 | that would have had to come from HQ app, which would have |
| | 11 | been at corporate. |
| 04:04 | 12 | Q.    What is HQ app? |
| 04:04 | 13 | A.    That's corporate. |
| 04:04 | 14 | Q.    What do you mean by corporate? |
| 04:04 | 15 | A.    Larry Ellison, Safra Catz.  Safra, S-A-F-R-A, C-A-T-Z. |
| 04:04 | 16 | Q.    Did Mr. Ellison approve this? |
| 04:04 | 17 | A.    For the final T's and C's, yes. |
| 04:04 | 18 | Q.    And Mr. Ellison is the top person -- |
| 04:04 | 19 | A.    Yes -- |
| 04:04 | 20 | Q.    -- in all -- |
| 04:04 | 21 | A.    -- it's out of his office.  He personally does not do |
| | 22 | it, but it's his office. |
| 04:04 | 23 | Q.    So someone would have his approval to approve it? |
| 04:04 | 24 | A.    Right. |
| 04:04 | 25 | Q.    Do you know why it was approved? |

04:04    1    A.    Because it made good business sense to change the T's

         2    and C's to accommodate the government and Oracle.

04:04    3    Q.    And Oracle was gonna make a profit off this

         4    transaction, correct?

04:05    5    A.    Yes, if we had been paid.

04:05    6    Q.    But Oracle also made a profit off the licensing,

         7    correct?

04:05    8    A.    Yes, if we had been paid.

04:05    9    Q.    It's my understanding that software goes to a customer?

04:05   10    A.    Yes.

04:05   11    Q.    And then the customer still has to pay Oracle for the

        12    license, the -- to use that product; is that correct?

04:05   13    A.    The payment goes from the customer, in this case, PBGC,

        14    to the reseller, which is Dearborne, to Oracle.  It does not

        15    come directly to Oracle.  The reseller is between us.

04:05   16    Q.    But once that product is delivered to the customer,

        17    then, Oracle still bills that customer for --

04:05   18    A.    No, we do not bill the customer directly.  We invoice

        19    the reseller.

04:05   20    Q.    Okay.  It's my understanding that once the product's

        21    delivered to the reseller -- to the customer, he will use

        22    this product for a period of time.  Are you saying his

        23    financial obligations to Oracle are ended once the product

        24    is delivered to him?

04:06   25    A.    His -- the payment obligations are from the customer to

1    the reseller, who is then obligated to pay Oracle.  The

2    customer made his payment obligation when he issued a check

3    to Dearborne for $908,000.

04:06  4    Q.    But doesn't PBGC continue to have to pay -- continues

5    to pay Oracle for the use of that product?

04:06  6    A.    No.  In this case, they did not renew their support for

7    this product.

04:06  8    Q.    And would that be this case only or all case laws?

04:06  9    A.    Well, it depends on whether they want to renew their

10    support on an annual basis.  In this case, they did not.

04:07  11    Q.    So the contract allowed them to refuse that support?

04:07  12    A.    Right.  I mean, the support is -- you get a new support

13    quote on an annual basis.  And it's an -- the licenses are

14    perpetual, which means they go on forever, but the support

15    is an annual contract.

04:07  16    Q.    Have you ever testified in a lawsuit on behalf of

17    Oracle before?

04:07  18    A.    No.

04:07  19    Q.    This is the fist time you've testified for Oracle in a

20    lawsuit?

04:07  21    A.    Yes.

04:07  22    Q.    And you reside in -- close to Washington D.C., you

23    said?

04:07  24    A.    Yes.  Reston, Virginia.  It's a suburb of Washington.

04:07  25    Q.    Are you still a channel manager?

04:07   1   A.   No.   I've moved into business development group.

04:07   2   Q.   Is there any reason for that?

04:07   3   A.   I was looking for a new opportunity.  And in my current

        4   opportunity, I spend a lot of time with customers now, which

        5   I enjoy.

04:08   6   Q.   Are you still with Oracle?

04:08   7   A.   I'm still with Oracle.

04:08   8   Q.   Have you ever met Quin Rudin in person?

04:08   9   A.   No.

04:08  10   Q.   And you've talked to him on the telephone?

04:08  11   A.   Yes.

04:08  12   Q.   How often have you talked to him on the telephone?

04:08  13   A.   I haven't talked to him since 2009, maybe 2010, when I

       14   was contacting him and Michael Mai, both, trying to get

       15   payment for these invoices.

04:08  16   Q.   When was the first time you spoke with Quin Rudin?

04:08  17   A.   August 28th, 2009.

04:08  18   Q.   Did you speak to Quin Rudin about any other transaction

       19   besides this one?

04:08  20   A.   I don't believe so.

04:09  21   Q.   Did you know who he was when he first contacted you?

04:09  22   A.   No.

04:09  23   Q.   Can you tell me about how that first conversation came

       24   about?

04:09  25   A.   The first conversation came about based upon the

1    e-mail, which we had gone through this morning or this

2    afternoon, introducing him as the managing partner that

3    would work with me for the PBGC order.

04:09    4    Q.    How did he get you as a contact?

04:09    5    A.    Debbie Dilldine gave my name to Michael Mai.  I also

6    sent him an e-mail saying I would be the contact for that

7    transaction.

04:09    8    Q.    So was Ms. Dilldine the first person that contacted

9    Mr. Rudin?

04:09    10   A.    I don't know.

04:09    11   Q.    Do you recall what was said in that conversation?

04:09    12   A.    Not specifically, no.

04:09    13   Q.    What was the importance of that conversation?

04:10    14   A.    The first conversation was just an introductory one.

15   Here I am.  I'm gonna help you.  Yes, I understand you're

16   going to be sending me your Partner Ordering Document.  Send

17   it to me, and then we'll discuss the details.

04:10    18   Q.    Did he say what company he was with?

04:10    19   A.    I don't recall.

04:10    20   Q.    Did you discover what company he was with at some

21   point?

04:10    22   A.    He was with Dearborne.

04:10    23   Q.    Wasn't it true that he owned a company called "Certus

24   Solutions"?

04:10    25   A.    Which had been acquired by Dearborne in 2008.

Case 8:10-cv-01853-DOC-RNB   Document 193   Filed 09/19/13   Page 112 of 138   Page ID #:2160
SACV 10-1853 DOC   7/19/2013 - Day 1

112

04:10   1   Q.   The first time you spoke -- how do you know that it was

        2   acquired by Dearborne in 2008?

04:10   3   A.   Because of the e-mails that I have from him and Michael

        4   Mai, both.

04:10   5   Q.   Are you aware that Certus Solutions was the -- the

        6   partner with Oracle?

04:11   7   A.   They were in the Oracle Partner Network, yes.

04:11   8   Q.   Dearborne never was a partner, correct?

04:11   9   A.   They were not in the partner network, to my knowledge.

04:11  10   Q.   Did you do any research to find out it was true; that

       11   Dearborne actually had acquired Certus?

04:11  12   A.   I did not do any further research other than what I was

       13   told by Michael Mai and Quin Rudin.

04:11  14   Q.   I thought it was your testimony that Mr. Mai never told

       15   you that --

04:11  16   A.   It was in an e-mail from him.

04:11  17   Q.   But Mr. Mai never told you on the phone that he

       18   acquired Certus?

04:11  19   A.   It was in an e-mail.

04:11  20   Q.   How do you know that e-mail came from Michael Mai and

       21   not from Quin Rudin?

04:11  22   A.   It came from Michael Mai at Dearborne.  It was a

       23   Michael Mai at Dearborne address.

04:11  24   Q.   Could have Quin Rudin sent you that e-mail saying it

       25   was Michael Mai?

Case 8:10-cv-01853-DOC-RNB  Document 193  Filed 09/19/13  Page 113 of 138  Page ID #:2161
SACV 10-1853 DOC  7/19/2013 - Day 1

113

04:12   1          MR. CRONE:  Objection.  Foundation.

04:12   2          THE COURT:  Just a moment.

04:12   3          Overruled.  You can answer the question.

04:12   4          THE WITNESS:  I guess he could have.  Anything's

        5   possible, but, I mean, there were multiple instances when I

        6   received e-mails from Michael Mai, Quin Rudin.

04:12   7          THE COURT:  Just a moment.

04:12   8          Are you asking if she's recognizing the voice from

        9   more than one conversation?  It is speculative, if they had

       10   one conversation.  So I'm going to reverse that and cause a

       11   foundation:  If she's had more than one conversation and she

       12   recognizes somebody continually representing himself as

       13   Rudin.

04:13  14          MR. RAMP:  My question was the e-mail received.

04:13  15          THE COURT:  Your question was speculative,

       16   actually; it asked could it have been.  So just reask it,

       17   Counsel.

04:13  18          I'm going to sustain the objection.  Just reask

       19   it.

04:13  20   BY MR. RAMP:

04:13  21   Q.   You received an e-mail from Quin Rudin stating that

       22   Michael Mai purchased Certus?

04:13  23   A.   Yes.

04:13  24   Q.   Could Quin Rudin have sent you that e-mail instead of

       25   Michael Mai?

| | | |
|---|---|---|
| 04:13 | 1 | MR. CRONE:  Same objection, Your Honor. |
| 04:13 | 2 | THE COURT:  I don't know how she'd know that, |
| | 3 | Counsel.  I'm going to sustain it.  It's speculative. |
| 04:13 | 4 | BY MR. RAMP: |
| 04:13 | 5 | Q.  Did you do any research to find out? |
| 04:13 | 6 | A.  To find out what? |
| 04:13 | 7 | Q.  Whether Michael Mai had actually purchased Dearborne? |
| 04:13 | 8 | A.  No, I did not. |
| 04:13 | 9 | Q.  And he never told you on the phone that he did, |
| | 10 | correct? |
| 04:13 | 11 | A.  No, but I had an e-mail from him. |
| 04:13 | 12 | Q.  My question is, did he talk to you on the phone and say |
| | 13 | he purchased Dearborne? |
| 04:13 | 14 | A.  I don't recall. |
| 04:14 | 15 | Q.  Have you ever met Quin Rudin in person? |
| 04:14 | 16 | A.  No, I have not. |
| 04:14 | 17 | Q.  Before today, have you ever met Michael Mai in person? |
| 04:14 | 18 | A.  No, I haven't. |
| 04:14 | 19 | Q.  Do you know the difference in their telephone voices? |
| 04:14 | 20 | A.  I did at the time, because I had several conversations |
| | 21 | with each of 'em. |
| 04:14 | 22 | Q.  And how do you know which one was which? |
| 04:14 | 23 | A.  Because I had different conversations.  I mean, it's |
| | 24 | just like, how do I know Andrew's voice from Josh.  I've |
| | 25 | talked to 'em and you recognize it. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 04:14 | 1 | Q.    But you've met them in person before, haven't you? |
| 04:14 | 2 | A.    No.  Oh, Andrew and Josh, yes. |
| 04:14 | 3 | Q.    So you know their voices 'cause you've seen them in |
| | 4 | person? |
| 04:14 | 5 | A.    Right. |
| 04:14 | 6 | Q.    But you've never seen Mr. Rudin or Mr. Mai? |
| 04:14 | 7 | A.    That's true. |
| 04:15 | 8 | Q.    If Dearborne had solicited this bid, they would not |
| | 9 | have gotten a contract because they were not a seller, |
| | 10 | correct? |
| 04:15 | 11 | A.    Can you rephrase the question? |
| 04:15 | 12 | Q.    You would have to be a reseller to have this |
| | 13 | transaction approved? |
| 04:15 | 14 | A.    They would have to be a reseller in the flow of |
| | 15 | companies involved.  There are cases where we have a |
| | 16 | non-reseller working directly with the government, |
| | 17 | purchasing from a reseller, who purchases from Oracle, and |
| | 18 | it's what we typically call a "double hopper." |
| 04:15 | 19 | Q.    Was Quin Rudin -- individually, was he a reseller? |
| 04:15 | 20 | A.    Certus was listed as a reseller, yes. |
| 04:15 | 21 | Q.    And it must be something in your computer showing who |
| | 22 | was the owner of Certus? |
| 04:15 | 23 | A.    Quin Rudin. |
| 04:15 | 24 | Q.    So you saw that at the time? |
| 04:15 | 25 | A.    Yes. |

04:15  1    Q.   Quin Rudin was the owner?

04:15  2    A.   Of Certus, yes.

04:15  3    Q.   Did it ever change -- the reseller status, did it ever

       4    change showing Michael Mai the owner?

04:16  5    A.   No.

04:16  6    Q.   So Quin Rudin was the most important person for this

       7    transaction to get done, since he was the reseller of -- he

       8    was reseller?

04:16  9    A.   His name was with the reseller, but Dearborne had

       10   purchased Certus.  They were the parent company.

04:16  11   Q.   Are you aware of a company called K2?

04:16  12   A.   No.

04:16  13   Q.   Were you aware that Quin Rudin was the owner of that

       14   company?

04:16  15   A.   No, not aware of it.

04:16  16   Q.   Were you are aware that K2 engaged in a transaction

       17   with Oracle?

04:16  18   A.   No.  Was it in the federal space?

04:16  19   Q.   Sorry?

04:16  20   A.   If it was not in the federal space, I would not be

       21   aware of it.

04:17  22   Q.   What do you mean by "federal space"?

04:17  23   A.   Federal space, civilian agencies or Department of

       24   Defense.  That is the only thing I had visibility into.

04:17  25   Q.   So you would -- you just handled government

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | transactions --                                                        |
| 04:17 | 2  | A.   Yes.                                                               |
| 04:17 | 3  | Q.   -- with Oracle?                                                    |
| 04:17 | 4  | A.   U.S. Government.  I do not do state and local, only                |
|       | 5  | U.S. Government.                                                        |
| 04:17 | 6  | Q.   So someone else would do city governments?                        |
| 04:17 | 7  | A.   Yes.                                                               |
| 04:17 | 8  | Q.   Do you have any proof that Michael Mai was involved in            |
|       | 9  | the K2 transaction?                                                     |
| 04:17 | 10 |         MR. CRONE:  Objection.  Outside the scope,                      |
|       | 11 | Your Honor.                                                             |
| 04:17 | 12 |         THE COURT:  Sustained.                                          |
| 04:17 | 13 |         And the reason, Counsel, is because before, I'm                 |
|       | 14 | not clear, in looking at this realtime, the question is                 |
|       | 15 | "Were you aware that K2 engaged in a transaction," and then             |
|       | 16 | we got into a discussion about federal space and what her              |
|       | 17 | purview was.  So I don't have any foundation about K2 right             |
|       | 18 | now and if she has any knowledge about K2.                              |
| 04:18 | 19 |         MR. RAMP:  I understand, Your Honor.                            |
| 04:18 | 20 |         THE COURT:  Okay.                                               |
| 04:18 | 21 | BY MR. RAMP:                                                            |
| 04:18 | 22 | Q.   Do you have any knowledge of the K2 transaction?                   |
| 04:18 | 23 | A.   No, I don't.                                                       |
| 04:18 | 24 | Q.   Is there any reason why you wouldn't have knowledge of             |
|       | 25 | that?                                                                   |

DEBBIE GALE, U.S. COURT REPORTER

| 04:18 | 1 | A.   If it was not a federal contract, something I worked |
| | 2 | on, no. |
| 04:18 | 3 | Q.   Are you aware of a transaction between a company called |
| | 4 | CGCPP *(sic)* with Oracle? |
| 04:18 | 5 | A.   No. |
| 04:18 | 6 | Q.   Have you ever heard of that transaction? |
| 04:18 | 7 | A.   No. |
| 04:18 | 8 | Q.   Were you aware that Quin Rudin was the owner of that |
| | 9 | company? |
| 04:18 | 10 | MR. CRONE:  Objection.  Assumes facts not in |
| | 11 | evidence, Your Honor. |
| 04:18 | 12 | THE COURT:  Sustained. |
| 04:18 | 13 | BY MR. RAMP: |
| 04:18 | 14 | Q.   So before my questioning to you just now, you've never |
| | 15 | heard of that transaction? |
| 04:19 | 16 | A.   I've never heard of it. |
| 04:19 | 17 | Q.   Have you heard of a transaction with a company called |
| | 18 | "Media Lead"? |
| 04:19 | 19 | A.   No. |
| 04:19 | 20 | Q.   Do you know who was the owner of Media Lead? |
| 04:19 | 21 | A.   No. |
| 04:19 | 22 | Q.   Do you know who Mark Tiernan is? |
| 04:19 | 23 | A.   No. |
| 04:19 | 24 | Q.   Besides your attorneys, has anyone discussed the name |
| | 25 | of Mark Tiernan with you? |

04:19  1   A.   I've seen his name as a possible witness, but that is

2   it.

04:19  3   Q.   Have you seen his name involved in -- in the PCBC *(sic)*

4   transaction?

04:19  5              MR. CRONE:  Objection.  Outside the scope,

6   Your Honor.

04:19  7              THE COURT:  Overruled.

04:19  8              You can answer that question.  You can answer it.

04:19  9              THE WITNESS:  Um, no, not with this transaction.

04:19  10  BY MR. RAMP:

04:19  11  Q.   Have you seen Mark Tiernan associated with Quin Rudin?

04:19  12  A.   No.

04:20  13  Q.   Have you heard of a company called "Alethea"?

04:20  14  A.   No.

04:20  15  Q.   Are you aware that Mark Tiernan is an officer,

16  director, employer of that company?

04:20  17             MR. CRONE:  Objection.  Outside the scope,

18  Your Honor.

04:20  19             THE COURT:  No.  You can answer that question.

04:20  20             THE WITNESS:  Answer it?

04:20  21             THE COURT:  Yeah, you said before you were not

22  aware of it.

04:20  23             THE WITNESS:  I'm not aware.  I'm still not aware.

04:20  24             THE COURT:  Okay.

25

04:20    1    BY MR. RAMP:

04:20    2    Q.    Have you ever heard of a company called "Alethea"?

04:20    3    A.    No.

04:20    4    Q.    Have you had -- ever had any discussions with Mark

         5    Tiernan?

04:20    6    A.    No.

04:20    7    Q.    Do you know who he is?

04:20    8    A.    No.

04:20    9    Q.    Has anyone besides your attorneys informed you what

        10    relationship Mark Tiernan had with the PBGC transaction?

04:21   11              MR. CRONE:  Objection.  Assumes facts.

04:21   12              THE COURT:  In its present form, I'm going to

        13    sustain the objection.

04:21   14              THE WITNESS:  Answer?

04:21   15              THE COURT:  No.

04:21   16    BY MR. RAMP:

04:21   17    Q.    Do you know if Mr. Rudin introduced Michael Mai to

        18    Tiernan in 2009?

04:21   19    A.    No, I do not.

04:21   20    Q.    Are you aware that Mr. Tiernan signed a promissory note

        21    with Mr. Mai?

04:21   22              MR. CRONE:  Objection.  Outside the scope.

04:21   23              THE COURT:  Sustained.

04:21   24    BY MR. RAMP:

04:21   25    Q.    Okay.  I'm going to ask you some questions about the

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
|       | 1  | PBGC transaction.                                                        |
| 04:21 | 2  |     When did you first become aware of that transaction?                 |
| 04:21 | 3  | A.   First week in August when company called TUSC submitted             |
|       | 4  | a nonstandard request for increased discounts.                           |
| 04:21 | 5  | Q.   Who were they?                                                       |
| 04:21 | 6  | A.   TUSC, they were on site at PBGC doing some consulting                |
|       | 7  | work, and they had been working very closely with the                    |
|       | 8  | customer.                                                                 |
| 04:22 | 9  | Q.   They inform you that they made a bid on this?                        |
| 04:22 | 10 | A.   No.  They were seeking nonstandard approvals for                     |
|       | 11 | discounts so they could reply to the solicitation, which was             |
|       | 12 | due the following week.                                                   |
| 04:22 | 13 | Q.   Okay.  And what was the outcome of that?                             |
| 04:22 | 14 | A.   They received nonstandard approvals.  I don't remember              |
|       | 15 | exactly what the amount was, but they did receive increased              |
|       | 16 | discounts so they could reply to the government.                         |
| 04:22 | 17 | Q.   And do you know if they did reply to the government?                 |
| 04:22 | 18 | A.   Yes, they did.                                                       |
| 04:22 | 19 | Q.   And they submitted a bid?                                            |
| 04:22 | 20 | A.   Yes.                                                                 |
| 04:22 | 21 | Q.   They didn't win that bid?                                            |
| 04:22 | 22 | A.   They did not win.                                                    |
| 04:22 | 23 | Q.   And you said another company also notified you of this              |
|       | 24 | bid?                                                                      |
| 04:22 | 25 | A.   Yes.  DLT Solutions requested nonstandard discounts on              |

DEBBIE GALE, U.S. COURT REPORTER

|        | 1  | the 12th of August so that they could reply on the 13th. |
|--------|----|----------------------------------------------------------|
| 04:22  | 2  | Q.   Who is DLT Solutions? |
| 04:22  | 3  | A.   DLT is one of our GSA schedule resellers. |
| 04:22  | 4  | Q.   What is a GSA reschedule seller *(sic)*? |
| 04:23  | 5  | A.   Okay.  GSA is General Services Administration.  They're |
|        | 6  | a part of the civilian part of the federal government.  They |
|        | 7  | manage catalogs for all types of products and services for |
|        | 8  | the government, probably in thousands. |
| 04:23  | 9  | If you want to buy paper clips, if you want to buy |
|        | 10 | pencils, software, hardware, cars, GSA has a catalog that |
|        | 11 | you can buy the products from. |
| 04:23  | 12 | Q.   And they were planning on making a bid on this -- |
| 04:23  | 13 | A.   Yes. |
| 04:23  | 14 | Q.   -- transaction? |
| 04:23  | 15 | So they got a quote from Oracle as to what the price of |
|        | 16 | the product would be? |
| 04:23  | 17 | A.   They did not get a quote from Oracle.  They received |
|        | 18 | approvals for nonstandard discounts. |
| 04:23  | 19 | Q.   Okay.  So when they got that approval, did they know |
|        | 20 | how much this product would cost so they could figure out |
|        | 21 | what their bid would -- |
| 04:23  | 22 | A.   Yes. |
| 04:23  | 23 | Q.   -- they had a number; they had a figure? |
| 04:23  | 24 | A.   Right. |
| 04:23  | 25 | Q.   And then it was up to them as to what profit margin |

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
|        | 1  | they wanted to make, to add --                               |
| 04:24  | 2  | A.   Right.                                                   |
| 04:24  | 3  | Q.   -- to that number and submit it to PBGC?                 |
| 04:24  | 4  | A.   Yes.                                                     |
| 04:24  | 5  | Q.   And do you know if they did that?                        |
| 04:24  | 6  | A.   They submitted a price to PBGC.                          |
| 04:24  | 7  | Q.   And was there any other company that was planning on     |
|        | 8  | making a bid?                                                 |
| 04:24  | 9  | A.   Not to my knowledge.  Those were the only two            |
|        | 10 | nonstandard approvals that I saw.                             |
| 04:24  | 11 | Q.   But someone else could have made a bid without the       |
|        | 12 | approval?                                                     |
| 04:24  | 13 | A.   They could have made a bid without the approval.         |
| 04:24  | 14 | Q.   Are you aware of anyone else making a bid without the    |
|        | 15 | approval?                                                     |
| 04:24  | 16 | A.   Only Dearborne.                                          |
| 04:24  | 17 | Q.   And I believe it was your testimony that the government  |
|        | 18 | needs three bids --                                           |
| 04:24  | 19 | A.   Yes.                                                     |
| 04:24  | 20 | Q.   And so the government got its three bids in this         |
|        | 21 | transaction?                                                  |
| 04:24  | 22 | A.   They may have gotten more.  I mean, if they go with      |
|        | 23 | standard discounts, they do not need approvals.               |
| 04:24  | 24 | Q.   And then at that point, the PBGC would accept the        |
|        | 25 | winning bid.  Is that how it works?                           |

Case 8:10-cv-01853-DOC-RNB  Document 193  Filed 09/19/13  Page 124 of 138  Page ID #:2172
SACV 10-1853 DOC  7/19/2013 - Day 1

124

04:25   1   A.   They would determine the best value to the government

     2   and select a winner.

04:25   3   Q.   And in this case, it was Dearborne?

04:25   4   A.   Yes.

04:25   5   Q.   And Dearborne was not a reseller when Dearborne

     6   submitted that bid, correct?

04:25   7   A.   That's true.

04:25   8   Q.   And then what happened after that?

04:25   9   A.   That's when we discovered that Dearborne had acquired

     10   Certus, who was a reseller.  That allowed us to treat them

     11   as one and the same, so Dearborne was able to execute the

     12   transaction.

04:25   13   Q.   Why did -- why did Certus need Dearborne?

04:25   14   A.   Technically, they didn't, but they might have felt like

     15   the "service-disabled" ticket was something that helped 'em.

04:26   16   Q.   Well, the service-disabled-veteran status --

04:26   17   A.   Right.

04:26   18   Q.   -- that was not a necessity for this?

04:26   19   A.   That was not a requirement, but quite often the

     20   government will award it to a minority-type company because

     21   they know they can report it on their score card and it will

     22   help them.

04:26   23   Q.   But you don't know that's the reason why --

04:26   24   A.   No, I don't.

04:26   25   Q.   So you're speculating on that?

04:26    1    A.    Right.

04:26    2    Q.    And it wasn't a requirement from Oracle to have a

         3    disabled-veteran service company?

04:26    4    A.    Right.  It was not our requirement.

04:26    5    Q.    Do you remember the exact number of telephone calls you

         6    made with Quin Rudin regarding this?

04:26    7    A.    No.

04:26    8    Q.    Do you recall the exact number of phone calls you made

         9    with Michael Mai regarding this transaction?

04:27   10    A.    No, I don't.

04:27   11    Q.    Do you have a knowledge of FedBid?

04:27   12    A.    Yes.

04:27   13    Q.    What is FedBid?

04:27   14    A.    That's the organization where they post opportunities.

        15    They send you notifications of opportunities.  You can go in

        16    and you can say, I'm interested in opportunities for this

        17    type of software or this type of renewal.  And they will

        18    e-mail you notification of those.

04:27   19         They also have a bulletin-board type where -- you know,

        20    bulletin board where you can go search and pick

        21    opportunities that you're interested in.

04:27   22         I've got a user I.D. for it, and just today I received

        23    a notice of opportunities.

04:27   24    Q.    Now, since you work at Oracle, why would you have that?

04:27   25    A.    Um, because we like to watch the opportunities, and

Case 8:10-cv-01853-DOC-RNB  Document 193  Filed 09/19/13  Page 126 of 138  Page ID #:2174
SACV 10-1853 DOC  7/19/2013 – Day 1

126



1  there are cases where we might bid directly.  It's the

2  exception, but we might.

04:28   3  Q.    Instead of using a third party like DLT or the other

4  companies you mentioned, why doesn't Oracle submit the bid

5  directly?

04:28   6  A.    Because we like to use resellers because that gives us

7  more salespeople touching the customers, reaching out to the

8  customers, having contact with the customers.  Our staff is

9  very limited.  And by use of the resellers, we have more

10  people working with our customers on our behalf.

04:28  11  Q.    Is it your understanding that Michael Mai went through

12  FedBid to win this contract?

04:28  13  A.    Yes, it is.

04:28  14  Q.    And that was a legal thing he did?

04:28  15  A.    Yes.

04:28  16  Q.    Was it your understanding that it was Quin Rudin, since

17  his company was the reseller, it was his obligation to pay

18  back Oracle?

04:28  19  A.    The purchase order and the Partner Ordering Document

20  indicated that invoices and "bill to" would be Dearborne

21  Circle, LLC.

04:29  22  Q.    But Certus was the company name.  It was care of

23  Dearborne Circle; is that right?

04:29  24  A.    Certus, care of, and it had the address of Dearborne

25  Circle, Huntington Beach.

04:29   1   Q.   How many telephone conversations did you have with

        2   Michael Mai regarding this transaction?

04:29   3   A.   I don't recall.

04:29   4   Q.   Can you give me an estimate?  More than five?  Less

        5   than five?

04:29   6   A.   More than five, less than a dozen.

04:29   7   Q.   When was the first time you spoke to Michael Mai?

04:29   8   A.   Would have been the 28th of August.

04:29   9   Q.   And why was -- why was that conversation made?

04:29  10   A.   Because that was the date it was awarded.

04:30  11   Q.   How do you know it was awarded on that date?

04:30  12   A.   Because when I received a copy of the government order

       13   to Dearborne, it was dated the 28th.

04:30  14   Q.   Did you call him, or did he call you?

04:30  15   A.   I don't recall who made the first phone call.

04:30  16   Q.   And what was the gist of that conversation?

04:30  17   A.   Working through the transaction.

04:30  18   Q.   Did you tell Michael Mai certain things that he had to

       19   do to conclude -- to finish the transaction?

04:30  20   A.   No, because he had indicated that Quin Rudin would be

       21   taking point -- taking lead on the transaction.

04:30  22   Q.   Well, you did -- did you consider that significant that

       23   he said Quin Rudin would be taking the lead in this

       24   transaction?

04:30  25   A.   I mean, no more so than -- I mean, lots of resellers

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| | 1 | have lots of different people working on various |
| | 2 | transactions.  If I work with DLT, I'll work with one person |
| | 3 | for one transaction and a second person for another |
| | 4 | transaction.  They don't have one person doing all the |
| | 5 | transactions. |
| 04:31 | 6 | Q.   Were any of your phone calls with Quin Rudin or Michael |
| | 7 | Mai recorded? |
| 04:31 | 8 | A.   No.  I don't record my calls, I'm sorry. |
| 04:31 | 9 | Q.   Do you have any records of those telephone |
| | 10 | conversations? |
| 04:31 | 11 | A.   No. |
| 04:31 | 12 | Q.   Did you make notes of each telephone conversation you |
| | 13 | had with Michael Mai? |
| 04:31 | 14 | A.   I may have made notes at the time.  I probably did, but |
| | 15 | I don't have those notes any longer. |
| 04:31 | 16 | Q.   Was there anything that you typed in a computer |
| | 17 | regarding your conversations with Mr. Mike Mai? |
| 04:31 | 18 | A.   No.  Unfortunately, I am an old-school -- paper.  Give |
| | 19 | me a notebook, and I will write out notes. |
| 04:31 | 20 | Q.   So it's Oracle's company policy there's no verification |
| | 21 | of what was said during a conversation with a reseller or |
| | 22 | with a customer or with anyone? |
| 04:32 | 23 | MR. CRONE:  Objection.  Foundation, Your Honor. |
| 04:32 | 24 | THE COURT:  Overruled. |
| 04:32 | 25 | You can answer that question. |

04:32   1           THE WITNESS:  There's no policy that we keep --

       2   and I really keep every e-mail as tracking.  And in this

       3   case, I had a -- quite a few e-mails to track the progress.

04:32   4   BY MR. RAMP:

04:32   5   Q.   And how long do you keep those e-mails per transaction?

04:32   6   A.   Um, I have e-mails on my hard drive from 1999.  I am

       7   probably the worst person for hoarding e-mails.

04:32   8   Q.   Okay.  So do some e-mails get deleted?

04:32   9   A.   Not with transactions.

04:32   10   Q.   How do you know that?

04:32   11   A.   Because I tend to keep everything.

04:32   12   Q.   Well, could someone else who worked on this

       13   transaction -- could someone else have deleted an e-mail?

04:32   14   A.   They could have, but not from my hard drive.

04:33   15   Q.   Would it be in your hard drive?

04:33   16   A.   I keep the e-mails on my hard drive.

04:33   17   Q.   Okay.  You mentioned --

04:33   18   A.   And Oracle corporate also maintains e-mails.  I've been

       19   surprised sometimes at what they find that I have deleted.

04:33   20   Q.   Okay.  So there have been e-mails deleted?

04:33   21   A.   At times.  But when I deal with transactions, I -- I

       22   put 'em all in a folder.

04:33   23   Q.   Okay.  You mentioned you needed approval -- from this

       24   transaction, you needed approval from higher people in your

       25   company?

Case 8:10-cv-01853-DOC-RNB   Document 193   Filed 09/19/13   Page 130 of 138   Page ID #:2178
SACV 10-1853 DOC   7/19/2013 - Day 1

130

| | | |
|---|---|---|
| 04:33 | 1 | A.   Right, yes. |
| 04:33 | 2 | Q.   Did you have an e-mail from any person higher up than |
| | 3 | you saying we are gonna agree to do this transaction? |
| 04:33 | 4 | A.   Yes. |
| 04:33 | 5 | Q.   Did you provide that e-mail to -- to Mr. Mai? |
| 04:33 | 6 | A.   We would not provide that e-mail specifically.  We |
| | 7 | would provide a summary of the approval saying you are |
| | 8 | approved for this discount.  You are approved for this |
| | 9 | second year of support. |
| 04:33 | 10 | Q.   Was that ever provided to Mr. Mai -- |
| 04:34 | 11 | A.   I would assume so. |
| 04:34 | 12 | Q.   -- the summary? |
| 04:34 | 13 | A.   I would have to check. |
| 04:34 | 14 | Q.   But you're not aware right now? |
| 04:34 | 15 | A.   At this point in time, I would have to check my system. |
| 04:34 | 16 | Q.   What was the total number of e-mails you received from |
| | 17 | Mr. Mai? |
| 04:34 | 18 | A.   I don't know. |
| 04:34 | 19 | Q.   What was the total number of e-mails that you sent to |
| | 20 | Mr. Mai? |
| 04:34 | 21 | A.   I don't know. |
| 04:34 | 22 | Q.   And Mr. Quin Rudin, how many did you receive from him? |
| 04:34 | 23 | A.   I don't know. |
| 04:34 | 24 | Q.   How many did you send to Mr. Rudin? |
| 04:34 | 25 | A.   I don't know. |

| 04:34 | 1 | Q.   Did you have any contacts with anyone at your company |
| | 2 | where you discussed the character of Mr. Quin Rudin? |
| 04:34 | 3 | A.   No. |
| 04:35 | 4 | Q.   So you're aware that Mr. Mai went to other people |
| | 5 | besides Certus to formalize a bid on this transaction? |
| 04:35 | 6 | MR. CRONE:  Objection.  Mischaracterizes her |
| | 7 | testimony. |
| 04:35 | 8 | THE COURT:  Do you understand the question?  Do |
| | 9 | you understand the question? |
| 04:35 | 10 | THE WITNESS:  I think so. |
| 04:35 | 11 | THE COURT:  All right.  Overruled. |
| 04:35 | 12 | You can answer it. |
| 04:35 | 13 | THE WITNESS:  I was not aware until I heard your |
| | 14 | opening statement today. |
| 04:35 | 15 | THE COURT:  Oh, well, Counsel, then if it's based |
| | 16 | on that, there's lack of foundation. |
| 04:35 | 17 | MR. RAMP:  I understand. |
| 04:35 | 18 | BY MR. RAMP: |
| 04:35 | 19 | Q.   But no one else -- no one told you before today that |
| | 20 | Mr. Mai had talked to two other companies about helping |
| | 21 | him -- I mean -- strike that. |
| 04:35 | 22 | No one told you before today Mr. Mai had gone to two |
| | 23 | other resellers to try to get this bid approved with PBGC? |
| 04:36 | 24 | A.   No. |
| 04:36 | 25 | Q.   Wouldn't you think that would be important? |

04:36    1           MR. CRONE:  Objection.  Argumentative.

04:36    2           THE COURT:  Sustained.

04:36    3    BY MR. RAMP:

04:36    4    Q.   The contract, which was eventually signed, had a

         5    provision that it was Quin Rudin whose responsibility it was

         6    to pay Oracle for the product; isn't that true?

04:36    7    A.   Which contract?  I mean, the Partner Ordering Document

         8    indicated the "bill to" to be Michael Mai --

04:36    9    Q.   Well --

04:36   10    A.   -- the purchase order indicated that also.

04:36   11    Q.   Well, the "bill to" was gonna be to Certus; is that

        12    correct?

04:36   13    A.   If we go back and look -- can we go back and look at

        14    the Partner Ordering Document?  Do you remember what exhibit

        15    that is?

04:37   16           MR. RAMP:  Your Honor, I'm going to be going over

        17    a number of exhibits.  Should we continue?

04:37   18           THE COURT:  Is this a good time, then, to recess?

04:37   19           MR. RAMP:  I think so.

04:37   20           THE COURT:  I wanted to make sure I didn't break

        21    the chain.

04:37   22           *(To the Jury:)*  Let's send you home and have you

        23    beat the traffic.  I'd like to get back into session Monday.

04:37   24           *(To a Juror:)*  But I want to talk to you for just

        25    a moment in the presence of the other jurors.

04:37    1              Are you working Sunday evening?

04:37    2              A JUROR:  No.

04:37    3              THE COURT:  That's why I want to get back, because

         4    I'm trying to avoid when you'd be up -- one of you would be

         5    up all night.  I'm sorry.  I've got the wrong person.

04:37    6              A JUROR:  I'm working Sunday night.

04:37    7              THE COURT:  You're working Sunday night.

04:37    8              A JUROR:  Yes.

04:37    9              THE COURT:  I've got to resume -- I mean, this

        10    case is going to go by -- I'd like to keep the continuity.

        11    I'm going to bring you back.  If you can't hold up, I want

        12    you to tell me.  Okay?

04:37   13              A JUROR:  Okay.

04:37   14              THE COURT:  But come on in.  Let's see how you do.

04:37   15              What time do you get off?

04:37   16              A JUROR:  6:30 in the morning.  Unless I take

        17    Sunday off for jury duty, I don't get paid for it.

04:38   18              THE COURT:  No, I'm not discouraging you from

        19    working, trust me; these are difficult times.  Let's see how

        20    you hold up during the day.  Okay?

04:38   21              I think there's a good chance that this case will

        22    be going to jury on Tuesday, and I would like to keep it

        23    going if possible.  And if you're not doing well, I'll talk

        24    to both counsel.  But I'm a little afraid of the time delay.

04:38   25              I've been moving cases around today.  Normally,

DEBBIE GALE, U.S. COURT REPORTER

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | Mondays are a calendar day.  But we've been moving things            |
|       | 2  | into 7:00, 7:30 in the morning and back to 4:30 or 5:00              |
|       | 3  | o'clock at night.                                                    |
| 04:38 | 4  |            To be safe, I'm going to ask you to come in at --          |
| 04:38 | 5  |            Off the record for a minute.                               |
| 04:38 | 6  |       *(Discussion off the record.)*                                 |
| 04:38 | 7  |       THE COURT:  *(To the Jury:)*  9:00 clock, that's                |
|       | 8  | great.  We've moved a lot of things.  So at 9:00 o'clock.            |
|       | 9  | I'd like to get as far as we can, depending.                         |

THE COURT:  *(To the Jury:)*  9:00 clock, that's great.  We've moved a lot of things.  So at 9:00 o'clock. I'd like to get as far as we can, depending.

04:39  10  But I think there's every possibility we'll have
11  this case to you by Tuesday.  Okay?  Now, I can't promise
12  that, but I think so.

04:39  13  You're admonished not to discuss this matter
14  amongst yourselves, nor form or express any opinion
15  concerning the case.  I'll order you back at 9:00 o'clock on
16  Monday.

04:39  17  *(To Counsel:)*  I want to make sure with counsel,
18  both counsel.

04:39  19  Especially -- Counsel, is this a convenient time
20  for you to break?

04:39  21  MR. RAMP:  Yes, Your Honor.

04:39  22  THE COURT:  I didn't want to interrupt whatever
23  flow both parties had for the plaintiff and defense.

04:39  24  Please don't talk to anybody.  We'll see you at
25  9:00 o'clock.  Leave the pad or notebook on the seat that

Case 8:10-cv-01853-DOC-RNB  Document 193  Filed 09/19/13  Page 135 of 138  Page ID
#:2183
SACV 10-1853 DOC  7/19/2013 - Day 1

135

|       |    |                                                               |
|-------|----|---------------------------------------------------------------|
|       | 1  | you occupy.                                                    |
| 04:39 | 2  | *(Jury adjourns at 4:39 p.m.)*                                 |
| 04:39 | 3  | THE COURT:  You can step down.                                 |
| 04:39 | 4  | *(Witness steps down.)*                                        |
| 04:39 | 5  | THE COURT:  Okay.  Debbie, rest your hands.                    |
| 04:39 | 6  | *(Pause in the proceedings at 4:39 p.m.)*                      |
| 04:39 | 7  | *(Proceedings resumed at 4:41 p.m.)*                           |
| 04:40 | 8  | *(Outside the presence of the jury.)*                          |
| 04:40 | 9  | THE COURT:  Back on record.  We're back on the                |
|       | 10 | record.                                                        |
| 04:41 | 11 | I received a set of jury instructions, and even               |
|       | 12 | though they didn't seem to be unopposed, I still want to go    |
|       | 13 | over those in detail.  It's my duty to instruct               |
|       | 14 | appropriately.                                                |
| 04:41 | 15 | Are there going to be any other jury instructions             |
|       | 16 | submitted by the defense, and if so, I want to get them       |
|       | 17 | earlier rather than later.                                    |
| 04:41 | 18 | MR. RAMP:  When would we have to give that to the             |
|       | 19 | Court, Your Honor?                                             |
| 04:41 | 20 | THE COURT:  Well, they should have been done a                |
|       | 21 | long time ago, but I want to instruct carefully and           |
|       | 22 | precisely on the law, and I'll still give you some            |
|       | 23 | opportunity about that.                                       |
| 04:41 | 24 | I would think by Monday morning.  Okay?  I'll be              |
|       | 25 | working this weekend, but I'm trying not to call all of you   |

Case 8:10-cv-01853-DOC-RNB  Document 193  Filed 09/19/13  Page 136 of 138  Page ID #:2184
SACV 10-1853 DOC  7/19/2013 – Day 1

136

| | 1 | in on a Saturday, if possible. |
|---|---|---|
| 04:41 | 2 | So by Monday morning, I'd like to see that, but |
| | 3 | I'm pretty far down the line.  What I'm really doing is |
| | 4 | checking plaintiff's instructions and waiting to see what |
| | 5 | the evidence is before I make a final decision. |
| 04:41 | 6 | But Monday morning, I'd say by 8:00 o'clock. |
| 04:41 | 7 | MR. RAMP:  That would be fine, Your Honor. |
| 04:42 | 8 | THE COURT:  Okay.  Now, is there anything further |
| | 9 | this evening so I don't keep you? |
| 04:42 | 10 | MR. CRONE:  When would Your Honor like us here? |
| | 11 | 8:00 o'clock Monday or earlier? |
| 04:42 | 12 | THE COURT:  I think 8:00 o'clock.  We're going to |
| | 13 | start on those instructions before the jury comes in for an |
| | 14 | hour or so.  And you're going to work with both my law |
| | 15 | clerks on those instructions.  Okay? |
| 04:42 | 16 | MR. CRONE:  Okay. |
| 04:42 | 17 | THE COURT:  And I'll be in session probably about |
| | 18 | 7:30. |
| 04:42 | 19 | MR. CRONE:  And, Your Honor, there was the issue |
| | 20 | of one of the exhibits that was brought up during |
| | 21 | Ms. Achey's direct. |
| 04:42 | 22 | THE COURT:  Yeah.  It lacks foundation as far as |
| | 23 | the Court's concerned.  You can fly that person out, find |
| | 24 | that person, but I'm a little hesitant with the generalized |
| | 25 | way it started.  Somebody took notes.  I didn't know the |

1    name.  Then we finally got down to a name.  Now, I'm not

2    certain how that person took notes, how accurate that is.  I

3    think it's hearsay.

04:42    4            MR. CRONE:  Okay.

04:42    5            THE COURT:  Okay.  Thank you very much, Counsel.

04:42    6            Both of you have a good weekend.

04:42    7            MR. CRONE:  Thank you, Your Honor.

04:42    8            MR. RAMP:  Thank you, Your Honor.

04:42    9        *(Proceedings adjourned at 4:42 p.m.)*

04:42   10                        -oOo-

04:42   11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

-oOo-


CERTIFICATE


        I hereby certify that pursuant to Section 753,

Title 28, United States Code, the foregoing is a true and

correct transcript of the stenographically reported

proceedings held in the above-entitled matter and that the

transcript page format is in conformance with the

regulations of the Judicial Conference of the United States.


Date:  September 16, 2013



                        /s/ Debbie Gale
                        _____
                        DEBBIE GALE, U.S. COURT REPORTER
                        CSR NO. 9472, RPR, CCRR