1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3          HONORABLE DAVID O. CARTER, JUDGE PRESIDING

4                  - - - - - - -

5    ORACLE AMERICA, INC., et al.,      )
                                        )
6            Plaintiffs,                )
                                        )
7        vs.                            ) No. SACV 10-1853 DOC
                                        )      Day 2
8    MICHAEL Q. MAI,                    )
                                        )
9            Defendant.                 )
     _____)

10

11

12

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                    Jury Trial

15               Santa Ana, California

16              Monday, July 22, 2013

17

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   10cv1853 Oracle 2013-07-22 D2

1    **APPEARANCES OF COUNSEL:**

2

     FOR PLAINTIFFS ORACLE AMERICA, INC., et al.:
3

4            Andrew C. Temkin
             ORACLE CORPORATION
5            500 Oracle Parkway MS 5op7
             Redwood City, CA 94065
6            650-506-5200

7            Daryl M. Crone
             CRONE HAWXHURST LLP
8            10880 Wilshire Boulevard
             Suite 1150
9            Los Angeles, California 90024
             310-893-5150

10
             Joshua Paul Gelbart
11           CRONE HAWXHURST LLP
             10880 Wilshire Boulevard
12           Suite 1150
             Los Angeles, California 90024
13           310-893-5150

14

15   FOR DEFENDANT MICHAEL Q. MAI:

16           John J. Ramp
             RAMP & ASSOCIATES
17           7755 Center Avenue
             Suite 1100
18           Huntington Beach, California 92647
             714-372-2292
19

20

21

22

23

24

25

**I N D E X**


**TESTIMONY**

| PLAINTIFF WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ACHEY, Anne (Resumed) | | | | |
| By Mr. Ramp | | 5 | | 58 |
| By Mr. Crone | | | 38 | |
| | | | | |
| MAI, Micahel Quang | | | | |
| By Mr. Crone | 67 | | | |


**EXHIBITS**

| EXHIBIT NO./DESCRIPTION | IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 10 Letter from B. Vargas to M. Tiernan re Promissory Note | | 158 |
| 11 9/15/10 E-mail from M. Mai to Microsoft | | 182 |
| 12 Printout from GoDaddy.com website | | 188 |
| 16 Transactional documents between Dearborne Circle and PBGC | | 93 |
| 19 Public Sector Partner Ordering Document | | 27 |
| 23 Packet of bank statements, cancelled checks | | 83 |

| | **EXHIBITS (Continued)** | | |
|---|---|---|---|
| | **EXHIBIT NO./DESCRIPTION** | **IDENTIFICATION** | **IN EVIDENCE** |
| 24 | Bank account documents | | 152 |
| 26 | 6/8/10 Letter from R. McKague to M. Mai and C. Kramer | | 168 |
| 27 | 6/10/10 e-mail from PBGC to Mr. Mai | | 172 |
| 28 | 09/29/09 E-mail from Q. Rudin to M. Mai | | 154 |
| 29 | 11/3/09 E-mail from Q. Rudin to M. Mai | | 154 |
| 36 | Letter to M. Mai from L. Pae, Dept. of Veterans Affairs | | 79 |
| 60 | 8/31/10 E-mail from M. Mai to M. Tiernan | | 176 |
| 120 | 09/19/09 E-mail from R. Price to M. Mai re QA Delivery Notice | | 73 |
| 121 | Email from R. Price to Mr. Mai | | 133 |

```
 1              SANTA ANA, CALIFORNIA, MONDAY, JULY 22, 2013

 2                              Day 2

 3                           (9:02 a.m.)

 4         (In the presence of the jury.)

 5              THE COURT:  Good morning.  If you would be seated,

 6    then.  We're back in session.  The jury's present.

 7              Counsel, if you would be seated, please, and the

 8    witness.

 9         ANNE ACHEY, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

10                         RESUMED THE STAND

11              THE COURT:  Counsel, this is your continued

12    cross-examination.

13              MR. RAMP:  Thank you, Your Honor.

14                  CROSS-EXAMINATION  (Resumed)

15    BY MR. RAMP:

16    Q.   Good morning, Ms. Achey.

17    A.   Good morning.  How are you?

18    Q.   Very good.

19         On Friday, we were discussing about the e-mails between

20    Mr. Rudin and -- to you.

21    A.   Right.

22    Q.   After you received these e-mails from Mr. Rudin, did

23    you ever call Mr. Mai and speak to him on the phone, ask --

24    and asking him whether he authorized those e-mails?

25    A.   No.  I talked to him, but I did not ask him whether he
```

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | authorized the e-mails.  Since he was copied on 'em, the           |
|       | 2  | natural assumption was he was.                                     |
| 09:03 | 3  | Q.   But you didn't ask him?                                       |
| 09:03 | 4  | A.   No, I didn't.                                                 |
| 09:03 | 5  | Q.   You just assumed he authorized that?                         |
| 09:03 | 6  | A.   He was copied on the e-mails, yes.                           |
| 09:03 | 7  | Q.   My question was you assumed that, didn't you?               |
| 09:03 | 8  | A.   Yes.                                                          |
| 09:03 | 9  | Q.   Did you ask anyone at Oracle about Mr. Rudin when he        |
|       | 10 | first approached you regarding this transaction?                 |
| 09:03 | 11 | A.   No, I didn't.  I just checked the OPN site to ensure        |
|       | 12 | that they were an OPN.                                            |
| 09:03 | 13 | Q.   Did you ask anyone at Oracle whether Mr. Rudin had done     |
|       | 14 | prior transactions with Oracle?                                   |
| 09:04 | 15 | A.   No, I did not.                                               |
| 09:04 | 16 | Q.   Did you ever become aware that Oracle had problems with    |
|       | 17 | Mr. Rudin regarding prior transactions Mr. Rudin conducted      |
|       | 18 | with Oracle?                                                      |
| 09:04 | 19 |          MR. CRONE:  Objection.  Assumes facts not in            |
|       | 20 | evidence.                                                         |
| 09:04 | 21 |          THE COURT:  Restate the question, Counsel, one          |
|       | 22 | more time.                                                        |
| 09:04 | 23 |          MR. RAMP:  I'll state another question.                |
| 09:04 | 24 | BY MR. RAMP:                                                      |
| 09:04 | 25 | Q.   Did anyone at Oracle inform you that they were             |

DEBBIE GALE, U.S. COURT REPORTER

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | concerned about Mr. Rudin's performance in prior                    |
|       | 2  | transactions?                                                       |
| 09:04 | 3  | A.   No.                                                            |
| 09:04 | 4  | Q.   Did you ever become aware that Oracle believed that            |
|       | 5  | Mr. Rudin had done wrongful acts in prior transactions?             |
| 09:04 | 6  | MR. CRONE:  Objection.  Assumes facts.                              |
| 09:04 | 7  | THE COURT:  *(To the Jury:)*  Well, you're not to                   |
|       | 8  | assume that these questions are facts.  I'm going to let            |
|       | 9  | counsel inquire.  But I don't -- otherwise the questions by         |
|       | 10 | the attorneys are not facts.  It's only the witness's               |
|       | 11 | answer.  So you're not to assume that there were, you know,         |
|       | 12 | prior bad acts or there weren't, just to find out if there         |
|       | 13 | was any information about this.                                     |
| 09:05 | 14 | *(To the Witness:)*  You can answer the question.                   |
| 09:05 | 15 | THE WITNESS:  Would you restate the question                        |
|       | 16 | again?                                                              |
| 09:05 | 17 | THE COURT:  And don't state it as a statement,                      |
|       | 18 | Counsel.                                                            |
| 09:05 | 19 | State it as an inquiry, if she's aware of any bad                   |
|       | 20 | acts.                                                               |
| 09:05 | 21 | BY MR. RAMP:                                                        |
| 09:05 | 22 | Q.   Did you ever become aware of any bad acts by Mr. Rudin?        |
| 09:05 | 23 | A.   Not in the 2009/2010 time frame.                               |
| 09:05 | 24 | Q.   Did you become aware later?                                    |
| 09:05 | 25 | A.   Yes.                                                           |

8

| 09:05 | 1 | Q.   And when was that? |
| 09:05 | 2 | A.   Probably 2011, 2012, when I became aware of the suit |
|       | 3 | that was going forward. |
| 09:05 | 4 | Q.   And I am not talking about the PBGC transactions -- |
| 09:05 | 5 | A.   Right. |
| 09:05 | 6 | Q.   -- I'm talking other transactions. |
| 09:05 | 7 | A.   Right.  And I was told that there was some prior |
|       | 8 | concerns.  But did wasn't until 2011/2012 time frame. |
| 09:06 | 9 | Q.   And that was with other companies, correct? |
| 09:06 | 10 | A.   On other transactions. |
| 09:06 | 11 | Q.   And Mr. Mai was not involved in that transaction, |
|       | 12 | correct? |
| 09:06 | 13 | A.   I don't know. |
| 09:06 | 14 | Q.   But no one informed you that he was? |
| 09:06 | 15 | A.   No. |
| 09:06 | 16 | Q.   Any other transactions besides that one you mentioned? |
| 09:06 | 17 | A.   Any other transactions? |
| 09:06 | 18 | Q.   That Oracle accused Mr. Rudin of committing bad acts? |
| 09:06 | 19 | A.   I don't know the details of the transactions.  I just |
|       | 20 | know there was some stated problems. |
| 09:06 | 21 | Q.   Did people at Oracle tell you when they became aware of |
|       | 22 | Mr. Rudin's prior bad acts? |
| 09:06 | 23 | A.   No. |
| 09:06 | 24 | MR. CRONE:  Objection.  Privilege. |
| 09:06 | 25 | THE COURT:  Overruled. |

DEBBIE GALE, U.S. COURT REPORTER

| 09:06 | 1  | You can answer. |
| 09:06 | 2  | THE WITNESS:  No. |
| 09:07 | 3  | BY MR. RAMP: |
| 09:07 | 4  | Q.   Did you inquire of Mr. Rudin about his prior bad acts? |
| 09:07 | 5  | A.   No. |
| 09:07 | 6  | Q.   Did you ask Mr. Mai about it? |
| 09:07 | 7  | A.   No. |
| 09:07 | 8  | Q.   I believe on Friday we confirmed that Certus was the |
|       | 9  | reseller in this transaction? |
| 09:07 | 10 | A.   Dearborne Certus. |
| 09:07 | 11 | Q.   But -- |
| 09:07 | 12 | A.   They were one in the same.  Dearborne had acquired |
|       | 13 | Certus. |
| 09:07 | 14 | Q.   But Certus -- Dearborne was not authorized reseller. |
|       | 15 | Dearborne itself was not an authorized reseller, correct? |
| 09:07 | 16 | A.   Right.  But they were the parent company. |
| 09:07 | 17 | Q.   It was Certus who was the authorized reseller, correct? |
| 09:07 | 18 | A.   Right. |
| 09:07 | 19 | Q.   What -- what -- besides these e-mails, what documents |
|       | 20 | do you have to prove that Dearborne purchased Certus? |
| 09:07 | 21 | A.   None.  Only the e-mails. |
| 09:07 | 22 | Q.   And I believe on Friday you testified that Mr. Mai |
|       | 23 | never told you over the phone or in person that he acquired |
|       | 24 | Certus, correct? |
| 09:08 | 25 | A.   No, it was only via the e-mail. |

| 09:08 | 1 | Q.   Did you research any government document to confirm |
| | 2 | that Dearborne had purchased Certus? |
| 09:08 | 3 | A.   No. |
| 09:08 | 4 | THE COURT:  Counsel, once again could you spell -- |
| | 5 | or would you spell Certus for us.  It's been referred to.  I |
| | 6 | want to get the correct spelling. |
| 09:08 | 7 | MR. RAMP:  That's C-E-R-T-U-S. |
| 09:08 | 8 | THE COURT:  All right.  Thank you. |
| 09:08 | 9 | BY MR. RAMP: |
| 09:08 | 10 | Q.   If I was applying for Oracle Credit, and I stated I |
| | 11 | purchased Coca-Cola in an e-mail, you would just believe |
| | 12 | that? |
| 09:08 | 13 | A.   That I would not believe. |
| 09:08 | 14 | Q.   What about if I purchased Pepsi, would you believe that |
| | 15 | one? |
| 09:08 | 16 | A.   No. |
| 09:08 | 17 | Q.   But you saw no document from a Secretary of State, |
| | 18 | nothing in writing to confirm the fact that Mr. Mai |
| | 19 | purchased Dearborne *(sic)*? |
| 09:09 | 20 | A.   I had an e-mail from Mr. Mai and one from Mr. Rudin to |
| | 21 | that effect. |
| 09:09 | 22 | Q.   And how do you know Mr. Mai sent you that e-mail and it |
| | 23 | wasn't Mr. Rudin forging his name? |
| 09:09 | 24 | A.   It came from the Dearborne server. |
| 09:09 | 25 | Q.   Could Mr. Rudin have used that server? |

| | | |
|---|---|---|
| 09:09 | 1 | MR. CRONE:  Objection.  Foundation. |
| 09:09 | 2 | THE COURT:  Sustained. |
| 09:09 | 3 | BY MR. RAMP: |
| 09:09 | 4 | Q.   When you said it came from their server, what do you |
| | 5 | mean? |
| 09:09 | 6 | A.   The e-mail address was dearbornellc.com. |
| 09:09 | 7 | Q.   On each one? |
| 09:09 | 8 | A.   Yes. |
| 09:09 | 9 | Q.   Does Oracle -- when someone says they purchased another |
| | 10 | company, is it routine that Oracle does not take any action |
| | 11 | to verify that? |
| 09:10 | 12 | A.   That was not my job to do that. |
| 09:10 | 13 | Q.   Whose job would that have been? |
| 09:10 | 14 | A.   That would have come out in the -- when the Dearborne |
| | 15 | financials were submitted to credit and they included |
| | 16 | consolidated statements for Dearborne and Certus. |
| 09:10 | 17 | Q.   No credit was ever given in this PBGC transaction, |
| | 18 | correct? |
| 09:10 | 19 | A.   Credit was given to Dearborne; otherwise, we could not |
| | 20 | have executed the deal. |
| 09:10 | 21 | Q.   How much credit -- |
| 09:10 | 22 | A.   Credit approval -- excuse me. |
| 09:10 | 23 | Q.   Credit approval? |
| 09:10 | 24 | A.   Credit approval was given for Dearborne; otherwise, we |
| | 25 | could not have executed the deal. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:10 | 1 | Q.   When was that credit approval given? |
| 09:10 | 2 | A.   Weekend of August, first of September, that time frame. |
| 09:11 | 3 | Q.   First of? |
| 09:11 | 4 | A.   The last weekend in August, first of September.  I |
| | 5 | would have to find the e-mail from credit. |
| 09:11 | 6 | Q.   What year? |
| 09:11 | 7 | A.   2009. |
| 09:11 | 8 | Q.   And didn't you testify on Friday that it was |
| | 9 | August 28th that you first became aware of this transaction? |
| 09:11 | 10 | A.   Yes. |
| 09:11 | 11 | Q.   And credit was approved in a day or two days; is that |
| | 12 | your testimony? |
| 09:11 | 13 | A.   Yes. |
| 09:11 | 14 | Q.   What document do you have showing that credit was |
| | 15 | approved for Dearborne? |
| 09:11 | 16 | A.   I have an e-mail from the credit department. |
| 09:11 | 17 | Q.   Did you bring it with you? |
| 09:11 | 18 | A.   Is it in these books?  Let me look. |
| 09:15 | 19 |      I don't see the actual credit approval in these |
| | 20 | binders.  I have it on my hard drive and can bring it in if |
| | 21 | necessary. |
| 09:15 | 22 |          MR. RAMP:  Well, we need it for trial, Ms. Achey. |
| 09:15 | 23 |          THE WITNESS:  Okay. |
| 09:15 | 24 |          MR. CRONE:  Objection.  Argumentative. |
| 09:15 | 25 |          THE COURT:  Overruled. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:15 | 1 | So are you two reaching an accommodation that this |
| | 2 | can be brought in? |
| 09:15 | 3 | MR. RAMP:  Reach an accommodation it can be |
| | 4 | brought in.  I'm sorry.  I don't understand your question, |
| | 5 | Your Honor. |
| 09:15 | 6 | THE COURT:  Are you asking her to bring it in? |
| 09:15 | 7 | MR. RAMP:  No.  I'm asking does she have it for |
| | 8 | court. |
| 09:16 | 9 | THE COURT:  Well, she says she has it on her hard |
| | 10 | drive. |
| 09:16 | 11 | BY MR. RAMP: |
| 09:16 | 12 | Q.   Where is the hard -- |
| 09:16 | 13 | A.   The hard drive is in my hotel. |
| 09:16 | 14 | Q.   You can bring that in tomorrow. |
| 09:16 | 15 | A.   Okay. |
| 09:16 | 16 | Q.   So I think you said on Friday it was $800,000 worth of |
| | 17 | credit would have to be approved? |
| 09:16 | 18 | A.   Yes. |
| 09:16 | 19 | Q.   To get $800,000 in credit from Oracle, what would the |
| | 20 | company's net worth have to be? |
| 09:16 | 21 | A.   I don't know. |
| 09:16 | 22 | Q.   Well, what's the guidelines for approving $800,000 |
| | 23 | worth of credit at Oracle? |
| 09:16 | 24 | A.   I don't know.  That's not my job.  That's outside of my |
| | 25 | purview. |

| | | |
|---|---|---|
| 09:16 | 1 | Q.   Can you tell me what financial documents Dearborne sent |
| | 2 | to Oracle to get approval for $800,000 in credit? |
| 09:16 | 3 | A.   According to the e-mail, they sent consolidated |
| | 4 | financial statements. |
| 09:17 | 5 | Q.   And where are those statements? |
| 09:17 | 6 | A.   I don't know.  I never saw them.  I'm not in that |
| | 7 | chain. |
| 09:17 | 8 | Q.   Do you have any documents to show this jury that what |
| | 9 | you're saying is true? |
| 09:17 | 10 | A.   I have the e-mail, a copy of the e-mail where they sent |
| | 11 | them to credit, and I have the credit approval. |
| 09:17 | 12 | Q.   I'm asking for the financial statements that Dearborne |
| | 13 | sent. |
| 09:17 | 14 | A.   I -- no.  It's always been my policy not to review any |
| | 15 | financial statements.  I do not want to even see them. |
| 09:17 | 16 | Q.   Did Mr. Rudin send those statements, or did Mr. Mai |
| | 17 | send those statements? |
| 09:17 | 18 | A.   I believe the e-mail was from Mr. Mai. |
| 09:17 | 19 | Q.   But you never saw the financial records? |
| 09:17 | 20 | A.   No. |
| 09:17 | 21 | Q.   How did you see this e-mail from Mr. Mai, then? |
| 09:17 | 22 | A.   It was provided to me later. |
| 09:18 | 23 | Q.   When later? |
| 09:18 | 24 | A.   It's in these documents here.  It's on the basis of -- |
| | 25 | I requested that they contact Oracle Finance, and I gave |

DEBBIE GALE, U.S. COURT REPORTER

1    them two points of contact.  And then they did send an

2    e-mail and financial statements.

09:18    3         And I was not copied on that actual e-mail, but it's in

4    one of the exhibits here.

09:18    5    Q.   And you're saying $800,000 worth of credit was approved

6    within two days?

09:18    7    A.   Yes.

09:18    8    Q.   Isn't it true, Ms. Achey, that credit was never used in

9    this transaction?

09:18    10   A.   Credit was used in the fact that we had it so that we

11   could book the deal, but we were never paid.

09:18    12   Q.   But no money was borrowed from Oracle?

09:18    13   A.   Oh, just because it's a credit approval, it means

14   they're not borrowing money but they're going to pay us.  We

15   had the expectation that they would be able to pay us the

16   $874,000.

09:19    17   Q.   Was Certus ever asked for financial records?

09:19    18   A.   I believe their records were included with the

19   Dearborne records.  It was a consolidated statement

20   according to the e-mail.

09:19    21   Q.   I believe on Friday you testified that Oracle goes

22   through resellers for the -- for government contracts for

23   their purchase of software.

09:19    24   A.   Yes.

09:19    25   Q.   And why is it, again, that Oracle doesn't directly

|       |    |                                                                   |
|-------|----|-------------------------------------------------------------------|
|       | 1  | sell?                                                             |
| 09:19 | 2  | A.   We use resellers for most of our contracts because it        |
|       | 3  | allows us to have more individuals reaching our customers,        |
|       | 4  | touching our customers.  It allows us to expand our sales         |
|       | 5  | force.                                                            |
| 09:20 | 6  | Q.   But these resellers, wouldn't you describe them as           |
|       | 7  | middlemen?                                                        |
| 09:20 | 8  | A.   They are middlemen.  I mean, but they do a lot of work       |
|       | 9  | often in working with the customers.                             |
| 09:20 | 10 | Q.   And they get paid money for that?                            |
| 09:20 | 11 | A.   Yes.                                                         |
| 09:20 | 12 | Q.   Wouldn't it be more cost efficient if Oracle just cut       |
|       | 13 | out the middleman, as we say, and just directly sold to          |
|       | 14 | these agencies?                                                  |
| 09:20 | 15 | A.   We would have to increase our staff.                        |
| 09:20 | 16 | Q.   Would you agree that Oracle has the money to increase       |
|       | 17 | staff?                                                           |
| 09:20 | 18 |          MR. CRONE:  Objection.  Relevance.                      |
| 09:20 | 19 |          THE COURT:  Overruled.                                  |
| 09:20 | 20 |          THE WITNESS:  That's a business decision that the       |
|       | 21 | corporation has made well above my level.                       |
| 09:21 | 22 | BY MR. RAMP:                                                     |
| 09:21 | 23 | Q.   Isn't it true that Oracle goes through this process so      |
|       | 24 | they can't be accused of price fixing?                          |
| 09:21 | 25 |          MR. CRONE:  Objection.  Relevance.                      |

| | | |
|---|---|---|
| 09:21 | 1 | THE COURT:  Overruled. |
| 09:21 | 2 | THE WITNESS:  I'm not aware that that's why they |
| | 3 | go through that process. |
| 09:21 | 4 | BY MR. RAMP: |
| 09:21 | 5 | Q.   Are you aware that Oracle has been accused of price |
| | 6 | fixing before? |
| 09:21 | 7 | MR. CRONE:  Objection.  This is a *motion in* |
| | 8 | *limine*, Your Honor. |
| 09:21 | 9 | THE COURT:  Yeah.  It's sustained, Counsel. |
| 09:21 | 10 | BY MR. RAMP: |
| 09:21 | 11 | Q.   Friday, I believe you testified that DLT software |
| | 12 | submitted a bid to PBGC, correct? |
| 09:21 | 13 | A.   DLT Solutions, yes. |
| 09:21 | 14 | Q.   And TUSC also did? |
| 09:21 | 15 | A.   Yes. |
| 09:21 | 16 | Q.   And you're aware that Mr. Mai went to DLT to secure a |
| | 17 | price from them before he submitted the bid to PBGC? |
| 09:22 | 18 | A.   I was not aware of that until I heard your opening |
| | 19 | statements. |
| 09:22 | 20 | Q.   Okay.  Were you aware that Mr. Mai went to GSA.gov to |
| | 21 | get a pricing to submit a bid? |
| 09:22 | 22 | A.   I was not aware of that, and I find it very interesting |
| | 23 | because GSA.gov is a government agency. |
| 09:22 | 24 | Q.   If Mr. Mai had purchased Certus, would it be abnormal |
| | 25 | that he would go to another agency to get pricing to submit |

DEBBIE GALE, U.S. COURT REPORTER

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | a quote to PBGC?                                            |
| 09:22 | 2  | A.   Agencies don't have the right to give out Oracle      |
|       | 3  | pricing.  GSA.gov cannot give out Oracle pricing.  GSA.gov |
|       | 4  | would have reseller catalogs on their site.                |
| 09:23 | 5  | Q.   What about DLT?                                        |
| 09:23 | 6  | A.   DLT could give out pricing, yes.                       |
| 09:23 | 7  | Q.   Do they have to go to Oracle to obtain the price?      |
| 09:23 | 8  | A.   Only if they were asking for increased discounts or   |
|       | 9  | other nonstandard terms.                                   |
| 09:23 | 10 | Q.   And they were given nonstandard terms?                |
| 09:23 | 11 | A.   For their bid on this opportunity, they asked for     |
|       | 12 | increased discount, yes.                                    |
| 09:23 | 13 | Q.   And they both received nonstandard pricing.  Is that  |
|       | 14 | what --                                                     |
| 09:23 | 15 | A.   -- TUSC and DLT both did.                              |
| 09:23 | 16 |         THE COURT:  I'm going to strike the question and    |
|       | 17 | answer because there was a talk over, and we couldn't get  |
|       | 18 | the question or the answer.                                 |
| 09:23 | 19 |         Just restate it, Counsel.                          |
| 09:23 | 20 | BY MR. RAMP:                                                |
| 09:23 | 21 | Q.   In your direct testimony you spoke about nonstandard  |
|       | 22 | pricing.  Could you refresh my memory about that?          |
| 09:23 | 23 | A.   Both DLT and TUSC had standard discounts that they    |
|       | 24 | could have used for this opportunity.  Both of 'em asked for|
|       | 25 | increased discounts so they could meet what they believed  |

DEBBIE GALE, U.S. COURT REPORTER

```
          1    was the government's price threshold.
09:24     2    Q.   And they were granted that, correct?
09:24     3    A.   Yes.
09:24     4    Q.   Isn't that the same thing Mr. Mai did?
09:24     5    A.   No.
09:24     6    Q.   What was the difference between what they did and
          7    Mr. Mai did?
09:24     8    A.   Mr. Mai never asked for increased discounts.
09:24     9    Q.   But he got nonstandard pricing?
09:24    10    A.   He got nonstandard pricing only after he presented us
         11    with a purchase order and we were trying to work through how
         12    could we make the deal work for Oracle and him.  It was
         13    after the fact.
09:24    14    Q.   And -- but he did get that nonstandard pricing?
09:24    15    A.   Yes, he did, after the fact.  The process is you're
         16    supposed to have it before you submit your bid to the
         17    government.
09:24    18    Q.   But what he got was the same thing as the other two
         19    companies received?
09:24    20    A.   He received nonstandard pricing, yes.
09:25    21    Q.   I'd like to refer you to Exhibit 119 in the book.
09:25    22    A.   Okay.  I'm there.
09:25    23    Q.   Did you find it?
09:25    24    A.   I'm there.
09:25    25         DEFENDANT MAI:  Excuse me.  There's a display on
```

```
        1   the TV.
09:25   2           THE COURT:  Well, just a moment.
09:25   3           Until something's received, it doesn't go up on
        4   the screen.  Has this been received into evidence?
09:26   5           MR. RAMP:  Yes, Your Honor.
09:26   6           THE COURT:  Okay.  Then it can go up.
09:26   7       (Exhibit displayed.)
09:26   8           MR. RAMP:  This was the plaintiff's exhibit that
        9   was admitted.
09:27  10   BY MR. RAMP:
09:27  11   Q.   I'd like to refer you to the first page of that
       12   exhibit --
09:27  13   A.   Yes.
09:27  14   Q.   -- it's marked 119-1.
09:27  15        And this is an e-mail from Quin Rudin, correct?
09:27  16   A.   Quin Rudin to myself, copying Debbie Dilldine, Michael
       17   Mai, and Claude Kramer.
09:27  18   Q.   Do you see where it says "redacted" on the front?
09:27  19   A.   Yes.
09:27  20   Q.   Why is that there?
09:27  21   A.   Normally, I would think that something had been removed
       22   from the e-mail.  But I do not see anything that's -- well,
       23   when you get to the pages 119-8 through -9, all the pricing
       24   on the government P.O. has been redacted.
09:27  25   Q.   Do you know for certain that was on this page, the
```

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | first page?                                                  |
| 09:27 | 2  | A.   Do I know for certain that?                             |
| 09:27 | 3  | Q.   Do you know for certain what was redacted on this first |
|       | 4  | page?                                                        |
| 09:27 | 5  | A.   Not on this first page, I don't think anything was; but |
|       | 6  | when you get back to pages 8 and 9 of the exhibit, the       |
|       | 7  | pricing has all been redacted.                               |
| 09:28 | 8  | Q.   All right.  But I'm talking about the first page,       |
|       | 9  | 119-1, it says "redacted."  I'm asking you -- you don't know |
|       | 10 | what was redacted?                                           |
| 09:28 | 11 | A.   I don't know what was redacted.                         |
| 09:28 | 12 | Q.   Something was taken out?                                |
| 09:28 | 13 | A.   That would be the assumption, or it was blacked out.    |
| 09:28 | 14 | Q.   See the last sentence that says, "I have worked quite a |
|       | 15 | bit with the channel's team in the past"?                    |
| 09:28 | 16 | A.   Yes.                                                    |
| 09:28 | 17 | Q.   And you're with the channel's team, correct?            |
| 09:28 | 18 | A.   I was with the channel's team at that point.            |
| 09:28 | 19 | Q.   And then the next part of the sentence says, "and we    |
|       | 20 | look forward to working with the federal IBU?                |
| 09:28 | 21 | A.   Yes.                                                    |
| 09:28 | 22 | Q.   What is the federal IBU?                                |
| 09:28 | 23 | A.   The channel's team that supports the federal business.  |
|       | 24 | The team that supports sales to the U.S. Government.         |
| 09:29 | 25 | Q.   So I'll refer you to page 119-3.                        |

| | | |
|---|---|---|
| 09:29 | 1 | A.   Yes, I'm there. |
| 09:29 | 2 | Q.   This is -- says, "Oracle Public Sector Partner Ordering |
| | 3 | Document"? |
| 09:29 | 4 | A.   Yes. |
| 09:29 | 5 | *(Exhibit displayed.)* |
| 09:29 | 6 | BY MR. RAMP: |
| 09:29 | 7 | Q.   And this is what someone would send to Oracle when |
| | 8 | they're trying to go forward with a transaction? |
| 09:29 | 9 | A.   Yes.  The public -- the Partner Ordering Document is |
| | 10 | what enumerates all of the products being sold, metrics and |
| | 11 | the pricing and any special terms. |
| 09:30 | 12 | DEFENDANT MAI:  Somehow we lost that page No. 3. |
| 09:30 | 13 | BY MR. RAMP: |
| 09:30 | 14 | Q.   Would anyone from PBGC sign this document? |
| 09:30 | 15 | A.   No. |
| 09:30 | 16 | Q.   Would -- |
| 09:30 | 17 | A.   This is -- it says "Partner Ordering Document."  That |
| | 18 | is because it is between Oracle and the partner. |
| 09:30 | 19 | Q.   And once again, Quin Rudin was the Oracle partner? |
| 09:30 | 20 | A.   Quin Rudin and Michael Mai, Certus, Dearborne, all in |
| | 21 | the same. |
| 09:30 | 22 | Q.   But Mr. Mai was never an authorized partner, correct? |
| 09:30 | 23 | A.   That is true.  But he represented that he had |
| | 24 | 100 percent ownership of Certus, which gave him the right to |
| | 25 | move forward. |

| | | |
|---|---|---|
| 09:31 | 1 | Q.   I'd like to refer you to page 119-7. |
| 09:31 | 2 | A.   Yes. |
| 09:31 | 3 | Q.   When did you first see this document? |
| 09:31 | 4 | A.   Would have been August 28th. |
| 09:31 | 5 | Q.   Says "signature date, August 28th, '09"? |
| 09:31 | 6 | A.   Yes. |
| 09:31 | 7 | Q.   You got this document the exact same day? |
| 09:31 | 8 | A.   Yes. |
| 09:31 | 9 | Q.   And is it your testimony that it's Michael Mai's |
| | 10 | signature? |
| 09:31 | 11 | A.   Michael Mai is the name on it, and the signature above |
| | 12 | it appears to say "Michael Mai." |
| 09:31 | 13 | Q.   Do you know, in fact, that that is his signature? |
| 09:31 | 14 | A.   No.  He was copied on the e-mail that sent me the |
| | 15 | document. |
| 09:31 | 16 | Q.   After this document was received by you, what did you |
| | 17 | do after that? |
| 09:32 | 18 | A.   We started reviewing it to see whether it was complete, |
| | 19 | whether we could book the order with it.  And there were a |
| | 20 | number of problems. |
| 09:32 | 21 | Q.   Did you send a document to Mr. Rudin or Mr. Mai stating |
| | 22 | that they would need credit approval after you received that |
| | 23 | on August 28th? |
| 09:32 | 24 | A.   In the course of doing business, I would have advised |
| | 25 | them.  I don't know whether I sent an actual e-mail or not. |

| | | |
|---|---|---|
| 09:32 | 1 | Q.   If you don't know if you sent an e-mail, how did you |
| | 2 | advise them? |
| 09:32 | 3 | A.   I did advise them that we would need financial |
| | 4 | statements for the credit approval.  And that was when I |
| | 5 | gave them the two individuals' names in Oracle Credit. |
| 09:32 | 6 | Q.   When did you advise Mr. Mai, the exact date and time? |
| 09:33 | 7 | A.   Okay. |
| 09:33 | 8 | Okay.  The e-mail went out from me to Quin Rudin, |
| | 9 | copying Michael Mai, Claude Kramer, on August 30th, 2009. |
| | 10 | It is Exhibit No. 125. |
| 09:33 | 11 | Q.   Okay.  Going back to Exhibit 119, the Public Sector |
| | 12 | Partner Ordering Document -- |
| 09:33 | 13 | A.   Yes. |
| 09:33 | 14 | Q.   -- and the first page is the e-mail? |
| 09:33 | 15 | A.   The first page is the e-mail transmitting that document |
| | 16 | to me. |
| 09:34 | 17 | Q.   From Quin Rudin? |
| 09:34 | 18 | A.   Yes, it's from Quin, copying Debbie, Michael, and |
| | 19 | Claude Kramer. |
| 09:34 | 20 | Q.   Doesn't that show that the Public Sector Partner |
| | 21 | Ordering Document was submitted by Quin Rudin? |
| 09:34 | 22 | A.   The e-mail was sent by Quin Rudin.  The POD was signed |
| | 23 | by Michael Mai. |
| 09:34 | 24 | Q.   But the document was attached to the e-mail? |
| 09:34 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 09:34 | 1 | Q.    So the Public Sector Partner Ordering Document came |
| | 2 | with the e-mail, correct? |
| 09:34 | 3 | A.    It was attached to the e-mail, yes. |
| 09:34 | 4 | Q.    And it was sent to you from Quin Rudin, correct? |
| 09:34 | 5 | A.    Yes. |
| 09:34 | 6 | Q.    And that document purporting it was Michael Mai who |
| | 7 | signed it, that was sent to you from Quin Rudin, correct? |
| 09:34 | 8 | A.    That is true, but Michael Mai was copied on the e-mail. |
| 09:35 | 9 | Q.    Let's go back to Exhibit 19.  This is the second Public |
| | 10 | Sector Partner Ordering Document. |
| 09:35 | 11 | A.    Okay.  Yes. |
| 09:35 | 12 | Q.    And why -- and I think you've testified during direct |
| | 13 | about this document. |
| 09:35 | 14 |      Can you refresh our memory as to why this second |
| | 15 | ordering document had to be created? |
| 09:35 | 16 | A.    Okay.  When the first one was submitted, it was not |
| | 17 | submitted with an Oracle license agreement. |
| 09:35 | 18 |           MR. CRONE:  Objection, Your Honor.  This is not in |
| | 19 | evidence. |
| 09:35 | 20 |      (Exhibit displayed.) |
| 09:35 | 21 |           THE COURT:  Counsel, I haven't received 19, have |
| | 22 | I? |
| 09:35 | 23 |           MR. RAMP:  It was my understanding that Mr. Crone |
| | 24 | had gone over this in direct. |
| 09:35 | 25 |           THE COURT:  Well, until it's received into |

DEBBIE GALE, U.S. COURT REPORTER

|  |  |  |
|---|---|---|
|  | 1 | evidence -- let's get the rules straight between both of |
|  | 2 | you -- nothing goes up.  So take this down for a moment. |
|  | 3 | I'm having trouble with this for some reason.  Who's |
|  | 4 | operating this machine?  Cut it off. |
| 09:36 | 5 | DEFENDANT MAI:  *(Complies.)* |
| 09:36 | 6 | THE COURT:  Nothing goes up on that board until I |
|  | 7 | give permission. |
| 09:36 | 8 | DEFENDANT MAI:  Yes, Your Honor. |
| 09:36 | 9 | THE COURT:  Now, if it's received in a few |
|  | 10 | moments, you can certainly put it back up.  So all I'll need |
|  | 11 | is a foundation, and I'll probably receive the document. |
| 09:36 | 12 | Okay. |
| 09:36 | 13 | MR. RAMP:  I would like for the Court to allow us |
|  | 14 | to bring this document in.  It's a document that's submitted |
|  | 15 | by the defendant -- by the plaintiffs. |
| 09:36 | 16 | THE COURT:  I need a foundation, Counsel, about |
|  | 17 | what this document is again.  Normally prepared in the |
|  | 18 | course of business.  I don't know that, and the jury doesn't |
|  | 19 | know that. |
| 09:36 | 20 | MR. RAMP:  Thank you, Your Honor. |
| 09:36 | 21 | THE COURT:  Thank you. |
| 09:36 | 22 | BY MR. RAMP: |
| 09:36 | 23 | Q.   I'm going to refer you to what's in the book as |
|  | 24 | Exhibit 19. |
| 09:36 | 25 | Have you seen this document before? |

| 09:36 | 1 | A.    Yes, I have. |
| 09:36 | 2 | Q.    What is this document? |
| 09:37 | 3 | A.    This is a Public Sector Partner Ordering Document |
|  | 4 | between Dearborne and Oracle. |
| 09:37 | 5 | Q.    Do you recall when you first saw this document? |
| 09:37 | 6 | A.    Let's see.  This is -- this would have been towards the |
|  | 7 | end of September.  The exact date, I'd have to find the |
|  | 8 | e-mail that transmitted it. |
| 09:37 | 9 | Q.    But it is your testimony that you received it at the |
|  | 10 | end of September 2009? |
| 09:37 | 11 | A.    Yes. |
| 09:37 | 12 | Q.    And you've seen it before? |
| 09:37 | 13 | A.    Yes, I have. |
| 09:37 | 14 | Q.    And this is a document received in the ordinary course |
|  | 15 | of business of Oracle? |
| 09:37 | 16 | A.    Yes. |
| 09:37 | 17 | THE COURT:  All right.  Now I'll receive it, |
|  | 18 | Counsel. |
| 09:37 | 19 | MR. RAMP:  Thank you, Your Honor. |
| 09:37 | 20 | THE COURT:  Received. |
| 11:45 | 21 | *(Exhibit No. 19 received in evidence.)* |
| 09:37 | 22 | THE COURT:  That's the process I need followed on |
|  | 23 | each occasion. |
| 09:37 | 24 | MR. RAMP:  Thank you, Your Honor. |
| 09:37 | 25 | THE COURT:  Now you can put the document up. |

DEBBIE GALE, U.S. COURT REPORTER

Case 8:10-cv-01853-DOC-RNB  Document 194  Filed 09/19/13  Page 28 of 199  Page ID #:2214
SACV 10-1853 DOC - 7/22/2013 - Day 2

28

| | | |
|---|---|---|
| 09:37 | 1 | DEFENDANT MAI:  Thank you, Your Honor. |
| 09:37 | 2 | *(Exhibit displayed.)* |
| 09:38 | 3 | BY MR. RAMP: |
| 09:38 | 4 | Q.   Okay.  Can you explain to us why the second Partner |
| | 5 | Ordering Document was required? |
| 09:38 | 6 | A.   Okay.  The first order -- ordering document did not |
| | 7 | have any license terms with it that were accepted by the |
| | 8 | customer.  We realized that -- we were notified that the |
| | 9 | customer would not sign Oracle's standard license agreement, |
| | 10 | and I had to work with customer legal and Oracle legal to |
| | 11 | make some modifications to the standard license agreement so |
| | 12 | that it would be acceptable to both Oracle and the customer. |
| 09:38 | 13 | This document was prepared after the license agreement |
| | 14 | was agreed upon. |
| 09:38 | 15 | This one in particular had to be -- there was a change |
| | 16 | in products from WebLogic to IAS, and we had to change the |
| | 17 | products enumerated on page 1. |
| 09:39 | 18 | Q.   It was a mistake in the ordering process of what kind |
| | 19 | of product was really needed by the customer? |
| 09:39 | 20 | A.   It was a mistake when the customer enumerated what he |
| | 21 | wanted purchased.  He did not realize the interdependencies |
| | 22 | of the products. |
| 09:39 | 23 | Q.   And this wasn't any fault of Mr. Mai, was it? |
| 09:39 | 24 | A.   No.  This was not his fault. |
| 09:39 | 25 | Q.   And did someone with Oracle work with the customer -- |

DEBBIE GALE, U.S. COURT REPORTER

| | 1 | the customer was PBGC, correct? |
|---|---|---|
| 09:39 | 2 | A.    Yes. |
| 09:39 | 3 | Q.    Did someone work with them to make this document |
| | 4 | corrected? |
| 09:39 | 5 | A.    Not to correct this document, per se.  We worked with |
| | 6 | the customer to agree upon the license terms that were |
| | 7 | attached that this was based upon.  This document was |
| | 8 | between us and the partner, and we worked between us and the |
| | 9 | partner to get this document correct. |
| 09:40 | 10 | Q.    Did PBGC ever sign a contract directly with Oracle? |
| 09:40 | 11 | A.    The only thing they signed was the license agreement. |
| 09:40 | 12 | Q.    And the license agreement allows them to use the Oracle |
| | 13 | product? |
| 09:40 | 14 | A.    The license agreement that enumerates all the terms |
| | 15 | that go along with the use of the product. |
| 09:40 | 16 | Q.    Do you know how many days it took to finish this second |
| | 17 | ordering document? |
| 09:40 | 18 | A.    The entire process took about a month. |
| 09:40 | 19 | Q.    It took about a month? |
| 09:40 | 20 | A.    Yes. |
| 09:40 | 21 | Q.    And do you recall when the document was completed and |
| | 22 | the process was completed? |
| 09:40 | 23 | A.    Towards the end of September. |
| 09:40 | 24 | Q.    September. |
| 09:40 | 25 | I'd like to refer you to page 5, Exhibit 1 -- sorry. |

|  |  |  |
|---|---|---|
|  | 1 | Exhibit 19-5. |
| 09:41 | 2 | A.    Yes. |
| 09:41 | 3 | Q.    Do you see the date when that is signed? |
| 09:41 | 4 | A.    Signature date says 8/28/2009. |
| 09:41 | 5 | Q.    And whose signature is that? |
| 09:41 | 6 | A.    That is Quin Rudin's. |
| 09:41 | 7 | Q.    Can you explain to me why Quin Rudin signs this on |
|  | 8 | August 28 of 2009? |
| 09:41 | 9 | MR. CRONE:  Objection.  Foundation. |
| 09:41 | 10 | THE COURT:  Overruled. |
| 09:41 | 11 | THE WITNESS:  It says "signature date."  That is |
|  | 12 | the date the deal was originally booked and the deal that -- |
|  | 13 | the date that the deal went that -- was booked. |
| 09:41 | 14 | BY MR. RAMP: |
| 09:41 | 15 | Q.   But there were two -- two agreements.  There was the |
|  | 16 | original -- |
| 09:41 | 17 | A.   There was the original one, and this took place of the |
|  | 18 | original one.  We had to go through a credit memo rebill, |
|  | 19 | which is the process where we say the old order was not the |
|  | 20 | one that was final, this is the new order that's final. |
| 09:41 | 21 | Q.   Right.  But it's signed on August 28, 2008 *(sic)*, and |
|  | 22 | this document was delivered the same time as the rest of -- |
|  | 23 | the document, this page? |
| 09:42 | 24 | A.   Yes.  It was delivered as one via an e-mail from |
|  | 25 | Michael Mai. |

DEBBIE GALE, U.S. COURT REPORTER

09:42    1    Q.   But it's Quin Rudin who signed this one?

09:42    2    A.   It's Quin Rudin who signed it, but Michael Mai sent the

         3    e-mail that transmitted the document.

09:42    4    Q.   Where is that e-mail?

09:42    5    A.   Let me find it.

09:42    6        Bear with me because I did not put these books

         7    together.

09:43    8    Q.   Well, your attorney will have a chance to ask you

         9    questions.  Maybe he can find it in the meantime.  Would

    10    that be okay with you, Ms. Achey?

09:43   11    A.   Yes.

09:43   12    Q.   Did anyone review this document and find it odd that it

    13    was signed on August 28, 2009, by Quin Rudin when it took a

    14    month after August 28th, 2009, to complete this second

    15    ordering?

09:43   16    A.   No.  Because the deal originally came in on

    17    August 28th.  And that was based upon the customer's

    18    purchase order and the deal came in, and that's when it was

    19    originally booked.

09:43   20    Q.   I'd like to refer you to Exhibit No. 126.

09:44   21    A.   Oh, okay.  This is the e-mail that transmitted that

    22    Partner Ordering Document.  Very good.

09:45   23        MR. RAMP:  Your Honor, this has already been

    24    admitted into evidence, so we'd like to show it on the

    25    screen.

| | | |
|---|---|---|
| 09:45 | 1 | THE COURT:  You may.  You may show 126. |
| 09:45 | 2 | (Exhibit displayed.) |
| 09:45 | 3 | BY MR. RAMP: |
| 09:45 | 4 | Q.   See the first page, 126-1? |
| 09:45 | 5 | A.   Yes. |
| 09:45 | 6 | Q.   See on the top page it says "redacted"? |
| 09:45 | 7 | A.   I see. |
| 09:45 | 8 | Q.   Why is it redacted? |
| 09:45 | 9 | A.   I don't know. |
| 09:45 | 10 | Q.   That means e-mails have been taken out of here, |
| | 11 | correct? |
| 09:45 | 12 | MR. CRONE:  Objection.  Foundation. |
| 09:45 | 13 | THE COURT:  Well, as to e-mails, sustained.  We |
| | 14 | don't know if it's an e-mail, a copy. |
| 09:45 | 15 | BY MR. RAMP: |
| 09:45 | 16 | Q.   You don't know what was taken out of here, correct? |
| 09:45 | 17 | A.   I do not know. |
| 09:45 | 18 | Q.   Below that are e-mails? |
| 09:45 | 19 | A.   Pardon? |
| 09:45 | 20 | Q.   Below that redacted, that section taken out, there's |
| | 21 | e-mails below that? |
| 09:46 | 22 | A.   Yes, there are.  I could compare this to what's on my |
| | 23 | hard drive and determine what's been taken out. |
| 09:46 | 24 | Q.   Do you know why they were taken out? |
| 09:46 | 25 | A.   No, I don't. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:46 | 1 | Q.   You see page 3, 126 -- Exhibit No. 126-3? |
| 09:46 | 2 | A.   Yes. |
| 09:46 | 3 | Q.   Do you see that in your book? |
| 09:46 | 4 | A.   I see 126-3 in my book.  We need to go back a page. |
| 09:46 | 5 | DEFENDANT MAI:  I -- somehow we don't have the |
| | 6 | number 3 in here. |
| 09:46 | 7 | BY MR. RAMP: |
| 09:46 | 8 | Q.   Do you see page 126-3? |
| 09:46 | 9 | A.   Yes. |
| 09:47 | 10 | Q.   What's on that page? |
| 09:47 | 11 | A.   Three signature blocks from myself, from my e-mail |
| | 12 | system. |
| 09:47 | 13 | Q.   Everything's blank, correct? |
| 09:47 | 14 | A.   It's three signature blocks.  When the e-mail's are |
| | 15 | prepared, the signature blocks start stacking up at the |
| | 16 | bottom of the document. |
| 09:47 | 17 | Q.   But what's been taken out? |
| 09:47 | 18 | A.   I would have to compare this against my -- what's on my |
| | 19 | hard drive to determine. |
| 09:47 | 20 | Let's see. |
| 09:47 | 21 | There's one e-mail starting on 126-2, where it says |
| | 22 | "Anne W. Achey wrote."  That's one. |
| 09:47 | 23 | There's a second e-mail that says, "What is your |
| | 24 | schedule for getting me an updated order package," number |
| | 25 | two. |

| | | |
|---|---|---|
| 09:47 | 1 | And there's a third one, "Michael, my spreadsheet |
| | 2 | matches the amounts on the original order." |
| 09:48 | 3 | So those are three separate e-mails that I sent. |
| 09:48 | 4 | Q.   On the next page, on 126-3, there's three signature |
| | 5 | sections with no e-mails or anything in between those. |
| 09:48 | 6 | A.   Right.  Because the system -- our e-mail system puts |
| | 7 | all the signature blocks at the end.  They just stack 'em |
| | 8 | up. |
| 09:48 | 9 | Q.   Don't most e-mails, when you send an e-mail, it would |
| | 10 | be my signature; then it would send another e-mail, it would |
| | 11 | be my signature; it wouldn't be three all at once? |
| 09:48 | 12 | A.   I mean, all systems differ. |
| 09:49 | 13 | Q.   The next thing is going to be the slide that your |
| | 14 | attorney showed you.  It was marked as A-3. |
| 09:49 | 15 | A.   Okay. |
| 09:49 | 16 | *(Exhibit displayed.)* |
| 09:50 | 17 | THE COURT:  Counsel. |
| 09:50 | 18 | MR. RAMP:  Thank you, Your Honor. |
| 09:50 | 19 | BY MR. RAMP: |
| 09:50 | 20 | Q.   You recall going over this on Friday with your |
| | 21 | attorney? |
| 09:50 | 22 | A.   Yes, I do. |
| 09:50 | 23 | Q.   Do you see the line where it says "No. 4"? |
| 09:50 | 24 | A.   Products and services, yes. |
| 09:50 | 25 | Q.   Yes.  Isn't that an incorrect version as to what |

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | happened in this case?                                               |
| 09:50 | 2  | A.   We provided the software, the products to be available         |
|       | 3  | via electronic download.                                            |
| 09:50 | 4  | Q.   And you see where it says "United States Government"?           |
| 09:50 | 5  | A.   Yes.                                                            |
| 09:50 | 6  | Q.   That is really PBGC you're talking about?                      |
| 09:51 | 7  | A.   Right.  PBGC, that's right.                                    |
| 09:51 | 8  | Q.   Did, in fact -- this product didn't go back to the             |
|       | 9  | reseller and the reseller submitted it to PBGC?                     |
| 09:51 | 10 | A.   We never actually shipped any software with this.  We          |
|       | 11 | provided the information via Partner Ordering Document via          |
|       | 12 | electronic download.  And once the CSI was available, it            |
|       | 13 | could have been downloaded from the system.  We never              |
|       | 14 | shipped anything.                                                   |
| 09:51 | 15 | Q.   Is there a code that you're talking about?                     |
| 09:51 | 16 | A.   Customer service identification.  That's the number            |
|       | 17 | that's provided when the deal is booked.                            |
| 09:51 | 18 | Q.   Wasn't that code sent back to the reseller?                    |
| 09:51 | 19 | A.   It would have been sent to the reseller, yes.                  |
| 09:51 | 20 | Q.   From the reseller, it would have gone to PBGC?                 |
| 09:51 | 21 | A.   Right.                                                          |
| 09:51 | 22 | Q.   Or, as you said, United States Government?                     |
| 09:51 | 23 | A.   Yes.                                                            |
| 09:51 | 24 |      Sometimes that code is sent directly to the customer;          |
|       | 25 | sometimes it isn't.  But it's always sent to the reseller.          |

DEBBIE GALE, U.S. COURT REPORTER

| 09:52 | 1 | Q.   And in this case, did the customer, it just downloaded |
| | 2 | on its own computer system at its offices? |
| 09:52 | 3 | A.   Yes. |
| 09:52 | 4 | Q.   And then they needed that code from the reseller for it |
| | 5 | to actually work? |
| 09:52 | 6 | A.   They would need the code to download, and then the code |
| | 7 | would also allow them access to My Oracle Support, so they |
| | 8 | could get patch updates -- patches, updates, any technical |
| | 9 | assistance they required. |
| 09:52 | 10 | Q.   And do you recall what kind of software they needed -- |
| | 11 | what was the purpose they needed this for?  Was it |
| | 12 | employment, or do you know? |
| 09:52 | 13 | A.   I don't know the specific application that was being |
| | 14 | developed. |
| 09:52 | 15 | Q.   Would the reseller get that information from the |
| | 16 | customers and then submit it to Oracle?  Is that how it |
| | 17 | would work? |
| 09:52 | 18 | A.   About the specific application? |
| 09:52 | 19 | Q.   Yes. |
| 09:52 | 20 | A.   Normally not. |
| 09:52 | 21 | Q.   You would -- Oracle would get that from the customer |
| | 22 | directly? |
| 09:53 | 23 | A.   More often than not, we did not know the customer's |
| | 24 | specific application. |
| 09:53 | 25 | Q.   I'm a little confused.  Well, Oracle would have to know |

DEBBIE GALE, U.S. COURT REPORTER

|          |    |                                                               |
|----------|----|---------------------------------------------------------------|
|          | 1  | what the customer needs the software for to give 'em the      |
|          | 2  | proper software, right?                                       |
| 09:53    | 3  | A.   We need to know what the proper licenses are being       |
|          | 4  | purchased.  The sales team would have known what the          |
|          | 5  | specific applications were, not myself.                       |
| 09:53    | 6  | Q.   And who was the sales team --                            |
| 09:53    | 7  | A.   Debbie Dilldine.                                          |
| 09:53    | 8  | Q.   -- in this...                                            |
| 09:53    | 9  |      And Oracle wanted this transaction to take place and to  |
|          | 10 | finish, correct?                                              |
| 09:53    | 11 | A.   We wanted it to take place -- what?                      |
| 09:53    | 12 | Q.   You wanted it to be concluded?                           |
| 09:54    | 13 | A.   Oh, yes, you always want the transaction to be           |
|          | 14 | concluded.                                                    |
| 09:54    | 15 | Q.   Do you have any firsthand knowledge from what Mr. Mai    |
|          | 16 | told you that he was conspiring with Mr. Rudin to do harm to  |
|          | 17 | Oracle?                                                        |
| 09:54    | 18 | A.   No.                                                       |
| 09:54    | 19 | Q.   Do you have any firsthand knowledge that Mr. Mai agreed  |
|          | 20 | to do wrongdoing with Mr. Rudin?                              |
| 09:54    | 21 | A.   No.                                                       |
| 09:54    | 22 | Q.   Do you have any firsthand knowledge that Mr. Mai, when   |
|          | 23 | he entered this transaction, it was his intent to commit      |
|          | 24 | fraud on Oracle?                                              |
| 09:54    | 25 | A.   No.  If I'd have had the firsthand knowledge, we would   |

DEBBIE GALE, U.S. COURT REPORTER

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | not have moved forward with the transaction.                 |
| 09:54 | 2  | Q.   Did Mr. Mai ever inform you that he was engaged in this |
|       | 3  | transaction so he could make a commission?                   |
| 09:55 | 4  | A.   I doubt seriously that he informed me that.  Resellers  |
|       | 5  | do do this so they can make money.  That's part of the       |
|       | 6  | general business plan.                                       |
| 09:55 | 7  | Q.   So you would have known that already; that was his      |
|       | 8  | purpose, was to make a commission?                           |
| 09:55 | 9  | A.   Oh, yes.                                                 |
| 09:55 | 10 | Q.   Do you have any firsthand knowledge that Mr. Mai was    |
|       | 11 | investigated by any government agency for this transaction?  |
| 09:55 | 12 | A.   No.                                                      |
| 09:55 | 13 | MR. RAMP:  I have no further questions,                       |
|       | 14 | Your Honor.                                                  |
| 09:55 | 15 | THE COURT:  Redirect.                                         |
| 09:55 | 16 | MR. CRONE:  May I proceed, Your Honor?                        |
| 09:55 | 17 | THE COURT:  You may.                                          |
| 09:55 | 18 | MR. CRONE:  Thank you.                                        |
| 09:55 | 19 | **REDIRECT EXAMINATION**                                     |
| 09:55 | 20 | BY MR. CRONE:                                                 |
| 09:55 | 21 | Q.   Ms. Achey, first I'd like to just have you turn back to |
|       | 22 | Exhibit 119.                                                 |
| 09:56 | 23 | MR. CRONE:  Your Honor, this is in evidence.  May            |
|       | 24 | I publish?                                                   |
| 09:56 | 25 | THE COURT:  You may.                                          |

| 09:56 | 1 | MR. CRONE:  Thank you. |
| 09:56 | 2 | *(Exhibit displayed.)* |
| 09:56 | 3 | BY MR. CRONE: |
| 09:56 | 4 | Q.  First, if -- well, let me know when you're there, |
|       | 5 | Ms. Achey. |
| 09:56 | 6 | A.  I am there. |
| 09:56 | 7 | Q.  All right.  Can you confirm for us are all of the pages |
|       | 8 | of Exhibit 119 in the book in front of you? |
| 09:56 | 9 | A.  I believe they are. |
| 09:56 | 10 | Q.  All right.  And Mr. Ramp asked you about that redacted |
|       | 11 | stamp at the -- |
| 09:56 | 12 | A.  Yes. |
| 09:56 | 13 | Q.  -- top of page 1. |
| 09:56 | 14 | Do you recall, during the course of this case, |
|       | 15 | forwarding this e-mail chain to me by e-mail? |
| 09:56 | 16 | A.  Not forwarding this e-mail to you.  I don't recall |
|       | 17 | forwarding this one specific e-mail.  I know the IT |
|       | 18 | department took a complete dump of my system for you. |
| 09:56 | 19 | Q.  All right.  Do you know, sitting here today, without |
|       | 20 | having the benefit of checking your e-mails, whether or not |
|       | 21 | the redacted stamp could contain a privileged communication |
|       | 22 | between us, Ms. Achey? |
| 09:57 | 23 | A.  That could be, yes. |
| 09:57 | 24 | Q.  Now, did you ever speak with Mr. Mai after receiving |
|       | 25 | Exhibit 119 on which he was copied? |

| | | |
|---|---|---|
| 09:57 | 1 | A.   Yes. |
| 09:57 | 2 | Q.   And even if you don't recall the specific details of |
| | 3 | that -- those conversations, do you recall just discussing |
| | 4 | the transactional documents generally including a Partner |
| | 5 | Ordering Document with Mr. Mai? |
| 09:57 | 6 | A.   Yes, we did discuss it. |
| 09:57 | 7 | Q.   Do you recall Mr. Mai ever telling you that Dearborne |
| | 8 | didn't own Certus Solutions? |
| 09:57 | 9 | A.   No. |
| 09:57 | 10 | Q.   Do you recall Mr. Mai ever telling you that -- in any |
| | 11 | conversation or e-mail, that Certus Solutions was a separate |
| | 12 | entity and that it would be paying Oracle rather than |
| | 13 | Dearborne Circle? |
| 09:58 | 14 | A.   No. |
| 09:58 | 15 | Q.   Why didn't you independently research in 2009 whether |
| | 16 | Dearborne had acquired Certus? |
| 09:58 | 17 | A.   'Cause I had principals from both companies informing |
| | 18 | me via e-mail that they -- that that had happened; that |
| | 19 | Dearborne had acquired Certus. |
| 09:58 | 20 | Q.   All right.  And you also -- Mr. Ramp asked you earlier, |
| | 21 | just a few minutes ago, regarding some questions about |
| | 22 | Mr. Rudin's bad acts.  Do you remember those questions? |
| 09:58 | 23 | A.   Right. |
| 09:58 | 24 | Q.   Had you heard anything of the sort before this Pension |
| | 25 | Benefit Guaranty Corporation transaction was concluded? |

| 09:58 | 1 | A.   No. |
| 09:58 | 2 | Q.   Had you heard anything of the sort before this lawsuit |
| | 3 | was filed? |
| 09:58 | 4 | A.   No.  It was only after the lawsuit was filed. |
| 09:59 | 5 | Q.   All right.  And just stepping back for a moment, in |
| | 6 | terms of looking into whether or not Dearborne had actually |
| | 7 | acquired Certus Solutions, is it a requirement of your |
| | 8 | position to independently research whether two companies |
| | 9 | have merged with one another if they tell you they've done |
| | 10 | so? |
| 09:59 | 11 | A.   No.  That is not within my job. |
| 09:59 | 12 | Q.   As far as you knew, did Mr. Mai and Mr. Rudin both have |
| | 13 | the authority to complete the Pension Benefit Guaranty |
| | 14 | Corporation on Dearborne Circle's behalf? |
| 09:59 | 15 | A.   Yes. |
| 09:59 | 16 | Q.   And what was that understanding based on? |
| 09:59 | 17 | A.   That was based upon -- okay -- if you look on |
| | 18 | page 119-2, go over one page, it's an e-mail from -- you can |
| | 19 | see, at the bottom of 119-1, the e-mail is from Michael Mai, |
| | 20 | and it's indicating that Quin Rudin will be working with us |
| | 21 | to fulfill the order.  And it also indicates that Dearborne |
| | 22 | has 100 percent ownership of the Certus Solutions.  And it's |
| | 23 | from Michael Mai. |
| 10:00 | 24 | Q.   Do you have an understanding as to who the managing |
| | 25 | members of Dearborne Circle were in August and September of |

|        | 1  | 2009? |
|--------|----|-------|
| 10:00  | 2  | A.   Michael Mai and Quin Rudin. |
| 10:00  | 3  | Q.   And what was that based on? |
| 10:00  | 4  | A.   Based upon the discussions in the e-mails.  On page 1, |
|        | 5  | Quin Rudin signs his signature block, indicates managing |
|        | 6  | partner.  And that's from a Dearborne address. |
| 10:00  | 7  | Q.   When you say "Dearborne address," you mean e-mail |
|        | 8  | address? |
| 10:00  | 9  | A.   E-mail address, yes. |
| 10:01  | 10 | Q.   And then if we turn to page 7 of Exhibit 119, |
|        | 11 | Ms. Achey. |
| 10:01  | 12 | A.   Yes, I'm there. |
| 10:01  | 13 | Q.   All right.  And it bears a signature.  And I think you |
|        | 14 | said you're not entirely sure who -- you can't speak for who |
|        | 15 | signed it -- |
| 10:01  | 16 | A.   Right. |
| 10:01  | 17 | Q.   -- but there is a signature above Mr. Mai's name; is |
|        | 18 | that right? |
| 10:01  | 19 | A.   Right. |
| 10:01  | 20 | Q.   What company, to your understanding, signed this |
|        | 21 | Partner Ordering Document? |
| 10:01  | 22 | A.   Dearborne. |
| 10:01  | 23 | Q.   And did it matter to you at the time, in terms of your |
|        | 24 | work completing this transaction, which of Mr. Mai or |
|        | 25 | Mr. Rudin signed this Partner Ordering Document on behalf of |

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | Dearborne Circle?                                          |
| 10:01 | 2  | A.   No, because I looked at both of 'em having equal      |
|       | 3  | status.                                                    |
| 10:01 | 4  | Q.   And would it have mattered to you at the time whether |
|       | 5  | or not Mr. Mai had given Quin Rudin his permission to sign |
|       | 6  | Mr. Mai's name to this document?                           |
| 10:02 | 7  | A.    If Mr. Mai -- if Quin Rudin signed on behalf of      |
|       | 8  | Mr. Mai, I would have expected to see something to that    |
|       | 9  | effect.                                                    |
| 10:02 | 10 | Q.   That's not anything that they told you at the time; is |
|       | 11 | that right?                                                |
| 10:02 | 12 | A.   No.                                                   |
| 10:02 | 13 | Q.   I'm going to have you turn back to Exhibit 126 now,   |
|       | 14 | Ms. Achey.                                                 |
| 10:02 | 15 | MR. CRONE:  Your Honor, this is also in evidence.          |
|       | 16 | May I publish?                                             |
| 10:02 | 17 | THE COURT:  You may.                                       |
| 10:02 | 18 | *(Exhibit displayed.)*                                     |
| 10:02 | 19 | THE WITNESS:  I'm there.                                   |
| 10:02 | 20 | BY MR. CRONE:                                              |
| 10:02 | 21 | Q.   All right.  And again, Ms. Achey, do you have all of  |
|       | 22 | the pages of this e-mail in the book in front of you?      |
| 10:02 | 23 | A.    It appears to be complete, yes.                      |
| 10:03 | 24 | Q.   All right.  And you see there Mr. Ramp pointed out    |
|       | 25 | there's a redacted stamp on the first page of --           |

| 10:03 | 1 | A. Yes. |
| 10:03 | 2 | Q. -- Exhibit 126? |
| 10:03 | 3 | A. Yes. |
| 10:03 | 4 | Q. Do you recall forwarding this e-mail to my office |
| | 5 | during the course of this case? |
| 10:03 | 6 | A. Don't recall forwarding this e-mail, per se, but I know |
| | 7 | that IT took a dump of my system. |
| 10:03 | 8 | Q. Okay. Do you know whether or not the redacted stamp |
| | 9 | could indicate that there was a privileged communication? |
| 10:03 | 10 | MR. RAMP: Objection, Your Honor. Leading. |
| | 11 | Speculation. |
| 10:03 | 12 | THE COURT: Overruled. |
| 10:03 | 13 | BY MR. CRONE: |
| 10:03 | 14 | Q. Ms. Achey, do you know whether or not this redacted |
| | 15 | stamp could indicate that there was a privileged |
| | 16 | communication? |
| 10:03 | 17 | THE COURT: Well, just a moment. |
| 10:03 | 18 | Counsel, I don't know how she would know. |
| 10:03 | 19 | MR. CRONE: Okay. |
| 10:03 | 20 | THE COURT: Sustain the objection, Counsel. It's |
| | 21 | an incorrect ruling by me. I'm going to reverse the ruling. |
| 10:03 | 22 | I'm going to sustain the objection. Speculation. |
| 10:03 | 23 | BY MR. CRONE: |
| 10:04 | 24 | Q. Let me show you page 3 of this exhibit, Ms. Achey, if |
| | 25 | you could turn to that. |

DEBBIE GALE, U.S. COURT REPORTER

| 10:04 | 1 | A.   Yes. |
| 10:04 | 2 | Q.   Are these the signature blocks that you were just |
|       | 3 | referring to a few minutes ago? |
| 10:04 | 4 | A.   Yes, they are. |
| 10:04 | 5 | Q.   And can you just explain for us again why it is that |
|       | 6 | these signature blocks are stacked up like this? |
| 10:04 | 7 | A.   The Oracle e-mail system just stacks 'em up at the end |
|       | 8 | of the message rather than in line.  I don't know why it |
|       | 9 | chooses to do it that way. |
| 10:04 | 10 | Q.   All right.  And does that give you any indication that |
|       | 11 | something was deleted from this e-mail? |
| 10:04 | 12 | A.   No. |
| 10:04 | 13 | Q.   All right.  And is -- to be clear, pages 1, 2, and 3 of |
|       | 14 | this exhibit are a single e-mail.  And is it accurate to say |
|       | 15 | that the remaining pages of the exhibit are the attachments |
|       | 16 | to the e-mail? |
| 10:05 | 17 | A.   Yes. |
| 10:05 | 18 | Q.   And then Mr. Ramp showed you Exhibit 19.  Ms. Achey, |
|       | 19 | just to be clear, I want to have you compare Exhibit 19 to |
|       | 20 | the attachment to Exhibit 126. |
| 10:05 | 21 | A.   Okay.  It's the same Partner Ordering Document. |
| 10:05 | 22 | Q.   Thank you, Ms. Achey. |
| 10:05 | 23 | And if we can turn to -- back to Exhibit 126.  If we |
|       | 24 | can -- if you could turn to page 9. |
| 10:06 | 25 | MR. CRONE:  If we could have that, Mr. Owens. |

| | | |
|---|---|---|
| 10:06 | 1 | (Exhibit displayed.) |
| 10:06 | 2 | THE WITNESS:  Yes. |
| 10:06 | 3 | BY MR. CRONE: |
| 10:06 | 4 | Q.   And this is the signature block for the revised Partner |
| | 5 | Ordering Document you received in September 2009; is that |
| | 6 | right? |
| 10:06 | 7 | A.   That's true. |
| 10:06 | 8 | Q.   Can you tell us what company signed this Partner |
| | 9 | Ordering Document? |
| 10:06 | 10 | A.   I will go back to page 1, where it says, "Certus |
| | 11 | Solutions care of Dearborne Circle, Dearborne." |
| 10:06 | 12 | Q.   And page 9 shows a -- |
| 10:06 | 13 | MR. CRONE:  We can turn back to page 9. |
| 10:06 | 14 | (Exhibit displayed.) |
| 10:06 | 15 | BY MR. CRONE: |
| 10:06 | 16 | Q.   Ms. Achey, do you know for sure whether Quin Rudin |
| | 17 | signed this as opposed to Michael Mai? |
| 10:06 | 18 | A.   No, I don't. |
| 10:06 | 19 | Q.   Is it possible Mr. Mai signed this one? |
| 10:06 | 20 | A.   Yes. |
| 10:06 | 21 | Q.   Now, did it matter to you which one of Mr. Mai or |
| | 22 | Mr. Rudin signed this version of the Partner Ordering |
| | 23 | Document? |
| 10:07 | 24 | A.   No, because I looked at both of 'em having equal |
| | 25 | authority for Dearborne. |

10:07  1    Q.   And was there anything abnormal about this document

       2    still being dated August 28, 2009, even though it was sent

       3    after that date?

10:07  4    A.   If you read the last sentence in the signature block,

       5    it says, "your signature date or electronic date will be the

       6    effective date of this ordering document."

10:07  7         And that was the date the order was originally brought

       8    in and booked.

10:07  9    Q.   All right.  Now, turning back to page 1 of Exhibit 126,

      10    Ms. Achey.

10:07 11    A.   Yes.

10:07 12    Q.   To be clear, who had sent this version of the Partner

      13    Ordering Document to you which purports to bear a signature

      14    from Mr. Rudin?

10:07 15    A.   It came from Michael Mai, copying Claude Kramer and

      16    Quin Rudin.

10:08 17    Q.   And would the transaction have been prepared

      18    differently had it been directly between Oracle and Certus

      19    Solutions as opposed to Dearborne Circle?

10:08 20    A.   Yes, the paperwork would have been different.  We would

      21    have had to use a different ordering document.

10:08 22    Q.   Have you turn to page -- sorry -- Exhibit 125,

      23    Ms. Achey.

10:08 24         MR. CRONE:  And, Your Honor, this is also in

      25    evidence.  May we publish?

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:08 | 1 | THE COURT:  You may publish. |
| 10:08 | 2 | *(Exhibit displayed.)* |
| 10:08 | 3 | BY MR. CRONE: |
| 10:08 | 4 | Q.   Ms. Achey, if we can focus on the first e-mail on this |
| | 5 | chain for now. |
| 10:08 | 6 | A.   Okay. |
| 10:08 | 7 | Q.   I'll wait until we will expand that a bit. |
| 10:08 | 8 | I believe you testified that this was the e-mail that |
| | 9 | Mr. Mai had transmitted to Oracle Credit? |
| 10:09 | 10 | A.   Yes. |
| 10:09 | 11 | Q.   Again, if -- I'll focus your attention on the second |
| | 12 | sentence in this e-mail.  It says, "Attached is our |
| | 13 | consolidated financial statements for Dearborne Circle, LLC, |
| | 14 | which acquired Certus Solutions, Inc. at the end of 2008." |
| 10:09 | 15 | Did I read that correctly? |
| 10:09 | 16 | A.   Yes, you did. |
| 10:09 | 17 | Q.   And would the -- so is that consistent -- just so I |
| | 18 | understand, Ms. Achey, would the financials then have been |
| | 19 | different for what Oracle Credit had to review if it was |
| | 20 | with a separate entity rather than Dearborne Circle? |
| 10:09 | 21 | A.   Yes.  If we were looking at a separate entity such as |
| | 22 | Certus, we would have reviewed their financials rather than |
| | 23 | this. |
| 10:09 | 24 | Q.   Okay.  Now, Mr. Ramp asked you a few minutes ago about |
| | 25 | a credit decision versus a financed transaction -- |

| | | |
|---|---|---|
| 10:09 | 1 | A.   Right. |
| 10:09 | 2 | Q.   -- do you recall that? |
| 10:09 | 3 | A.   Yes. |
| 10:09 | 4 | Q.   Can you explain which one of those was used in this |
| | 5 | particular transaction? |
| 10:10 | 6 | A.   This was a credit decision. |
| 10:10 | 7 | Q.   Okay.  Why did -- can you explain for us why it didn't |
| | 8 | include -- why this was not a financed transaction? |
| 10:10 | 9 | A.   So, "credit decision" because we expected to receive |
| | 10 | payment net 30, the entire payment.  A finance would have |
| | 11 | been over two to three years. |
| 10:10 | 12 | Q.   Okay.  And can you just generally explain what the |
| | 13 | difference is between a merely needing to run credit on a |
| | 14 | reseller versus a financed transaction? |
| 10:10 | 15 | A.   A financed transaction would be just like if you went |
| | 16 | out to get a car loan.  You buy a car loan, and you make |
| | 17 | payments over what? -- three to four years.  And a financed |
| | 18 | transaction would be the same thing.  It's essentially a |
| | 19 | lease where you make payments over two to three years. |
| 10:10 | 20 | Q.   Would a financed transaction have required Oracle |
| | 21 | Credit to consider the customer's financials?  In this case, |
| | 22 | the Pension Benefit Guaranty Corporation? |
| 10:11 | 23 | Well, let me ask that differently.  Generally speaking, |
| | 24 | in a financed transaction, a lease, Ms. Achey, would that |
| | 25 | have required Oracle Credit to consider the end-user |

DEBBIE GALE, U.S. COURT REPORTER

|        |    |                                                          |
|--------|----|----------------------------------------------------------|
|        | 1  | customer's financials?                                   |
| 10:11  | 2  | A.   They wouldn't consider financials, but they do a number |
|        | 3  | of documents with the customer for finance deals, essential |
|        | 4  | use documents, and they enter into additional terms between |
|        | 5  | the financing organization and the customer and the     |
|        | 6  | reseller.                                                |
| 10:11  | 7  | Q.   Was any of that done in this case?                  |
| 10:11  | 8  | A.   Oh, absolutely not.                                 |
| 10:11  | 9  | Q.   All right.  Now, we haven't looked at -- farther into |
|        | 10 | this document, Ms. Achey, so if you can actually turn to the |
|        | 11 | bottom portion of this first page.                       |
| 10:12  | 12 | A.   Okay.                                               |
| 10:12  | 13 |      (Exhibit displayed.)                                |
| 10:12  | 14 | BY MR. CRONE:                                            |
| 10:12  | 15 | Q.   Do you see where I am?                              |
| 10:12  | 16 |        MR. CRONE:  If we could have that magnified.      |
| 10:12  | 17 |      (Technician complies.)                              |
| 10:12  | 18 |        THE WITNESS:  My e-mail from myself to Quin Rudin? |
| 10:12  | 19 | BY MR. CRONE:                                            |
| 10:12  | 20 | Q.   Yes.  And you see there's an e-mail -- you're referring |
|        | 21 | to the e-mail from the day before, August 30th, 2009?   |
| 10:12  | 22 | A.   Yes.                                                |
| 10:12  | 23 | Q.   Is that the e-mail that you were just referring to a |
|        | 24 | few minutes ago when Mr. Ramp was speaking with you?    |
| 10:12  | 25 | A.   Yes.                                                |

| | | |
|---|---|---|
| 10:12 | 1 | Q.   And that was -- and you copied Mr. Mai on that e-mail? |
| 10:12 | 2 | A.   I did.  And Claude Kramer also. |
| 10:12 | 3 | Q.   And I realize, Ms. Achey, that you don't have the |
| | 4 | precise e-mail with you today, and I'll get back to you |
| | 5 | about that in a minute; but if we could turn to the second |
| | 6 | page of this e-mail. |
| 10:12 | 7 | *(Exhibit displayed.)* |
| 10:12 | 8 | BY MR. CRONE: |
| 10:12 | 9 | Q.   You'll see in the middle of the page there is a |
| | 10 | sentence from you that says, with underline, "need some help |
| | 11 | immediately." |
| 10:13 | 12 | A.   Right. |
| 10:13 | 13 | Q.   Do you see where I'm reading? |
| 10:13 | 14 | A.   Yes, I am. |
| 10:13 | 15 | Q.   And then it says, "I submitted the request for credit |
| | 16 | approval for our PBGC deal and found that Oracle needs |
| | 17 | additional information from Certus before credit approval |
| | 18 | can be granted." |
| 10:13 | 19 | A.   That is true. |
| 10:13 | 20 | Q.   All right.  And is that consistent with what you're |
| | 21 | saying with your testimony that you were seeking credit |
| | 22 | approval from Oracle Credit? |
| 10:13 | 23 | A.   Yes. |
| 10:13 | 24 | Q.   And again, why is it that you were using Certus as |
| | 25 | opposed to Dearborne in this sentence in particular? |

10:13   1   A.   In my mind, they were one in the same; interchangeable.

10:13   2   Q.   And did you have any responsibility yourself during

3   this time period or any time period for assessing the credit

4   of a reseller?

10:14   5   A.   No.

10:14   6   Q.   Was it out of the ordinary for you to be unaware of the

7   specifics of any financials that had been provided?

10:14   8   A.   Never aware of financial information.

10:14   9   Q.   Mr. Ramp also asked you a series of questions on Friday

10   regarding whether or not you had ever met Mr. Rudin or

11   Mr. Mai face-to-face in 2009; do you recall that?

10:14   12   A.   Yes, I do.

10:14   13   Q.   Do you normally meet with resellers in person on a

14   given transaction?

10:14   15   A.   No, I don't.

10:14   16   Q.   And why --

10:14   17   A.   Everything --

10:14   18   Q.   -- why not?

10:14   19   A.   Everything we do is electronic over the Internet,

20   e-mails back and forth, documents passed via e-mail.

10:14   21   Q.   Did Mr. Mai ever contact you at any time to tell you he

22   felt someone might have called you and impersonated him over

23   the phone?

10:15   24   A.   No.

10:15   25   Q.   This may be a fairly minor point, Ms. Achey, but do you

| | | |
|---|---|---|
| | 1 | remember that Mr. Ramp asked you on Friday about a -- |
| | 2 | whether or not you had met with Mr. Mark Tiernan before -- |
| | 3 | which he had pronounced as "Turnan"? |
| 10:15 | 4 | A.   Yes, I recall that conversation. |
| 10:15 | 5 | Q.   Had you actually met Mr. Tiernan before? |
| 10:15 | 6 | A.   I met him briefly on Thursday of last week. |
| 10:15 | 7 | Q.   All right.  Before last week, had you met Mr. Tiernan? |
| 10:15 | 8 | A.   No. |
| 10:15 | 9 | Q.   Had you ever spoken with him? |
| 10:15 | 10 | A.   No. |
| 10:15 | 11 | Q.   Had you ever heard of him? |
| 10:15 | 12 | A.   No. |
| 10:15 | 13 | Q.   So when Mr. Ramp asked you about that subject on |
| | 14 | Friday, what did you think he was referring to? |
| 10:15 | 15 | A.   I was focused in on the time period for PBGC and |
| | 16 | players involved with PBGC, looking at 2009, 2010; and |
| | 17 | frankly, I didn't make the connection to the person I'd met |
| | 18 | the day before. |
| 10:16 | 19 | Q.   All right.  Mr. Ramp was asking you questions about the |
| | 20 | documents that you had produced in this case.  Did you make |
| | 21 | any effort during this case to -- can I just refresh your |
| | 22 | recollection as to what you did to -- did you make an effort |
| | 23 | to search for and produce e-mails regarding this 2009 |
| | 24 | transaction? |
| 10:16 | 25 | A.   Yes. |

| 10:16 | 1 | Q.   And to your knowledge, before today Mr. Mai or his |
| | 2 | counsel ask for you to produce any documents, let alone some |
| | 3 | about credit approval? |
| 10:16 | 4 | A.   No. |
| 10:16 | 5 | Q.   Mr. Ramp also asked you on Friday a series of questions |
| | 6 | about other transactions that may or may not have involved |
| | 7 | either Mr. Rudin or Mr. Mai.  He referred to K2 and CGC and |
| | 8 | a few others. |
| 10:17 | 9 | Do you recall that? |
| 10:17 | 10 | A.   I do. |
| 10:17 | 11 | Q.   Did any of those entities that Mr. Ramp referenced have |
| | 12 | any involvement at all in the Pension Benefit Guaranty |
| | 13 | Corporation transaction you've described for us? |
| 10:17 | 14 | A.   No involvement. |
| 10:17 | 15 | Q.   And again, would you have had any involvement in a |
| | 16 | transaction that involved a sale of software to someone |
| | 17 | other than the U.S. Government or one of its agencies? |
| 10:17 | 18 | A.   No. |
| 10:17 | 19 | Q.   Do you have an understanding of how many transactions |
| | 20 | Oracle does in a given year? |
| 10:17 | 21 | A.   Thousands, hundreds of thousands. |
| 10:17 | 22 | Q.   And about how many did you complete in the three-month |
| | 23 | period during which this particular software was sold to the |
| | 24 | PBGC? |
| 10:17 | 25 | A.   I had 28 separate transactions in that three-month |

DEBBIE GALE, U.S. COURT REPORTER

```
        1   period.
10:17   2   Q.   Okay.  And is that -- you might refer to that as a --
        3   was that the fiscal quarter?
10:17   4   A.   Yes.
10:17   5   Q.   And is that typical for the fiscal quarter, roughly?
10:17   6   A.   That's typical, yes.
10:17   7   Q.   So if we multiply that by four quarters, would that
        8   have been approximately 100 transactions that you did in
        9   2009?
10:18  10   A.   Yes.
10:18  11   Q.   And so, as against the many thousands of transactions
       12   that Oracle conducted during that time period, could we talk
       13   for hours about transactions you weren't involved in?
10:18  14   A.   Yes, we could.
10:18  15   Q.   Ms. Achey, if I could have you turn to Exhibit 17.
10:18  16   A.   Okay.
10:18  17        MR. CRONE:  And, I'm sorry, Your Honor.  This is
       18   in evidence.  May we publish?
10:18  19        THE COURT:  You may.
10:18  20      (Exhibit displayed.)
10:18  21   BY MR. CRONE:
10:18  22   Q.   Ms. Achey, this is the -- you recall Mr. Ramp asking
       23   you some questions about this e-mail, as well, on Friday?
10:19  24   A.   Yes.
10:19  25   Q.   And was this the e-mail -- can you just refresh our
```

|  | 1 | memory about what this e-mail regarded? |
|10:19| 2 | A.   This e-mail came after the fact, after I received the |
|  | 3 | Partner Ordering Document.  I realized that we needed to go |
|  | 4 | up to corporate for some nonstandard approvals for increased |
|  | 5 | discount in order to make this deal work. |
|10:19| 6 | Q.   All right.  And so, again, if you could just -- if we |
|  | 7 | could focus on the last paragraph on this page. |
|10:19| 8 | A.   Okay. |
|10:19| 9 | (Exhibit displayed.) |
|10:19| 10 | BY MR. CRONE: |
|10:19| 11 | Q.   Ms. Achey, is this something that you helped to |
|  | 12 | prepare? |
|10:19| 13 | A.   I authored this paragraph as a suggested |
|  | 14 | justification -- based upon my conversations with Quin Rudin |
|  | 15 | and Michael Mai, I offered this paragraph as justification |
|  | 16 | for increased discount. |
|10:20| 17 | Q.   Okay.  Was this something that you provided to your |
|  | 18 | approval chain that you testified about? |
|10:20| 19 | A.   It eventually went up the approval chain, yes. |
|10:20| 20 | Q.   When you provided it to your approval chain, did it |
|  | 21 | include a reference to service-disabled veteran company? |
|10:20| 22 | A.   Yes, it did.  That's in what? -- the third sentence, I |
|  | 23 | believe.  Yes. |
|10:20| 24 | Q.   Let me now turn back to the -- let me show you again |
|  | 25 | the slide that we just took another look at, where you |

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
|       | 1  | described the transaction.                                                |
| 10:20 | 2  | MR. CRONE:  *(To the Technician:)*  Do we have D3?                       |
| 10:20 | 3  | May we publish, Your Honor?                                               |
| 10:20 | 4  | THE COURT:  You may.                                                      |
| 10:20 | 5  | *(Exhibit displayed.)*                                                    |
| 10:21 | 6  | BY MR. CRONE:                                                             |
| 10:21 | 7  | Q.   All right.  Now, Ms. Achey, again, was this slide                    |
|       | 8  | describing, generally, the type of purchase agreements that              |
|       | 9  | you work on -- worked on during this time period?                        |
| 10:21 | 10 | A.   This is a normal flow for a purchase agreement from the             |
|       | 11 | government through a reseller to Oracle.                                  |
| 10:21 | 12 | Q.   Okay.  And just to be clear, Step No. 4, did that take              |
|       | 13 | place in this transaction?                                               |
| 10:21 | 14 | A.   Yes.                                                                 |
| 10:21 | 15 | Q.   All right.  But did -- but did Step 8 occur in this                 |
|       | 16 | transaction?                                                             |
| 10:21 | 17 | A.   No, Step 8 never occurred.                                          |
| 10:21 | 18 | Q.   And finally, Ms. Achey, Mr. Ramp asked you regarding               |
|       | 19 | whether or not back in 2009 you had -- I think he said                    |
|       | 20 | direct personal knowledge about whether or not Mr. Mai was               |
|       | 21 | conspiring with Mr. Rudin.  Do you recall that?                           |
| 10:22 | 22 | A.   Yes, I do.                                                           |
| 10:22 | 23 | Q.   All right.  Looking at the e-mails that we've seen in               |
|       | 24 | Exhibit 119 and Exhibit 125, in retrospect, do you think                 |
|       | 25 | that they were conspiring, Ms. Achey?                                     |

| | | |
|---|---|---|
| 10:22 | 1 | MR. RAMP:  Objection.  Calls for speculation. |
| 10:22 | 2 | THE COURT:  Sustained. |
| 10:22 | 3 | MR. CRONE:  I have no further questions.  Thank |
| | 4 | you. |
| 10:22 | 5 | THE COURT:  All right.  Counsel, recross. |
| 10:22 | 6 | **RECROSS-EXAMINATION** |
| 10:22 | 7 | BY MR. RAMP: |
| 10:23 | 8 | Q.   I'd like to refer you to Exhibit 125-3 -- Exhibit 125, |
| | 9 | page 3. |
| 10:23 | 10 | A.   Page 3.  Okay.  I'm there. |
| 10:23 | 11 | Q.   So you wrote this e-mail to Quin Rudin, correct? |
| 10:23 | 12 | A.   Yes. |
| 10:23 | 13 | Q.   And the first sentence you state, "We made great |
| | 14 | progress last night.  Our nonstandard requests were approved |
| | 15 | by corporate." |
| 10:23 | 16 | A.   Right. |
| 10:23 | 17 | Q.   And it showed that they had the nonstandard pricing, |
| | 18 | the same as the other two companies that submitted bids, |
| | 19 | correct? |
| 10:23 | 20 | A.   No.  That was not the same as the other two companies. |
| | 21 | It was the approved discount for Dearborne. |
| 10:23 | 22 | Q.   But the other two companies were getting discounts |
| | 23 | also? |
| 10:23 | 24 | A.   They also received other discounts. |
| 10:24 | 25 | Q.   So this company -- Mr. Mai received the same |

|  | 1 | discount -- or a discount just like the other -- |
| 10:24 | 2 | A.   He received an increased discount for this transaction. |
| 10:24 | 3 | Q.   Was Mr. Quin Rudin using two e-mails during this |
|  | 4 | transaction? |
| 10:24 | 5 | A.   There were a couple of e-mails from a non-Dearborne |
|  | 6 | address. |
| 10:24 | 7 | Q.   Refer you to Exhibit 126 -- |
| 10:24 | 8 |    *(Exhibit displayed.)* |
| 10:24 | 9 | BY MR. RAMP: |
| 10:24 | 10 | Q.   -- first page. |
| 10:24 | 11 | A.   Yes, that's his second address. |
| 10:24 | 12 | Q.   So he had two addresses? |
| 10:24 | 13 | A.   Yes. |
| 10:24 | 14 | Q.   Do you know what -- it says "Quin@CGCRP." |
| 10:24 | 15 |    Do you know what that means, that CGCRP? |
| 10:24 | 16 | A.   No, I don't. |
| 10:24 | 17 | Q.   Did it concern you that he was using two e-mails? |
| 10:25 | 18 | A.   Frankly not, because the first e-mail that I got from |
|  | 19 | Michael Mai gave this second e-mail address for Quin Rudin; |
|  | 20 | but most of the e-mails that we had going back and forth all |
|  | 21 | used the Dearborne e-mail. |
| 10:25 | 22 | Q.   And your e-mail address is Anne.Achey@Oracle.com, |
|  | 23 | right? |
| 10:25 | 24 | A.   Yes. |
| 10:25 | 25 | Q.   And you get to use that Oracle.com because you're an |

| | | |
|---|---|---|
| | 1 | employee of them? |
| 10:25 | 2 | A.   Yes. |
| 10:25 | 3 | Q.   Could someone else send an e-mail on that same e-mail |
| | 4 | that you have? |
| 10:25 | 5 | A.   No, that's my personal e-mail. |
| 10:25 | 6 | Q.   Could someone use your personal e-mail? |
| 10:25 | 7 | A.   Theoretically, yes. |
| 10:25 | 8 | Q.   It could happen? |
| 10:25 | 9 | A.   If they had my password to the system, but that's not |
| | 10 | something I give out. |
| 10:25 | 11 | Q.   If someone gets your password, they could send an |
| | 12 | e-mail with your address and your name? |
| 10:25 | 13 | A.   Theoretically, yes. |
| 10:26 | 14 | Q.   Who is CKramer@dearborne.com? |
| 10:26 | 15 | A.   Claude Kramer III, who I was told was their contracts |
| | 16 | manager. |
| 10:26 | 17 | Q.   Did you ever have any personal conversations with |
| | 18 | Mr. Kramer? |
| 10:26 | 19 | A.   No, I didn't. |
| 10:26 | 20 | Q.   Did Mr. Kramer state he was a part owner of Certus? |
| 10:26 | 21 | MR. CRONE:  Objection.  Scope. |
| 10:26 | 22 | THE COURT:  Overruled. |
| 10:26 | 23 | THE WITNESS:  I never had any conversations with |
| | 24 | Mr. Kramer. |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:26 | 1 | BY MR. CRONE: |
| 10:26 | 2 | Q.   It was just through e-mail you had conversations with |
| | 3 | him? |
| 10:26 | 4 | A.   He was copied on most of the e-mails that went back and |
| | 5 | forth, yes. |
| 10:26 | 6 | Q.   Did he ever send you any e-mails? |
| 10:26 | 7 | A.   Not to my recollection. |
| 10:26 | 8 | Q.   Why were you copying him? |
| 10:26 | 9 | A.   Because I was -- initially, I was told Quin Rudin was |
| | 10 | the managing partner, Claude Kramer was the contracts |
| | 11 | person, and Claude Kramer actually signed the P.O. that came |
| | 12 | in to Oracle. |
| 10:27 | 13 | Q.   And who told you he was the contracts contact? |
| 10:27 | 14 | A.   I believe that's in an e-mail from Mr. Mai. |
| 10:27 | 15 | Q.   See -- I'll refer you to Exhibit 126, second page. |
| 10:27 | 16 | A.   Okay.  I'm there. |
| 10:27 | 17 | Q.   This is an e-mail from you.  Says from Anne W. Achey -- |
| 10:27 | 18 | A.   Right. |
| 10:27 | 19 | Q.   -- to Anne W. Achey. |
| 10:27 | 20 | A.   Copy Michael Mai, PS-orders, and Quin Rudin, right. |
| 10:27 | 21 | Q.   Why would you send an e-mail to yourself? |
| 10:27 | 22 | A.   You know, I don't even know.  Sometimes you start the |
| | 23 | e-mail, and the system pops up with to's, copies, blind |
| | 24 | copies.  That's something I didn't catch. |
| 10:28 | 25 | Q.   And then it says below that, copy -- CC Michael Mai and |

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | then it says PS-orders_US@Oracle.com.  What does that mean?         |
| 10:28 | 2  | A.   That was the mailbox where all of the orders come in.          |
|       | 3  | Normally, the orders come in directly to PS-orders,                 |
|       | 4  | underscore, US@Oracle.com, and then they're passed to me.          |
| 10:28 | 5  |      In this case, I was doing the communications with             |
|       | 6  | Dearborne, and I was trying to copy them on the orders, you        |
|       | 7  | know, on the communications so they would know what was           |
|       | 8  | going on.                                                          |
| 10:28 | 9  | Q.   And you just informed us that you met with Mr. Tiernan        |
|       | 10 | in this case?                                                      |
| 10:28 | 11 | A.   Briefly on Thursday I was introduced to him.                 |
| 10:28 | 12 | Q.   Were you aware that Mr. Tiernan had been a defendant in      |
|       | 13 | this case?                                                         |
| 10:28 | 14 | A.   No.                                                           |
| 10:29 | 15 | Q.   Were you ever informed that?                                  |
| 10:29 | 16 | A.   No.                                                           |
| 10:29 | 17 | Q.   When you met with him on Thursday, no one told you that      |
|       | 18 | at that time?                                                      |
| 10:29 | 19 | A.   No, we just had small talk.                                   |
| 10:29 | 20 | Q.   And where did you meet him?                                   |
| 10:29 | 21 | A.   At the Westin Hotel.                                          |
| 10:29 | 22 | Q.   Was your attorneys with you *(verbatim)*?                     |
| 10:29 | 23 | A.   Yes.                                                          |
| 10:29 | 24 | Q.   Did you tell him what your testimony was gonna be?           |
| 10:29 | 25 | A.   No, we did not discuss testimonies.                          |

| | | |
|---|---|---|
| 10:29 | 1 | Q.   Did you ask him what his testimony -- |
| 10:29 | 2 | A.   No. |
| 10:29 | 3 | Q.   Do you know what the purpose of this meeting was for? |
| 10:29 | 4 | A.   No. |
| 10:29 | 5 | Q.   Were you are aware that he's scheduled to testify in |
| | 6 | this trial? |
| 10:29 | 7 | A.   Yes. |
| 10:29 | 8 | Q.   And are you aware that he resides in the state of |
| | 9 | Washington? |
| 10:29 | 10 | A.   I think that did come up in the discussions. |
| 10:29 | 11 | Q.   But you had no discussions about what would be said |
| | 12 | at -- during this trial? |
| 10:29 | 13 | A.   No. |
| 10:29 | 14 | MR. RAMP:  All right.  Thank you, Ms. Achey. |
| 10:29 | 15 | THE COURT:  All right.  Counsel, may this witness |
| | 16 | be excused? |
| 10:29 | 17 | MR. CRONE:  Yes. |
| 10:30 | 18 | THE COURT:  Counsel? |
| 10:30 | 19 | MR. RAMP:  I'd like to be able to recall her. |
| 10:30 | 20 | THE COURT:  All right.  I'm going to ask you to be |
| | 21 | subject to recall possibly.  If you would step down.  Thank |
| | 22 | you very much. |
| 10:30 | 23 | *(Witness excused, subject to recall.)* |
| 10:30 | 24 | THE COURT:  Ladies and gentlemen, why don't we |
| | 25 | take a 45-minute recess.  The next witness is going to take |

10:30

10:30

10:30

10:30

10:30

10:30

10:31

10:31

10:31

10:31

10:31

```
 1   quite a while.  I like to hear them in a block of time, so
 2   you're probably going to be in session from about 11:15
 3   until about 1:30.
 4          And we're going to go through the lunch hour.  So
 5   I suggest you go down to the cafeteria, grab a bite to eat
 6   or something.  I'm trying to get these people to you in one
 7   block of time.
 8          I think Counsel's going to call Mr. Mai next, he
 9   represented, so it will be a -- I think a lengthy session.
10          You're admonished not to discuss this matter
11   amongst yourselves, nor form or express any opinion
12   concerning this case.
13          Have a nice recess.  We'll see you quarter after
14   the hour.  11:15.
15          (Jury recesses at 10:31 a.m.)
16          (Outside the presence of the jury.)
17          THE COURT:  All right.  Counsel, have a nice
18   recess.  We'll see you at 11:15.
19          MR. RAMP:  Thank you, Your Honor.
20          MR. CRONE:  Your Honor, may I ask one quick thing?
21   Your Honor, I would just request that when documents are
22   being shown by the defense that Mr. Mai's desktop not be
23   shown to the jury, if we could avoid that.
24          THE COURT:  His desktop?
25          MR. CRONE:  We're seeing folder structure and some
```

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | references --                                                        |
| 10:31 | 2  | THE COURT:  I hadn't seen that.  I'll watch,                         |
|       | 3  | Counsel.  Just the exhibit goes up.                                  |
| 10:31 | 4  | MR. CRONE:  Thank you, Your Honor.                                   |
| 10:31 | 5  | THE COURT:  Okay.                                                    |
| 10:31 | 6  | *(Recess held at 10:31 a.m.)*                                        |
| 11:33 | 7  | *(Proceedings resumed at 11:33 a.m.)*                                |
| 11:33 | 8  | *(In the presence of the jury.)*                                     |
| 11:34 | 9  | THE COURT:  All right.  Then we're back in                          |
|       | 10 | session.  The jury's present.  And discussing with counsel,          |
|       | 11 | we're going to take about a two-hour, hour-and-45-minute             |
|       | 12 | run, right up to about 1:15, 1:30; then take another recess,         |
|       | 13 | and then come back in.                                               |
| 11:34 | 14 | Counsel, if you would be seated.  Thank you for                     |
|       | 15 | your courtesy and the parties.                                       |
| 11:34 | 16 | Counsel, would you like to call your next witness,                  |
|       | 17 | please.                                                              |
| 11:34 | 18 | MR. CRONE:  Yes, Your Honor, Oracle calls Mr. Mai,                  |
|       | 19 | adversely, to the stand.                                             |
| 11:34 | 20 | THE COURT:  Thank you.                                               |
| 11:34 | 21 | Mr. Mai, if you would be kind enough, sir, just                     |
|       | 22 | raise your right hand at that location.  Julie will                 |
|       | 23 | administer an oath.                                                  |
| 11:34 | 24 | **MICHAEL MAI, PLAINTIFF'S WITNESS, SWORN**                          |
| 11:34 | 25 | THE DEFENDANT:  I do.                                                |

11:35    1          THE COURT:  Mr. Mai, would you state your full

2   name for the record.

11:35    3          THE WITNESS:  My name is Michael Quang Mai.

11:35    4          THE COURT:  Would you spell your last name, sir.

11:35    5          THE WITNESS:  M-A-I.

11:35    6          THE COURT:  Now, let me stop and explain to the

7   jury.  Either party is entitled in a civil action to call a

8   person who might normally be testifying for the other side.

9   The plaintiff here has decided, Oracle, to call Mr. Mai,

10   who's the defendant.  They can do that.  They can even ask

11   leading questions.  But be careful.  Although they're

12   allowed to ask leading questions, remember it's the answer.

13   The question can lead, but you're listening to the answers.

11:35   14        So, therefore, it's appropriate if Mr. Mai also

15   calls Ms. Achey back or somebody else on the other side.  In

16   fact, Mr. Mai has the option, because he's being called

17   during Oracle's case, to be called once again by his counsel

18   during his case.

11:36   19        So that is why you heard counsel say Mr. Mai is an

20   adverse witness.  Well, he's on the other side, obviously.

11:36   21        So, Counsel, your questions on direct examination,

22   please.

11:36   23        MR. CRONE:  Thank you, Your Honor.

24

25

| 11:36 | 1 | **DIRECT EXAMINATION** |
|---|---|---|
| 11:36 | 2 | BY MR. CRONE: |
| 11:36 | 3 | Q.   Mr. Mai, I'd like to just clear up a couple of things |
| | 4 | right up front.  It is true that you and not someone |
| | 5 | impersonating you bid on and secured a contract with the |
| | 6 | Pension Benefit Guaranty Corporation for the sale of Oracle |
| | 7 | software in August of 2009; is that right? |
| 11:36 | 8 | A.   I -- can you repeat that?  I don't understand what you |
| | 9 | try to ask. |
| 11:36 | 10 | Q.   Sure.  Is it true that you personally bid on and |
| | 11 | secured a contract with the Pension Benefit Guaranty |
| | 12 | Corporation in August of 2009? |
| 11:37 | 13 | A.   Yes. |
| 11:37 | 14 | Q.   And you were personally involved in communications with |
| | 15 | Oracle concerning that transaction? |
| 11:37 | 16 | A.   Um, if I recall, at some occasion, yes, I did talk to |
| | 17 | Ms. Anne Achey. |
| 11:37 | 18 | Q.   And it is true that neither you nor your Dearborne |
| | 19 | Circle paid Oracle any portion of the money that Dearborne |
| | 20 | Circle received from the U.S. Treasury in connection with |
| | 21 | this transaction; is that correct? |
| 11:37 | 22 | A.   We did pay to our reseller that -- who I purchased the |
| | 23 | software from, which is Certus, so we paid them.  And they |
| | 24 | responsible to pay Oracle. |
| 11:37 | 25 | Q.   Okay.  Mr. Mai, I appreciate that you'd like to tell |

```
         1    the jury what you believe happened, and your counsel will

         2    have ample opportunity to ask you some questions after I'm

         3    done.  If you would just focus on the question that I'm

         4    asking.

11:38    5         Is it true that neither you nor Dearborne Circle

         6    directly paid Oracle a dollar of what you received from the

         7    U.S. Treasury?  Is that true?

11:38    8    A.   I am not obligated to pay to Oracle because I pay to

         9    Certus.

11:38   10    Q.   So is it true, then, sir, that you did not pay Oracle a

        11    dollar of what you received from the federal government

        12    directly?

11:38   13    A.   Yes, I did not pay Oracle.

11:38   14    Q.   And it is true that you received more than $900,000

        15    from the U.S. Treasury in payment for what you had promised

        16    to deliver to the Pension Benefit Guaranty Corporation.  Is

        17    that true, sir?

11:38   18    A.   I have to look at the particular exhibit to show -- to

        19    remember the exact dollar amount.

11:39   20    Q.   Okay.  You do recall that you received a check from the

        21    U.S. Treasury, do you not?

11:39   22    A.   Yes, I did.

11:39   23    Q.   Okay.  And you were here during my opening statement,

        24    where I put a picture of the check up on the screen; do you

        25    recall that?
```

| | | |
|---|---|---|
| 11:39 | 1 | A.   Yes, I did. |
| 11:39 | 2 | Q.   And was that the check you received, sir, in September |
| | 3 | of 2009 -- or October of 2009? |
| 11:39 | 4 | A.   Yes, I did. |
| 11:39 | 5 | Q.   We've heard a little bit about Quin Rudin in this case, |
| | 6 | Mr. Mai.  You've known him for quite some time; isn't that |
| | 7 | right? |
| 11:39 | 8 | A.   I met Mr. Rudin in 1996, I believe. |
| 11:39 | 9 | Q.   All right.  What I'd like to focus on, though, if we |
| | 10 | could, is the transaction that's at issue in this case, the |
| | 11 | Pension Benefit Guaranty Corporation transaction. |
| 11:39 | 12 |      Sometime before you ever bid on the -- on this software |
| | 13 | that the PBGC desired from Oracle, Mr. Rudin told you that |
| | 14 | he owned a company called Certus Solutions; isn't that |
| | 15 | correct? |
| 11:40 | 16 | A.   Yes. |
| 11:40 | 17 | Q.   And he told you that Certus was authorized to sell |
| | 18 | Oracle software, right? |
| 11:40 | 19 | A.   Yes. |
| 11:40 | 20 | Q.   And you've heard of this fedbid.com website or system |
| | 21 | that Ms. Achey described earlier? |
| 11:40 | 22 | A.   Yes. |
| 11:40 | 23 | Q.   And you understand that's a system that's run out of |
| | 24 | the Washington, D.C. area, available over the Internet? |
| 11:40 | 25 | A.   I know it's available on the Internet, but I don't know |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | exactly where the company headquarters is.                   |
| 11:40 | 2  | Q.   All right.  What that system allows you to do is it's a  |
|       | 3  | type of bulletin board system where you can sign up and get  |
|       | 4  | information about available government contracts, such as    |
|       | 5  | the one that's at issue in this case; is that right?         |
| 11:40 | 6  | A.   The fedbid.com is the auction site where you can sign   |
|       | 7  | up, you know, like you say, bulletin board information, and  |
|       | 8  | then whenever there's an auction for any federal contract,   |
|       | 9  | then they would e-mail to you.                               |
| 11:41 | 10 | Q.   Okay.  So at some point in time you -- well, just to be |
|       | 11 | clear.  The fedbid.com website at the time in 2009 would     |
|       | 12 | list various contracts that were available for bid from      |
|       | 13 | various branches or agencies of the U.S. Government; isn't   |
|       | 14 | that right?                                                  |
| 11:41 | 15 | A.   Yes.                                                    |
| 11:41 | 16 | Q.   And you, ultimately, signed up for these regular        |
|       | 17 | e-mails from the fedbid.com website because you wanted to    |
|       | 18 | bid on available U.S. Government contracts?                  |
| 11:41 | 19 | A.   Yes.                                                    |
| 11:41 | 20 | Q.   And the way this worked is you would submit a bid, and  |
|       | 21 | various other parties might submit a bid, and it's a type of |
|       | 22 | auction process.  Am I right?                                |
| 11:42 | 23 | A.   Yes.                                                    |
| 11:42 | 24 | Q.   And you hope that you're selected, based primarily in   |
|       | 25 | part on various criteria including the price, correct?       |

DEBBIE GALE, U.S. COURT REPORTER

| 11:42 | 1 | A.   Based on each of the particular bid.  The government or |
| | 2 | FedBid will tell you what kind of requirement that in order |
| | 3 | for you to participate.  And for the PBGC transaction, the |
| | 4 | only thing they care about was the price. |
| 11:42 | 5 | Q.   Sir, I'm not there yet.  I'm just asking you generally |
| | 6 | speaking. |
| 11:42 | 7 | The fedbid.com website evaluates each auction by a |
| | 8 | variety of criteria including price; isn't that right? |
| 11:42 | 9 | A.   Yes. |
| 11:42 | 10 | Q.   At some point in time in the summer, or as late as |
| | 11 | August of 2009, you found out about a contract that was |
| | 12 | opened for bid circulated by the Pension Benefit Guaranty |
| | 13 | Corporation on the fedbid.com website; is that right? |
| 11:43 | 14 | A.   Normally, FedBid always post the information of the bid |
| | 15 | like 30 day or sometime 60 day in advance for you to go in |
| | 16 | and take a look at it. |
| 11:43 | 17 | Q.   All right.  So within 30 or 60 days before your bid was |
| | 18 | accepted by the PBGC, you learned about the existence of |
| | 19 | this potential contract award; is that right? |
| 11:43 | 20 | A.   Yes. |
| 11:43 | 21 | Q.   And then, through your Dearborne Circle company -- you |
| | 22 | did own a company or do own a company called Dearborne |
| | 23 | Circle, LLC; is that right? |
| 11:43 | 24 | A.   Yes. |
| 11:43 | 25 | Q.   And through your Dearborne Circle, you bid on a |

|        |    |                                                                    |
|--------|----|--------------------------------------------------------------------|
|        | 1  | contract to deliver Oracle software licenses to this agency        |
|        | 2  | of the U.S. Government; is that right?                              |
| 11:43  | 3  | A.   Yes.                                                           |
| 11:43  | 4  | Q.   I'm going to have you turn to Exhibit 120, if you             |
|        | 5  | could, in the binders in front of you.                             |
| 11:44  | 6  | Are you with me, sir?                                               |
| 11:44  | 7  | A.   Yes.                                                           |
| 11:44  | 8  | Q.   Ultimately, you did learn that the Pension Benefit           |
|        | 9  | Guaranty Corporation accepted your bid as the lowest bid; is      |
|        | 10 | that correct?                                                       |
| 11:44  | 11 | A.   Yes.                                                           |
| 11:44  | 12 | Q.   The e-mail that we're looking at as Exhibit 120 shows a      |
|        | 13 | "from" e-mail address of clientservices@fedbid.com; is that       |
|        | 14 | right?                                                              |
| 11:44  | 15 | A.   Yes.                                                           |
| 11:44  | 16 | Q.   Is that an e-mail address that you received                   |
|        | 17 | communications relating to this PBGC transaction from             |
|        | 18 | fedbid.com?                                                         |
| 11:44  | 19 | A.   Yes.                                                           |
| 11:44  | 20 | Q.   And then there's a "to" line, where it shows it was          |
|        | 21 | sent to MMai@dearbornellc.com.                                     |
| 11:45  | 22 | Do you see where I'm reading?                                      |
| 11:45  | 23 | A.   Yes.                                                           |
| 11:45  | 24 | Q.   That was your e-mail address at the time?                     |
| 11:45  | 25 | A.   Yes.                                                           |

| | | |
|---|---|---|
| 11:45 | 1 | Q.   And you see that it's copied to two individuals, one of |
| | 2 | which is Price.Robert@PBGC.gov.  Do you see where I'm |
| | 3 | reading? |
| 11:45 | 4 | A.   Yes. |
| 11:45 | 5 | Q.   To your understanding, Mr. Price was the contracting |
| | 6 | officer for the Pension Benefit Guaranty Corporation that |
| | 7 | you worked with? |
| 11:45 | 8 | A.   Yes. |
| 11:45 | 9 | Q.   And this is an e-mail that you received on |
| | 10 | September 19, 2009? |
| 11:45 | 11 | A.   Yes. |
| 11:45 | 12 | MR. CRONE:  Your Honor, I would move |
| | 13 | Exhibit 120 in evidence. |
| 11:45 | 14 | THE COURT:  Received. |
| 11:45 | 15 | (Exhibit No. 120 received in evidence.) |
| 11:46 | 16 | MR. CRONE:  May I publish? |
| 11:46 | 17 | THE COURT:  You may. |
| 11:46 | 18 | (Exhibit displayed.) |
| 11:46 | 19 | BY MR. CRONE: |
| 11:46 | 20 | Q.   Mr. Mai, to be clear, the September 19, 2009 date, |
| | 21 | that's not the first time that you heard that you had won |
| | 22 | this auction process; isn't that right? |
| 11:46 | 23 | A.   I receive a phone call on August 28 from fedbid.com to |
| | 24 | inform me that I had won the contract -- |
| 11:46 | 25 | Q.   Okay. |

| 11:46 | 1 | A.    -- and this is just a follow-up e-mail to -- for -- to |
|---|---|---|
| | 2 | make sure that I have received the notice. |
| 11:46 | 3 | Q.   All right.  And then if you read below, the first |
| | 4 | sentence begins, says, "Dear Michael, our records --" |
| 11:46 | 5 | MR. CRONE:  Well, let's highlight it first. |
| 11:46 | 6 | (Technician complies.) |
| 11:46 | 7 | BY MR. CRONE: |
| 11:46 | 8 | Q.   Says, "Dear Michael, our records show that Robert Price |
| | 9 | from Pension Benefit Guaranty Corporation accepted your bid |
| | 10 | on August 28, 2009, for the buy detailed below." |
| 11:46 | 11 | Did I read that correctly? |
| 11:46 | 12 | A.   Yes. |
| 11:46 | 13 | Q.   And that's consistent with what you just testified that |
| | 14 | you got notice that your bid was accepted on August 28th, |
| | 15 | 2009? |
| 11:47 | 16 | A.   Yes. |
| 11:47 | 17 | Q.   And then if you look below, there's a series of data |
| | 18 | that begins with the title "By Summary." |
| 11:47 | 19 | See where I'm reading? |
| 11:47 | 20 | A.   Yes. |
| 11:47 | 21 | Q.   In the third line, it says "By Description." |
| 11:47 | 22 | Do you see where I'm reading? |
| 11:47 | 23 | It says "Oracle system products"? |
| 11:47 | 24 | A.   Yes. |
| 11:47 | 25 | Q.   Does that reflect the fact that this buy included |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | Oracle system products, sir?                                 |
| 11:47 | 2  | A.    Yes.                                                   |
| 11:47 | 3  | Q.    When you submitted your bid to the Pension Benefit     |
|       | 4  | Guaranty Corporation, did you do that electronically using   |
|       | 5  | the Internet?                                                |
| 11:48 | 6  | A.    Yes.                                                   |
| 11:48 | 7  | Q.    Was that by e-mail, or did you log on to the fedbid.com |
|       | 8  | website in order to submit that bid?                         |
| 11:48 | 9  | A.    I would log on to the fedbid.com.                      |
| 11:48 | 10 | Q.    It is accurate that you didn't -- you personally didn't |
|       | 11 | contact Oracle before submitting a bid to the PBGC to obtain |
|       | 12 | nonstandard pricing or a higher discount from Oracle?        |
| 11:48 | 13 | A.    Because I'm not a reseller of Oracle, I don't even know |
|       | 14 | what I need to do.  So all I did is I contacted a reseller   |
|       | 15 | that I found on the Internet, DLT software.  And I also go   |
|       | 16 | to GSA.gov, and they have information of the pricing of the  |
|       | 17 | product.                                                     |
| 11:48 | 18 |          MR. CRONE:  Your Honor, I will move to strike as    |
|       | 19 | nonresponsive.                                               |
| 11:48 | 20 |          THE COURT:  The answer remains.  Just reask the     |
|       | 21 | question.                                                    |
| 11:49 | 22 | BY MR. CRONE:                                                 |
| 11:49 | 23 | Q.    Sir, is it true that you personally didn't contact     |
|       | 24 | Oracle before submitting this bid to the Pension Benefit     |
|       | 25 | Guaranty Corporation via fedbid.com for any greater discount |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | for its software licenses?  Is that right?                   |
| 11:49 | 2  | A.   I have indicated, because I'm not reseller, so I really |
|       | 3  | don't know who to contact at Oracle.                         |
| 11:49 | 4  | Q.   Okay.  So the answer to my question was no, sir?        |
| 11:49 | 5  | A.   Yeah.  No, I never contact anyone at Oracle.            |
| 11:49 | 6  | Q.   And isn't it true that before this transaction, your    |
|       | 7  | Dearborne Circle had never sold software licenses to anyone  |
|       | 8  | before?                                                      |
| 11:49 | 9  | A.   Yes, we'd never sold any software license before.       |
| 11:49 | 10 | Q.   And before this transaction, Dearborne Circle, LLC had  |
|       | 11 | not joined the Oracle Partner Network that you heard         |
|       | 12 | Ms. Achey describe?                                          |
| 11:50 | 13 | A.   Yes, we never joined the Oracle Partner Network.        |
| 11:50 | 14 | Q.   Did you make any attempt to investigate how easy it was |
|       | 15 | to do that?                                                  |
| 11:50 | 16 | A.   I don't even know where to start.                       |
| 11:50 | 17 | Q.   You -- I believe you testified a few minutes ago that   |
|       | 18 | the -- this particular bid didn't have -- was selected, you  |
|       | 19 | believe, solely on the basis of price; is that right?        |
| 11:50 | 20 | A.   Yes.                                                    |
| 11:50 | 21 | Q.   But you did tell the Pension Benefit Guaranty           |
|       | 22 | Corporation that Dearborne, in fact, had been certified by   |
|       | 23 | the federal government as a Service-Disabled Veteran-Owned   |
|       | 24 | Small Business; isn't that right?                            |
| 11:50 | 25 | A.   Yes, at that time, we are a certified disabled vet.     |

1    And but for this particular bid, it doesn't require that we

2    have to be a service-disabled vet to participate.  Because

3    what happened, if the bid was set aside for disabled vet,

4    then they would indicate it as one of the requirement that

5    you had to be a disabled vet in order for you to participate

6    to the bid.  But this one is not.  It's open for anybody to

7    bid.

11:51    8    Q.    Okay.  So just to be clear, what you're saying is this

9    was not a set aside, as Ms. Achey had previously referenced;

10    is that right?

11:51    11    A.    Yes.

11:51    12    Q.    But notwithstanding that, you did represent to the PBGC

13    in connection with this transaction that you were a

14    Service-Disabled Veteran-Owned Small Business; isn't that

15    right?

11:51    16    A.    Yes.  And we are disabled vet.

11:51    17    Q.    I beg your pardon?

11:51    18    A.    And we are a disabled vet company.

11:51    19    Q.    You're saying that you are today?

11:51    20    A.    Not today.  But at that -- in 2009, we were.

11:51    21    Q.    Sir, you understood at the time that having a

22    Service-Disabled Veteran-Owned Small Business certification

23    was something that was given out by the government to

24    companies that were owned by military veterans who were

25    disabled through their service, didn't you?

11:52   1   A.   Yes.

11:52   2   Q.   And you obtained certification for Dearborne from the

        3   U.S. Department of Veterans Affairs, correct?

11:52   4   A.   I did not obtain that.  It was my brother, my younger

        5   brother.  His name is Dr. Vu Mai.  Vu, V-U, is first name,

        6   and Mai, like my name.  And he is the owner of -- part owner

        7   of Dearborne, and he apply for the service-disabled vet

        8   because he is a military officer, the U.S. Army.

11:52   9   Q.   All right.  Well, I'll show that to you in a moment,

       10   Mr. Mai.

11:52  11        But you did know -- your purpose in doing so in

       12   obtaining the certification was to help assist you in

       13   obtaining potential government contracts that, for example,

       14   might be a set aside; isn't that right?

11:53  15   A.   Yes.

11:53  16   Q.   And you knew, for example, that you might often be

       17   bidding against service-disabled veteran-owned companies

       18   that had been certified by the government, correct?

11:53  19   A.   Yes.

11:53  20   Q.   Let me now show you that certification you have

       21   referred to, sir.  If you could turn to Exhibit 36 in your

       22   binders.

11:53  23   A.   *(Witness complies.)*

11:53  24   Q.   Are you there, sir?

11:53  25   A.   Yes.

| 11:53 | 1 | Q.   Is 36 the certification that you referred to that your |
| | 2 | brother, Dr. Vu Mai, obtained on behalf of Dearborne Circle? |
| 11:54 | 3 | A.   Yes. |
| 11:54 | 4 | Q.   And you see that it's dated May 11, 2009? |
| 11:54 | 5 | A.   Yes. |
| 11:54 | 6 | Q.   And this is a document that Dearborne Circle has kept |
| | 7 | in its files -- or you've kept in your files since then? |
| 11:54 | 8 | A.   Yes. |
| 11:54 | 9 | Q.   And you produced it in this case to Oracle? |
| 11:54 | 10 | A.   Yes. |
| 11:54 | 11 | MR. CRONE:  Your Honor, I would move Exhibit 36 in |
| | 12 | evidence. |
| 11:54 | 13 | THE COURT:  Received. |
| 11:54 | 14 | (Exhibit No. 36 received in evidence.) |
| 11:54 | 15 | THE COURT:  You may display it. |
| 11:54 | 16 | MR. CRONE:  Thank you, Your Honor. |
| 11:54 | 17 | (Exhibit displayed.) |
| 11:54 | 18 | BY MR. CRONE: |
| 11:54 | 19 | Q.   Now, Mr. Mai, just focusing on the top part of |
| | 20 | Exhibit 36, you'll see there's a date in the top middle of |
| | 21 | the page. |
| 11:54 | 22 | Do you see where I'm reading? |
| 11:54 | 23 | A.   Yes. |
| 11:54 | 24 | Q.   And does that indicate that you -- that this |
| | 25 | certification was received on May 11, 2009? |

DEBBIE GALE, U.S. COURT REPORTER

| 11:54 | 1 | A.   Yes. |
| 11:54 | 2 | Q.   And if we look at the address on the left-hand side of |
| | 3 | this document, that is your brother's name, Dr. Vu Mai, that |
| | 4 | we're looking at? |
| 11:55 | 5 | A.   Yes. |
| 11:55 | 6 | Q.   And I think you said that it was your brother that |
| | 7 | submitted a certification -- well, let me step back. |
| 11:55 | 8 |      Did you personally send in the certification to the |
| | 9 | Department of Veterans Affairs, even though it was sent in |
| | 10 | the name of your brother? |
| 11:55 | 11 | A.   No, he sent it. |
| 11:55 | 12 | Q.   Okay.  And but you certainly knew that your brother was |
| | 13 | sending it, correct? |
| 11:55 | 14 | A.   Of course. |
| 11:55 | 15 | Q.   Okay.  And was that -- was that mailed in to the |
| | 16 | Department of Veterans Affairs in Washington? |
| 11:55 | 17 | A.   I believe so. |
| 11:55 | 18 | Q.   Let me have you turn to the -- |
| 11:56 | 19 |      Just to be clear, sir, you personally have never served |
| | 20 | in the military; is that accurate? |
| 11:56 | 21 | A.   Yes, I never serve in the military. |
| 11:56 | 22 | Q.   Okay.  And, by the way, this address that we're looking |
| | 23 | at in the upper left-hand corner, where is -- whose address |
| | 24 | is that? |
| 11:56 | 25 | A.   That's the address of my brother dental clinic. |

| 11:56 | 1 | Q.   Is that still his address, sir? |
| 11:56 | 2 | A.   Yes. |
| 11:56 | 3 | Q.   And then turning to the third paragraph in this letter, |
| | 4 | you see in the second sentence where it says, "Our goal is |
| | 5 | to establish a strong veterans' movement by branding your |
| | 6 | status as a verified Service-Disabled Veteran-Owned Small |
| | 7 | Business." |
| 11:57 | 8 | Do you remember reading that when you received this |
| | 9 | letter, sir? |
| 11:57 | 10 | A.   Yes. |
| 11:57 | 11 | Q.   Your brother was never an employee of Dearborne; isn't |
| | 12 | that right? |
| 11:57 | 13 | A.   He's the owner of Dearborne at that time in 2009. |
| 11:57 | 14 | Q.   He was never a member of Dearborne, correct? |
| 11:57 | 15 | A.   He's a member of Dearborne. |
| 11:57 | 16 | Q.   I'm sorry, he was a member of Dearborne? |
| 11:57 | 17 | A.   He is a member of Dearborne. |
| 11:57 | 18 | Q.   At what time, sir? |
| 11:57 | 19 | A.   2009 and 2010. |
| 11:58 | 20 | Q.   Do you agree that you have no documentation of your |
| | 21 | brother being a member of Dearborne, LLC at any time? |
| 11:58 | 22 | A.   I do have evidence that he is a member of Dearborne. |
| | 23 | It's one -- it's Exhibit No. 23. |
| 11:58 | 24 | Q.   Well, let me have you turn to Exhibit 23, then.  Sir, |
| | 25 | Exhibit 23, this was a series of bank records from Bank of |

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
|        | 1  | America that you saw at a deposition that I took in this     |
|        | 2  | case?                                                        |
| 11:59  | 3  | A.   Yes.                                                    |
| 11:59  | 4  | Q.   And just to be clear, when I say "deposition," that was |
|        | 5  | when you came to a conference room at my office about a year |
|        | 6  | ago over the course of several days and gave testimony under |
|        | 7  | oath just like you're doing today?                           |
| 11:59  | 8  | A.   Yes.                                                    |
| 11:59  | 9  | Q.   And there was a court reporter there just like there is |
|        | 10 | a court reporter today?                                      |
| 11:59  | 11 | A.   Yes.                                                    |
| 11:59  | 12 | Q.   And there was actually somebody with a videotape        |
|        | 13 | machine that was also videotaping you; isn't that right?     |
| 11:59  | 14 | A.   Yes.                                                    |
| 11:59  | 15 | Q.   Okay.  Okay.  And you would agree that Exhibit 23 is a  |
|        | 16 | collection of bank records from your Dearborne Circle bank   |
|        | 17 | account with Bank of America?                                |
| 11:59  | 18 | A.   Yes.  And I believe some of the information on this you |
|        | 19 | subpoena to the bank and you obtained them directly, so --   |
|        | 20 | as well.                                                     |
| 12:00  | 21 | Q.   Okay.  And you had the opportunity to review these      |
|        | 22 | documents at your deposition?                                |
| 12:00  | 23 | A.   I don't recall that I have review every single thing in |
|        | 24 | here because it's been a while --                            |
| 12:00  | 25 | Q.   Okay.                                                   |

DEBBIE GALE, U.S. COURT REPORTER

12:00   1   A.   -- but I remember that I did provide to you the bank

        2   statement and also the Bank of America, where I have the

        3   bank for Dearborne Circle, LLC, provide you the bank

        4   statement as well.

12:00   5   Q.   But you would agree that Exhibit 23 is a collection of

        6   your bank statements from Bank of America account for

        7   Dearborne Circle; is that right?

12:00   8   A.   Yes.

12:00   9        MR. CRONE:  Your Honor, I would move Exhibit 23

       10   into evidence.

12:00  11        THE COURT:  Received.

12:00  12     (Exhibit No. 23 received in evidence.)

12:00  13        THE COURT:  You may display it.

12:00  14        MR. CRONE:  Thank you, Your Honor.

12:00  15     (Exhibit displayed.)

12:00  16   BY MR. CRONE:

12:00  17   Q.   I'll be returning back to these later on, Mr. Mai, but

       18   I believe you said a moment ago that it was within

       19   Exhibit 23 that you had documentation that your brother was

       20   at one time a part owner of Dearborne Circle, LLC; is that

       21   correct?

12:00  22   A.   Yes.

12:01  23   Q.   Okay.  Are you -- could you tell me where in Exhibit 23

       24   you're pointing to?

12:01  25   A.   If you look at page No. 3.

12:01    1    Q.   All right.

12:01    2         THE WITNESS:  Okay.  Can you bring it up?

12:01    3         (Exhibit displayed.)

12:01    4         THE WITNESS:  You see my brother's name.

12:01    5    BY MR. CRONE:

12:01    6    Q.   Are you looking at the signature lines on the first two

         7    lines in the middle of the page?

12:01    8    A.   Yes.

12:01    9    Q.   Okay.  And just to be clear for the record, it says

        10    "Michael Mai, manager," correct?  Is that right?

12:01   11    A.   Yes.

12:01   12    Q.   And then it says your brother's name, signer; is that

        13    right?

12:01   14    A.   Yes.

12:01   15    Q.   Does anywhere in this document say that your brother

        16    was a manager or owner of Dearborne Circle, LLC at any time?

12:01   17    A.   Well, if he's not an owner, why do I allow him to have

        18    full authorization to sign, to write, to withdraw money from

        19    Bank of America?

12:02   20    Q.   Sir, is it true that nowhere in this document or

        21    anywhere else in your bank records does it say that your

        22    brother was a manager or an owner of Dearborne Circle, LLC,

        23    the company?

12:02   24    A.   I think from Bank of America all they want to know who

        25    the other signer, so they did not specify that here.  But I

DEBBIE GALE, U.S. COURT REPORTER

1    say if he's not the owner, I would not allow him to withdraw

2    money from Bank of America, because he have full access to

3    Bank of America just like I do.

12:02    4    Q.    Okay.  Sir, only because you pointed to this document,

5    I'll make sure we're all clear.

12:02    6         Is there anywhere in this document where it

7    specifically says your brother was the manager or an owner

8    of Dearborne Circle, LLC?

12:02    9    A.    For this particular thing, all he have manager is me

10    and my brother as a signer.

12:03    11    Q.    And isn't it true that you have no other formal,

12    written documentation showing your brother ever being added

13    or removed as a member of the LLC?  Isn't that right?

12:03    14    A.    Because we are brother and there's no one else, so we

15    have a verbal agreement.  You know what I mean?  So we did

16    not go to great length, try to get a lawyer, try to

17    formalize everything, you know, because we're brothers.

12:03    18    Q.    So the answer to my question, sir, is there's no --

19    nothing in writing, right?

12:03    20    A.    Yes, only verbal agreement.

12:03    21    Q.    Your brother never participated in the management of

22    Dearborne Circle at any time, did he?

12:03    23    A.    He is -- he involved in the management of Dearborne

24    Circle.  Do you want me to explain to you detail?

12:04    25    Q.    Your counsel will have the opportunity to ask you

```
        1    questions, Mr. Mai.
12:04   2    A.    Okay.
12:04   3              MR. CRONE:  Your Honor, I would request permission
        4    to play from the videotape the deposition of Mr. Mai.
12:04   5              THE COURT:  Which portions, though?  I'm not able
        6    to see what those portions are quickly enough.
12:04   7              MR. CRONE:  Okay.  And just so you know,
        8    Your Honor, I gave two copies of the transcripts in case the
        9    Court would like to see it.
12:04  10              THE COURT:  Why don't one of your associates hand
       11    that to me and show me that location.
12:04  12              MR. CRONE:  I believe the clerk may have that
       13    transcript.
12:04  14              THE COURT:  She does, but you can come up and find
       15    it for me.  Usually, I don't have my clerk do that.  She has
       16    other things to do.
12:04  17              You turn the pages and you show me the pages.
12:04  18              MR. CRONE:  May I approach, Your Honor?  May be --
12:05  19              THE COURT:  Certainly.
12:05  20              MR. CRONE:  -- may be more expedient.
12:05  21              THE COURT:  And have your associate get out each
       22    one of those for me so I can see those.  I'm not going to
       23    take notes, watch realtime, and also do that.  I want you to
       24    do that.
12:05  25              THE WITNESS:  Your Honor?  Can I obtain a bottle
```

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | of water so I can drink?  Can I step down and get a bottle   |
|       | 2  | of water?                                                    |
| 12:05 | 3  | THE COURT:  You may.                                         |
| 12:05 | 4  | THE WITNESS:  Thank you.                                     |
| 12:05 | 5  | THE COURT:  All right.  Now, what page is it,                |
|       | 6  | Counsel?                                                     |
| 12:05 | 7  | MR. CRONE:  It's page 184, line 18, through                  |
|       | 8  | page 186, line 6.                                            |
| 12:06 | 9  | THE COURT:  To page 186, line 6?                             |
| 12:06 | 10 | MR. CRONE:  Yes, that was the end, Your Honor.               |
| 12:06 | 11 | THE COURT:  You may.                                         |
| 12:06 | 12 | MR. CRONE:  Thank you, Your Honor.                           |
| 12:06 | 13 | *(Video recording played, not reported.)*                   |
| 12:07 | 14 | BY MR. CRONE:                                                |
| 12:08 | 15 | Q.  Mr. Mai, isn't it also true that your brother never     |
|       | 16 | owned -- he was never a 51 percent unconditional and direct |
|       | 17 | owner of Dearborne Circle?                                   |
| 12:08 | 18 | A.  He owned 51 percent of Dearborne.                        |
| 12:08 | 19 | MR. CRONE:  Your Honor, from the same transcript,            |
|       | 20 | I would request permission to play from the videotape       |
|       | 21 | deposition of Mr. Mai at page 319, lines 12 through 15.      |
| 12:08 | 22 | THE COURT:  You may.                                         |
| 12:08 | 23 | MR. CRONE:  Thank you, Your Honor.                           |
| 12:08 | 24 | *(Video recording played, not reported.)*                   |
|       | 25 |                                                              |

| 12:09 | 1 | BY MR. CRONE: |
| 12:09 | 2 | Q.   Now, Dearborne -- well, first of all, this -- the |
| | 3 | Exhibit 36, this was -- I believe you said that your brother |
| | 4 | mailed out the request for a Service-Disabled Veteran-Owned |
| | 5 | Certification from his office in Garden Grove; is that |
| | 6 | correct? |
| 12:09 | 7 | A.   Yes. |
| 12:09 | 8 | Q.   And but Dearborne isn't certified as a Service-Disabled |
| | 9 | Veteran-Owned Small Business today, is it? |
| 12:09 | 10 | A.   At the -- in 2010, when we feel that it, you know, |
| | 11 | doesn't do anything for us.  So we informed the VA that we |
| | 12 | would withdraw our civil -- what you call it -- |
| | 13 | service-disabled vet. |
| 12:10 | 14 | And my brother, he also was to withdraw from Dearborne, |
| | 15 | as well, because we don't feel that -- he doesn't do |
| | 16 | anything for us at all, you know, any more value for it. |
| 12:10 | 17 | Q.   Sir, first of all, I think what you're -- first of all, |
| | 18 | sir, you're familiar with the fact that the U.S. Government |
| | 19 | annually audits these certifications, right? |
| 12:10 | 20 | A.   Yes, and they came down to talk to both me and my |
| | 21 | brother. |
| 12:10 | 22 | Q.   And you said that occurred in 2010? |
| 12:10 | 23 | A.   Yes, because this thing, it was annually. |
| 12:10 | 24 | Q.   Okay.  And so when we're looking at this May 11, 2009, |
| | 25 | date on Exhibit 36 -- and I just want to make sure we're |

|  | 1 | crystal clear about this -- the annual audit you got was |
|---|---|---|
|  | 2 | around May of 2010; is that right? |
| 12:11 | 3 | A.   Something in that nature, yes. |
| 12:11 | 4 | Q.   So give or take a couple weeks; is that right? |
| 12:11 | 5 | A.   Yes.  I don't remember exactly -- they did have |
|  | 6 | somebody from VA came down and talk to us. |
| 12:11 | 7 | Q.   And when you say somebody came to talk to you, that was |
|  | 8 | in connection with an audit of your certification, right? |
| 12:11 | 9 | A.   Correct. |
| 12:11 | 10 | Q.   And what they learned was that Dearborne isn't and |
|  | 11 | never has been principally owned by a service-disabled |
|  | 12 | veteran; isn't that right? |
| 12:11 | 13 | A.   I think you try to misrepresent the question, because I |
|  | 14 | really don't understand what you try to say.  In 2009, we |
|  | 15 | provide information to VA, and they allow us to become a |
|  | 16 | disabled vet under my brother and Dearborne Circle, LLC. |
| 12:11 | 17 | In 2010, when they came down and would like to talk to |
|  | 18 | us about, okay, the information and whether you want to |
|  | 19 | continue to be a disabled vet, that's when we informed them |
|  | 20 | that we no longer wish to participate. |
| 12:12 | 21 | Q.   Sir, isn't it true that you were told by a member of |
|  | 22 | the U.S. Government that, in fact, Dearborne Circle was not |
|  | 23 | a Service-Disabled Veteran-Owned Small business?  Isn't that |
|  | 24 | right? |
| 12:12 | 25 | A.   In -- you have to be specific on what year, because |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | 2009 we were; but 2010, after May 2010, after we informed    |
|       | 2  | the government and my brother actual informed them that he   |
|       | 3  | would like to withdraw his participation in Dearborne, so we |
|       | 4  | didn't no longer need to be a disabled vet --                |
| 12:12 | 5  | Q.   Sir --                                                   |
| 12:12 | 6  | A.   -- so your question was asked me -- you not specific to  |
|       | 7  | what year.  So in deposition, you ask me now, so I said,     |
|       | 8  | "Yeah, right now, he's not."                                 |
| 12:12 | 9  | Q.   Sir, isn't it true that the government told you in 2010  |
|       | 10 | that Dearborne Circle was never and should never have been   |
|       | 11 | certified as a Service-Disabled Veteran-Owned Small          |
|       | 12 | Business?                                                     |
| 12:13 | 13 | A.   They did not say that.                                   |
| 12:13 | 14 |          MR. CRONE:  Your Honor, permission to play from      |
|       | 15 | the deposition of Mr. Mai, the same volume, page 318, line   |
|       | 16 | 19, through 319, line 2?                                      |
| 12:13 | 17 |          THE COURT:  You may.                                 |
| 12:13 | 18 |    (Video recording played, not reported.)                   |
| 12:14 | 19 | BY MR. CRONE:                                                 |
| 12:14 | 20 | Q.   All right.  Mr. Mai, I'd like to turn to the --         |
|       | 21 | specifically to the Pension Benefit Guaranty Corporation     |
|       | 22 | transaction.  And you understand that you sometimes have     |
|       | 23 | referred to that agency as the PBGC, right?                  |
| 12:14 | 24 | A.   Yes.                                                     |
| 12:14 | 25 | Q.   And you knew that you weren't the only bidder on this   |

DEBBIE GALE, U.S. COURT REPORTER

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | transaction, correct?                                        |
| 12:14 | 2  | A.    No.                                                    |
| 12:14 | 3  | Q.    You didn't know that?                                  |
| 12:14 | 4  | A.    I -- I assumed there's other bidder, because it's a    |
|       | 5  | reverse auction.  So when I put in the initial price and     |
|       | 6  | then few minute later it said that I have been outbid by     |
|       | 7  | someone else, so I assume there must be other bidder.        |
| 12:14 | 8  | Q.    Sir, isn't it true that you knew you weren't the only  |
|       | 9  | bidder for this transaction?                                 |
| 12:14 | 10 | A.    I believe so, because, like I said, if I put in a price |
|       | 11 | and few second -- few minute later someone else outbid my    |
|       | 12 | price and, you know, then that's -- so I assume someone else |
|       | 13 | bid for it.                                                  |
| 12:15 | 14 | Q.    Let me have you turn to page -- to Exhibit 16, Mr. Mai. |
|       | 15 | Let me know when you're there.                               |
| 12:15 | 16 | A.    Okay.                                                  |
| 12:15 | 17 | Q.    You've seen this document before, sir?                 |
| 12:15 | 18 | A.    Yes.                                                   |
| 12:15 | 19 | Q.    And we went over this at your deposition.  This is the |
|       | 20 | bid that Dearborne won; isn't that right?                    |
| 12:15 | 21 | A.    This is the invoice that we have to -- after we got the |
|       | 22 | information, the announcement from PBGC and FedBid, they     |
|       | 23 | require that we have to submit a formal invoice, and so this |
|       | 24 | is the one that I put together.                              |
| 12:15 | 25 | Q.    Okay.  And to be clear, these are the transactional    |

| | | |
|---|---|---|
| | 1 | documents that are between Dearborne Circle and the Pension |
| | 2 | Benefit Guaranty Corporation; is that right? |
| 12:16 | 3 | A.   There's a lot of document.  Can you tell me which page? |
| 12:16 | 4 | Q.   Well, starting at page 1, you understand that starting |
| | 5 | as of page 1, this is a copy of the transactional documents |
| | 6 | between you, meaning Dearborne Circle, LLC, and the Pension |
| | 7 | Benefit Guaranty Corporation, just the whole of them? |
| 12:16 | 8 | A.   Yes. |
| 12:16 | 9 | Q.   Feel free to look through them. |
| 12:16 | 10 | Is that right, sir? |
| 12:16 | 11 | A.   For the first page, yes. |
| 12:16 | 12 | Q.   Starting at the second page, that's a copy of the |
| | 13 | actual purchase order between your company and the Pension |
| | 14 | Benefit Guaranty Corporation? |
| 12:16 | 15 | A.   Yes. |
| 12:16 | 16 | Q.   And then continuing at page 7, there are special |
| | 17 | contract requirements that are attached to that purchase |
| | 18 | order? |
| 12:17 | 19 | A.   Yes. |
| 12:17 | 20 | Q.   And then starting at page 14, there's an amendment to |
| | 21 | the contract; isn't that right, sir? |
| 12:17 | 22 | A.   Yes. |
| 12:17 | 23 | Q.   And the amendment is signed by you? |
| 12:17 | 24 | A.   Yes. |
| 12:17 | 25 | Q.   And the original purchase order was signed by you? |

| | | |
|---|---|---|
| 12:17 | 1 | A.   Yes. |
| 12:17 | 2 | MR. CRONE:  Your Honor, I would move Exhibit 16 in |
| | 3 | evidence. |
| 12:17 | 4 | THE COURT:  Received. |
| 12:17 | 5 | *(Exhibit No. 16 received in evidence.)* |
| 12:17 | 6 | MR. CRONE:  May I publish, Your Honor? |
| 12:17 | 7 | THE COURT:  You may. |
| 12:17 | 8 | *(Exhibit displayed.)* |
| 12:17 | 9 | BY MR. CRONE: |
| 12:17 | 10 | Q.   Let's turn to exhibit -- sorry -- to page 2, Mr. Mai. |
| | 11 | And again, what we're looking at here is the original |
| | 12 | purchase order between Dearborne Circle and an agency of the |
| | 13 | U.S. Government, the PBGC, correct? |
| 12:18 | 14 | A.   Yes. |
| 12:18 | 15 | Q.   And you can see -- and just to be clear, if we just |
| | 16 | focus on the bottom part of the document with the |
| | 17 | signatures -- |
| 12:18 | 18 | MR. CRONE:  Let's highlight that. |
| 12:18 | 19 | *(Technician complies.)* |
| 12:18 | 20 | BY MR. CRONE: |
| 12:18 | 21 | Q.   -- we have the signature on the left is yours, correct? |
| 12:18 | 22 | A.   Correct. |
| 12:18 | 23 | Q.   And it shows that you signed it in -- is that |
| | 24 | August 28th or 29th of 2009? |
| 12:18 | 25 | A.   August 29. |

| | | |
|---|---|---|
| 12:18 | 1 | Q.   And then there is a signature that appears to be from |
| | 2 | Robert Price, that was dated August 28th, 2009? |
| 12:18 | 3 | A.   Correct. |
| 12:18 | 4 | Q.   And again, Mr. Price was the contracting officer that |
| | 5 | represented the Pension Benefit Guaranty Corporation in |
| | 6 | connection with contracts, correct? |
| 12:18 | 7 | A.   Yes. |
| 12:18 | 8 | Q.   So then let's turn to the -- back up to the top of this |
| | 9 | page, page 2 of Exhibit 16.  If you look at Box No. 3, if we |
| | 10 | could call that out.  You see there's a date here that says |
| | 11 | August 28, 2009. |
| 12:19 | 12 | Did I read that right? |
| 12:19 | 13 | A.   Yes. |
| 12:19 | 14 | Q.   And you see that in the box that says "award/effective |
| | 15 | date." |
| 12:19 | 16 | See where I'm reading? |
| 12:19 | 17 | A.   Yes. |
| 12:19 | 18 | Q.   And that's consistent with your earlier testimony that |
| | 19 | that's the date that the Pension Benefit Guaranty |
| | 20 | Corporation awarded you this transaction through the bidding |
| | 21 | process? |
| 12:19 | 22 | A.   Yes. |
| 12:19 | 23 | Q.   If you could now look at Box No. 9, just below that, by |
| | 24 | two rows. |
| 12:19 | 25 | A.   Yes. |

12:19    1    Q.    You see where it says "issued by Pension Benefit

         2    Guaranty Corporation."

12:19    3          Do you see where I'm reading?

12:19    4    A.    Yes.

12:19    5    Q.    And it then has an address in Washington, D.C.,

         6    correct?

12:19    7    A.    Correct.

12:19    8    Q.    Did you have an understanding during this time period

         9    that that's where the PBGC was located?

12:20   10    A.    I assumed, yes.

12:20   11    Q.    And that's where the PBGC would be downloading any

        12    software sent to it by Oracle in connection with this

        13    transaction?

12:20   14    A.    I don't know where the exact location of the IT

        15    department where they gonna download the software, but I

        16    assume they might be in the same building.

12:20   17    Q.    Did anyone from the Pension Benefit Guaranty

        18    Corporation ever tell you that it would be delivered to a

        19    different address other than the one that we see on the

        20    screen right now?

12:20   21    A.    I don't remember that they told me yes or no.

12:20   22    Q.    Okay.  By the way, where was -- Dearborne Circle's

        23    offices, so to speak, were run out of your home, correct?

12:20   24    A.    Yes.

12:20   25    Q.    And they were run out of -- and your home at the time

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | was an address on Dearborne Circle in Huntington Beach; is           |
|       | 2  | that's right?                                                         |
| 12:20 | 3  | A.   Yes.                                                             |
| 12:20 | 4  | Q.   Let me now have you look at Box No. 17A.  That's about           |
|       | 5  | three lines before that.                                             |
| 12:21 | 6  |      You see where it says Dearborne Circle, LLC, and then           |
|       | 7  | it has an address in Garden Grove, California?                        |
| 12:21 | 8  | A.   Yes.                                                             |
| 12:21 | 9  | Q.   And again, that was the -- that wasn't Dearborne's              |
|       | 10 | address; that was your brother's address; isn't that right?          |
| 12:21 | 11 | A.   Correct.                                                         |
| 12:21 | 12 | Q.   That's where he ran his dental practice; isn't that            |
|       | 13 | right?                                                                |
| 12:21 | 14 | A.   Yes.                                                             |
| 12:21 | 15 |      MR. CRONE:  Let me, Mr. Owens, if I could see just             |
|       | 16 | a little bit below that, the magnified portion.  Thank you.          |
| 12:21 | 17 |      (Technician complies.)                                           |
| 12:21 | 18 | BY MR. CRONE:                                                         |
| 12:21 | 19 | Q.   You see in this box there is a telephone number, sir?          |
|       | 20 | You see that?                                                         |
| 12:21 | 21 | A.   Yes.                                                             |
| 12:21 | 22 | Q.   That's an area code 312 number?                                 |
| 12:21 | 23 | A.   Yes.                                                             |
| 12:21 | 24 | Q.   Who's telephone number was that?                                |
| 12:21 | 25 | A.   That was Quin Rudin.                                             |

| 12:21 | 1 | Q.   And you're the one that put Quin Rudin's telephone |
|---|---|---|
| | 2 | number on this purchase order with the Pension Benefit |
| | 3 | Guaranty Corporation? |
| 12:22 | 4 | A.   The reason I put it there, because he understand the |
| | 5 | whole software sales with PBGC, so he can explain it better |
| | 6 | than I do. |
| 12:22 | 7 | Q.   All right.  So Mr. Rudin was involved in -- strike |
| | 8 | that. |
| 12:22 | 9 | Sir, you're the one that put Mr. Rudin's phone number |
| | 10 | on this document, aren't you? |
| 12:22 | 11 | A.   Correct. |
| 12:22 | 12 | Q.   And you put that under the box that said the |
| | 13 | contractor/offeror; isn't that right? |
| 12:22 | 14 | A.   Yes. |
| 12:22 | 15 | Q.   If you can now look at Box No. 26 that's to the right |
| | 16 | and a couple rows down.  You'll see a "total award amount," |
| | 17 | right? |
| 12:22 | 18 | A.   Yes. |
| 12:22 | 19 | Q.   And that reflects that the total dollar amount of this |
| | 20 | award for this contract was $908,504.85; isn't that right? |
| 12:23 | 21 | A.   Yes. |
| 12:23 | 22 | Q.   And if we turn to page 4 of this purchase order, you'll |
| | 23 | see a -- there's a list of various pieces of software that |
| | 24 | the Pension Benefit Guaranty Corporation wanted to purchase, |
| | 25 | wanted to have delivered to it in connection with this |

DEBBIE GALE, U.S. COURT REPORTER

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | contract --                                                  |
| 12:23 | 2  | A.   Yes.                                                     |
| 12:23 | 3  | Q.   -- is that right?                                        |
| 12:23 | 4  | A.   Yes.                                                     |
| 12:23 | 5  | Q.   And this contract, in fact, if you look at the line --  |
|       | 6  | well, you see there's item numbers, and they go              |
|       | 7  | sequentially, but if you look, there's a row that says "001" |
|       | 8  | on the left-hand column.                                     |
| 12:23 | 9  |          MR. CRONE:  And, actually, if you go just a bit     |
|       | 10 | above that, sir.                                             |
| 12:24 | 11 |      (Exhibit displayed.)                                    |
| 12:24 | 12 | BY MR. CRONE:                                                 |
| 12:24 | 13 | Q.   Do you see where I'm reading?                           |
| 12:24 | 14 | A.   Yes.                                                     |
| 12:24 | 15 | Q.   Do you see a reference to "annual technical support is  |
|       | 16 | for one year after acceptance of supplies."                  |
| 12:24 | 17 |      Do you see where I'm reading?                           |
| 12:24 | 18 | A.   Yes.                                                     |
| 12:24 | 19 | Q.   And you understood that to mean that what the PBGC      |
|       | 20 | wanted was not only Oracle software licenses, but one year's |
|       | 21 | worth of the support services that Ms. Achey referenced      |
|       | 22 | during her testimony last week; isn't that right?           |
| 12:24 | 23 | A.   Yes.                                                     |
| 12:24 | 24 | Q.   And so what the Pension Benefit Guaranty Corporation    |
|       | 25 | had agreed to do was to pay Dearborne Circle, LLC more than  |

| | | |
|---|---|---|
| | 1 | $908,000 for delivery of the software licenses that are |
| | 2 | reflected on pages 4 and 5 as well as one-year technical |
| | 3 | support serves for that software; isn't that right? |
| 12:25 | 4 | A.   At the price of $908,000 and 504 cents *(sic)* and 86 -- |
| | 5 | and 85 cents, yeah, it's comprised of the first year support |
| | 6 | and the software purchase. |
| 12:25 | 7 | BY MR. CRONE: |
| 12:25 | 8 | Q.   But that $908,000 number, approximately, that was the |
| | 9 | amount that the Pension Benefit Guaranty Corporation was |
| | 10 | going to pay Dearborne.  It wasn't necessarily what someone |
| | 11 | was gonna pay Oracle to deliver that software; isn't that |
| | 12 | right? |
| 12:25 | 13 | A.   Yes.  What they do is they pay Dearborne and then |
| | 14 | Dearborne pay to Certus. |
| 12:25 | 15 | Q.   Well, someone was gonna pay Oracle, and it wasn't |
| | 16 | necessarily $908,000; isn't that right? |
| 12:26 | 17 | A.   I assume that should be less. |
| 12:26 | 18 | Q.   All right.  And then, as we went over a few minutes |
| | 19 | ago, there's also a modification to this purchase order; is |
| | 20 | that correct? |
| 12:26 | 21 | A.   Which page I reference? |
| 12:26 | 22 | Q.   If you could turn to page 14. |
| 12:26 | 23 | A.   Yes. |
| 12:26 | 24 | Q.   You see in the top, if we can take a look at the top |
| | 25 | part of this document, it -- |

Case 8:10-cv-01853-DOC-RNB  Document 194  Filed 09/19/13  Page 100 of 199  Page ID #:2286
SACV 10-1853 DOC  7/22/2013 - Day 2

100

| 12:26 | 1 | MR. CRONE:  Let's magnify that. |
| 12:26 | 2 | *(Technician complies.)* |
| 12:26 | 3 | BY MR. CRONE: |
| 12:26 | 4 | Q.   You see it says "amendment of solicitation/ |
|       | 5 | modification of contract." |
| 12:26 | 6 | You see where I'm reading? |
| 12:26 | 7 | A.   Yes. |
| 12:26 | 8 | Q.   And you would agree that this document that is at |
|       | 9 | pages 14 and 15 of Exhibit 16 was slightly modifying the |
|       | 10 | original terms of the purchase order, correct? |
| 12:27 | 11 | A.   Yes.  Because the -- as Ms. Achey pointed out, when |
|       | 12 | PBGC asked us to switch the WebLogic to the AIS, which the |
|       | 13 | application Internet server software, so they requires that |
|       | 14 | there will be a change. |
| 12:27 | 15 | Q.   Okay.  I won't ask you specifically as to the technical |
|       | 16 | details behind that, Mr. Mai, but did that change that the |
|       | 17 | PBGC requested, result in any modification of the price that |
|       | 18 | the Pension Benefit Guaranty Corporation was agreeing to pay |
|       | 19 | Dearborne Circle? |
| 12:27 | 20 | A.   No. |
| 12:27 | 21 | Q.   And you see that there is a Box No. 3 just below the |
|       | 22 | title.  It says "effective date"? |
| 12:28 | 23 | A.   Yes. |
| 12:28 | 24 | Q.   Would you agree with me that that reflects that the |
|       | 25 | effective date of this modification that you just testified |

|         |    |                                                              |
|---------|----|--------------------------------------------------------------|
|         | 1  | about was September 26, 2009?                                |
| 12:28   | 2  | A.   Correct.                                                |
| 12:28   | 3  | Q.   If you then turn to Line No. 8, and you see there it    |
|         | 4  | also refers to the name and address of the contractor.       |
| 12:28   | 5  |      Did I read that correctly?                              |
| 12:28   | 6  | A.   Yes.                                                    |
| 12:28   | 7  | Q.   And it also has your brother's Dearborne Circle -- it   |
|         | 8  | has your brother's dental office address?                    |
| 12:28   | 9  | A.   Yes.                                                    |
| 12:28   | 10 | Q.   And there it has not only Mr. Rudin's telephone number, |
|         | 11 | but also his name, doesn't it, sir?                          |
| 12:28   | 12 | A.   Yes.                                                    |
| 12:28   | 13 | Q.   And again, you're the one that put that on this         |
|         | 14 | document, aren't you, sir?                                   |
| 12:28   | 15 | A.   Yes.                                                    |
| 12:29   | 16 | Q.   Shortly after you won the Pension Benefit Guaranty      |
|         | 17 | Corporation bid, you reached out to Oracle to try to         |
|         | 18 | complete the transaction; isn't that right?                  |
| 12:29   | 19 | A.   Oracle reach out to me first.                           |
| 12:29   | 20 | Q.   Okay.  And the reason why you and/or Mr. Rudin needed   |
|         | 21 | Oracle was because Oracle was the one that was ultimately     |
|         | 22 | going to be delivering the products that were listed in this |
|         | 23 | purchase order to the Pension Benefit Guaranty Corporation;  |
|         | 24 | isn't that right?                                            |
| 12:29   | 25 | A.   Yes.                                                    |

DEBBIE GALE, U.S. COURT REPORTER

Case 8:10-cv-01853-DOC-RNB  Document 194  Filed 09/19/13  Page 102 of 199  Page ID #:2288
SACV 10-1853 DOC  7/22/2013 - Day 2

102

| | | |
|---|---|---|
| 12:29 | 1 | Q.   And I think, ultimately, you said you ended up speaking |
| | 2 | with at least Ms. Achey that you can recall? |
| 12:29 | 3 | A.   Yes. |
| 12:29 | 4 | Q.   You recall speaking with Ms. Dilldine at some point in |
| | 5 | time? |
| 12:29 | 6 | A.   She called me, um, like -- I think she call me, but I |
| | 7 | don't remember when. |
| 12:29 | 8 | Q.   Okay.  But you do recall having a conversation with |
| | 9 | Ms. Dilldine, right? |
| 12:30 | 10 | A.   Yes. |
| 12:30 | 11 | Q.   And you understood that they were located in the D.C., |
| | 12 | greater D.C. area; isn't that right? |
| 12:30 | 13 | A.   I assume, yes. |
| 12:30 | 14 | Q.   Okay.  And they had -- well, they had an area code and |
| | 15 | their e-mails reflected a Virginia address; isn't that |
| | 16 | right? |
| 12:30 | 17 | A.   The e-mail doesn't reflect that.  It just say Oracle |
| | 18 | Corporation.  So I don't know -- I assume that they East |
| | 19 | Coast, you know, somewhere in Virginia, you know, or D.C. |
| | 20 | area. |
| 12:30 | 21 | Q.   Okay.  Let me show you Exhibit 119. |
| 12:30 | 22 | MR. CRONE:  Your Honor, this is in evidence.  May |
| | 23 | I publish? |
| 12:30 | 24 | THE COURT:  You may. |
| 12:30 | 25 | *(Exhibit displayed.)* |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 12:30 | 1 | BY MR. CRONE: |
| 12:30 | 2 | Q.   Mr. Mai, if you could turn to Exhibit 119, page 2. |
| 12:30 | 3 | If you could specifically look at the very bottom part |
| | 4 | of this e-mail.  You see there's an e-mail there from a |
| | 5 | Deborah Dilldine to you. |
| 12:31 | 6 | MR. CRONE:  If we could magnify the entire e-mail, |
| | 7 | Mr. Owens. |
| 12:31 | 8 | *(Exhibit displayed.)* |
| 12:31 | 9 | BY MR. CRONE: |
| 12:31 | 10 | Q.   You see that this is an e-mail from Ms. Dilldine to |
| | 11 | you, dated August 28th, 2009, at 8:08 a.m. |
| 12:31 | 12 | Do you see that? |
| 12:31 | 13 | A.   Yes. |
| 12:31 | 14 | Q.   And do you see -- and, again, where it says "to," it |
| | 15 | says "MMai@dearbornellc.com." |
| 12:31 | 16 | Do you see where I'm reading? |
| 12:31 | 17 | A.   Yes. |
| 12:31 | 18 | Q.   And that was, again, your e-mail address at the time? |
| 12:31 | 19 | A.   Yes. |
| 12:31 | 20 | Q.   And then it goes on to say, "Michael, please, find my |
| | 21 | name, contact information below.  I left a voice mail with |
| | 22 | your co-worker.  I am hoping we can get this resolved ASAP |
| | 23 | so as not to inconvenience the customer.  I appreciate your |
| | 24 | attention to this issue." |
| 12:32 | 25 | Did I read that correctly? |

Case 8:10-cv-01853-DOC-RNB  Document 194  Filed 09/19/13  Page 104 of 199  Page ID #:2290
SACV 10-1853 DOC  7/22/2013 - Day 2

104

12:32   1   A.   Yes.

12:32   2   Q.   And you understood that what this e-mail was referring

        3   to was there was an issue as to the pricing of the

        4   transaction that had to be worked through?

12:32   5   A.   Um, I don't recall --

12:32   6   Q.   Do you recall --

12:32   7   A.   -- maybe -- maybe it's -- but it's been awhile, so I

        8   don't remember exactly what it was.

12:32   9   Q.   Do you remember the nonstandard pricing requests that

       10   had to be made through Oracle in late August 2009 and early

       11   September 2009 in order to get this transaction finalized?

12:32  12   A.   Later on, yes.  But at that time, if you look at the

       13   time, it was on August 28, and she's e-mail it to me at

       14   8:00 a.m.'s from Eastern times, so it's only 5:00 a.m. in

       15   the morning in California times.

12:32  16        So, you know, I mean, it's something about this,

       17   because if I don't know about the award of the contract,

       18   then does he know that in advance?  And she already talk

       19   about issues.

12:33  20   Q.   Mr. Mai, do you recall Ms. Dilldine or Ms. Achey

       21   telling you at the time that one of them found out from the

       22   Pension Benefit Guaranty Corporation who had won this bid?

12:33  23   A.   Yes, but I thought that they have to inform me first if

       24   I'm the one who won the contract.  How come all could know

       25   that in advance about who winning the contract even before I

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | do?                                                                  |
| 12:33 | 2  | Q.   Do you have something in writing from fedbid.com that            |
|       | 3  | tells you that the winning bidder has to be informed                 |
|       | 4  | electronically in advance before the supplier; in this case,         |
|       | 5  | Oracle?                                                              |
| 12:33 | 6  | A.   Yes.  You saw the e-mail that you pointed out earlier           |
|       | 7  | from fedbid.com's.                                                   |
| 12:33 | 8  | Q.   Let's turn back to Exhibit 120, if we could.                    |
| 12:34 | 9  | MR. CRONE:  Your Honor, this is in evidence.                         |
| 12:34 | 10 | THE COURT:  You may display 120.                                     |
| 12:34 | 11 | MR. CRONE:  Thank you, Your Honor.                                   |
| 12:34 | 12 | (Exhibit displayed.)                                                 |
| 12:34 | 13 | BY MR. CRONE:                                                        |
| 12:34 | 14 | Q.   Mr. Mai, can you point out where -- is there somewhere          |
|       | 15 | in Exhibit 120 where it says that you were being contacted          |
|       | 16 | before Oracle or there was some prohibition on Oracle being         |
|       | 17 | informed of which reseller had won the bidding process              |
|       | 18 | before they contacted the reseller itself?                          |
| 12:34 | 19 | A.   Well, it say right there in the first line, it says            |
|       | 20 | that "our records show that Robert Price from the Pension           |
|       | 21 | Benefit Guaranty Corporation accept your bid on August 28,          |
|       | 22 | 2009."                                                               |
| 12:34 | 23 | Q.   Is there anything else other than that sentence that           |
|       | 24 | you believe reflects that Oracle somehow couldn't learn             |
|       | 25 | before you who had won the bidding process for this                 |

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | transaction?                                               |
| 12:34 | 2  | A.   Well, I'm not Debbie, so I don't know how she know, how |
|       | 3  | she find out about that.                                   |
| 12:35 | 4  | Q.   So you would agree it's entirely possible that        |
|       | 5  | Ms. Dilldine did independently learn from the Pension      |
|       | 6  | Benefit Guaranty Corporation who had won this transaction, |
|       | 7  | correct?                                                   |
| 12:35 | 8  | A.   Like I said, I have no idea how she know.  So I assume |
|       | 9  | that she learn from somewhere.                             |
| 12:35 | 10 | Q.   Okay.  And you did testify a few minutes ago that     |
|       | 11 | Ms. -- someone from Oracle actually had reached out to you |
|       | 12 | first, not the other way around; isn't that right?         |
| 12:35 | 13 | A.   Correct.                                              |
| 12:35 | 14 | Q.   And let me turn to the signature block here from      |
|       | 15 | Ms. Dilldine -- sorry, I apologize.                        |
| 12:35 | 16 | Mr. Mai, if we could turn back to Exhibit 119.         |
| 12:35 | 17 | MR. CRONE:  Your Honor, this is in evidence.       |
| 12:35 | 18 | Page No. 2.                                            |
| 12:35 | 19 | (Exhibit displayed.)                                   |
| 12:35 | 20 | BY MR. CRONE:                                              |
| 12:35 | 21 | Q.   And again, if we look at the bottom e-mail here,      |
|       | 22 | Mr. Mai, you see that Ms. Dilldine has an address there in |
|       | 23 | Reston, Virginia.                                         |
| 12:36 | 24 | Do you see that?                                      |
| 12:36 | 25 | A.   Correct.                                              |

| | | |
|---|---|---|
| 12:36 | 1 | Q.   Does that refresh your recollection that in your |
| | 2 | e-mails with Oracle representatives, Ms. Achey and |
| | 3 | Ms. Dilldine, that they were e-mailing you from Virginia? |
| 12:36 | 4 | A.   Yes.  Based from the address right now, yes. |
| 12:36 | 5 | Q.   And throughout your communications with Oracle, whether |
| | 6 | it had been by phone or by e-mail, you were doing that from |
| | 7 | California; isn't that right? |
| 12:36 | 8 | A.   Correct. |
| 12:36 | 9 | Q.   Mr. Mai, let me now focus your attention on the e-mail |
| | 10 | that's immediately above that. |
| 12:37 | 11 | It's -- you at least agree with me, sir, that at least |
| | 12 | on its face, if we start, actually, on the bottom of page 1, |
| | 13 | it shows a "from" of Michael Mai, MMai@dearbornellc.com. |
| 12:37 | 14 | Would you at least agree with that? |
| 12:37 | 15 | A.   Yes. |
| 12:37 | 16 | Q.   And then on the next page, if we continue on, it shows |
| | 17 | that it was sent to DebbieDilldine@Oracle.com; is that |
| | 18 | right? |
| 12:37 | 19 | A.   Yes. |
| 12:37 | 20 | Q.   And that's on August 28th, 2009, at 10:30 a.m.? |
| 12:37 | 21 | A.   Correct. |
| 12:37 | 22 | Q.   And then below, it shows a -- some information about |
| | 23 | Quin Rudin working with Oracle to fulfill the order; is that |
| | 24 | right? |
| 12:37 | 25 | A.   Correct. |

Case 8:10-cv-01853-DOC-RNB  Document 194  Filed 09/19/13  Page 108 of 199  Page ID #:2294
SACV 10-1853 DOC  7/22/2013 - Day 2

108

| 12:37 | 1 | Q.   And then immediately below that, there's some contact |
| | 2 | information; and then below that, there's a sentence, |
| | 3 | correct? |
| 12:38 | 4 | A.   Correct. |
| 12:38 | 5 | Q.   Okay.  Now, the sentence says, "Like I have indicated |
| | 6 | to you on the phone, Dearborne Circle, LLC has 100 percent |
| | 7 | ownership of Certus Solutions, Inc." |
| 12:38 | 8 | Is that right? |
| 12:38 | 9 | A.   That's what it's say on the e-mail, yes. |
| 12:38 | 10 | Q.   Okay.  You would agree that that was false, right? |
| 12:38 | 11 | A.   This e-mail was not sent by me.  It was sent by Quin |
| | 12 | Rudin. |
| 12:38 | 13 | Q.   I understand that's your position, sir.  But the |
| | 14 | question I'm asking is a little bit different. |
| 12:38 | 15 | You would agree with me that that sentence in this |
| | 16 | e-mail was false; isn't that right? |
| 12:38 | 17 | A.   It was false, yes. |
| 12:38 | 18 | Q.   Because Dearborne never acquired Certus at any point in |
| | 19 | time; isn't that right? |
| 12:38 | 20 | A.   Yes. |
| 12:39 | 21 | Q.   Let me have you turn to the first page of this exhibit, |
| | 22 | sir. |
| 12:39 | 23 | MR. CRONE:  Let me -- let's magnify the address |
| | 24 | block at the top, Mr. Owens. |
| 12:39 | 25 | *(Technician complies.)* |

DEBBIE GALE, U.S. COURT REPORTER

| 12:39 | 1 | BY MR. CRONE: |
| 12:39 | 2 | Q.   You see there's -- you would agree that this is an |
|       | 3 | e-mail that Mr. Rudin actually sent on August 28, 2009; |
|       | 4 | isn't that right? |
| 12:39 | 5 | A.   Um, this is -- when I saw this thing, I assume that it |
|       | 6 | was sent by Quin. |
| 12:39 | 7 | Q.   Okay.  And what you mean is when you saw it -- when you |
|       | 8 | saw it on August 28th 2009; isn't that right? |
| 12:39 | 9 | A.   I don't recall exactly in August 28, 2009, I have -- I |
|       | 10 | saw this e-mail. |
| 12:39 | 11 | Q.   Well, you saw it either on that day or somewhere around |
|       | 12 | that time frame? |
| 12:39 | 13 | A.   I can say that I saw during the deposition that you |
|       | 14 | show it to me. |
| 12:40 | 15 | Q.   Sir, are you saying that you never saw this e-mail in |
|       | 16 | August 2009 or thereabouts? |
| 12:40 | 17 | A.   Like I say, I don't remember exactly did I saw it or I |
|       | 18 | didn't saw it, but been long time ago. |
| 12:40 | 19 | Q.   Mr. Mai, you would agree that, again, this e-mail |
|       | 20 | reflects an e-mail address that says copied to Michael Mai, |
|       | 21 | MMai@dearbornellc.com; is that right? |
| 12:40 | 22 | A.   Yes. |
| 12:40 | 23 |      But one thing that I would like to point it out.  Quin |
|       | 24 | Rudin have full access to the e-mail server, so there's a |
|       | 25 | lot of time he e-mail stuff out without my knowledge -- |

| 12:40 | 1 | Q.   Okay. |
| 12:40 | 2 | A.   -- I was sent the e-mail, and then since he have full |
|  | 3 | access to the e-mail server, um, he could delete the e-mail |
|  | 4 | even before I see it. |
| 12:40 | 5 | Q.   Okay.  So what you're saying, sir, is Mr. Rudin not |
|  | 6 | only was manufacturing e-mails, but deleting in-box e-mails. |
|  | 7 | Is that what you're saying? |
| 12:41 | 8 | A.   He could do so, because he had full access at the |
|  | 9 | server.  Just like when you pointed out when -- the word |
|  | 10 | "redact," IT department of Oracle or whoever they have |
|  | 11 | access to the e-mail server can modify, delete e-mail, just |
|  | 12 | like Ms. Anne Achey was saying. |
| 12:41 | 13 |         MR. CRONE:  Move to strike as nonresponsive, Your |
|  | 14 | Honor. |
| 12:41 | 15 |         THE COURT:  No.  Just reask the question. |
| 12:41 | 16 | BY MR. CRONE: |
| 12:41 | 17 | Q.   Sir, you knew at the time, in 2009, that Mr. Rudin had |
|  | 18 | access to your server.  Is that what you're saying? |
| 12:41 | 19 | A.   At that time, I know that he full access to the |
|  | 20 | servers, yes. |
| 12:41 | 21 | Q.   And you never changed that, did you, sir, in 2009? |
| 12:41 | 22 | A.   I'm sorry.  I don't understand your question. |
| 12:41 | 23 | Q.   You never modified his access to your e-mail server. |
|  | 24 | Is that your testimony? |
| 12:41 | 25 | A.   Because at that time, I have good faith that he was -- |

```
12:42    1   have no harm or did not commit any identity theft, because I
         2   did not know that was his bad faith intention.
12:42    3   Q.   Okay.  Well, to be clear, sir, when you say you gave
         4   him access, you controlled your company's e-mail server and
         5   e-mail accounts, didn't you?
12:42    6   A.   So let's recap a little bit.  Because what happened is,
         7   before, we don't have any e-mail or any website; and then
         8   when Quin Rudin came and he said that he would like to work
         9   with me, and then he offer to build e-mail website and --
        10   you know, e-mail and website for the company.  And he said
        11   he will build a server to host e-mail and thing like that.
12:42   12        So I thought that he would just like to help us, to
        13   make us become more structure, instead of using our Gmail
        14   account, Yahoo account.  So I did not know that it was he
        15   intention to stole the identity of my company and of me.
12:42   16   Q.   Mr. Mai, is it true that you controlled in this time
        17   frame your e-mail server?
12:43   18   A.   I don't control the e-mail server.  It's Quin Rudin
        19   control the e-mail server.
12:43   20        MR. CRONE:  Your Honor, may I approach with
        21   Volume III of Mr. Mai's transcript?
12:43   22        THE COURT:  You may.  Thank you.
12:43   23        (Document provided to the Court.)
12:43   24        THE COURT:  Thank you.
12:44   25        MR. CRONE:  Your Honor, permission to play from
```

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | the videotaped deposition of Mr. Mai from Volume III of his          |
|       | 2  | transcript, page 350, line 12, through 351, line 7.                  |
| 12:44 | 3  | THE COURT:  You may.                                                 |
| 12:44 | 4  | *(Video recording played, not reported.)*                           |
| 12:45 | 5  | BY MR. CRONE:                                                        |
| 12:45 | 6  | Q.   Now, Mr. Mai, without getting too technical about it,          |
|       | 7  | I'd like to ask you just a couple questions about just              |
|       | 8  | domain name and domain name registration.                           |
| 12:45 | 9  | You understand that -- you know what a domain registrar             |
|       | 10 | is, right, sir?                                                      |
| 12:46 | 11 | A.   Yes.                                                            |
| 12:46 | 12 | Q.   So for example, there's a registrar called                     |
|       | 13 | "GoDaddy.com"?                                                       |
| 12:46 | 14 | A.   Correct.                                                        |
| 12:46 | 15 | Q.   And what the domain name registrar does is you put in          |
|       | 16 | your domain name, which in this case was dearbornellc.com?          |
| 12:46 | 17 | A.   Correct.                                                        |
| 12:46 | 18 | Q.   So that means anybody that sends an e-mail to something        |
|       | 19 | at dearbornellc.com, those records with the registrar tell          |
|       | 20 | the e-mail where on the Internet to go; isn't that right?           |
| 12:46 | 21 | A.   Correct.                                                        |
| 12:46 | 22 | Q.   So, for example, if I were to send an e-mail to John           |
|       | 23 | Smith@dearbornellc.com, somewhere on the Internet it would          |
|       | 24 | be able to know where to find these records to show where to        |
|       | 25 | send that e-mail to send it to your e-mail in-box, right?           |

| 12:46 | 1 | A.    Yes. |
| 12:46 | 2 | Q.    Okay. |
| 12:46 | 3 | A.    That's from the register? |
| 12:46 | 4 | Q.    Yes, sir. |
| 12:46 | 5 | A.    And then from the e-mail server.  See, a lot I |

12:46   5   A.    And then from the e-mail server.  See, a lot I

6   misunderstand what you try to ask.  There's two big

7   different.  One is the register is with how you like, who,

8   where to send the e-mail.  And there's an e-mail server.

9   The e-mail server is the actual server where we store the

10  e-mail, you know, and all that stuff.  Like when you sent

11  out the e-mail, when you receive an e-mail, it would store

12  all that information.

12:47   13  Q.    Okay.  Let me make sure we have that right.  So you're

14  making a distinction between where the e-mails are

15  warehoused, essentially stored, versus how the e-mails get

16  to the e-mail server; is that right?

12:47   17  A.    Yeah.  So it's -- it two different things --

12:47   18  Q.    Okay.

12:47   19  A.    -- and what I would try -- because I misunderstand --

20  misunderstood in deposition what you tried to ask.  The

21  e-mail server, the actual server, is like a physical

22  computer with an e-mail stuff.  It was hold by Quin Rudin.

23  Which is the register of that e-mail, I registered that long

24  time ago when I incorporate Dearborne Circle, LLC back in

25  1999.

| 12:48 | 1 | Q.   Sir, after your deposition, all of this was typed up |
| | 2 | into a transcript, right?  Do you recall that? |
| 12:48 | 3 | A.   I assume so, but you did not provide us a copy of that. |
| 12:48 | 4 | Q.   Your counsel never provided you with a copy of the |
| | 5 | transcript?  Do you know whether or not your counsel |
| | 6 | received a copy of the transcript? |
| 12:48 | 7 | A.   I think that you demand us to pay for it or something, |
| | 8 | so I don't remember. |
| 12:48 | 9 | Q.   Okay. |
| 12:48 | 10 | To be -- to be clear, just to wrap up this topic about |
| | 11 | domain name registration.  If someone at the time, in the |
| | 12 | fall of 2009, had sent an e-mail to Quin@dearbornellc.com, |
| | 13 | those records would have sent the e-mail to Mr. Rudin, |
| | 14 | right? |
| 12:49 | 15 | A.   I don't understand what you trying to say. |
| 12:49 | 16 | Q.   Let me restate it.  If someone at the time had sent |
| | 17 | Mr. Rudin an e-mail at his Quin@dearbornellc.com address -- |
| | 18 | are you with me so far, sir -- |
| 12:49 | 19 | A.   Okay. |
| 12:49 | 20 | Q.   -- if they had done that, they would have gone -- the |
| | 21 | e-mail that was being sent across the Internet would have |
| | 22 | had to go to your domain name registrar records to know |
| | 23 | which e-mail server to go to; isn't that -- |
| 12:49 | 24 | A.   Correct. |
| 12:49 | 25 | Q.   Okay. |

Case 8:10-cv-01853-DOC-RNB  Document 194  Filed 09/19/13  Page 115 of 199  Page ID #:2301
SACV 10-1853 DOC  7/22/2013 - Day 2

115

| 12:49 | 1 | A.   But if someone at the e-mail server itself have full |
|       | 2 | access to the e-mail server, they can delete or -- what you |
|       | 3 | call it -- forward all to the e-mail goes somewhere else, |
|       | 4 | easily. |
| 12:49 | 5 | Q.   Mr. Mai, I'm going to turn back to Exhibit 119, if we |
|       | 6 | could. |
| 12:50 | 7 |        MR. CRONE:  Why don't we publish that again, |
|       | 8 | Mr. Owens. |
| 12:50 | 9 |        *(Exhibit displayed.)* |
| 12:50 | 10 | BY MR. CRONE: |
| 12:50 | 11 | Q.   You see that this e-mail was also copied to Claude |
|       | 12 | Kramer III? |
| 12:50 | 13 | A.   Yes. |
| 12:50 | 14 | Q.   It's true that Mr. Kramer at the time was a Dearborne |
|       | 15 | Circle employee, wasn't he? |
| 12:50 | 16 | A.   He was a subcontractor that we use. |
| 12:50 | 17 | Q.   And if you'd turn to the first sentence of the e-mail, |
|       | 18 | it says, "Hi, Anne.  Here is the POD and contract award from |
|       | 19 | PBGC." |
| 12:50 | 20 |        You see where I'm reading? |
| 12:50 | 21 | A.   Yes. |
| 12:50 | 22 | Q.   And you understood that at that time that POD was |
|       | 23 | referring to a Partner Ordering Document? |
| 12:50 | 24 | A.   Based from what I know today, I assume, yes. |
| 12:51 | 25 | Q.   You understood that contract -- well, let me turn to |

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | the next -- the second half of the sentence referred to a          |
|       | 2  | contract award from PBGC.                                          |
| 12:51 | 3  | Do you see where I'm reading?                                      |
| 12:51 | 4  | Did you understand that to refer to the Pension Benefit           |
|       | 5  | Guaranty Corporation purchase order that we looked at a few        |
|       | 6  | minutes ago?                                                       |
| 12:51 | 7  | A.   Which one?  Can you -- I don't want to answer something       |
|       | 8  | that I'm not too clear.                                            |
| 12:51 | 9  | Q.   Sure.  If you can turn back to Exhibit 16.                    |
| 12:51 | 10 | A.   Sixteen?  Okay.  I have it in front of -- Exhibit 16.         |
| 12:52 | 11 | Q.   Turn to page 2.                                               |
| 12:52 | 12 | *(Exhibit displayed.)*                                             |
| 12:52 | 13 | BY MR. CRONE:                                                      |
| 12:52 | 14 | Q.   Did you understand this to be the contract award for         |
|       | 15 | the Pension Benefit Guaranty Corporation?                          |
| 12:52 | 16 | A.   Yes.                                                          |
| 12:52 | 17 | Q.   We'll turn back to Exhibit 119, sir, page 1.                  |
| 12:52 | 18 | *(Exhibit displayed.)*                                             |
| 12:52 | 19 | BY MR. CRONE:                                                      |
| 12:52 | 20 | Q.   You see in the second sentence it says, "For your            |
|       | 21 | reference, you can work with Michael Mai directly as he            |
|       | 22 | account manages our federal customers, and Claude Kramer III       |
|       | 23 | is our contracts manager."                                         |
| 12:52 | 24 | Do you see where I'm reading?                                      |
| 12:52 | 25 | A.   Yes.                                                          |

| 12:52 | 1 | BY MR. CRONE: |
|---|---|---|
| 12:52 | 2 | Q.   Mr. Kramer was never a contracts manager for Dearborne |
| | 3 | Circle at any time, was he? |
| 12:52 | 4 | A.   He is a contract for couple of the other solicitation |
| | 5 | that we have won in 2009.  So in 2009, we won many other |
| | 6 | contract, and this is just one of them.  And some of the |
| | 7 | other contract he was the contract officer. |
| 12:53 | 8 | So, for instance, we won like selling -- you know, like |
| | 9 | service for dental clinic -- dental service to the National |
| | 10 | Guard in Florida.  We won a contract of selling x-ray |
| | 11 | equipment and thing like that.  So he did handle some of the |
| | 12 | contract for us. |
| 12:53 | 13 | Q.   Sir, on August 28, 2009, the date of this e-mail, was |
| | 14 | Mr. Kramer the contracts manager for Dearborne Circle? |
| 12:53 | 15 | A.   Yes, he was a contract manager. |
| 12:53 | 16 | MR. CRONE:  Your Honor, permission to play from |
| | 17 | the videotaped deposition of Mr. Mai, Volume III, page 354. |
| 12:54 | 18 | THE COURT:  354? |
| 12:54 | 19 | MR. CRONE:  Yes, Your Honor.  Line 10 through 18. |
| 12:54 | 20 | THE COURT:  You may. |
| 12:54 | 21 | *(Video recording played, not reported.)* |
| 12:54 | 22 | THE WITNESS:  Can I say something about that? |
| 12:54 | 23 | MR. CRONE:  Mr. Mai, your counsel will have the |
| | 24 | opportunity to ask you questions after I'm done. |
| | 25 | |

| | |
|---|---|
| 12:54 | 1 |
| 12:54 | 2 |
| | 3 |
| 12:55 | 4 |
| 12:55 | 5 |
| 12:55 | 6 |
| | 7 |
| | 8 |
| | 9 |
| | 10 |
| 12:55 | 11 |
| 12:55 | 12 |
| 12:55 | 13 |
| | 14 |
| | 15 |
| | 16 |
| | 17 |
| 12:56 | 18 |
| 12:56 | 19 |
| | 20 |
| | 21 |
| | 22 |
| | 23 |
| 12:56 | 24 |
| | 25 |

BY MR. CRONE:

Q.   Mr. Mai, I now want to focus on the third sentence in Exhibit 119, page 1, if we could.

        (Exhibit displayed.)

BY MR. CRONE:

Q.   You see the third sentence says, "FYI Dearborne Circle, LLC is a certified SDVOSB."  And I'll stop there.  You see that also Mr. Rudin has that in his signature block below his e-mail address @dearbornellc.com, where it also says, "a certified Service-Disabled Veteran-Owned Business."

        Did I read that correctly?

A.   Yes.

Q.   And then you'll see, if we turn to page 2, if we look at your signature block, as well, your signature block at the time also told third parties that Dearborne Circle was a certified Service-Disabled Veteran-Owned Business; is that correct?

A.   Yes, because we are.

Q.   And I believe you said earlier that you -- despite the fact this was not a set aside, you told the Pension Benefit Guaranty Corporation that your Dearborne Circle was a Service-Disabled Veteran-Owned Small Business in connection with this transaction?

A.   Yes.  On the e-mail, the VA informed us that we can put this kind of stuff and said that we are a service-disabled

DEBBIE GALE, U.S. COURT REPORTER

Case 8:10-cv-01853-DOC-RNB   Document 194   Filed 09/19/13   Page 119 of 199   Page ID #:2305
SACV 10-1853 DOC   7/22/2013 - Day 2

119

```
         1   vet, which we are in 2009.
12:56    2   Q.   And you would agree, sir, would you not, as Ms. Achey
         3   testified today, that you provided that Dearborne Circle
         4   Service-Disabled Veteran-Owned Small Business Certification,
         5   the document itself, both to the PBGC and to Oracle in
         6   connection with this transaction, didn't you?
12:56    7   A.   I remember that I did provide it to PBGC.  But I did
         8   not remember I provided to Ms. Anne Achey.
12:57    9   Q.   Let me draw your attention back to page 1 of
        10   Exhibit 119 and Mr. Rudin's signature block.
12:57   11       You see where it says that Quin Rudin is the managing
        12   partner of Dearborne Circle, LLC?
12:57   13   A.   Yes.
12:57   14   Q.   You'd agree that was false too, right, sir?
12:57   15   A.   Yes.  Quin, he said a lot of stuff was false.
12:57   16       And he also stole the identity of my company.
12:57   17   Q.   Sir, is it true that you never corrected any of these
        18   misrepresentations that Mr. Rudin was making in any e-mail
        19   to Oracle at any time?
12:58   20   A.   I did not send an e-mail out, but I told Ms. -- Debbie
        21   that Dearborne never acquired Certus.
12:58   22   Q.   So you corrected -- what your testimony is, is that you
        23   corrected something that Mr. Rudin had said in this e-mail?
        24   Is that what you're saying?
12:58   25   A.   When she call me at one time and I told her that they
```

DEBBIE GALE, U.S. COURT REPORTER

Case 8:10-cv-01853-DOC-RNB  Document 194  Filed 09/19/13  Page 120 of 199  Page ID
#:2306
SACV 10-1853 DOC  7/22/2013 - Day 2

120

|       |    |                                                               |
|-------|----|---------------------------------------------------------------|
|       | 1  | were -- never acquired Certus.                                |
| 12:58 | 2  | Q.   Isn't it true that after Exhibit 119 was sent, you       |
|       | 3  | didn't inform anyone at Oracle that Mr. Rudin had             |
|       | 4  | misrepresented the facts to Oracle?  Isn't that right?        |
| 12:58 | 5  | A.   I -- like I say, I did inform Oracle, and I believe      |
|       | 6  | that Quin Rudin also sent out an e-mail later on to Oracle    |
|       | 7  | lawyer say that he took the company back and he was in        |
|       | 8  | Afghanistan and Iraq and all kind of stuff, which he was --   |
|       | 9  | never did.                                                    |
| 12:59 | 10 | So he would make up whatever the story that for               |
|       | 11 | convenience of the day to -- to say.  So that's why on the,   |
|       | 12 | um, you know, Oracle later, on this address, sent an e-mail   |
|       | 13 | out for the payment term and stuff like that just to address  |
|       | 14 | Certus only.                                                  |
| 12:59 | 15 | MR. CRONE:  Your Honor, permission to play from               |
|       | 16 | the videotaped deposition of Mr. Mai, Volume III.  This is    |
|       | 17 | page 360, lines 6 through 13.                                 |
| 12:59 | 18 | THE COURT:  Is it 6 or line 4?  Doesn't the                   |
|       | 19 | question start at line 4?                                     |
| 12:59 | 20 | MR. CRONE:  Four through 13, Your Honor.  Thank               |
|       | 21 | you.                                                          |
| 01:00 | 22 | THE COURT:  You may.                                          |
| 01:00 | 23 | *(Video recording played, not recorded.)*                     |
| 01:00 | 24 | BY MR. CRONE:                                                 |
| 01:00 | 25 | Q.   Mr. Mai, I'm going to have you turn to Exhibit 125 in    |

DEBBIE GALE, U.S. COURT REPORTER

```
        1   your binders.  Let me know when you're there.
01:00   2           MR. CRONE:  Your Honor, this is also in evidence.
01:00   3           THE COURT:  You may display it.
01:01   4       (Exhibit displayed.)
01:01   5   BY MR. CRONE:
01:01   6   Q.   Mr. Mai, you recall this e-mail that Ms. Achey
        7   testified about during her testimony?
01:01   8   A.   Correct.
01:01   9   Q.   And this is an e-mail, again, that's sent from your
        10  e-mail address, MMai@dearbornellc.com; is that correct?
01:01   11  A.   I believe this -- I did not send this e-mail --
01:01   12  Q.   Okay.
01:01   13  A.   -- and I can point out why, the reason why.
01:01   14  Q.   Okay.  Mr. Mai, again, you'll have the opportunity to
        15  say that during your counsel's questioning.
01:01   16       You would agree with me that a purchase -- well, let me
        17  just direct your attention to the first sentence in this
        18  e-mail.  It says:
01:01   19           "Prasenjit,
01:01   20           "Anne Achey referred you to us as we
        21           need to issue a purchase order to Oracle
        22           to book an order which will require
        23           credit approval."
01:01   24       Do you see where I'm reading?
01:01   25  A.   Correct.
```

DEBBIE GALE, U.S. COURT REPORTER

Case 8:10-cv-01853-DOC-RNB  Document 194  Filed 09/19/13  Page 122 of 199  Page ID #:2308
SACV 10-1853 DOC  7/22/2013 - Day 2

122

01:01    1    Q.    You do agree that you do recall Ms. Achey having
         2    conversations or e-mails with you and Mr. Rudin about
         3    requiring credit approval in order to complete this
         4    transaction, don't you?
01:02    5    A.    She talk to Certus and request Certus for the credit
         6    approval, because I never e-mail her any kind of a credit
         7    information of my company.
01:02    8         That's why I -- when you asked me during deposition, I
         9    was surprise, and I ask you can you show me something that
        10    said I submit to Oracle a credit.  And I believe because you
        11    don't have, that's why Oracle Credit dismissed me from the
        12    case.
01:02   13    Q.    Let me have -- let's pull up the second sentence of
        14    this e-mail, Mr. Mai.
01:02   15         "Attached is our consolidated financial statements for
        16    Dearborne Circle, LLC, which acquired Certus Solutions, Inc.
        17    at the end of 2008."
01:03   18         Did I read that correctly?
01:03   19    A.    Correct.
01:03   20    Q.    I mean, you would agree with me that that's just false,
        21    right?
01:03   22    A.    It is false.
01:03   23         And another thing, too, if you see the form, Michael
        24    Mai --
01:03   25    Q.    Mr. Mai, there's no question pending.

DEBBIE GALE, U.S. COURT REPORTER

01:03  1   A.   Oh, okay.

01:03  2   Q.   Let me have you turn to Exhibit 126, Mr. Mai.

01:03  3          MR. CRONE:  Your Honor, this is also in evidence.

01:03  4       *(Exhibit displayed.)*

01:03  5   BY MR. CRONE:

01:03  6   Q.   Mr. Mai, you see that this is an e-mail dated

       7   September 29, 2009?

01:03  8   A.   Correct.

01:03  9   Q.   And it's sent from Michael Mai at

       10  MMai@dearbornellc.com.

01:03  11       Do you see that?

01:03  12  A.   Yes.

01:04  13  Q.   Do you recall sending this e-mail, Mr. Mai?

01:04  14  A.   Um, it look like I was sent it, yeah.  But again, too

       15  many e-mail back and forth and back in 2008, so I don't

       16  remember everything.

01:04  17  Q.   So you're not sure whether or not this was -- you

       18  actually sent this or not?

01:04  19  A.   Correct.

01:04  20  Q.   Did you ever -- strike that.

01:04  21       You didn't tell Ms. Achey in any e-mail at any point in

       22  time since August and September of 2009 that your e-mail had

       23  somehow been hacked and Mr. Rudin was writing e-mails on

       24  your behalf or deleting ones you'd received, did you?

01:05  25  A.   I have indicated until after I saw the lawsuit and a

DEBBIE GALE, U.S. COURT REPORTER

Case 8:10-cv-01853-DOC-RNB  Document 194  Filed 09/19/13  Page 124 of 199  Page ID #:2310
SACV 10-1853 DOC  7/22/2013 - Day 2

124

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
|       | 1  | lot of the information was display or attach on the lawsuit              |
|       | 2  | as a exhibit, that when I realize that Quin Rudin have stole             |
|       | 3  | my identify and sent out a lot of e-mail.  Like he                       |
|       | 4  | forgery -- he forge my signature on many things.  So that's             |
|       | 5  | when I realize it.  But if I did not know -- I did not                   |
|       | 6  | inform Ms. Achey if I don't know.                                        |
| 01:05 | 7  | Q.   Mr. Mai, you would agree that you haven't produced in              |
|       | 8  | this case any forensic analysis of any kind of your e-mail              |
|       | 9  | server or e-mail records to show that Mr. Rudin                          |
|       | 10 | inappropriately gained access to your account in 2009?                   |
| 01:06 | 11 | A.   I have indicated to you Mr. Rudin have the e-mail                   |
|       | 12 | server even today.  So if I don't have the e-mail server,               |
|       | 13 | how can I submit it?                                                      |
| 01:06 | 14 | Q.   So what you're saying is Mr. Rudin had, actually, the              |
|       | 15 | e-mail server -- physical control of Dearborne Circle, LLC's            |
|       | 16 | e-mail server the entire time.  Is that what you're saying?              |
| 01:06 | 17 | A.   Correct.  Until today.                                              |
| 01:06 | 18 | Q.   And you had also accessed that e-mail server, didn't               |
|       | 19 | you, back in 2009?                                                       |
| 01:06 | 20 | A.   Well, let me be -- let me be a little bit specific.                 |
|       | 21 | Okay?  So there's two thing:  An e-mail server, which is                 |
|       | 22 | where they control -- you know, where e-mail things in and              |
|       | 23 | out; and then at the client machine, which is your personal             |
|       | 24 | machine -- just like Ms. Anne Achey takes -- she said she                |
|       | 25 | have e-mail on her laptop, but then Oracle IT also have the             |

01:07    1    e-mail server.  That's why they would put "redact," because
         2    they have send out stuff they have possession as well.
01:07    3         So the actual e-mail server is Quin Rudin have it.  But
         4    when I log-in, depend what I e-mail.  If he did not delete
         5    it in advance, I will be able to download into my local
         6    drive of my e-mail.
01:07    7    Q.   Sir, aren't you the one that provided Mr. Rudin his
         8    dearbornellc.com e-mail address?  Isn't that right?
01:07    9    A.   I provide to -- I agree that he can use, you know, the
        10    QuinRudin@dearbornecirclellc, but I think you have to put
        11    your question into specific.  The server is owned -- right
        12    now, as of today, he still have the server.  So he have full
        13    access to everything.
01:07   14         That's why when I -- when you ask me during deposition
        15    I misunderstood what you try to ask.
01:08   16    Q.   You would agree that you previously testified that you
        17    had provided that e-mail address to Mr. Rudin?
01:08   18    A.   E-mail address, if he full access at the server, he can
        19    create additional e-mail, does whatever he need to want.
01:08   20         Yes, I had said that, Quin, you can use Dearborne
        21    Circle, LLC e-mail.  But, you know, he created himself,
        22    because he have full access to the server.
01:08   23         And that's what I misunderstood your question, because
        24    you ask -- a lot of your question was very vague.
01:08   25    Q.   Okay.  Well, since it's vague, let me play it for you

```
01:08    1    again, Mr. Mai.
01:08    2         MR. CRONE:  Your Honor, permission to play from
01:08    3    the videotaped deposition of Mr. Mai.  It's from Volume III,
         4    page 350, lines 12 through 19.
01:08    5         THE COURT:  You may.
01:08    6         MR. CRONE:  Thank you, Your Honor.
01:09    7         (Video recording played, not reported.)
01:09    8    BY MR. CRONE:
01:09    9    Q.   Now, Mr. Mai, I'll ask you the same question that your
        10    counsel asked Ms. Achey earlier today.
01:09   11         Can you tell us exactly how many e-mails you exchanged
        12    with Quin Rudin in 2009, sitting here today?
01:09   13    A.   I don't remember how many.
01:09   14    Q.   Okay.  I mean, you'd agree that sitting here today,
        15    you're not able to answer that question.  Would you agree
        16    with that?
01:09   17    A.   Yes.
01:09   18    Q.   Let me have you turn to Exhibit 18.
01:10   19         MR. CRONE:  Your Honor, I believe this is in
        20    evidence, No. 18.
01:10   21         THE COURT:  It is.  You may display it.
01:10   22         MR. CRONE:  Thank you, Your Honor.
01:10   23         (Exhibit displayed.)
01:10   24    BY MR. CRONE:
01:10   25    Q.   You would agree with me, Mr. Mai, that this is the
```

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
|       | 1  | purchase order that was sent to Oracle in connection with        |
|       | 2  | this transaction?                                                |
| 01:10 | 3  | A.   Um, see, I think that you need to be little bit more         |
|       | 4  | specific in your question, because there two thing.  There's     |
|       | 5  | a purchase order that Dearborne issued to PBGC and that --       |
|       | 6  | the other purchase order that Certus send to Oracle.  So you     |
|       | 7  | have to be specific to which one; otherwise, I will be           |
|       | 8  | confused not to know what to tell you.                           |
| 01:10 | 9  | Q.   All right.  Mr. Mai, I apologize if I was being             |
|       | 10 | imprecise.  I thought I said it was sent to Oracle.  I           |
|       | 11 | definitely want you to focus on that.                            |
| 01:10 | 12 |      Was this the purchase order that was sent to Oracle in      |
|       | 13 | connection with this transaction for the order of Oracle        |
|       | 14 | products to be delivered to the PBGC?                            |
| 01:11 | 15 | A.   The one that come from Certus, the public sector            |
|       | 16 | ordering; is that what you refer to?                             |
| 01:11 | 17 | Q.   Sir, you would agree with me this is a -- one moment.       |
| 01:11 | 18 |      MR. CRONE:  Your Honor, permission to play from             |
|       | 19 | the videotaped deposition of Mr. Mai.  This is Volume II,        |
|       | 20 | Your Honor.                                                      |
| 01:11 | 21 |      THE COURT:  Volume II.  Just a moment.                      |
| 01:11 | 22 |      I have Volume II.  Thank you.                               |
| 01:11 | 23 |      MR. CRONE:  It's page 221.                                  |
| 01:11 | 24 |      THE COURT:  221.  Okay.                                     |
| 01:12 | 25 |      MR. CRONE:  Lines 16 through 24.                            |

| | | |
|---|---|---|
| 01:12 | 1 | THE COURT:  You may. |
| 01:12 | 2 | *(Video recording played, not reported.)* |
| 01:12 | 3 | BY MR. CRONE: |
| 01:12 | 4 | Q.   Turning back to Exhibit 18, Mr. Mai, you would agree |
| | 5 | with me that it reflects an amount of -- a total of |
| | 6 | $874,996.20? |
| 01:13 | 7 | A.   Yes. |
| 01:13 | 8 | Q.   And I'd be glad to show you again the Partner Ordering |
| | 9 | Documents that we've looked at previously in this case, but |
| | 10 | do you recall that that was the same number that was on the |
| | 11 | Partner Ordering Documents sent to Oracle? |
| 01:13 | 12 | A.   Can you show me the other one?  The Partner Ordering |
| | 13 | document. |
| 01:13 | 14 | MR. CRONE:  Of course.  If you could turn back to |
| | 15 | Exhibit 119. |
| 01:13 | 16 | *(Exhibit displayed.)* |
| 01:13 | 17 | MR. CRONE:  Actually, I'm sorry.  126. |
| 01:13 | 18 | *(Exhibit displayed.)* |
| 01:13 | 19 | MR. CRONE:  Page 6. |
| 01:13 | 20 | *(Exhibit displayed.)* |
| 01:13 | 21 | BY MR. CRONE: |
| 01:13 | 22 | Q.   If you look at the total fees, the row for total fees |
| | 23 | in the middle of the page.  Do you see that it is also in |
| | 24 | the amount of $874,996.20? |
| 01:14 | 25 | A.   Yes. |

| 01:14 | 1 | Q.   If we could turn back to Exhibit 18. |
| 01:14 | 2 |      *(Exhibit displayed.)* |
| 01:14 | 3 | BY MR. CRONE: |
| 01:14 | 4 | Q.   And, specifically, the name and address in the upper |
|       | 5 | left-hand corner of the exhibit. |
| 01:14 | 6 | A.   Okay. |
| 01:14 | 7 | Q.   You see that it says -- above that, it says "Certus |
|       | 8 | Solutions Inc." and then "Care of Dearborne Circle, LLC." |
| 01:14 | 9 |      Do you see where I'm reading? |
| 01:14 | 10 | A.   Yes. |
| 01:14 | 11 | Q.   And then it recites a mailing address, right? |
| 01:14 | 12 | A.   Yes. |
| 01:14 | 13 | Q.   That was your home address, correct, sir? |
| 01:14 | 14 | A.   Yes. |
| 01:14 | 15 | Q.   And that was your phone and fax number? |
| 01:14 | 16 | A.   Yes. |
| 01:14 | 17 | Q.   And that was your e-mail address, right? |
| 01:14 | 18 | A.   Correct. |
| 01:14 | 19 | Q.   And again, if we look at the right-hand part of that |
|       | 20 | page, it reflects that -- a date of August 31st, 2009, |
|       | 21 | correct? |
| 01:15 | 22 | A.   Correct.  But this purchase order it was not created by |
|       | 23 | me. |
| 01:15 | 24 | Q.   There's no question pending, sir. |
| 01:15 | 25 | A.   Okay. |

DEBBIE GALE, U.S. COURT REPORTER

Case 8:10-cv-01853-DOC-RNB   Document 194   Filed 09/19/13   Page 130 of 199   Page ID
#:2316
SACV 10-1853 DOC 7/22/2013 - Day 2

130

| | | |
|---|---|---|
| 01:15 | 1 | Q.   You see that there's a -- withdraw -- I'll withdraw |
| | 2 | that question. |
| 01:15 | 3 | If you could turn to Exhibit 20.  Let me know when |
| | 4 | you're there. |
| 01:15 | 5 | A.   Yes. |
| 01:15 | 6 | *(Exhibit displayed.)* |
| 01:15 | 7 | BY MR. CRONE: |
| 01:15 | 8 | Q.   These -- you heard Ms. Achey testify about how these |
| | 9 | are the -- this is the invoice for the software licenses |
| | 10 | that were ordered from Oracle in connection with this |
| | 11 | transaction with the Pension Benefit Guaranty Corporation? |
| 01:16 | 12 | A.   Yes. |
| 01:16 | 13 | Q.   Now, we could go through, not only this invoice, but |
| | 14 | you'll also see there are a series of invoices on |
| | 15 | Exhibit 21? |
| 01:16 | 16 | A.   Yes. |
| 01:16 | 17 | Q.   And you heard Ms. Achey testify that those invoices |
| | 18 | were for the quarterly payment in arrears of the annual |
| | 19 | support services for this software? |
| 01:16 | 20 | A.   Yes. |
| 01:16 | 21 | Q.   And without going through each one of these documents |
| | 22 | on the screen, would you agree with me that each one of them |
| | 23 | has a "bill to" address of Certus Solutions, Inc., Michael |
| | 24 | Mai, and then Care of Dearborne Circle, LLC with your home |
| | 25 | address? |

Case 8:10-cv-01853-DOC-RNB   Document 194   Filed 09/19/13   Page 131 of 199   Page ID #:2317
SACV 10-1853 DOC   7/22/2013 - Day 2

131

01:16    1    A.    Yes.

01:16    2    Q.    Now, you -- I asked you a little while ago about your

         3    original bid to the Pension Benefit Guaranty Corporation,

         4    and I asked you whether or not the price that would be

         5    ultimately paid to Oracle for the software would be -- it

         6    wouldn't necessarily be approximately $908,000.  You

         7    remember when I asked you about that a few minutes ago?

01:17    8    A.    Yes.

01:17    9    Q.    And you said -- and I wrote it down 'cause I thought it

        10    was important.  You said, "I assume that the amount paid to

        11    Oracle should be less."

01:17   12          Do you remember that?

01:17   13    A.    Yes.

01:17   14    Q.    You'd agree with me that the invoices that are

        15    reflected in Exhibit 20 and 21 included sales tax, right,

        16    sir?

01:18   17    A.    Yes.

01:18   18    Q.    Have you ever made any effort at any time -- well, I

        19    guess let's start from before Ms. Achey testified on Friday.

        20    Did you ever make any effort to add up these invoices?

01:18   21    A.    Yes.

01:18   22    Q.    Okay.  And did you arrive at the conclusion that the

        23    grand total of these invoices was more than $908,000?

01:18   24    A.    Because, again, the sell tax was not for Dearborne; it

        25    was for Certus.

Case 8:10-cv-01853-DOC-RNB  Document 194  Filed 09/19/13  Page 132 of 199  Page ID #:2318
SACV 10-1853 DOC 7/22/2013 - Day 2

132

01:18   1   Q.   Okay.

01:18   2   A.   Because on the price that we received, $908,000 from

        3   PBGC, there is the fee that we have to pay to FedBid, as

        4   well, for the auction, administration, everything like that.

01:18   5   Q.   Sir, I just want you to focus -- if you could focus on

        6   my question.

01:18   7   A.   Okay.

01:18   8   Q.   You would agree with me that the total of these

        9   invoices, Exhibit 20 and Exhibit 21, with sales tax, was

        10  more than what you were paid from the Pension Benefit

        11  Guaranty Corporation care of the U.S. Treasury?

01:19   12  A.   If we add it all up right now, then I could see it, but

        13  at that time I don't recall that I add them up --

01:19   14  Q.   And certainly --

01:19   15  A.   -- because it's not applicable to me.

01:19   16  Q.   Certainly, you made no effort to provide any of the

        17  documentation of any kind to Oracle in an attempt to get

        18  the -- to not pay sales tax in connection with this

        19  transaction; is that right?

01:19   20  A.   Again, this is between Certus and Oracle.  It's not

        21  Dearborne, so that's why I did -- I did -- it's not my

        22  concern.  Because Certus is the software reseller of Oracle.

        23  So it's they responsibility to do that.  It's not me.

01:20   24  Q.   Mr. Mai, let me have you turn to Exhibit 121.  Let me

        25  know when you're there.

| 01:20 | 1 | A.   Yes. |
| 01:20 | 2 | Q.   You'd agree with me that this is a document that you |
|  | 3 | produced in this case, sir? |
| 01:20 | 4 | A.   Yes. |
| 01:20 | 5 | Q.   And it's an e-mail that you received from Robert Price, |
|  | 6 | again, who is the contract officer, or the contracting |
|  | 7 | officer, for the Pension Benefit Guaranty Corporation? |
| 01:20 | 8 | A.   Correct. |
| 01:20 | 9 | Q.   And you received it on October 2nd, 2009? |
| 01:20 | 10 | A.   Correct. |
| 01:20 | 11 | Q.   Okay.  And you see that it was -- strike that. |
| 01:20 | 12 |         MR. CRONE:  Your Honor, I would move Exhibit 121 |
|  | 13 | in evidence. |
| 01:21 | 14 |         THE COURT:  Received. |
| 01:21 | 15 |     (Exhibit No. 121 received in evidence.) |
| 01:21 | 16 |         THE COURT:  You may display it. |
| 01:21 | 17 |         MR. CRONE:  Thank you, Your Honor. |
| 01:21 | 18 |      (Exhibit displayed.) |
| 01:21 | 19 | BY MR. CRONE: |
| 01:21 | 20 | Q.   I want to direct your attention, Mr. Mai, to an e-mail |
|  | 21 | that's in the middle of this page.  You see that there's a |
|  | 22 | "From:  Michael Mai, MMai@dearbornellc.com"? |
| 01:21 | 23 |      Do you see where I'm reading? |
| 01:21 | 24 | A.   Yes. |
| 01:21 | 25 | Q.   And it's dated on Saturday, September 26, 2009, to |

|       |    |                                                             |
|-------|----|-------------------------------------------------------------|
|       | 1  | Mr. Price?                                                  |
| 01:21 | 2  | A.   Correct.                                               |
| 01:21 | 3  | Q.   Okay.  You recall sending this e-mail to Mr. Price?    |
| 01:21 | 4  | A.   Yes.                                                   |
| 01:21 | 5  | Q.   Okay.  So this is not an e-mail that Mr. Rudin had any |
|       | 6  | part in fabricating; is that right?                         |
| 01:21 | 7  | A.   Yes.                                                   |
| 01:21 | 8  | Q.   And you see that there is -- you say to Mr. Price,      |
|       | 9  | "Hello Robert.  Signed revised Form 30 with revised invoice. |
|       | 10 | Please proceed with payment as soon as possible as we have  |
|       | 11 | discussed."                                                 |
| 01:21 | 12 | Did I read that correctly?                                  |
| 01:22 | 13 | A.   Yes.                                                   |
| 01:22 | 14 | Q.   And your intent in sending that was you wanted the PBGC |
|       | 15 | to expedite payment to you as quickly as possible, correct? |
| 01:22 | 16 | A.   Yes.                                                   |
| 01:22 | 17 | Q.   And then, if you see in Mr. Price's response above, it  |
|       | 18 | says -- it says in the second sentence -- well, I'll start  |
|       | 19 | with the first sentence.                                    |
| 01:22 | 20 | "Michael called and asked for a customer service            |
|       | 21 | update.  I expressed, as far as I know, products have been  |
|       | 22 | received and the OLSA has been signed."                     |
| 01:22 | 23 | Let me stop there.                                          |
| 01:22 | 24 | Mr. Mai, you understood that the Pension Benefit            |
|       | 25 | Guaranty Corporation actually received the products that it |

DEBBIE GALE, U.S. COURT REPORTER

01:22    3   A.   Yes.

01:23    4   Q.   And when it says, "the OLSA has been signed," you agree
         5   that that's the license agreement that Ms. Achey testified
         6   had to be negotiated and signed?

01:23    7   A.   Yes.

01:23    8   Q.   And then the next sentence says, "His request is to
         9   please expedite invoice for payment.  If you could do that,
        10   it would be greatly appreciated.  Thanks."

01:23   11        Did I read that correctly?

01:23   12   A.   Yes.

01:23   13   Q.   And as far as you know, the PBGC made its best effort
        14   to expedite payment to you?

01:23   15   A.   Correct.

01:23   16        MR. CRONE:  Your Honor, this may be a convenient
        17   breaking point.

01:23   18        THE COURT:  Ladies and gentlemen, I have a 1:30
        19   matter unconnected with this trial.  So I'm going to ask you
        20   to take one hour.  And I'm going to meet you here at 2:30.
        21   I can be done beforehand, but I don't want you just sitting
        22   back there.

01:24   23        Better yet, Counsel, can we make it 45 minutes?
        24   Can we do that?

01:24   25        MR. CRONE:  Sure.

| | | |
|---|---|---|
| 01:24 | 1 | THE COURT: Yeah, 45 minutes instead. Let me see |
| | 2 | if I can work through the lunch hour right now. |
| 01:24 | 3 | You're admonished not to discuss this matter |
| | 4 | amongst yourselves, nor form or express any opinion |
| | 5 | concerning the case. We'll see you at quarter after 2:00. |
| | 6 | Okay. |
| 01:24 | 7 | *(Jury recesses at 1:24 p.m.)* |
| 01:24 | 8 | *(Outside the presence of the jury.)* |
| 01:24 | 9 | THE COURT: Okay. Sir, you may step down. |
| 01:24 | 10 | *(Witness steps down.)* |
| 01:24 | 11 | THE COURT: Thank you, Counsel. Have a nice |
| | 12 | lunch. You can just leave your things right there. |
| 01:24 | 13 | MR. CRONE: Thank you. |
| 01:24 | 14 | *(Pause in the proceedings at 1:24 p.m.)* |
| 02:15 | 15 | *(Proceedings resumed at 2:16 p.m.)* |
| 02:16 | 16 | *(In the presence of the jury.)* |
| 02:16 | 17 | THE COURT: The jury's back in session. All |
| | 18 | counsel are back in session. |
| 02:16 | 19 | Mr. Mai, if you'd retake the stand. |
| 02:16 | 20 | DEFENDANT MAI: Yes, sir. |
| 02:17 | 21 | THE COURT: Thank you. |
| 02:17 | 22 | Counsel, if you would like to resume your direct |
| | 23 | examination. |
| 02:17 | 24 | MR. CRONE: Yes. Thank you, Your Honor. |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|--|--|--|
| 02:17 | 1 | DIRECT EXAMINATION *(Resumed)* |
| 02:17 | 2 | BY MR. CRONE: |
| 02:17 | 3 | Q.   Mr. Mai, before the break, we were going over some |
| | 4 | technical issues, some computer issues, and I realize that I |
| | 5 | was remiss in that I didn't ask you a little bit about your |
| | 6 | background. |
| 02:17 | 7 |     You are an electrical engineer, are you not? |
| 02:17 | 8 | A.   Yes. |
| 02:17 | 9 | Q.   And you have a business -- a different business than |
| | 10 | Dearborne Circle that's called BPMB, Inc.; is that correct? |
| 02:17 | 11 | A.   Yes. |
| 02:17 | 12 | Q.   And that's in the information technology industry, the |
| | 13 | computer services industry; is that right? |
| 02:17 | 14 | A.   Yeah.  That I'm specialize in the PeopleSoft software |
| | 15 | consultant services. |
| 02:18 | 16 | Q.   And PeopleSoft is a fairly complex software package, |
| | 17 | right? |
| 02:18 | 18 | A.   Yes.  And it's owned by Oracle. |
| 02:18 | 19 | Q.   Okay.  Fair enough.  It is today, correct? |
| 02:18 | 20 | A.   Correct. |
| 02:18 | 21 | Q.   And PeopleSoft, when you say implementation, you |
| | 22 | help -- you've helped over the years customers install the |
| | 23 | software, essentially? |
| 02:18 | 24 | A.   Not install, but implementation.  So like service and |
| | 25 | testing.  So when they purchase from PeopleSoft, PeopleSoft |

```
       1    will send somebody out, or Oracle will, to install the
       2    software; and after they install the software, then they
       3    hire people like me to go in to help them understand the
       4    software, understand how to use it, make any kind of change
       5    to the software to adapt to the business need.
02:18  6    Q.   How long have you been in the information technology
       7    business dealing with computers?
02:18  8    A.   In PeopleSoft, ever since college until now.  I would
       9    say about 21 years.
02:19  10   Q.   I also wanted to ask you a little bit about the
       11   production of e-mails that you have that you've done in this
       12   case.  It's fair to say that you've only produced a handful
       13   of e-mails that you had with Quin Rudin from the 2009 time
       14   frame?
02:19  15   A.   Not a dozen.  Just I don't remember what the exact
       16   number.  The -- you know, too many.  I don't remember.
02:19  17   Q.   Isn't it true that you don't have all the e-mails that
       18   you sent Mr. Rudin because you have an automatic rule in
       19   your computer that automatically deletes all of the sent
       20   e-mails at the moment they're sent?
02:19  21   A.   Um, when you set up your e-mail, you know, in Outlook,
       22   you know, you have an option said you want to keep a copy of
       23   it or for how many days or you want to delete it.  And I
       24   remember I said I don't keep a copy of it or if whatever I
       25   need, no.  I think I keep it for like a few days, and then
```

Case 8:10-cv-01853-DOC-RNB  Document 194  Filed 09/19/13  Page 139 of 199  Page ID #:2325
SACV 10-1853 DOC 7/22/2013 - Day 2

139

| | | |
|---|---|---|
| | 1 | if -- if something important, then I would print 'em out or |
| | 2 | save 'em locally.  As Ms. Anne Achey would say, you know, |
| | 3 | she would save it somewhere else on her hard drive. |
| 02:20 | 4 | Q.  Okay.  To be clear, Mr. Mai, unless you deliberately |
| | 5 | save an e-mail at or around the time it was sent, it would |
| | 6 | be automatically deleted from your computer; is that right? |
| 02:20 | 7 | A.  I -- I think so. |
| 02:20 | 8 | Q.  And if -- if you had moved an e-mail to your trash box |
| | 9 | on your e-mail system, it would be automatically -- it would |
| | 10 | be automatically permanently deleted from your e-mail system |
| | 11 | as well; isn't that right? |
| 02:20 | 12 | A.  Yes, if you move to your trash. |
| 02:20 | 13 | Q.  And we're specifically referring to your |
| | 14 | dearbornellc.com e-mails? |
| 02:21 | 15 | A.  I have couple e-mail address, so, yeah, for Dearborne, |
| | 16 | LLC, yes.  And I set them all up like that so I don't have |
| | 17 | too many stuff in my e-mail in-box. |
| 02:21 | 18 | Q.  If you could turn to Exhibit 24, Mr. Mai -- sorry -- |
| | 19 | 23. |
| 02:21 | 20 | MR. CRONE:  And, Your Honor, I believe this is in |
| | 21 | evidence already. |
| 02:21 | 22 | THE COURT:  It is. |
| 02:21 | 23 | MR. CRONE:  May we publish? |
| 02:21 | 24 | THE COURT:  You may. |
| 02:21 | 25 | *(Exhibit displayed.)* |

| | | |
|---|---|---|
| 02:21 | 1 | BY MR. CRONE: |
| 02:21 | 2 | Q.   Mr. Mai, you testified earlier that these were -- this |
| | 3 | is a collection of your bank records from your Dearborne |
| | 4 | Circle, LLC account for a given time period? |
| 02:21 | 5 | A.   Yes. |
| 02:21 | 6 | Q.   And what we're looking at here on the first page of the |
| | 7 | exhibit is the actual deposit slip that you filled out to |
| | 8 | deposit the check you received from the PBGC; is that |
| | 9 | correct? |
| 02:22 | 10 | A.   Yes. |
| 02:22 | 11 | Q.   And it reflects that you -- if you look on the |
| | 12 | left-hand side, the upper left-hand side of this document, |
| | 13 | you'll see that there is a -- it shows a deposit slip, and |
| | 14 | it shows that it was deposited on October 14th of 2009; is |
| | 15 | that accurate? |
| 02:22 | 16 | A.   Yes. |
| 02:22 | 17 | Q.   And so that reflects that, in fact, you did deposit |
| | 18 | this check on that date? |
| 02:22 | 19 | A.   Yes. |
| 02:22 | 20 | Q.   If you could turn to the next page, page 2 of |
| | 21 | Exhibit 23.  And again, without belaboring the point, |
| | 22 | Mr. Mai, this again is the check that you received from the |
| | 23 | U.S. Treasury to Dearborne Circle, LLC in the amount that's |
| | 24 | reflected on that purchase order that you had with the PBGC; |
| | 25 | isn't that right? |

Case 8:10-cv-01853-DOC-RNB  Document 194  Filed 09/19/13  Page 141 of 199  Page ID #:2327
SACV 10-1853 DOC 7/22/2013 - Day 2

141

02:23   1   A.   Yes.

02:23   2   Q.   So this check is in the amount of $908,504.85?

02:23   3   A.   Yes.

02:23   4   Q.   All right.  And then, if you can turn to the next page,

        5   page 3, and this was the -- we looked at this before.  This

        6   was the document that you pointed me to in connection with

        7   the service-disabled veteran issue; is that right?

02:23   8   A.   Yes.  It show that my brother is also an owner of the

        9   company.

02:23  10   Q.   Okay.  And to be clear, this is just the signature card

       11   on the account; isn't that right?

02:23  12   A.   Yes.  But I say, you know, if he's not the owner, why

       13   do I give him full access to the bank of the company?

02:23  14   Q.   All right.  And again, just -- again, I don't mean to

       15   belabor the point, Mr. Mai, but again, I'll point to the

       16   middle of the page where it shows your name and your

       17   brother's name and it shows your signature and your

       18   brother's signature; is that right?

02:24  19   A.   Yes.

02:24  20   Q.   And there's a column that says "title, if applicable,"

       21   right?

02:24  22   A.   Yes.

02:24  23   Q.   And the bank didn't come up with that on its own;

       24   that's information that you provided to the bank; isn't that

       25   right?

Case 8:10-cv-01853-DOC-RNB  Document 194  Filed 09/19/13  Page 142 of 199  Page ID #:2328
SACV 10-1853 DOC 7/22/2013 - Day 2

142

| 02:24 | 1 | A.    Um, I don't know what kind of procedure that they |
| | 2 | told -- that they -- they put there.  We said that we will |
| | 3 | like to have Vu and me as a signature on the thing, so |
| | 4 | that's what they put.  So I assume -- that's what they put. |
| 02:24 | 5 | Q.    You agree that this document -- nowhere else on this |
| | 6 | document or anywhere else in Exhibit 23 does it say that |
| | 7 | your brother is the manager of Dearborne Circle, LLC? |
| 02:24 | 8 | A.    Yeah.  In the document, it doesn't say that. |
| 02:24 | 9 | Q.    Okay.  I'm going to have you turn to page 4, please. |
| | 10 | Have you seen this document before, sir? |
| 02:25 | 11 | A.    Yes. |
| 02:25 | 12 | Q.    You see where it says on the top, very top of this |
| | 13 | page, it says, "Certified Copy of Limited Liability Company |
| | 14 | Resolution --" so forth and so on. |
| 02:25 | 15 | Do you see where I'm reading? |
| 02:25 | 16 | A.    Yes. |
| 02:25 | 17 | Q.    And then below, it lists out the name of your company, |
| | 18 | Dearborne Circle, LLC -- |
| 02:25 | 19 | A.    Yes. |
| 02:25 | 20 | Q.    -- just below that. |
| 02:25 | 21 | And then it goes on to have the date of October 17th, |
| | 22 | 2009; is that right? |
| 02:25 | 23 | A.    Yes. |
| 02:25 | 24 | Q.    And then below that, it lists your name and brother's |
| | 25 | name again, doesn't it, sir? |

Case 8:10-cv-01853-DOC-RNB   Document 194   Filed 09/19/13   Page 143 of 199   Page ID #:2329
SACV 10-1853 DOC   7/22/2013 - Day 2

143

| | | |
|---|---|---|
| 02:26 | 1 | A.   Yes. |
| 02:26 | 2 | Q.   And it has, again, under title/status, for you, it says |
| | 3 | "manager," and for your brother it just says "signer"; isn't |
| | 4 | that right? |
| 02:26 | 5 | A.   I think that's the way how the bank want and just go |
| | 6 | with it -- |
| 02:26 | 7 | Q.   So -- |
| 02:26 | 8 | A.   -- like I say he's my brother, so it's not like he's |
| | 9 | someone else I don't trust. |
| 02:26 | 10 | Q.   And that's why you made your brother a signer on this |
| | 11 | account, sir? |
| 02:26 | 12 | A.   No.  He's the owner of Dearborne, and that's why he |
| | 13 | signer and, therefore, access to the account. |
| 02:26 | 14 | Q.   Sir, you provided the information to the bank for this |
| | 15 | document? |
| 02:26 | 16 | A.   Now, this is a document that was provided to me by the |
| | 17 | bank -- |
| 02:26 | 18 | Q.   You signed -- |
| 02:26 | 19 | A.   -- see the Bank of America on tops? |
| 02:26 | 20 | Q.   Sir, you signed this document; isn't that right? |
| 02:26 | 21 | A.   Yes. |
| 02:26 | 22 | Q.   In fact, if we look at the next page, page 5, you |
| | 23 | signed this document.  Is that your signature? |
| 02:26 | 24 | A.   Yes.  And can I make a note to this, signature is my |
| | 25 | real signature.  And the signature on the Partner Ordering |

Case 8:10-cv-01853-DOC-RNB  Document 194  Filed 09/19/13  Page 144 of 199  Page ID #:2330
SACV 10-1853 DOC 7/22/2013 - Day 2

144

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | Document that Ms. Achey was showing is a forgery signature.  |
|       | 2  | I don't know by who.  By Quin or by Oracle.                  |
| 02:27 | 3  | MR. CRONE:  Move to strike as nonresponsive,                 |
|       | 4  | Your Honor.                                                  |
| 02:27 | 5  | THE COURT:  No.                                              |
| 02:27 | 6  | Your next question, Counsel.                                 |
| 02:27 | 7  | BY MR. CRONE:                                                |
| 02:27 | 8  | Q.   Mr. Mai, let me have you turn your attention to page 18 |
|       | 9  | of this exhibit.                                             |
| 02:27 | 10 | If you can look in the upper right-hand corner, you'll       |
|       | 11 | see that there is -- it reflects that this is a statement    |
|       | 12 | for the period of September 29 through October 28, 2009.     |
| 02:28 | 13 | Do you see where I'm reading?                                |
| 02:28 | 14 | *(Exhibit displayed.)*                                       |
| 02:28 | 15 | THE WITNESS:  Yes.                                           |
| 02:28 | 16 | BY MR. CRONE:                                                |
| 02:28 | 17 | Q.   And you can see that it's your account number has been  |
|       | 18 | redacted just for privacy considerations, sir.  But you saw  |
|       | 19 | these statements during your deposition too, didn't you?     |
| 02:28 | 20 | A.   Yes.                                                    |
| 02:28 | 21 | Q.   If I focus your attention now on the account activity   |
|       | 22 | portion, which is on the bottom third of the page.           |
| 02:28 | 23 | A.   Yes.                                                    |
| 02:28 | 24 | Q.   You see that there is an entry for October 14th.  You   |
|       | 25 | would agree that's for October 14th, 2009?                   |

DEBBIE GALE, U.S. COURT REPORTER

02:28   1    A.    Yes.

02:28   2    Q.    And it reflects a credit, meaning a deposit of

        3    908,504.85?

02:28   4    A.    Yes.

02:28   5    Q.    And that's just reflecting your deposit of this U.S.

        6    Treasury check; is that right?

02:28   7    A.    Yes.

02:28   8    Q.    You'll see, then, there's series -- well, first of all,

        9    you see that after that balance -- sorry -- after that

        10   deposit, you see that there's a balance of $908,656.23?

02:29   11   A.    Yes.

02:29   12   Q.    So that -- and, actually, on that same day, you had a

        13   debit, a check that would have been written in the amount of

        14   about $23,095.58?

02:29   15   A.    Yes.

02:29   16   Q.    And so you would agree, sir, that that reflects that

        17   when you deposited the check from the PBGC in your Dearborne

        18   Circle account, that you only had a few thousand dollars in

        19   the account at the time?

02:29   20   A.    Yes.  Because we a small company.  We don't have a

        21   whole lot of money.

02:29   22   Q.    If you can turn to the bottom of the page, sir, where

        23   it says as the last entry for October 15th -- do you see

        24   where I'm reading?  There's a teller transfer in the amount

        25   of $50,000; is that accurate?

Case 8:10-cv-01853-DOC-RNB  Document 194  Filed 09/19/13  Page 146 of 199  Page ID #:2332
SACV 10-1853 DOC  7/22/2013 - Day 2

146

| | | |
|--|--|--|
| 02:30 | 1 | A.    Correct. |
| 02:30 | 2 | Q.    You would agree with me that that money was not sent to |
| | 3 | Oracle; is that correct? |
| 02:30 | 4 | A.    It was sent to Certus. |
| 02:30 | 5 | Q.    So you would agree with me that that money was not |
| | 6 | directly sent to Oracle; is that correct? |
| 02:30 | 7 | A.    Yes. |
| 02:30 | 8 | Q.    If you could turn to the next page, this is page 19 of |
| | 9 | Exhibit 23.  If I can direct you attention to the third line |
| | 10 | item. |
| 02:30 | 11 | (Exhibit displayed.) |
| 02:30 | 12 | BY MR. CRONE: |
| 02:30 | 13 | Q.    You see there's an entry of October 20, sir. |
| 02:30 | 14 | See where I'm reading? |
| 02:30 | 15 | A.    Yeah, October 20.  Yes. |
| 02:30 | 16 | Q.    And it says that there is a transfer to another |
| | 17 | checking account in the amount of $27,000.  Did I read that |
| | 18 | correctly? |
| 02:30 | 19 | A.    Yes. |
| 02:30 | 20 | Q.    You'd agree that that was not directly paid to Oracle? |
| 02:30 | 21 | A.    Yes. |
| 02:30 | 22 | Q.    You look two lines below, you'll see two days later an |
| | 23 | entry for October 22nd. |
| 02:31 | 24 | See where I'm reading? |
| 02:31 | 25 | A.    Yes. |

DEBBIE GALE, U.S. COURT REPORTER

Case 8:10-cv-01853-DOC-RNB  Document 194  Filed 09/19/13  Page 147 of 199  Page ID
#:2333
SACV 10-1853 DOC  7/22/2013 - Day 2

147

| 02:31 | 1 | Q. You see that there is another teller transfer, this |
| | 2 | time in the amount $100,000 even. |
| 02:31 | 3 | Do you see where I'm reading? |
| 02:31 | 4 | A. Yes. |
| 02:31 | 5 | Q. You'd agree that that money was not paid directly to |
| | 6 | Oracle? |
| 02:31 | 7 | A. Yes. |
| 02:31 | 8 | Q. You see the next day there's a check that was paid -- a |
| | 9 | check on October 23rd in the amount of $30,000. |
| 02:31 | 10 | Do you see where I'm reading? |
| 02:31 | 11 | A. Yes. |
| 02:31 | 12 | Q. You would agree that that was not paid to Oracle? |
| 02:31 | 13 | A. Yes. |
| 02:31 | 14 | Q. On the same day, there was an American Express bill |
| | 15 | payment in the amount of $46,000 even. |
| 02:31 | 16 | Did I read that correctly? |
| 02:31 | 17 | A. Correct. |
| 02:31 | 18 | Q. And then in -- on three days later, on October 26th, |
| | 19 | there was a withdrawal of $285,000 even; is that right? |
| 02:31 | 20 | A. Yes. It was for a cashier check to Certus. |
| 02:31 | 21 | Q. Okay. You obtained a cashier's check from the bank, |
| | 22 | sir? |
| 02:32 | 23 | A. Yeah. |
| 02:32 | 24 | Q. And you would agree with me that a cashier's check is |
| | 25 | virtually untraceable; isn't that right, sir? |

| 02:32 | 1 | A.    I don't know that it's untraceable or not.  I'm not a |
|---|---|---|
| | 2 | bank. |
| 02:32 | 3 | Q.    You see two entries below that there's an entry for |
| | 4 | October 28th. |
| 02:32 | 5 | Do you see where I'm reading? |
| 02:32 | 6 | A.    Yeah. |
| 02:32 | 7 | Q.    There's a check for $101,000. |
| 02:32 | 8 | Do you see where I'm reading? |
| 02:32 | 9 | A.    Yes. |
| 02:32 | 10 | Q.    And that was not paid directly to Oracle either? |
| 02:32 | 11 | A.    No. |
| 02:32 | 12 | Q.    If you could turn to the next page, is page 20. |
| 02:32 | 13 | *(Exhibit displayed.)* |
| 02:32 | 14 | BY MR. CRONE: |
| 02:32 | 15 | Q.    You would agree with me that this is another of your |
| | 16 | Bank of America monthly account statements for the period of |
| | 17 | October 29th through November 25th, 2009? |
| 02:32 | 18 | A.    Yes. |
| 02:32 | 19 | Q.    And again, you can see that we redacted out your |
| | 20 | account number below; is that right? |
| 02:33 | 21 | A.    Yes. |
| 02:33 | 22 | Q.    And then in the bottom third of the page, you see |
| | 23 | account activity again.  And the first entry of |
| | 24 | November 2nd, there's a check that you wrote for $30,000; is |
| | 25 | that right? |

02:33  1    A.    Correct.

02:33  2    Q.    And, actually, on the same day, you wrote a second

       3    check for another $100,000; is that right?

02:33  4    A.    Yes.

02:33  5    Q.    And neither of those were paid directly to Oracle; is

       6    that right?

02:33  7    A.    No, it was paid to Certus.

02:33  8    Q.    If you could turn to the next page, sir.

02:33  9          (Exhibit displayed.)

02:33  10   BY MR. CRONE:

02:33  11   Q.    You'll see that there's an entry -- there's a series of

       12   entries on November 16th, but I'd like to focus your

       13   attention on the last of them.  You see a wire transfer in

       14   the amount of $50,000 to a Bank of Hawaii account for the

       15   benefit of Quin Rudin.

02:34  16         Do you see that?

02:34  17   A.    Yes.

02:34  18   Q.    So, of course, that did not get paid to Oracle either.

02:34  19   A.    No.  I wire the money to Quin when he was in Hawaii.

       20   He asked me to wire him the money.

02:34  21   Q.    Let me have you turn your attention to page 22 of

       22   Exhibit 23.

02:34  23         (Exhibit displayed.)

02:34  24   BY MR. CRONE:

02:34  25   Q.    You would agree with me that this is a Bank of America

DEBBIE GALE, U.S. COURT REPORTER

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | bank statement for your Dearborne Circle account for the     |
|       | 2  | period of November 26th through December 29th of 2009?       |
| 02:34 | 3  | A.   Yes.                                                     |
| 02:34 | 4  | Q.   And here again, we have your account number redacted;   |
|       | 5  | is that right?                                               |
| 02:34 | 6  | A.   Yes.                                                     |
| 02:34 | 7  | Q.   And if you turn to the next page, you'll see some       |
|       | 8  | additional account activity that continues from the first    |
|       | 9  | page.  And let me focus your attention on the very first of  |
|       | 10 | these line entries.                                          |
| 02:35 | 11 | Do you see that there is a -- you wired out $40,000 to       |
|       | 12 | another Bank of Hawaii account for the benefit of someone    |
|       | 13 | named Ieremia Seigafo.                                       |
| 02:35 | 14 | Did I read that correctly?                                   |
| 02:35 | 15 | A.   Yes.  That was provided to me by Quin.                  |
| 02:35 | 16 | Q.   All right.  I want to go back to the first of the Bank  |
|       | 17 | of Hawaii transfers, Mr. Mai.                                |
| 02:35 | 18 | Let me have you turn to Exhibit 24.  Are you with me,        |
|       | 19 | sir?                                                          |
| 02:35 | 20 | A.   Yes.                                                     |
| 02:35 | 21 | Q.   You would agree with me that this is also a series of   |
|       | 22 | bank account documents that we looked at, at your            |
|       | 23 | deposition, that we subpoenaed from the Bank of Hawaii?      |
| 02:36 | 24 | A.   I don't recall that I see this at the deposition on     |
|       | 25 | that, but, yeah, I see this thing.                           |

Case 8:10-cv-01853-DOC-RNB   Document 194   Filed 09/19/13   Page 151 of 199   Page ID #:2337
SACV 10-1853 DOC   7/22/2013 - Day 2

151

02:36   1    Q.   Let me have you turn your -- turn -- let me have you

        2    look at page 1 of Exhibit 24.

02:36   3         Do you recall looking at a document from the Bank of

        4    Hawaii reflecting that -- as this page 1 reflects, that

        5    there was an amount received by wire of $50,000 on

        6    November 16, 2009, into this account for the benefit of Quin

        7    Rudin?

02:37   8    A.   Based on the information on this document right now,

        9    yes.

02:37  10    Q.   Let me have you turn the page, sir, to page No. 2.  You

       11    would agree with me that this is a consumer signature card

       12    that you've seen before?

02:37  13    A.   Yes, you show it to me.

02:37  14    Q.   This is a signature card that bears, not only Quin

       15    Rudin's name, but also your name?

02:37  16    A.   Yes.

02:37  17    Q.   And it has a date of December 4th, 2009?

02:37  18    A.   Correct.

02:37  19    Q.   And what this -- and your signature is actually on this

       20    page; is that correct?

02:37  21    A.   It is my signature.

02:37  22    Q.   Okay.  And Quin Rudin also signed this document?

02:37  23    A.   Yes.

02:37  24    Q.   And what this reflects, sir, is that on December 4th of

       25    2009, you and Mr. Rudin both showed up at a Bank of Hawaii

|        |    |                                                                 |
|--------|----|-----------------------------------------------------------------|
|        | 1  | branch with your passports and signed a signature card          |
|        | 2  | together?                                                        |
| 02:38  | 3  | A.   Yeah.  So what happened is while I was vacation in          |
|        | 4  | Hawaii, and Quin he asked me, "Michael, can you go in and,       |
|        | 5  | um, also sign on the account of Quin Rudin," because he have     |
|        | 6  | a high -- what you call a severe diabetes problems.  So he       |
|        | 7  | say, "If I die then, you know, you can help me wire the          |
|        | 8  | money back to my mom."  So I said, "Okay."  From -- I didn't     |
|        | 9  | know that he was tried to, you know, mean, um, lead me to        |
|        | 10 | some kind of scheme so, as a good friend -- as a friend at       |
|        | 11 | that time, I thought that he asked me, you know, to do it        |
|        | 12 | out good of heart in good faith, so I sign it with him.          |
| 02:38  | 13 | Q.   Mr. Mai, you would agree with me that the date of this      |
|        | 14 | signature card is after, several weeks after, the wire in of     |
|        | 15 | the $50,000 you transferred to him?                              |
| 02:39  | 16 | A.   Yes.                                                        |
| 02:39  | 17 | Q.   And so after December 4th of 2009, you had signature        |
|        | 18 | authority on this account; is that correct?                      |
| 02:39  | 19 | A.   Yes.                                                        |
| 02:39  | 20 |          MR. CRONE:  Your Honor, I would move in evidence        |
|        | 21 | Exhibit 24.                                                      |
| 02:39  | 22 |          THE COURT:  24 is received.                             |
| 02:39  | 23 |      (Exhibit No. 24 received in evidence.)                      |
| 02:39  | 24 |          MR. CRONE:  May I publish, Your Honor?                  |
| 02:39  | 25 |          THE COURT:  You may.                                    |

| | | |
|---|---|---|
| 02:39 | 1 | (Exhibit displayed.) |
| 02:39 | 2 | BY MR. CRONE: |
| 02:39 | 3 | Q.   Let me just pull up page No. 2, Mr. Mai, again, so that |
| | 4 | we're all looking at it now. |
| 02:39 | 5 | (Exhibit displayed.) |
| 02:39 | 6 | BY MR. CRONE: |
| 02:39 | 7 | Q.   And by the way -- and again, if we look at the top part |
| | 8 | of this document -- |
| 02:39 | 9 | MR. CRONE:  Thank you, Mr. Owens. |
| 02:39 | 10 | (Exhibit displayed.) |
| 02:39 | 11 | BY MR. CRONE: |
| 02:39 | 12 | Q.   -- again, this shows -- under account name in the top |
| | 13 | row, it shows your name and Mr. Rudin's name; is that |
| | 14 | accurate? |
| 02:39 | 15 | A.   Yes. |
| 02:40 | 16 | Q.   And again, just to confirm, there's a date in the upper |
| | 17 | right-hand corner, December 4, 2009; is that right? |
| 02:40 | 18 | A.   Yes. |
| 02:40 | 19 | Q.   All right.  Let me have you turn to Exhibit 28, |
| | 20 | Mr. Mai. |
| 02:40 | 21 | Let me know when you're there. |
| 02:40 | 22 | A.   Yes. |
| 02:40 | 23 | Q.   Mr. -- you recall your counsel, Mr. Ramp, saying during |
| | 24 | his opening statement that you were following Quin Rudin's |
| | 25 | payment instructions and you expected Mr. Rudin to pay |

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | Oracle; is that accurate?                                  |
| 02:40 | 2  | A.    Say that again?                                       |
| 02:40 | 3  | Q.    Sure.  Do you recall your counsel saying during his  |
|       | 4  | opening statement that you were following Mr. Rudin's      |
|       | 5  | payment instructions and you expected him to pay Oracle; is|
|       | 6  | that right?                                                 |
| 02:40 | 7  | A.    Yes.                                                  |
| 02:40 | 8  | Q.    And you produced, during this case, printouts of two |
|       | 9  | e-mail messages that you claimed show those payment        |
|       | 10 | instructions, right?                                       |
| 02:41 | 11 | A.    Yes.                                                  |
| 02:41 | 12 | Q.    Okay.  Is Exhibit 28 the first of those e-mails?     |
| 02:41 | 13 | A.    Yes.                                                  |
| 02:41 | 14 | Q.    And is Exhibit 29 the second of those e-mails?       |
| 02:41 | 15 | A.    Yes.                                                  |
| 02:41 | 16 |         MR. CRONE:  Your Honor, I'd move in evidence        |
|       | 17 | Exhibits 28 and 29.                                        |
| 02:41 | 18 |         THE COURT:  Received.                               |
| 02:41 | 19 |     (Exhibit No. 28 received in evidence.)                 |
| 02:41 | 20 |     (Exhibit No. 29 received in evidence.)                 |
| 02:41 | 21 |         THE COURT:  You may display them.                   |
| 02:41 | 22 | BY MR. CRONE:                                               |
| 02:41 | 23 | Q.    So let's first look at Exhibit 28, Mr. Mai.          |
| 02:41 | 24 |       (Exhibit displayed.)                                  |
|       | 25 |                                                            |

| | | |
|---|---|---|
| 02:41 | 1 | BY MR. CRONE: |
| 02:41 | 2 | Q.   If you look through the middle of the page, you'll see |
| | 3 | there's a series of seven line entries; is that right? |
| 02:41 | 4 | A.   Correct. |
| 02:41 | 5 | Q.   Okay.  And those are the payment instructions that |
| | 6 | you're referring to? |
| 02:41 | 7 | A.   Correct. |
| 02:41 | 8 | Q.   And if we take a quick look at Exhibit 29 -- |
| 02:41 | 9 | (Exhibit displayed.) |
| 02:42 | 10 | BY MR. CRONE: |
| 02:42 | 11 | Q.   -- if we could take a look at the first sentence of |
| | 12 | that e-mail.  And then this is where -- this is what you |
| | 13 | claim was the remainder of his payment instructions; is that |
| | 14 | right? |
| 02:42 | 15 | A.   Yes. |
| 02:42 | 16 | Q.   Let me focus your attention back on the first exhibit, |
| | 17 | Exhibit 28.  If we can look at the first paragraph of this |
| | 18 | e-mail. |
| 02:42 | 19 | First of all, it's dated September 22nd, 2009; is that |
| | 20 | right? |
| 02:42 | 21 | A.   Yeah.  September 22nd. |
| 02:42 | 22 | Q.   And it says -- the first sentence says, "Michael, I |
| | 23 | want to remind you the purchased price that Dearborne |
| | 24 | Circle, LLC has agreed to purchase the Oracle software from |
| | 25 | us, the price is $873,699.53," right? |

| 02:43 | 1 | A.  Yes. |

02:43   2   Q.   Is that the price that you and Mr. Rudin -- you're

        3   saying that you and Mr. Rudin had agreed -- had arrived at

        4   that you would be paying him for delivery of Oracle

        5   software?

02:43   6   A.   Yes.

02:43   7   Q.   The next sentence says, "Since I had engaged Dearborne

        8   Circle, LLC in making a bad loan to Alethea, LLC for Mark

        9   Tiernan, I will be fully responsible for the bad loan."

02:43  10        Did I read that correctly?

02:43  11   A.   Yes.

02:43  12   Q.   And you understand that -- well, by this point in time,

       13   September 22nd, 2009, you certainly knew who Mark Tiernan

       14   was, correct?

02:43  15   A.   Oh, of course.

02:43  16   Q.   And Mr. Tiernan was someone that resided in the area of

       17   Seattle, Washington?

02:44  18   A.   Yes.

02:44  19   Q.   And he owned a company called Aegis Technologies?

02:44  20   A.   Yes.

02:44  21   Q.   It was in the business of obtaining government

       22   contracts and working on them; is that right?

02:44  23   A.   I believe so.

02:44  24   Q.   And he also had a company called, Alethea, correct?

       25   That's what this e-mail refers to?

| | | |
|---|---|---|
| 02:44 | 1 | A.   Yes. |
| 02:44 | 2 | Q.   And he was the person who started that company? |
| 02:44 | 3 | A.   I believe so. |
| 02:44 | 4 | Q.   And at some point in time, Dearborne -- you had |
| | 5 | Dearborne Circle guarantee a loan that was made by Bank of |
| | 6 | America to Alethea; is that right? |
| 02:44 | 7 | A.   Yes. |
| 02:44 | 8 | Q.   But as of -- and the terms of your agreement with |
| | 9 | Mr. Tiernan and Alethea was that Mr. Tiernan's company would |
| | 10 | be making certain payments to Dearborne Circle over the |
| | 11 | course of the loan; isn't that right? |
| 02:44 | 12 | A.   Yes. |
| 02:45 | 13 | Q.   And again, this e-mail is referring to the fact that |
| | 14 | the loan had gone bad; is that right? |
| 02:45 | 15 | A.   Yes. |
| 02:45 | 16 | Q.   Isn't it true that Alethea didn't stop making payments |
| | 17 | until August or September of 2010? |
| 02:45 | 18 | A.   I don't remember exact time frame, but, um, they were |
| | 19 | paying, and then they stop for while, and then there was |
| | 20 | some payment, but I don't remember the exact time, date, |
| | 21 | 2009, 2010. |
| 02:45 | 22 |       MR. CRONE:  Your Honor, may I approach with |
| | 23 | Volume I to Mr. Mai's transcript? |
| 02:45 | 24 |       THE COURT:  You may. |
| 02:45 | 25 |       *(Document provided to the Court.)* |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|--|--|--|
| 02:46 | 1 | MR. CRONE:  Your Honor, I request permission to |
| | 2 | play two clips from Mr. Mai's transcript starting at 151, |
| | 3 | line 19, through 152-5. |
| 02:46 | 4 | THE COURT:  Just a moment. |
| 02:46 | 5 | MR. CRONE:  Sure. |
| 02:46 | 6 | THE COURT:  All right.  The next section? |
| 02:46 | 7 | MR. CRONE:  Was 158, 11 through 17. |
| 02:47 | 8 | THE COURT:  You may. |
| 02:47 | 9 | *(Video recording played, not reported.)* |
| 02:48 | 10 | BY MR. CRONE: |
| 02:48 | 11 | Q.  Mr. Mai, after Alethea actually stopped making payments |
| | 12 | on its loan the fall of 2010, you hired an attorney to make |
| | 13 | demand on Alethea that it pay; is that right? |
| 02:48 | 14 | A.  Yes. |
| 02:48 | 15 | Q.  And let me have you turn to Exhibit No. 10 in the |
| | 16 | binders in front of you. |
| 02:48 | 17 | Would you agree with me that Exhibit 10 is the letter |
| | 18 | that your -- the counsel that you hired sent to Mr. Tiernan |
| | 19 | demanding payment on the loan? |
| 02:49 | 20 | A.  Yes. |
| 02:49 | 21 | Q.  And specifically, isn't that -- well -- |
| 02:49 | 22 | MR. CRONE:  Your Honor, I would move Exhibit 10 |
| | 23 | into evidence. |
| 02:49 | 24 | THE COURT:  Received. |
| 02:49 | 25 | *(Exhibit No. 10 received in evidence.)* |

| 02:49 | 1 | MR. CRONE:  May we publish? |
|---|---|---|
| 02:49 | 2 | THE COURT:  You may. |
| 02:49 | 3 | *(Exhibit displayed.)* |
| 02:49 | 4 | BY MR. CRONE: |
| 02:49 | 5 | Q.  And just drawing your attention to the name of the |
| | 6 | attorney on the top center of the letter, Mr. Mai, as well |
| | 7 | as the date.  You see it's from a Brenda Vargas? |
| 02:49 | 8 | A.  Yes. |
| 02:49 | 9 | Q.  And again, this was the attorney that you hired? |
| 02:49 | 10 | A.  Yes, at that time. |
| 02:49 | 11 | Q.  And this was the attorney that you obtained on the |
| | 12 | recommendation of Quin Rudin; is that right? |
| 02:49 | 13 | A.  Yes. |
| 02:49 | 14 | Q.  It was Quin Rudin's own lawyer at that time, to your |
| | 15 | knowledge? |
| 02:49 | 16 | A.  I don't know whether she represent Mr. Rudin or not.  I |
| | 17 | don't believe she did.  She only represent her husband, |
| | 18 | David Cuevas; was another defendant on the case, and the |
| | 19 | owner of Certus. |
| 02:50 | 20 | Q.  Did Mr. Rudin, in fact, tell you that Ms. Vargas had |
| | 21 | been his attorney or attorney for his entities in the past? |
| 02:50 | 22 | A.  I don't remember if he did or he did not.  It's been a |
| | 23 | long time ago. |
| 02:50 | 24 | MR. CRONE:  Your Honor, I request permission to |
| | 25 | play from the videotaped deposition of Mr. Mai, Volume I, |

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
|       | 1  | page 157, line 11 through 158, line 14.                                  |
| 02:51 | 2  | THE COURT:  You may.  You may play those sections.                      |
| 02:51 | 3  | *(Video recording played, not reported.)*                               |
| 02:52 | 4  | MR. CRONE:  I think the answer there is "yes," but                      |
|       | 5  | it's not in the video clip.                                              |
| 02:52 | 6  | BY MR. CRONE:                                                            |
| 02:52 | 7  | Q.   Let's take a look back at Exhibit 28, if we could.                  |
| 02:52 | 8  | *(Exhibit displayed.)*                                                   |
| 02:52 | 9  | BY MR. CRONE:                                                            |
| 02:52 | 10 | Q.   Mr. Mai, despite the payment schedule that's -- appears            |
|       | 11 | on the face of these e-mails, you understood that Oracle was            |
|       | 12 | expecting to be paid on each of its invoices in a single                |
|       | 13 | lump sum; isn't that right?                                              |
| 02:53 | 14 | A.   Again, I'm not Certus, so I -- I don't know whether                |
|       | 15 | that Oracle expect Certus to pay the lump sum or not.                   |
| 02:53 | 16 | MR. CRONE:  Your Honor, permission to play from                        |
|       | 17 | the videotaped deposition of Mr. Mai, Volume II.                        |
| 02:53 | 18 | THE COURT:  All right.  Volume II.                                      |
| 02:53 | 19 | MR. CRONE:  Page 279, Your Honor.                                      |
| 02:53 | 20 | THE COURT:  Lines?                                                      |
| 02:53 | 21 | MR. CRONE:  Lines 21 through 25.                                        |
| 02:54 | 22 | THE COURT:  You may.                                                    |
| 02:54 | 23 | *(Audio recording played, not reported.)*                               |
| 02:54 | 24 | BY MR. CRONE:                                                            |
| 02:54 | 25 | Q.   Now, Mr. Mai, you know what a native e-mail file is,               |

Case 8:10-cv-01853-DOC-RNB   Document 194   Filed 09/19/13   Page 161 of 199   Page ID #:2347
SACV 10-1853 DOC   7/22/2013 - Day 2

161

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | correct?                                                     |
| 02:54 | 2  | A.   Yes.                                                    |
| 02:54 | 3  | Q.   For those of us who may not be as familiar with         |
|       | 4  | computers as you are, that's just the native e-mail that you |
|       | 5  | might actually receive within your in-box in Microsoft       |
|       | 6  | Outlook or in a Google Gmail, for example, correct?          |
| 02:54 | 7  | A.   Yes.                                                    |
| 02:54 | 8  | Q.   And you didn't produce these Exhibits 28 and 29 in      |
|       | 9  | their native file format at any time in this case, correct?  |
| 02:54 | 10 | A.   I e-mail to you the -- I believe I e-mail to my         |
|       | 11 | attorney, then he e-mail to you the actual PDF of this       |
|       | 12 | exhibit, which is -- so if it's a e-mail, then it's have to  |
|       | 13 | be in the whatever form that I copy at that time.            |
| 02:55 | 14 | Q.   Specifically, what you did, sir, is you converted the   |
|       | 15 | native e-mails into a PDF, or an image of the e-mail; is     |
|       | 16 | that right?                                                  |
| 02:55 | 17 | A.   Yes, something like that.                               |
| 02:55 | 18 | Q.   And you agree that in order for you to do that          |
|       | 19 | conversion, the native files necessarily had to exist when   |
|       | 20 | you created the PDF files; isn't that right?                 |
| 02:55 | 21 | A.   Oh, yeah, whenever the day that it was created.         |
| 02:55 | 22 | Q.   Sir, you created the PDF files for these Exhibits 28    |
|       | 23 | and 29 in September of 2011, the month before -- weeks       |
|       | 24 | before one of the days of your deposition in this case;     |
|       | 25 | isn't that right?                                            |

DEBBIE GALE, U.S. COURT REPORTER

02:55    1    A.    I did not create it like few week before my deposition,

         2    because even today if I try to copy or produce it in my hard

         3    drive, yeah, it will be -- show today's date.  So I don't

         4    understand what you trying to go after.

02:56    5    Q.    Do you recall creating the PDF files for these e-mails

         6    from their native file formats in September 2011, sir?

02:56    7    A.    Yes.  I believe during my deposition I pointed out to

         8    you the create date, but you keep go on talk about the date

         9    it was copy on the e-mail.  So we talk about apple and

        10    orange.  I remember that day, and I keep correcting you, but

        11    you won't listen.

02:56   12    Q.    Sir, the PDFs were created -- for example, Exhibit 28

        13    was created on September 26th, correct?  September 26th of

        14    2011?

02:57   15    A.    No.  It was created on September 22nd, 2009.  That's

        16    what it say on the e-mail sent.

02:57   17              MR. CRONE:  One moment, Your Honor.

02:57   18              Your Honor, permission to play from the videotape

        19    deposition of Mr. Mai, Volume III, page 393, line 7, through

        20    394, line 6.  And, I'm sorry, I can repeat that, Your Honor,

        21    if you'd like.

02:58   22              THE COURT:  You may.

02:58   23         (Video recording played, not reported.)

02:58   24    BY MR. CRONE:

02:59   25    Q.    And, Mr. Mai, I recognize the transcript says "2010,"

|       |    |                                                             |
|-------|----|-------------------------------------------------------------|
|       | 1  | but to be clear, you said "2011" on the video, correct?  Is |
|       | 2  | that correct, sir?                                          |
| 02:59 | 3  | A.   Say that again?                                        |
| 02:59 | 4  | Q.   I know in the video -- on the transcript, it says      |
|       | 5  | "2010," but you said on the video "September 26, 2011,"      |
|       | 6  | correct?                                                    |
| 02:59 | 7  | A.   Uh, can we play that?                                   |
| 02:59 | 8  |        MR. CRONE:  Your Honor, may I play just the clip?     |
| 03:00 | 9  |        THE COURT:  You may play it again, Counsel.          |
| 03:00 | 10 |   (Video recording replayed, not reported.)                 |
| 03:01 | 11 | BY MR. CRONE:                                                |
| 03:01 | 12 | Q.   And again, sir, so you would agree with me, having      |
|       | 13 | looked at the video again, that the transcript should say   |
|       | 14 | 2011 not 2010?                                              |
| 03:01 | 15 | A.   Yes.  But I did answer and correct you some more detail |
|       | 16 | that PDF file, but then you didn't show the rest of that    |
|       | 17 | here.  I just want to be on the record on that.             |
| 03:01 | 18 | Q.   Just to be clear, sir, I understand that what you're   |
|       | 19 | saying is -- your testimony is that the underlying e-mail -- |
|       | 20 | you're -- what you're referring to is the date of the       |
|       | 21 | underlying e-mail; is that right?                           |
| 03:01 | 22 | A.   Yeah.  So if you open the file, it will say "created   |
|       | 23 | and modified," you know, and more other information.  You   |
|       | 24 | just point at the line where it was modified.  That mean    |
|       | 25 | when you copy from one forms to another form, try to e-mail |

DEBBIE GALE, U.S. COURT REPORTER

            1    it out, it change and modify.  Are you gonna change it to

            2    the name?  So what I did, I go and I change the name to

            3    Exhibit 28, something easy to reference.  It would put in

            4    the new date for that on that particular file.

03:02       5        So I pointed it out.  But the original created date I

            6    pointed out to you, but you did not want to show the rest of

            7    the videos.

03:02       8    Q.  Sir, well, first, let me start with -- you created the

            9    PDF of Exhibit 29 on September 26, 2011, as well; is that

           10    right?

03:02      11    A.  Yes.  So I can e-mail to you on that day, but the

           12    original file was back in 2009.

03:02      13    Q.  Sir, the original files, they don't exist today, do

           14    they?

03:02      15    A.  It does.  I e-mail to you.  You have a soft copy of

           16    that.  I believe so.  And that you pointed out to the rest

           17    of the video, but you did not want to play that part.

03:03      18            MR. CRONE:  Your Honor, this is also from

           19    Volume III of Mr. Mai's transcript.  Permission to play the

           20    videotape excerpt of page 388.

03:03      21            THE COURT:  And the volume again?

03:03      22            MR. CRONE:  Volume III, Your Honor.

03:03      23            THE COURT:  388?

03:03      24            MR. CRONE:  Yes, Your Honor.

03:03      25            THE COURT:  Okay.

| 03:03 | 1 | MR. CRONE:  Line 19 -- |

03:03    1          MR. CRONE:  Line 19 --

03:03    2          THE COURT:  Okay.

03:03    3          MR. CRONE:  -- through 389, line 9.

03:03    4          THE COURT:  You may.

03:03    5          MR. CRONE:  Thank you, Your Honor.

03:03    6       *(Audio recording played, not reported.)*

03:05    7   BY MR. CRONE:

03:05    8   Q.   Sir, isn't it true that only with the underlying

         9   original, native files could someone independently determine

        10   when they were actually created or if they were ever

        11   modified during this case?

03:05   12   A.   Um, see, again, I think the way you construct the

        13   question the -- it's miss -- it's easy for be able to

        14   misunderstand.  One minute you talk about the PDF, when it

        15   was created, and you claim that it was in the native file

        16   format; and then, now, you said it's not a native file

        17   format as Microsoft Outlook.

03:05   18       So I did mention earlier that -- and Achey say too,

        19   whatever important document that she would have, she would

        20   save them locally in her hard drive as PDF or print it out.

        21   That's how normally people does.  You know what I mean?

03:06   22       So that's why I don't understand what you try to go

        23   after.  PDF or Outlook?

03:06   24   Q.   Sir, would you agree with me, we started this,

        25   Mr. Mai --

| | | |
|---|---|---|
| 03:06 | 1 | A.    Yes. |
| 03:06 | 2 | Q.    -- by you agreeing with me that a Microsoft Outlook |
| | 3 | file or a Google Gmail file was an example of a native file, |
| | 4 | correct? |
| 03:06 | 5 | A.    An e-mail is not a native file. |
| 03:06 | 6 | Q.    That's your testimony, sir? |
| 03:06 | 7 | A.    Yes.  So I can't misunderstand what you try to ask me. |
| 03:06 | 8 | Q.    Sir, would you agree with me that only with an |
| | 9 | underlying, native original file, only with that someone |
| | 10 | could independently determine when it was created and |
| | 11 | whether it was modified in connection with this case? |
| 03:06 | 12 | A.    Yeah, just like Oracle, you guy -- it's same as redact. |
| | 13 | It's not in the original format.  You even say that yourself |
| | 14 | that it was copy and printed out as a PDF.  So it's like an |
| | 15 | e-mail cannot be in a native file format, so I really don't |
| | 16 | understand what you try to say. |
| 03:07 | 17 | MR. CRONE:  Your Honor, permission to play from |
| | 18 | the videotaped deposition of Mr. Mai, Volume III, starting |
| | 19 | at page 396, line 25. |
| 03:07 | 20 | THE COURT:  Through? |
| 03:07 | 21 | MR. CRONE:  Through 397, line 24. |
| 03:07 | 22 | THE COURT:  You may. |
| 03:07 | 23 | *(Video recording played, not reported.)* |
| 03:09 | 24 | BY MR. CRONE: |
| 03:09 | 25 | Q.    Mr. Mai, Oracle employees told you repeatedly that -- |

| | | |
|---|---|---|
| | 1 | in early 2010 at the latest, that no one had been paid; that |
| | 2 | Oracle hadn't been paid for the software it delivered to the |
| | 3 | PBGC; isn't that right? |
| 03:09 | 4 | A.    Uh, yes. |
| 03:09 | 5 | Q.    And you certainly knew no later than February 2010; |
| | 6 | isn't that right? |
| 03:09 | 7 | A.    Um, I don't recall right now what the exact date of |
| | 8 | when in February -- in 2010.  But I remember that I did talk |
| | 9 | to someone from Oracle. |
| 03:10 | 10 | Q.    All right.  Let me attempt to refresh your |
| | 11 | recollection. |
| 03:10 | 12 | MR. CRONE:  Your Honor, may I play from the |
| | 13 | videotaped deposition of Mr. Mai, Volume II, page 253, |
| | 14 | line 11 through 16? |
| 03:10 | 15 | THE COURT:  253? |
| 03:10 | 16 | MR. CRONE:  Yes, Your Honor. |
| 03:10 | 17 | THE COURT:  Line 11? |
| 03:10 | 18 | MR. CRONE:  Through 16, Your Honor. |
| 03:10 | 19 | THE COURT:  You may. |
| 03:10 | 20 | *(Video recording played, not reported.)* |
| 03:11 | 21 | BY MR. CRONE: |
| 03:11 | 22 | Q.    Mr. Mai, let me now have you turn to Exhibit 26 in the |
| | 23 | binders in front of you. |
| 03:11 | 24 | Are you there? |
| 03:11 | 25 | A.    Yes. |

Case 8:10-cv-01853-DOC-RNB  Document 194  Filed 09/19/13  Page 168 of 199  Page ID #:2354
SACV 10-1853 DOC 7/22/2013 - Day 2

168

| | | |
|---|---|---|
| 03:11 | 1 | Q.   You would agree with me that this is a letter that you |
| | 2 | received shortly after June 8th of 2010, which is the date |
| | 3 | of this letter? |
| 03:11 | 4 | A.   Yes. |
| 03:11 | 5 | Q.   You would agree that it's a letter that was sent by |
| | 6 | in-house counsel, one of Mr. Temkin's colleagues, from |
| | 7 | Oracle? |
| 03:11 | 8 | A.   Yes. |
| 03:11 | 9 | MR. CRONE:  Your Honor, I would move Exhibit 26 in |
| | 10 | evidence. |
| 03:11 | 11 | THE COURT:  Received. |
| 03:11 | 12 | (Exhibit No. 26 received in evidence.) |
| 03:11 | 13 | MR. CRONE:  May we publish? |
| 03:11 | 14 | THE COURT:  You may. |
| 03:11 | 15 | (Exhibit displayed.) |
| 03:12 | 16 | BY MR. CRONE: |
| 03:12 | 17 | Q.   Mr. Mai, I focus you on the address blocks in the top |
| | 18 | half of this letter.  Can you see the first of those is |
| | 19 | Michael Mai, Dearborne Circle, LLC? |
| 03:12 | 20 | A.   Yes. |
| 03:12 | 21 | Q.   And that was still your residence address in Huntington |
| | 22 | Beach just below it? |
| 03:12 | 23 | A.   Yes. |
| 03:12 | 24 | Q.   Then there is an address for Mr. Kramer at Dearborne |
| | 25 | Circle, LLC? |

03:12   1   A.   Yes.

03:12   2   Q.   And then below that, it shows Quin Rudin?

03:12   3   A.   Yes.

03:12   4   Q.   It says Certus Solutions, Inc., but has his

        5   Quin@dearbornellc.com address?

03:12   6   A.   Yes.

03:12   7   Q.   In the first sentence of this letter that you received

        8   from Oracle, if you will focus on the first sentence of the

        9   first paragraph -- well, first, before we even get there,

        10   let me focus your attention on subject line of this letter.

03:13   11       You see that it says, "outstanding invoices owed by

        12   Certus Solutions, Inc. and Dearborne LLC"; is that right?

03:13   13   A.   Yes.

03:13   14   Q.   And then getting back to the first paragraph, it

        15   starts, "This is in reference to outstanding invoices that

        16   were issued to Certus Solutions, Inc. care of Dearborne

        17   Circle, LLC in connection with a transaction involving end

        18   customer Pension Benefit Guaranty Corporation"; is that

        19   right?

03:13   20   A.   Yes.

03:13   21   Q.   And what this letter said is it warned you that Oracle

        22   might bring suit against you as well as Mr. Rudin if Oracle

        23   wasn't paid; is that right?

03:13   24   A.   Uh, yes.

03:13   25   Q.   And just to be clear, there is a listing of invoices

Case 8:10-cv-01853-DOC-RNB   Document 194   Filed 09/19/13   Page 170 of 199   Page ID #:2356
SACV 10-1853 DOC   7/22/2013 - Day 2

170

03:14    1   that's below that.

03:14    2         MR. CRONE:  If I can just magnify that

03:14    3   momentarily.

03:14    4     *(Exhibit displayed.)*

03:14    5   BY MR. CRONE:

03:14    6   Q.   You'll see that it lists the original license invoice

7   as well as two of the other invoices.  You see that, sir?

03:14    8   A.   Yes.

03:14    9   Q.   Would you agree with me that because the support

10   invoices were billed quarterly, that as of June 8, 2010,

11   they had not yet come due?  That's why there's only two of

12   the four listed here?

03:14   13   A.   Uh, yes, but not in a lump sum, so...

03:14   14   Q.   I'm sorry, sir?

03:14   15   A.   Yeah.  You can see it's a multiple outstanding amount,

16   but it's not a lump sum.

03:14   17   Q.   Right.

03:14   18      Sir, you understand that Oracle expected a lump sum

19   payment on each one of its invoices, right?

03:14   20   A.   By looking at this thing, lump sum on each of the

21   invoice, yes.

03:14   22   Q.   Now, you didn't write back to Oracle to tell anyone at

23   Oracle that Quin Rudin had supposedly defrauded you too,

24   right?

03:15   25   A.   I confronted Rudin about this and, um, very strongly

Case 8:10-cv-01853-DOC-RNB  Document 194  Filed 09/19/13  Page 171 of 199  Page ID
#:2357
SACV 10-1853 DOC 7/22/2013 - Day 2

171

1    about it, and then in addition, I find out that he also

2    stole my identity, the company.  So that's when I go to the

3    police and file police report for identity theft against

4    Mr. Rudin.

03:15    5    Q.   Sir, when you got this letter in June 8th of 2010, you

6    didn't tell anybody at Oracle that you had supposedly been

7    defrauded by Mr. Rudin; isn't that right?

03:15    8    A.   I told someone at Oracle before that.  That's why if

9    you look at -- there's another -- in this evidence books,

10    Oracle set up installment payment from legal counsel of

11    Oracle, and it's only addressed to Certus.

03:16    12    MR. CRONE:  Your Honor, permission to play, from

13    Mr. Mai's videotape deposition, Volume II, page 263,

14    lines 10 through 24.

03:16    15    THE COURT:  You may.

03:16    16    (Video recording played, not reported.)

03:17    17    BY MR. CRONE:

03:17    18    Q.   Mr. Mai, let me have you turn to Exhibit 27 in your

19    books in front of you.  Let me know when you're there.

03:17    20    A.   Yes, I'm here.

03:17    21    Q.   Would you agree with me that this is an e-mail that

22    someone with the Pension Benefit Guaranty Corporation sent

23    to you and -- on June 10 of 2010?

03:17    24    A.   Yes.

03:17    25    MR. CRONE:  Your Honor, we would move Exhibit 27

|  | 1 | in evidence. |
03:18 | 2 | THE COURT:  Received.

03:18 3      *(Exhibit No. 27 received in evidence.)*

03:18 4            MR. CRONE:  May we publish?

03:18 5            THE COURT:  You may.

03:18 6         *(Exhibit displayed.)*

03:18 7    BY MR. CRONE:

03:18 8    Q.   If we could focus on the e-mail, the top half of

9    page 1, where it says -- starts "Michael" --

03:18 10           MR. CRONE:  If we could magnify the text.  Thank

11    you.

03:18 12        *(Exhibit displayed.)*

03:18 13    BY MR. CRONE:

03:18 14    Q.   It says, "Michael, Oracle has not received their money

15    for the licenses under the subject contract.  Please call

16    Ms. Achey at (703)364-3110 to resolve the problem."

03:18 17        Do you see where I'm reading?

03:18 18    A.   Yes.

03:18 19    Q.   And this is an e-mail that you recall receiving?

03:18 20    A.   Yes.

03:18 21    Q.   Okay.  So Mr. Rudin didn't delete this e-mail from your

22    in-box; is that right?

03:18 23    A.   No.

03:18 24    Q.   And even after receiving this e-mail that's reflected

25    on Exhibit 27, isn't it true that you continue to associate

DEBBIE GALE, U.S. COURT REPORTER

```
03:19    1  with and work with Mr. Rudin at least until September 2010
         2  or later?
03:19    3  A.   I don't remember exactly when, but I did, um, go out
         4  and file police report on him's in 2010 --
03:19    5            MR. CRONE:  Your Honor --
03:19    6            THE WITNESS:  -- I don't remember time when I
         7  stopped.
03:19    8            MR. CRONE:  Your Honor, permission to play from
         9  the videotaped deposition of Volume I.
03:19   10            THE COURT:  Just a moment, Counsel.
03:19   11            MR. CRONE:  Of course.
03:20   12            THE COURT:  Volume I.
03:20   13            MR. CRONE:  Yes, Your Honor, page 160.
03:20   14            THE COURT:  I'm sorry.  Volume I, page?
03:20   15            MR. CRONE:  160.
03:20   16            THE COURT:  160.
03:20   17            MR. CRONE:  Lines 9 through 15.
03:20   18            THE COURT:  You may.
03:20   19        (Video recording played, not reported.)
03:21   20  BY MR. CRONE:
03:21   21  Q.   Mr. Mai, I'm going to switch gears a bit here and turn
        22  to your involvement with Mr. Tiernan's company, Aegis
        23  Technologies, that we spoke about a few minutes ago.
03:21   24       Mr. Rudin introduced you to Mark Tiernan at some point
        25  in time?
```

DEBBIE GALE, U.S. COURT REPORTER

03:21   1    A.   Yes.

03:21   2    Q.   And again, you understood that Mr. Tiernan had this

        3    start-up company that was called "Alethea"; is that right?

03:21   4    A.   Yes.

03:21   5    Q.   And what Mr. Tiernan, through his Alethea, was

        6    attempting to do was commercialize a military-grade

        7    technology for civilian law enforcement that he called

        8    "Force Blue"; isn't that right?

03:21   9    A.   Yeah.  It's a surveillance software that he developed.

03:21   10   Q.   And this was a real product that you saw work; isn't

        11   that right?

03:21   12   A.   When he demo it to me in his office in Seattle, yes.

03:22   13   Q.   And you also knew that Mr. Tiernan was attempting to

        14   raise financing for his Alethea project?

03:22   15   A.   Yes.

03:22   16   Q.   At some point in the fall of 2010, you spoke to

        17   Mr. Tiernan about the possibility of Aegis Technologies

        18   entering into a transaction with Microsoft, right?

03:22   19   A.   Yes.

03:22   20   Q.   And Microsoft is the company behind Windows and Word

        21   and Excel and those programs; is that right?

03:22   22   A.   Yes.

03:22   23   Q.   And you proposed to him that he purchase certain

        24   software licenses and computer hardware in a transaction

        25   that was ultimately going to be financed by a bank called

Case 8:10-cv-01853-DOC-RNB  Document 194  Filed 09/19/13  Page 175 of 199  Page ID #:2361
SACV 10-1853 DOC 7/22/2013 - Day 2

175

|        |    |                                                            |
|--------|----|------------------------------------------------------------|
|        | 1  | PNC; isn't that right?                                     |
| 03:22  | 2  | A.   He the one who told me what he need to buy.  I have no |
|        | 3  | idea what he want.  So he provide me with a list of thing  |
|        | 4  | that he would like to have Microsoft finance.              |
| 03:23  | 5  | Q.   Okay.  Let me start that over again.                  |
| 03:23  | 6  |      You discussed with Mr. Tiernan the possibility of     |
|        | 7  | purchasing certain software licenses and computer hardware |
|        | 8  | in a transaction with Microsoft that would be financed by  |
|        | 9  | PNC Bank; is that accurate?                                |
| 03:23  | 10 | A.   Yes.                                                  |
| 03:23  | 11 | Q.   Let me have you turn to Exhibit 60 in your binders.   |
| 03:23  | 12 |      Are you there?                                        |
| 03:23  | 13 | A.   Yes.                                                  |
| 03:23  | 14 | Q.   And Exhibit 60 is an e-mail from you to Mr. Tiernan and |
|        | 15 | one of Mr. Tiernan's employees; is that right?             |
| 03:23  | 16 | A.   Yes.                                                  |
| 03:23  | 17 | Q.   And I see that it's from an e-mail address of         |
|        | 18 | MMai@BPMBinc.com; is that right?                           |
| 03:23  | 19 | A.   Yes.                                                  |
| 03:23  | 20 | Q.   And that was, again, one of your other companies at the |
|        | 21 | time?                                                       |
| 03:23  | 22 | A.   Yes.                                                  |
| 03:23  | 23 |          MR. CRONE:  Your Honor, I would move Exhibit 60 in |
|        | 24 | evidence.                                                  |
| 03:23  | 25 |          THE COURT:  Received.                             |

| | | |
|---|---|---|
| 03:23 | 1 | *(Exhibit No. 60 received in evidence.)* |
| 03:23 | 2 | MR. CRONE:  May we publish? |
| 03:23 | 3 | THE COURT:  You may. |
| 03:24 | 4 | *(Exhibit displayed.)* |
| 03:24 | 5 | BY MR. CRONE: |
| 03:24 | 6 | Q.   Mr. Mai, just focusing your attention on this first |
| | 7 | page of Exhibit 60, is it accurate to say that this was sent |
| | 8 | to Mr. Tiernan on August 31, 2010? |
| 03:24 | 9 | A.   Yes. |
| 03:24 | 10 | Q.   And then below that, you write, "Mark --" you're |
| | 11 | referring to Mr. Tiernan, obviously; is that right? |
| 03:24 | 12 | A.   Yes. |
| 03:24 | 13 | Q.   And you say, "This is what you will use" -- that, "This |
| | 14 | is what you will -- the -- use the MS finance to purchase." |
| 03:24 | 15 | Did I read that correctly? |
| 03:24 | 16 | A.   Yes. |
| 03:24 | 17 | Q.   And MS is short for Microsoft? |
| 03:24 | 18 | A.   Yes. |
| 03:24 | 19 | Q.   Let me have you turn to page 2. |
| 03:24 | 20 | *(Exhibit displayed.)* |
| 03:24 | 21 | BY MR. CRONE: |
| 03:24 | 22 | Q.   This was the attached customer -- proposed customer |
| | 23 | invoice that you sent to Mr. Tiernan; is that right? |
| 03:24 | 24 | A.   Correct. |
| 03:24 | 25 | Q.   And you see in the lower right-hand corner at -- well, |

Case 8:10-cv-01853-DOC-RNB   Document 194   Filed 09/19/13   Page 177 of 199   Page ID #:2363
SACV 10-1853 DOC   7/22/2013 - Day 2

177

```
03:25    1    strike that.  Let me walk backwards for a moment.
03:25    2        You see in the middle of the page there's a series of
         3    line items.
03:25    4        You see where I'm reading?
03:25    5    A.   Yes.
03:25    6    Q.   And those are the -- that's the software and computer
         7    equipment that you were discussing with Mr. Tiernan on this
         8    transaction?
03:25    9    A.   Yes.
03:25   10    Q.   And then you see, in the lower right-hand corner, a
        11    subtotal of $573,300.
03:25   12        You see where I'm reading?
03:25   13    A.   Correct.
03:25   14    Q.   And that was the total amount of what this proposed
        15    transaction would have been subject to a finance transaction
        16    with Microsoft and PNC Bank, right?
03:25   17    A.   Yes.
03:25   18    Q.   And you were working with Mr. Rudin on this transaction
        19    too, were you not?
03:25   20    A.   Yes.
03:25   21    Q.   And in your effort to complete this transaction, you
        22    ultimately provided certain accounting statements that
        23    supposedly reflected Aegis Technologies' financial condition
        24    to Microsoft and PNC Bank, correct?
03:26   25    A.   Mr. Rudin e-mailed directly to Microsoft the financial
```

DEBBIE GALE, U.S. COURT REPORTER

Case 8:10-cv-01853-DOC-RNB  Document 194  Filed 09/19/13  Page 178 of 199  Page ID #:2364
SACV 10-1853 DOC  7/22/2013 - Day 2

178

|        |    |                                                                              |
|--------|----|------------------------------------------------------------------------------|
|        | 1  | information of Aegis, because when I talk to Mr. Tiernans                     |
|        | 2  | and Mr. Rudin, Rudin said that he had work with Mr. Tiernan                   |
|        | 3  | in the past on an Oracle financing deal that, he have                        |
|        | 4  | financial information of Aegis, so he would just e-mail                       |
|        | 5  | Microsoft directly.  And there's evidence in this book show                  |
|        | 6  | that he have -- Mr. Tiernan provided to Mr. Rudin the                         |
|        | 7  | financial information of Aegis.                                              |
| 03:26  | 8  | Q.   Mr. Mai, isn't it true that you provided financial                      |
|        | 9  | documentation purportedly reflecting Aegis Technologies'                    |
|        | 10 | financial condition to Microsoft and PNC Bank?                               |
| 03:26  | 11 | A.   I did not provide.  Mr. Rudin provide it directly.                      |
| 03:26  | 12 | MR. CRONE:  Your Honor, permission to play from                             |
|        | 13 | the deposition of Mr. Mai, Volume I, page 162, line 25,                      |
|        | 14 | through 163, line 9.  Actually, I'm sorry, line 2.                          |
| 03:27  | 15 | THE COURT:  I don't think it's an accurate -- that                          |
|        | 16 | one portion isn't accurate, Counsel.  You'd have to go down                  |
|        | 17 | to line -- at least line 9.                                                 |
| 03:27  | 18 | MR. CRONE:  All right.                                                       |
| 03:27  | 19 | THE COURT:  By that I don't mean accurate.  I                               |
|        | 20 | mean, it's not a complete answer.                                           |
| 03:28  | 21 | *(Video recording played, not reported.)*                                   |
| 03:28  | 22 | BY MR. CRONE:                                                                |
| 03:28  | 23 | Q.   Mr. Mai, does that refresh your recollection that it                    |
|        | 24 | was you who provided the financial documentation to                         |
|        | 25 | Microsoft or PNC Bank?                                                       |

DEBBIE GALE, U.S. COURT REPORTER

| 03:28 | 1 | A.   Like I said earlier, I did not submit directly to PNC. |

03:28    1    A.   Like I said earlier, I did not submit directly to PNC.

         2    It was Rudin.  And he FYI'd me on it.

03:28    3                 MR. CRONE:  Your Honor, permission to play the

         4    videotape clip again.

03:28    5                 THE COURT:  You may.

03:28    6        *(Video recording played, not reported.)*

03:29    7    BY MR. CRONE:

03:29    8    Q.   Mr. Mai, I'd ask you to turn to Exhibit 52.

03:29    9                 THE COURT:  52, Counsel?

03:29   10                 MR. CRONE:  Yes, Your Honor.

03:29   11                 THE COURT:  All right.  Thank you.

03:29   12    BY MR. CRONE:

03:29   13    Q.   Are you there, Mr. Mai?

03:29   14    A.   Yes.

03:29   15    Q.   Would you agree with me that Exhibit 52 is the

        16    financial documentation that you provided to Microsoft and

        17    PNC Bank in connection with this transaction?

03:30   18    A.   Like I say, I did not provide it to PNC.  It was

        19    Mr. Rudin provide to them and FYI'd me on it.

03:30   20                 MR. CRONE:  Your Honor, permission to now play,

        21    from the videotaped deposition of Mr. Mai, Volume III, page

        22    388.

03:30   23                 THE COURT:  Line?

03:30   24                 MR. CRONE:  Line 8 through 18.

03:30   25                 THE COURT:  388?

| | | |
|---|---|---|
| 03:30 | 1 | MR. CRONE:  Yes, Your Honor.  Eight through 18. |
| 03:30 | 2 | THE COURT:  Well, 8 starts -- no, just a moment. |
| 03:31 | 3 | You may. |
| 03:31 | 4 | (Video recording played, not reported.) |
| 03:31 | 5 | BY MR. CRONE: |
| 03:31 | 6 | Q.   Sir, does that refresh your recollection that you |
| | 7 | provided Exhibit 52 to Microsoft and PNC Bank? |
| 03:31 | 8 | A.   Like I say, I did not provide.  I tried to submit in |
| | 9 | evidence to the Court, but you try to block it, to show that |
| | 10 | there was an e-mail sent to -- from Mr. Quin Rudin directly |
| | 11 | and FYI'd me on it.  But you don't want to bring that into |
| | 12 | evidence. |
| 03:32 | 13 | Q.   Sir, are you referring to a sanction from the Court |
| | 14 | that precluded you from introducing evidence in this case? |
| 03:32 | 15 | A.   Not sanction; it was in evidence we have submitted, but |
| | 16 | you said that you don't want to bring it in. |
| 03:32 | 17 | Q.   Sir, you would agree that when you gave this deposition |
| | 18 | testimony that we just played, you were under oath? |
| 03:32 | 19 | A.   Yes. |
| 03:32 | 20 | Q.   Let me turn back to Exhibit 60. |
| 03:32 | 21 | MR. CRONE:  Your Honor, this is in evidence. |
| 03:32 | 22 | THE COURT:  You may display it. |
| 03:32 | 23 | *(Exhibit displayed.)* |
| 03:32 | 24 | BY MR. CRONE: |
| 03:33 | 25 | Q.   Didn't Mr. Tiernan, shortly after you sent this e-mail, |

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | dated August 31, 2010, in the afternoon, immediately tell            |
|       | 2  | you that he was uninterested in going forward with this              |
|       | 3  | transaction?                                                         |
| 03:33 | 4  | A.   Yes, he told me, and I inform PNC and Microsoft.                |
| 03:33 | 5  | Q.   Okay.  And so that was within a day or two, correct,            |
|       | 6  | sir?                                                                 |
| 03:33 | 7  | A.   Same time, say day --                                           |
| 03:33 | 8  | Q.   Okay?                                                           |
| 03:33 | 9  | A.   -- so this deal was never materialized.  It never go           |
|       | 10 | through.                                                            |
| 03:33 | 11 | Q.   Mr. Mai, let me have you turn to Exhibit 11 in your            |
|       | 12 | books.                                                              |
| 03:34 | 13 |      Are you there, sir?                                            |
| 03:34 | 14 | A.   Yes.                                                           |
| 03:34 | 15 | Q.   You would agree with me that this is an e-mail that was        |
|       | 16 | sent from MMaidearbornellc.com to Microsoft on                      |
|       | 17 | September 15th, 2010?                                               |
| 03:34 | 18 | A.   Yes.  But that there is additional e-mail in this             |
|       | 19 | e-mail chain, so -- uh, but you did not show all of thems.         |
|       | 20 | So you purposely only take what is impor- -- you know, for         |
|       | 21 | you, but the rest of the e-mail you purposely deleted from         |
|       | 22 | here, this evidence.                                               |
| 03:34 | 23 | Q.   Sir, do you have a copy of the full e-mail?                    |
| 03:34 | 24 | A.   Yes, I do.                                                    |
| 03:34 | 25 | Q.   Okay.  Mr. Mai, you would agree, though, this was an          |

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
|       | 1  | e-mail sent on September 15th, 2010; is that accurate?           |
| 03:34 | 2  | A.   Yes.                                                        |
| 03:34 | 3  |          MR. CRONE:  Your Honor, I would move Exhibit 11         |
|       | 4  | into evidence.                                                   |
| 03:34 | 5  |          THE COURT:  Received.                                   |
| 03:34 | 6  |      *(Exhibit No. 11 received in evidence.)*                    |
| 03:34 | 7  |          MR. CRONE:  May we --                                   |
| 03:34 | 8  |          THE WITNESS:  But --                                    |
| 03:34 | 9  |          MR. CRONE:  -- publish, Your Honor?                     |
| 03:34 | 10 |          THE COURT:  You may.                                    |
| 03:35 | 11 |      *(Exhibit displayed.)*                                      |
| 03:35 | 12 | BY MR. CRONE:                                                    |
| 03:35 | 13 | Q.   Mr. --                                                      |
| 03:35 | 14 | A.   I asked you a question.                                     |
| 03:35 | 15 | Q.   There's no question pending, Mr. Mai.                       |
| 03:35 | 16 |      Again, if we could focus on the top part of this           |
|       | 17 | e-mail.  Again, if we look at the "from" line, it's from --      |
|       | 18 | appears to be from MMai@dearbornellc.com, and it's dated         |
|       | 19 | September 15th of 2010; is that accurate?                        |
| 03:35 | 20 | A.   Yes.                                                        |
| 03:35 | 21 | Q.   And in this e-mail, you inform Microsoft of certain         |
|       | 22 | changes in Mr. Tiernan's contact information?                    |
| 03:35 | 23 | A.   Yes.  But again, I say earlier there's a change of          |
|       | 24 | e-mail in this e-mail, but you don't show it, so this is         |
|       | 25 | modified evidence.                                               |

DEBBIE GALE, U.S. COURT REPORTER

03:35  1    Q.   Mr. Mai, again, your counsel will have ample
       2    opportunity to ask you questions when I'm finished.
03:35  3         Again, is what I'm saying correct, that this is an
       4    e-mail in which you provided Microsoft certain changes in
       5    contact information for Mark Tiernan?  Is that accurate?
03:36  6    A.   Yes.  And if you -- the other part of the e-mail will
       7    show that it was forward to me by Quin Rudin, but you
       8    deleted from this.
03:36  9    Q.   Sir, is it -- you do agree that you wrote this e-mail,
      10    though; isn't that right?
03:36 11    A.   I wrote the e-mail, yes.
03:36 12    Q.   And that's more than two weeks after, as you say, you
      13    had a conversation with Mr. Tiernan and this transaction was
      14    over; is that right?
03:36 15    A.   It was two weeks, but the date I was able to talk to
      16    Mark Tiernans, I don't remember, because I need to have an
      17    e-mail in front of me to show that day; but that there was
      18    an e-mail -- when I try to call hims and then after I
      19    talking to him and he told me that the -- no, he no longer
      20    interested in the loan.  So the rest when I'm -- inform
      21    Microsoft.  So it was right after the September 15th.  It's
      22    not on the August 31st.
03:37 23         August 31st is the date I e-mail to him what he go by,
      24    but the actual day that we would talk about the loan itself,
      25    it was a different date, not August 31st.

DEBBIE GALE, U.S. COURT REPORTER

| 03:37 | 1 | Q.  Sir, maybe I misunderstood you.  I thought you just |

03:37   1   Q.   Sir, maybe I misunderstood you.  I thought you just

2   testified a minute ago, when we looked at Exhibit 60, when I

3   asked you did you have a conversation with Mr. Tiernan

4   within a day or two that he cancelled the transaction and

5   you corrected me and you said, no, it was same day.  Isn't

6   that what you just said a minute ago?

03:37   7   A.   Yeah.  But I was misunderstood your question.  So I

8   would like to be clear about that, that we did have a

9   conversation, but it was not on August 31st.  So I

10  misunderstood what your question was.

03:37  11   Q.   All right.  Let me turn back to Exhibit 11.  You would

12  agree that in this e-mail, you requested that Microsoft

13  change Mr. Tiernan's contact information including his

14  e-mail address to MTiernan@aegisgrouptech.com?

03:38  15   A.   Yeah, it was forward to me by Quin Rudin and said he

16  talked to Tiernan and this is what Tiernan requested.

03:38  17          MR. CRONE:  Move to strike as hearsay, Your Honor.

03:38  18          THE COURT:  Well, I'm not sure which portion,

19  Counsel.

03:38  20          MR. CRONE:  As to what Quin Rudin said.

03:38  21          I'll move on, Your Honor.

03:38  22          THE COURT:  Yeah.  Denied.

03:38  23   BY MR. CRONE:

03:38  24   Q.   You see that the e-mail also recites a new telephone

25  number for Mr. Tiernan that you forwarded to Microsoft; is

DEBBIE GALE, U.S. COURT REPORTER

Case 8:10-cv-01853-DOC-RNB  Document 194  Filed 09/19/13  Page 185 of 199  Page ID
#:2371
SACV 10-1853 DOC  7/22/2013 - Day 2

185

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
|       | 1  | that correct?                                                    |
| 03:38 | 2  | A.    Yes.                                                       |
| 03:38 | 3  | Q.    And a new mailing address for Mr. Tiernan's company?      |
| 03:38 | 4  | A.    Yes.                                                       |
| 03:38 | 5  | Q.    You didn't speak with Mr. Tiernan to tell you were        |
|       | 6  | changing, for example, his contact e-mail address for this      |
|       | 7  | transaction, correct?                                            |
| 03:39 | 8  | A.    When I asked him about the loan, he told me he not        |
|       | 9  | interested, so I just assume, you know, why talk any            |
|       | 10 | further.  You know what I mean.  To when you -- when I call      |
|       | 11 | him up and I say, you know, "Are you go ahead with the          |
|       | 12 | loan?"  He told me, "No."  So I just "Okay."  Then I have to     |
|       | 13 | inform Microsoft right away.  So I don't even ask him about     |
|       | 14 | all the other stuff, is irrelevant.                             |
| 03:39 | 15 | Q.    Sir, is it accurate that you didn't speak with           |
|       | 16 | Mr. Tiernan before you sent Exhibit 11 to tell him you were     |
|       | 17 | changing, for example, his contact e-mail address with         |
|       | 18 | Microsoft?                                                       |
| 03:39 | 19 | A.    On the e-mail that was forward to me by Quin Rudin, it    |
|       | 20 | does have Mr. Tiernan e-mail address in there, so I assume      |
|       | 21 | that he knew about.  But it's just you don't disclose it in     |
|       | 22 | this evidence.  You delete it.                                   |
| 03:39 | 23 | MR. CRONE:  Your Honor, permission to play from        |
|       | 24 | Mr. Mai's deposition, Volume I, page 162.                       |
| 03:40 | 25 | THE COURT:  Just a moment.  What line?                |

DEBBIE GALE, U.S. COURT REPORTER

| 03:40 | 1 | MR. CRONE:  It's page 162, lines 20 to 24. |
| 03:40 | 2 | THE COURT:  You may. |
| 03:41 | 3 | *(Video recording played, not reported.)* |
| 03:41 | 4 | BY MR. CRONE: |
| 03:41 | 5 | Q.   Isn't it also true, Mr. Mai, that before you sent this |
| | 6 | e-mail, you never spoke with Mr. Tiernan about whether or |
| | 7 | not this was actually his new telephone number? |
| 03:41 | 8 | A.   Like I said earlier, you know, when I call him up, I |
| | 9 | was ask about the loan.  I did not ask him about the chain |
| | 10 | for e-mail and all the other stuff, because for me it's |
| | 11 | irrelevant. |
| 03:41 | 12 | Q.   You also didn't speak with Mr. Tiernan before you sent |
| | 13 | Exhibit 11 about a change of his mailing address; isn't that |
| | 14 | right? |
| 03:41 | 15 | A.   Because I saw a CC on the e-mail that forward to me by |
| | 16 | Quin that he ordered -- it come from Tiernan, so I assume |
| | 17 | that it was come from Mr. Tiernans. |
| 03:41 | 18 | Q.   Sir, you didn't actually speak with Mr. Tiernan before |
| | 19 | you sent Exhibit 11, did you? |
| 03:41 | 20 | A.   I never asked him about that.  I just ask him about the |
| | 21 | loan. |
| 03:42 | 22 | Q.   Sir, isn't it true that you also never e-mailed him |
| | 23 | about that subject? |
| 03:42 | 24 | A.   If I never thought about it, I just ask about the loan, |
| | 25 | then what do I e-mail and call him again?  I think you keep |

|  |  |  |
|--|--|--|
|  | 1 | go in circle here. |
| 03:42 | 2 | Q.   Sir, you're familiar with the GoDaddy.com registrar |
|  | 3 | service; we spoke about that earlier in your testimony here |
|  | 4 | today? |
| 03:42 | 5 | A.   Yes. |
| 03:42 | 6 | Q.   And again, that was a website at which you regis- -- |
|  | 7 | you hosted some of your domain name information where |
|  | 8 | e-mails go across the Internet; isn't that right? |
| 03:42 | 9 | A.   Yes. |
| 03:43 | 10 | Q.   You would agree that the day before that |
|  | 11 | September 15th, 2010 e-mail was sent to Microsoft, that the |
|  | 12 | domain, Aegisgrouptech.com, which we saw, was registered |
|  | 13 | using the GoDaddy.com website? |
| 03:43 | 14 | A.   Can you show me the document in front of me?  I don't |
|  | 15 | want... |
| 03:43 | 16 | Q.   Sir, isn't it true that your BPMB did, in fact, |
|  | 17 | register Aegisgrouptech.com on September 14th of 2010? |
| 03:43 | 18 | A.   Again, can you show me the evidence so when you and I |
|  | 19 | would talk about the same thing?  I don't want to make a |
|  | 20 | mistake, say something that I don't fully understand. |
| 03:43 | 21 | MR. CRONE:  Your Honor, may I please play from the |
|  | 22 | videotaped deposition from Volume I, page 166, lines 5 |
|  | 23 | through 7? |
| 03:44 | 24 | THE COURT:  You may. |
| 03:44 | 25 | (Videotape recording played, not recorded.) |

| | | |
|---|---|---|
| 03:44 | 1 | BY MR. CRONE: |
| 03:44 | 2 | Q.   Now, Mr. Mai, I'll have you turn to Exhibit No. 12 in |
| | 3 | your books in front of you. |
| 03:44 | 4 | Let me know when you're there. |
| 03:44 | 5 | A.   Yes, I'm here. |
| 03:44 | 6 | Q.   You agree with me that this is a printout from the |
| | 7 | GoDaddy.com website that reflects the registration records |
| | 8 | for the Aegisgrouptech.com domain that we saw in that e-mail |
| | 9 | to Microsoft? |
| 03:45 | 10 | A.   Yes. |
| 03:45 | 11 | Q.   And again, this is from an account that your BPMB, Inc. |
| | 12 | owns or owned? |
| 03:45 | 13 | A.   Yes. |
| 03:45 | 14 | MR. CRONE:  Your Honor, we'd move Exhibit No. 12 |
| | 15 | in evidence. |
| 03:45 | 16 | THE COURT:  Received. |
| 03:45 | 17 | *(Exhibit No. 12 received in evidence.)* |
| 03:45 | 18 | THE COURT:  You may display it. |
| 03:45 | 19 | MR. CRONE:  Thank you. |
| 03:45 | 20 | *(Exhibit displayed.)* |
| 03:45 | 21 | BY MR. CRONE: |
| 03:45 | 22 | Q.   Mr. Mai, I'd like to focus your attention on the bottom |
| | 23 | half of this printout. |
| 03:45 | 24 | MR. CRONE:  If we could magnify the bottom half. |
| 03:45 | 25 | *(Exhibit displayed.)* |

Case 8:10-cv-01853-DOC-RNB   Document 194   Filed 09/19/13   Page 189 of 199   Page ID #:2375
SACV 10-1853 DOC   7/22/2013 - Day 2

189

| 03:45 | 1 | BY MR. CRONE: |
|---|---|---|
| 03:45 | 2 | Q.   All right.  Mr. Mai, this document reflects that -- the |
| | 3 | registration of the Aegisgrouptech.com domain by BPMB, Inc., |
| | 4 | and it shows an address, your same residence address in |
| | 5 | Huntington Beach; is that accurate? |
| 03:46 | 6 | A.   Yes. |
| 03:46 | 7 | Q.   And then below that, it shows that -- below your |
| | 8 | address, it says it was created on September 14th of 2010; |
| | 9 | is that right? |
| 03:46 | 10 | A.   Correct. |
| 03:46 | 11 | Q.   And then below that, it shows an administrative contact |
| | 12 | and a technical contact, correct? |
| 03:46 | 13 | A.   Correct. |
| 03:46 | 14 | Q.   And both of those are your name; isn't that right? |
| 03:46 | 15 | A.   Yes. |
| 03:46 | 16 | Q.   And they both show an address at MMai@socal.RR.com, |
| | 17 | correct? |
| 03:46 | 18 | A.   Correct. |
| 03:46 | 19 | Q.   And that was an e-mail address that you also used |
| | 20 | during this time period; isn't that right? |
| 03:46 | 21 | A.   Yes. |
| 03:46 | 22 | Q.   And to be clear, when you register a new domain with |
| | 23 | GoDaddy.com, such as we're looking at here, an e-mail |
| | 24 | automatically goes out to the administrative and the |
| | 25 | technical contact, doesn't it? |

03:46  1  A.   Yes.

03:46  2  Q.   So you got notice that this was registered on

3  September 14th, 2010; isn't that right?

03:47  4  A.   Yes.  So what happened is when I give Quin access to

5  build the e-mail server and everything, he have full access

6  to GoDaddy.com as well, so he can put into the register the

7  way to send e-mail and thing like that.  So he log in and

8  create this Aegistech.com under my I.D.

03:47  9      So after he did that and then I saw this, I will

10  confront him about that.  "Why do you do something like

11  this?"  And he said, well, Mark Tiernan was asking him to do

12  something.  I don't recall anymore.  But when I talk to --

13  you know, when we talk about this, but then he say, "Well,

14  doesn't matter because Mark didn't go through with the

15  loan."

03:47  16  Q.   Mr. Mai, just so we're clear, you did immediately

17  receive an e-mail message when this was created; am I right?

03:48  18  A.   I don't remember I receive it right away or -- but I

19  did receive an e-mail.

03:48  20  Q.   Is it also correct, sir, that you never informed

21  Mr. Tiernan or anyone else at Alethea or Aegis that this

22  domain name had been registered under your account?

03:48  23  A.   Yeah.  Because I was focused, like I say, on the loan.

24  So when he told me he doesn't care about the loan anymore,

25  so to me it really doesn't matter.  So it's one of these

03:48

03:49

03:49

03:49

03:49

03:49

03:49

03:50

|  | 1  | thing that you say, okay, if you don't interested in the |
|---|----|----|
|  | 2  | loan, whatever, this -- that not -- to me it's not relevant. |
|  | 3  | Q.   Mr. Tiernan, however, did contact you about what had |
|  | 4  | happened, didn't he? |
|  | 5  | A.   When I try to call him and ask him about the payment of |
|  | 6  | the loan on the separate issues, the original loan that he |
|  | 7  | sign the promissory note against me, you know, that he |
|  | 8  | borrowed the money from me, yeah, when I confronted with him |
|  | 9  | about this and then he bring this up, and I had told him |
|  | 10 | that Quin Rudin did this. |
|  | 11 | Q.   Mr. Mai, didn't Mr. Tiernan e-mail you in early October |
|  | 12 | 2010 to demand that you cease and desist from securing any |
|  | 13 | fraudulent loans in the name of Aegis Technologies? |
|  | 14 | A.   Again, I only applied the loan when he approved me and |
|  | 15 | he asked me to do so.  So when he told me not to do it, I |
|  | 16 | did not do it.  So we did not do anything else. |
|  | 17 | Q.    Mr. Mai, if you could focus on my question. |
|  | 18 |     Did Mr. Tiernan e-mail you in early October 2010 and |
|  | 19 | demand that you cease and desist from engaging in a |
|  | 20 | fraudulent loan with Microsoft or PNC based on what he |
|  | 21 | learned about -- as we're looking at on the screen? |
|  | 22 | A.   Again, can you show me that e-mail, because I don't |
|  | 23 | want to say something that I don't remember a hundred |
|  | 24 | percent.  If you can show me an evidence or something, |
|  | 25 | because, again, it been long time ago. |

03:50   1          MR. CRONE:  Your Honor, may I approach?

03:50   2          THE COURT:  You may.

03:50   3       *(Document provided to defense counsel and the*

        4       *witness.)*

03:50   5          MR. RAMP:  Well, Your Honor, I'm going to raise an

        6    objection because this is not in the evidence book.  I'm

        7    unaware of this.

03:50   8          THE COURT:  Counsel, I don't know what you're

        9    referring to.  You just asked to approach.

03:50  10          MR. CRONE:  I'm sorry, Your Honor.  I'm attempting

       11    to refresh the witness's memory.  That's all.

03:50  12          THE COURT:  All right.

03:50  13    BY MR. CRONE:

03:50  14    Q.   Mr. Mai, I'd ask you to please review the e-mail that

       15    is in front of you.

03:51  16    A.   Yes.

03:51  17    Q.   Having reviewed the e-mail that's in front of you, does

       18    it refresh your recollection that on October 8th, 2010,

       19    Mr. Tiernan sent you an e-mail asking you to immediately

       20    cease and desist from use of the Aegis Group name and

       21    company information to secure what appeared to be fraudulent

       22    loans?

03:51  23    A.   Yes, according to this e-mail, the content.

03:51  24          But again, like I say, that I did communicate with him

       25    previously about this Microsoft loan, and he the one who say

DEBBIE GALE, U.S. COURT REPORTER

Case 8:10-cv-01853-DOC-RNB   Document 194   Filed 09/19/13   Page 193 of 199   Page ID
#:2379
SACV 10-1853 DOC   7/22/2013 - Day 2

193

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
|          | 1  | no.  So...                                                   |
| 03:51    | 2  | Q.   To be clear, Mr. Mai, you were working with Mr. Rudin   |
|          | 3  | on this attempted Microsoft transaction, were you not?       |
| 03:51    | 4  | A.   Yeah, I was working with Mr. Rudin and Mr. Tiernans.    |
| 03:52    | 5  | Q.   And that was about a year after the Pension Benefit     |
|          | 6  | Guaranty Corporation transaction had taken place in August   |
|          | 7  | or September of 2009?                                         |
| 03:52    | 8  | A.   I believe so.                                           |
| 03:52    | 9  |          MR. CRONE:  Pass the witness, Your Honor.           |
| 03:52    | 10 |          THE COURT:  All right.                              |
| 03:52    | 11 |          Counsel, do you want to start your                  |
|          | 12 | cross-examination now or tomorrow morning?                   |
| 03:52    | 13 |          MR. RAMP:  On Mr. Mai?  I'm going to call Mr. Mai    |
|          | 14 | when we start our case.                                      |
| 03:53    | 15 |          THE COURT:  Does that resolve the questions right   |
|          | 16 | now for Mr. Mai?                                             |
| 03:53    | 17 |          MR. RAMP:  Yes, Your Honor.                         |
| 03:53    | 18 |          THE COURT:  All right.  Mr. Mai, you may step       |
|          | 19 | down.                                                        |
| 03:53    | 20 |          THE WITNESS:  Thank you, sir.                       |
| 03:53    | 21 |     (Witness steps down.)                                    |
| 03:53    | 22 |          THE COURT:  Then, Counsel, who would your next      |
|          | 23 | witness be?                                                  |
| 03:53    | 24 |          MR. CRONE:  It would be Mark Tiernan.  He's         |
|          | 25 | prepared to go tomorrow morning.  If the Court --            |

DEBBIE GALE, U.S. COURT REPORTER

Case 8:10-cv-01853-DOC-RNB Document 194 Filed 09/19/13 Page 194 of 199 Page ID #:2380
SACV 10-1853 DOC 7/22/2013 - Day 2

194

| 03:53 | 1 | THE COURT: Just a moment. How long will he be |

03:53   1        THE COURT:  Just a moment.  How long will he be

        2    under direct examination?  All I need is an estimate, and

        3    that will make my decision easy.

03:53   4        MR. CRONE:  Circa 45 minutes to an hour at most.

03:53   5        THE COURT:  We'll start him tomorrow morning,

        6    then.

03:53   7        *(To the jury:)*  All right.  Ladies and gentlemen,

        8    we're going to send you home.  What time can you come back

        9    tomorrow?  Can you be here by 8:00 o'clock?  Can we start at

        10   8:00 o'clock?  If it's hard, don't worry about it.  We can

        11   start later.  What time?

03:53   12       Are you sure?  Then let's start --

03:53   13       Yes, sir?

03:53   14       A JUROR:  8:00 o'clock is kind of rough for me.

03:53   15       THE COURT:  Is there any way you can make it at

        16   8:00?  Because I'd like to get this case to you.  If you

        17   can't, that's fine.

03:53   18       A JUROR:  Yeah, I guess.

03:53   19       THE COURT:  Okay.  Let's try 8:00 o'clock, then.

        20   Okay?

03:54   21       You're admonished not to discuss this matter

        22   amongst yourselves, nor form or express any opinion

        23   concerning the case.

03:54   24       You have a nice evening.

03:54   25       *(Jury recesses at 3:54 p.m.)*

03:56    1                *(Outside the presence of the jury.)*

03:56    2                THE COURT:  We're back on record.  And we've had

         3    an informal discussion, but it started to turn into some

         4    substantive discussion.

03:56    5                First of all, counsel had indicated he may be

         6    calling Ms. Achey on rebuttal.  The Court's response to that

         7    is maybe.  It depends upon what that rebuttal is, so I'm not

         8    making that representation from that statement from counsel.

03:57    9                The second question was if Ms. Achey is precluded

        10    from testifying in light of *in limine* No. 2.

03:57   11                No.  Ms. Achey has already testified; and

        12    therefore, although my order was I was going to exclude the

        13    defendant from presenting witnesses other than Mr. Mai, she

        14    can certainly be recalled.

03:57   15                MR. CRONE:  I understand.

03:57   16                THE COURT:  And that order excluded witnesses, but

        17    certainly not those witnesses who have testified in the

        18    trial.

03:57   19                So you can call Ms. Achey if you choose to.

03:57   20                Now, there was an *in limine* Motion No. 1.  I don't

        21    want to be caught by surprise.  What was your intent on

        22    plaintiff's part?

03:57   23                MR. CRONE:  I'm sorry, *on in limine* --

03:57   24                THE COURT:  *In limine* Motion No. 1.

03:58   25                MR. CRONE:  Was that there would be an adverse

DEBBIE GALE, U.S. COURT REPORTER

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | inference instruction given to the jury.                     |
| 03:58 | 2  | THE COURT:  But when?                                         |
| 03:58 | 3  | MR. CRONE:  At the same time --                              |
| 03:58 | 4  | THE COURT:  In other words, I don't want to be               |
|       | 5  | caught by surprise by you suddenly you saying, "well,         |
|       | 6  | Judge."                                                       |
| 03:58 | 7  | MR. CRONE:  At the same time as the other                    |
|       | 8  | instructions, Your Honor.  Right before closing.             |
| 03:58 | 9  | Right before closing.                                        |
| 03:58 | 10 | THE COURT:  I think that -- well, all right.                 |
| 03:58 | 11 | The second thing is it would be helpful -- I'm not           |
|       | 12 | demanding it, but I'm going to -- it's hard for me if I'm    |
|       | 13 | really going to pay attention to the case to take notes,     |
|       | 14 | watch the exhibits, look at your exhibit book, and also go   |
|       | 15 | through the amount of depositions that we did.               |
| 03:58 | 16 | So I think that the easiest way to resolve that is           |
|       | 17 | for you to have somebody stand here and just hand them to    |
|       | 18 | me, because I'm taking too much time to find each one, look  |
|       | 19 | at them, and it's taking up your time.                       |
| 03:59 | 20 | MR. CRONE:  Okay.                                             |
| 03:59 | 21 | THE COURT:  So I don't know who's going to, but I            |
|       | 22 | think it would be a more appropriate way than having me      |
|       | 23 | reach for different binders at different times.  It will be  |
|       | 24 | a little bit easier for me, but it will also, most           |
|       | 25 | importantly, retain my retention level.  What you're finding |

```
 1    is I can't retain that quickly enough if I'm scooping down

 2    to get deposition books, so I'd appreciate it.  So,

 3    therefore, you're designated.

 4          MR. GELBERT:  Thank you, Your Honor.

 5          THE COURT:  So the next deposition he asked to

 6    have read, you're here.  It opens the page.  I give it back,

 7    and you wait for the next one.  It's much better.

 8          Well, then, are we -- it sounds, though, that your

 9    next witness is not very long, actually.  And then I assume

10    Mr. Achey is -- or, I'm sorry -- Mr. Mai is testifying,

11    potentially, in your case, Counsel, or you'll decide that

12    this evening, I assume.

13          I'm not going to ask you right now.  That's a

14    whole decision that you talk to your client about, whether

15    he's retaking the stand, what questions are being asked.

16          But I can guess that we might be arguing to the

17    jury tomorrow.

18          MR. CRONE:  We agree, Your Honor.

19          MR. RAMP:  I would think so.

20          THE COURT:  So I'm going to place the limitation

21    of an hour on each side.  I'm not going to allow you to have

22    any more than that.  You can summarize your case in that

23    time.  In fact, that's an extraordinary amount of time.

24          The way we're going to split it is this.  You have

25    50 minutes on your opening; 10 minutes on your closing.
```

Timestamps in left margin:
- 03:59 (line 4)
- 03:59 (line 5)
- 03:59 (line 8)
- 03:59 (line 13)
- 03:59 (line 16)
- 04:00 (line 18)
- 04:00 (line 19)
- 04:00 (line 20)
- 04:00 (line 24)

SACV 10-1853 DOC  7/22/2013 - Day 2

04:00   1          In other words, your rebuttal isn't an hour long.

      2    I'm just kidding you.  But I've seen that before, where it

      3    gets split half an hour and half an hour.  You've got 50

      4    minutes and then 10.  You argue in between for an hour.

      5    That makes it fair.  That way there's no sandbagging or

      6    laying back; not that counsel would, but I've seen it on

      7    numerous occasions.

04:00   8          You're going to be going over instructions tonight

      9    with the Court, so you can send your clients home if you

     10    want to, but two lead counsel are required to remain.  Okay?

04:00  11          Now, why don't you have a seat back in the

     12    audience and I'll get to you when I'm done with the other

     13    matters.  Thank you.

04:00  14          *(Proceedings adjourned at 4:00 p.m.)*

04:00  15                              -oOo-

04:00  16

     17

     18

     19

     20

     21

     22

     23

     24

     25

DEBBIE GALE, U.S. COURT REPORTER

04:00   1                              -oOo-

04:00   2

04:00   3                           CERTIFICATE

04:00   4

04:00   5          I hereby certify that pursuant to Section 753,

        6   Title 28, United States Code, the foregoing is a true and

        7   correct transcript of the stenographically reported

        8   proceedings held in the above-entitled matter and that the

        9   transcript page format is in conformance with the

        10  regulations of the Judicial Conference of the United States.

04:00   11

04:00   12  Date:  September 16, 2013

04:00   13

04:00   14
04:00                          /s/ Debbie Gale
04:00   15                  _____
04:00                          DEBBIE GALE, U.S. COURT REPORTER
04:00   16                     CSR NO. 9472, RPR, CCRR

04:00   17

        18

        19

        20

        21

        22

        23

        24

        25